Andrew Zollinger, State Bar No. 24063944
andrew.zollinger@dlapiper.com
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201-4629
Telephone: (214) 743-4500
Facsimile: (214) 743-4545

Thomas R. Califano (*pro hac vice admission pending*)
thomas.califano@dlapiper.com
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Tel: (212) 335-4500
Fax: (212) 335-4501

PROPOSED COUNSEL FOR THE DEBTOR

Rachel Nanes (*pro hac vice admission pending*)
rachel.nanes@dlapiper.com
DLA Piper LLP (US)
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131
Tel: (305) 423-8563
Fax: (305) 675-8206

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **CHAPTER 11** |
| **MAYFLOWER COMMUNITIES, INC.**[1] | § | |
| | § | **CASE NO. 19-30283 (HDH)** |
| Debtor. | § | |

## DECLARATION OF LOUIS E. ROBICHAUX IV
## IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, Louis E. Robichaux IV, declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.     I am the Chief Restructuring Officer ("CRO") of Mayflower Communities, Inc. (d/b/a The Barrington of Carmel), the debtor and debtor in possession ("Barrington" or the "Debtor") in the above-captioned case (the "Chapter 11 Case").

2.     I am also a Senior Managing Director of Ankura Consulting Group LLC ("Ankura"). Ankura was retained by the Debtor in June 2018, and I was appointed to the role of CRO on October 1, 2018. I have nearly 30 years of industry and restructuring experience, with a

---

[1] The last four digits of the Debtor's federal tax identification number is 6350.

focus on the U.S. healthcare industry. I have provided restructuring, crisis management, financial advisory, and expert witness services to parties in a broad variety of distressed corporate settings, with significant expertise serving in chief restructuring officer roles. I have extensive healthcare sector experience and have advised hospitals, HMO/managed care organizations, outpatient rehabilitation, skilled nursing care, and continuing care retirement communities.

3.      In my capacity as Chief Restructuring Officer for the Debtor, I have personal knowledge of, and am familiar with, the business affairs, day-to-day operations, books and records, and financial condition of the Debtor, and I am authorized to submit this Declaration (the "Declaration") on behalf of the Debtor. I submit this Declaration to assist the Court and parties in interest in understanding the circumstances that led to the commencement of this Chapter 11 Case and in support of: (a) the Debtor's voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date") in the United States Bankruptcy Court for the Northern District of Texas (the "Court"); and (b) the relief that the Debtor has requested from the Court.

4.      Contemporaneously herewith, the Debtor has filed the following motions and applications (collectively, the "First Day Pleadings"):[2]

> i.      Motion of the Debtor for Entry of an Order Extending the Deadline to File Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules Extension Motion");
>
> ii.     Application For Entry of an Order Appointing Donlin, Recano & Company, Inc. as Claims and Noticing Agent for the Debtor Pursuant to 28 U.S.C. § 156(c), Effective as of the Petition Date (the "Donlin Recano Retention Application");

---

[2] Capitalized terms not defined in this Declaration shall have the meanings ascribed to the term in the relevant First Day Pleading.

iii. Motion of the Debtor for Entry of an Order Authorizing the Implementation of Procedures to Maintain and Protect Confidential Patient Information (the "Patient Confidentiality Motion");

iv. Motion of the Debtor for Entry of Interim and Final Orders Authorizing (I) Continued Use of Existing Cash Management System, (II) Maintenance of Existing Bank Accounts, (III) Continued Use of Existing Business Forms, and (IV) an Extension of Time to Comply with 11 U.S.C. § 345(b) Deposit and Investment Requirements (the "Cash Management Motion");

v. Motion of Debtor for Order Authorizing the Debtor to Escrow Certain Entrance Fees and Refund Certain Entrance Fees (the "Escrow Motion");

vi. Motion of the Debtor for Entry of Interim and Final Orders Authorizing the Debtor to (I) Maintain, Administer and Modify Its Refund Program and Practices in Connection With Overpayment of Healthcare Services; and (II) Honor Obligations Related Thereto (the "Refund Program Motion");

vii. Motion of the Debtor for Interim and Final Orders Authorizing (I) the Debtor to Pay Prepetition Salaries, Wages, and Compensation, (II) the Continuation of Employee Benefit Programs and (II) Directing Banks to Honor and Process Checks and Transfers Related to Such Employee Obligations (the "Wage Motion");

viii. Motion of the Debtor for Entry of Interim and Final Orders Authorizing the Debtor to Pay Certain Prepetition Taxes (the "Tax Motion");

ix. Motion of the Debtor for Entry of Interim and Final Orders (I) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service, (II) Deeming The Utility Providers Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "Utilities Motion");

x. Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Maintain Existing Insurance Policies and Pay All Obligations Arising Thereunder and (B) Renew, Revise, Extend, Supplement, Change, or Enter Into New Insurance Policies, and (II) Granting Certain Related Relief (the "Insurance Motion"); and

3

     xi.    Motion of the Debtor for an Order Authorizing the Use of the Debtor's Cash (the "<u>Cash Collateral Motion</u>").

5.    I am generally familiar with the contents of each First Day Pleading and believe that the relief sought therein allows the Debtor to fulfill its duties as debtor in possession, minimize the disruption to the Debtor's business operations that may be caused by this chapter 11 filing.

6.    Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and knowledge of the Debtor's operations and financial condition, and information provided to me by management, advisors, or other representatives of the Debtor.  If called as a witness, I would testify consistently with the facts set forth in this Declaration.

7.    To familiarize the Court with the Debtor and the relief the Debtor seeks early in this Chapter 11 Case, this Declaration is organized into three sections.  <u>Section I</u> provides an overview of the Debtor's operations and capital structure.  Section II sets forth the events that have led up to this bankruptcy filing.  <u>Section III</u> sets forth the relevant facts in support of each of the First Day Pleadings filed in connection with the Chapter 11 Case, which the Debtor believes are critical to administering this case and preserving and maximizing the value of the Debtor's estate.

<b><u>PRELIMINARY STATEMENT</u></b>

8.    Incorporated in 2007, Barrington is a not-for-profit corporation that has built a best-in-class senior living retirement community in the State of Indiana dedicated to giving its residents an enriching lifestyle.  In particular, Barrington operates a continuing care retirement community ("<u>CCRC</u>") that offers its senior residents a continuum of care throughout the aging process.  Upon entering the CCRC, residents are provided spacious apartment homes and a broad

4

range of social and recreational activities creating an unmatched quality of life. As residents enter their later years and require additional assistance with everyday activities or health care services, they have access to assisted living, memory support, skilled nursing facilities, and rehabilitation located on the same campus. Simply put, the residents of Barrington have entrusted their health, safety, and well-being to Barrington for the duration of their lives.

9.      For many seniors, joining a CCRC is an attractive option for them and their families because it minimizes the burdens and costs associated with the aging process. These seniors will often sell their homes or liquidate significant assets, including their life savings, in order to become a part of a CCRC, like Barrington.

10.     CCRCs, however, are often operationally and financially complex. More specifically, CCRCs can be challenging to operate because they require the maintenance of a broad range of services to seniors in varying stages of the aging process. Additionally, CCRCs require a steady flow of new residents in order to maintain day-to-day operations and to remain current on financial obligations, including, most importantly, obligations to current and former residents.

11.     As will be described in greater detail below, Barrington relies on revenue generated by new residents to, among other things, maintain its day-to-day operations, meet its debt obligations and comply with its resident refund obligations. Recently, the highly competitive local senior living market has impacted Barrington's ability to generate sufficient net cash flow to cover all of its expenses. Because of these challenges, Barrington has been unable to pay its debts as they become due and, as discussed in greater detail below, defaulted on significant obligations.

12. In light of its financial condition, the Debtor's professionals immediately engaged in negotiations with representatives of the Bond Trustee in December 2018 regarding the terms of a forbearance agreement and a proposed operating budget. Additionally, the Debtor agreed to retain the Bond Trustee's proposed real estate broker and engage in a sale process on a timeline mutually acceptable to the Bond Trustee and the Debtor. Notwithstanding the Debtor's good faith efforts to reach a mutually acceptable course of action with the Bond Trustee, the Bond Trustee, without any notice to the Debtor or the Debtor's professionals, filed a *Complaint for Breach of Contract, Replevin, Foreclosure, and Immediate Appointment of a Receiver* (the "Complaint") and *Motion for Immediate Appointment of a Receiver* (the "Receiver Motion," and together with the Complaint, the "Receivership Action") in the Hamilton Superior Court in the County of Hamilton, Indiana (the "State Court"). As discussed in greater detail herein, the Bond Trustee commenced the Receivership Action in order to, among other things, divest the Debtor and SQLC (as defined herein) of any control of the Debtor, dictate the terms of a sale of the Debtor's assets, and prevent the Debtor from seeking bankruptcy relief. After carefully considering the Debtor's financial condition and the interests of its creditors, residents, employees and other interested parties, the Debtor's board of directors, with the support of SQLC, its sole member, unanimously decided that it was in the best interests of the Debtor's stakeholders that the Debtor commence this Chapter 11 Case.

## I. OVERVIEW OF THE DEBTOR'S BUSINESS

### A. Description of the Continuing Care Retirement Community and Affiliations

13. Barrington is a not-for-profit nonstock corporation which was chartered under the laws of the State of Delaware on November 21, 2007. The Debtor is governed by a Board of Directors who are elected by Senior Quality Lifestyles Corporation ("SQLC"), a non-profit

6

corporation that serves as Barrington's sole corporate non-voting member since May 7, 2012. The day-to-day operations of Barrington are managed by Seniority, Inc. ("Seniority"), a wholly-owned subsidiary of SQLC.

14. As a CCRC, Barrington offers its residents a continuum of care in a campus-style setting, providing living accommodations and related health care and support services to a target market of seniors aged sixty two (62) and older. Barrington is a 271 unit facility located in Carmel, Indiana featuring: (i) 141 independent living ("IL") apartments, (ii) 56 assisted living ("AL") units, (iii) 26 memory support ("MS") units, and (iv) 48 skilled nursing ("SNF") beds, all located on a 372,000 square foot, 19-acre campus (the "Facility").

15. The life care benefits that the Facility provides includes (i) assisted living services, (ii) memory support, and (iii) nursing services.

   a. **Assisted Living**. The Facility provides assistance with daily activities, such as dressing, eating, bathing, toileting, medication administration and ambulating. Services are provided under three level of care: (i) basic, (ii) level 1, and (iii) level 2. A resident's acuity level and the extent of services required are factors which determine the assigned level of care.

   b. **Memory Support**. The Facility provides a monitored memory support suite with services designed to assist with the daily living and the special needs of memory support residents, in accordance with applicable law.

   c. **Nursing Care**. The Facility provides licensed nursing care services which may include services required by applicable law to be supervised or administered by a professional licensed nursing staff, e.g., medication administration, condition and behavior observation and assessment, creation and administration of a care plan assistance with activities of daily living and communication with physicians and other care providers.

16. At the Facility, seniors are offered a variety of residency options, including one-bedroom, one-bedroom-plus den and two-bedroom styles that range in size of 757 square feet to 1,384 square feet. Living units include, among other things, designer kitchens with granite countertops, full size stainless steel appliances, individually controlled heating and air

conditioning, and washers and dryers. Barrington also offers its residents a full roster of activities, wellness programs, fine dining, and trips within the City of Carmel. Barrington provides its residents with a number of amenities in its 30,800 square foot common area including: (1) a multi-purpose room, (ii) a living room, (iii) a dining room, as well as a private dining room for special occasions, (iv) a bistro/café, (v) a wellness/fitness center, (vi) a library/business center, (vii) a beauty salon/barbershop, (viii) a creative arts center, (ix) a club room, (x) residential storage, and (xi) a mail alcove. Other amenities include concierge service, 24-hour security, landscaped courtyards, and a 53,600 square foot underground parking garage.

17.     The Facility currently has a high occupancy rate, with 271 residents currently living in the Facility. As of January 18, 2019, occupancy in the IL, AL, MS, and SNF was 91.5%, 87.5%, 92.3%, and 77.1%, respectively. Among these residents, 24 reside in Barrington's memory support unit, 37 in Barrington's skilled nursing unit, and 49 in Barrington's assisted living unit. Many of the residents, particularly those that reside in the memory support and skilled nursing units, depend on the physicians nurses, and aides at the Facility for their day-to-day care and overall well-being.

18.     The Debtor receives revenue from several sources, which include: (i) entrance fees ("Entrance Fees"), (ii) monthly service fees for IL, AL and MS, (iii) per diem rates for SNF services, (iv) fees for optional services, and (v) certain unit upgrade fees. Entrance Fees range from approximately $316,000 to $650,000. Monthly service fees range from $2,800 to $7,600. Per diem rates in the SNF range from approximately $150-$550.

B.      **Continuing Care Contracts**

19.     As is common practice in the CCRC industry, a resident interested in occupying an independent living unit in the Facility must enter into a continuing care contract (a

8

"Continuing Care Contract") with Barrington. Unlike a pure rental retirement community, whereby a resident pays monthly fees for services (which fees may increase as the resident's needs change), the Continuing Care Contract is a life care residency contract whereby a resident will pay an Entrance Fee and fixed monthly fees for Barrington's commitment to provide life care services for the duration of the resident's life, regardless of whether (i) the resident's needs change over time which may require additional services to be provided by Barrington, or (ii) the costs of providing such services increase for Barrington. Significantly, Barrington's commitment to provide life care services continue even if the resident's financial condition deteriorates and is unable to continue to make its payments.

20.     Barrington offers different plans of Continuing Care Contracts, including, but not limited to, 90% refundable for single occupancy and 80% refundable for double occupancy. The Continuing Care Contract sets forth terms and conditions under which the resident will occupy a unit, including outlining the obligations for the payment of an Entrance Fee, the amount and timing of the refundable portion of that Entrance Fee, the amount of monthly fees to be charged, and other general matters.

21.     In general, a prospective resident must pay an Entrance Fee prior to occupying an IL unit. Typically, in order to reserve the residence and, at the time of execution, provides a fully refundable deposit prior to executing the Continuing Care Contract. The remaining balance is due on or before the move-in date, except in circumstances where a deferred portion of the Entrance Fee is negotiated. Entrance Fees range from approximately $316,000 to approximately $650,000, depending on the unit selected by a resident.

22.     The Continuing Care Contract also requires residents to pay monthly service fees to the Barrington (the "Monthly Fee," together with the Entrance Fee, the "Fees"). In

consideration for payment of Entrance Fees, Monthly Fees and other fees charged by Barrington, residents are furnished with a residence and are given access to a wide array of services. Section 2.5 of the Continuing Care Contract provides that the Debtor "will provide the following services covered by the Monthly Fee and Entrance Fee," which services include: (i) dining service; (ii) housekeeping and laundry; (iii) utilities; (iv) security and emergency alert system; (v) maintenance; (vi) mail; (vii) transportation; (viii) social, educational, and wellness programs; (ix) property taxes and insurance; (x) storage area; (xi) a physician, to serve as a "Medical Director," as that term is defined under federal and Indiana State Department of Health regulations; (xii) life care benefit. Barrington uses the Fees to fund its operations, service its debt obligations, and make capital improvements to the Facility.

23. If, after the move-in date set forth in the Continuing Care Contract, (i) a resident terminates the Continuing Care Contract; (ii) a resident dies; or (iii) in rare instances, Barrington terminates the Continuing Care Contract pursuant to the provisions therein, then such resident is entitled to the refundable portion of his or her Entrance Fee (the "Refund") pursuant to the terms of its Continuing Care Contract. The Refund is due after a resident physically and permanently leaves the unit, including the removal of the residents personal property, and is made within ten (10) days of the later of (i) the effective date of termination of the Continuing Care Contract, or (ii) the date a new Entrance Fee and executed Continuing Care Contract is received by the Facility and the new resident has taken occupancy of that resident's unit.

## C. **Sponsorship by SQLC**

24. SQLC has been the sole corporate non-voting member and sponsor of Barrington since May 7, 2012. SQLC is a non-profit chartered under the laws of the State of Texas, a tax-exempt organization under section 501(c)(3) of the Tax Code, and a "supporting organization"

and public charity under section 509(a)(3) of the Tax Code. SQLC's mission is to enrich lives, provide compassionate care, and ensure financial security. SQLC provides support to six (6) unique "supported organizations" throughout Texas and in the City of Carmel, Indiana.

### D. Management by Seniority

25. Seniority is a California corporation with expertise in developing, operating, and managing CCRCs. SQLC is the sole owner of Seniority. SQLC hired Seniority, pursuant to that Master Management Services Agreement dated as of September 7, 2017 (the "Management Agreement") pursuant to which Seniority would serve as exclusive manager (the "Manager") of the day-to-day operations of each of SQLC's six (6) CCRCs, including Barrington. Seniority is an integral part of the Facility's managerial structure, and provides the following non-exhaustive list of services: (i) determine operating policies, procedures, and standard; (ii) develop and execute a sales plan; (iii) establish food and beverage policies; (iv) establish all employment policies, including wage and salary terms, benefits, retirement plans, and bonuses; (v) hire, promote, supervise, direct, train, transfer, and discharge all Barrington employees; (vi) negotiate and consummate such agreements as the Manager deem necessary or advisable for furnishing all utilities, services, supplies, food, beverages, equipment, and other materials and supplies for the maintenance and operation of the Facility; and (vii) establish advertising and public relations policies.

26. In exchange for such services, Barrington to pays to Seniority a management fee of six percent (6%) of the actual monthly revenues, as defined in the Management Agreement, attributable to Barrington for general management, accounting, human resources, and sales services provided. In addition, Seniority will be paid a monthly administrative fee equal to three percent (3%) of Barrington's monthly management fee for reimbursement of the Manager's out-

of-pocket administrative expenses. In addition, Seniority provides an executive management team for Barrington, which includes an executive director and a health care administrator, the costs of which are charged to Barrington in addition to the management fees and monthly administrative fees.

**E.**     **The Debtor's Prepetition Capital Structure**

27.     As of the Petition Date, on a book value basis, Barrington has approximately $96.5 million in assets which consists of approximately:

 i.     $3.5 million in cash and cash equivalents;
 ii.     $300,000 in accounts receivable
 iii.     $1.1 million of deferred entrance fee receivables;
 iv.     $77 million in property and equipment,
 v.     $8 million of restricted cash; and
 vi.     $6.6 million of other assets.

28.     As of the Petition Date, the Debtor has approximately $151.9 million of liabilities, which consists of approximately:

 i.     $300,000 of trade accounts payable;
 ii.     $2.4 million of oversight fees owed to SQLC;
 iii.     $52.4 million of resident refund obligations;
 iv.     $92.7 million (plus accrued interest) of long-term municipal bond obligations; and
 v.     $4.1 million (plus accrued interest) of subordinated note obligations.

29.     Barrington has received a determination letter from the Internal Revenue Service setting forth its determination that Barrington is exempt from federal income taxation under section 501(a) of the Internal Revenue Code (the "Tax Code") as an organization described in section 501(c)(3) of the Tax Code.

**1.**     **Municipal Bond Debt**

30.     Pursuant to that Master Trust Indenture dated as of August 1, 2012 (the "Master Indenture"), between Barrington, as the initial member of the Obligated Group as defined in the

Master Indenture, and The Bank of New York Mellon Trust Company, N.A. ("BNYM"), as prior master trustee (the "Master Trustee") and to UMB Bank, N.A. ("UMB"), as the successor bond trustee (the "Bond Trustee"), under that Bond Trust Indenture date as of August 1, 2012 (the "Bond Indenture"), between the City of Carmel, Indiana (the "Issuer") and BNYM, the Issuer issued revenue bonds in the aggregate principal amount of $119,020,000 (the "Bonds").  As security for the issuance of the Bonds, Barrington issued the following note obligations: (i) $94,575,000 Direct Note Obligation, Series 2012A (the "Series 2012A Obligation"); (ii) $3,000,000 Direct Note Obligation, Series 2012B (the "Series 2012B Obligation"); (iii) $3,515,000 Direct Note Obligation, Series 2012C-1 (the "Series 2012C-1 Obligation"); (iv) $7,905,000 Series 2012C-2 (the "Series 2012C-2 Obligation"); (v) $3,025,000 Series 2012C-3 (the "Series 2012C-3 Obligation"); (vi) $7,000,000 Direct Note Obligation, Series 2012D (the "Series 2012D Obligation") (collectively, the "Series 2012 Obligations").[3]

31.     Pursuant to that loan agreement dated as of August 1, 2012 (the "Loan Agreement") between Barrington and the Issuer, the Issuer loaned the proceeds of the Bonds to Barrington for the purpose of, among other things,   (i) payment or reimbursement for the payment of certain costs of acquiring, constructing. renovating, remodeling, and equipping the Facility, (ii) payment or reimbursement for the payment of certain project costs incurred prior to the issuance of the Bonds, (iii) funding a debt service reserve fund, and (iv) paying a portion of the interest of the Bonds.

32.     The rights of the Issuer under the Loan Agreement were assigned to the Bond Trustee pursuant to the Bond Indenture.  As security for its obligations with respect to the Bonds,

---

[3] Capitalized terms not otherwise defined in this paragraph shall have the definition provided in the Master Indenture.

Barrington entered into the Master Indenture and a Mortgage, Assignment of Leases and Rents, Security Agreement, and Fixture Filing dated as of August 1, 2012 between Barrington and the Master Trustee (the "Mortgage and Security Agreement"), pursuant to which Barrington purportedly granted the Bond Trustee a security interest in certain assets of Barrington as described in the Master Indenture and the Mortgage and Security Agreement.[4]

33.     Barrington defaulted on the Series 2012 Obligations by failing to make the required installments of principal and interest on November 10, 2018, December 10, 2018, and January 10, 2019 (collectively, the "Payment Defaults").  The Payment Defaults constitute an event of default under the Bond Documents.

### 2.     The Liquidity Support Agreement

34.     On August 1, 2012, SQLC LSA, LLC, ("SQLC LSA"), a Texas limited liability company whose sole member is SQLC, SQLC, Barrington and the Master Trustee entered into that certain Liquidity Support Agreement, dated August 1, 2012, (the "Liquidity Support Agreement").  Pursuant to the Liquidity Support Agreement, SQLC LSA agreed to transfer $2,000,000 to the Master Trustee for deposit into a Liquidity Support Fund, as defined in the Liquidity Support Agreement.  Additionally, Barrington agreed to make the following payments: (i) $2,375,000 to the Master Trustee for deposit into the Supplemental Liquidity Support Fund, as defined in the Liquidity Support Agreement, and (ii) $1,875,000 to the Master Trustee for deposit into the Special Project Liquidity Support Fund, as defined in the Liquidity Support Agreement.

---

[4]  The Bond Indenture, the Loan Agreement, the Master Indenture, and the Mortgage and Security Agreement are collectively referred to as the "Bond Documents".

35.     Pursuant to that liquidity support agreement dated as of August 30, 2012 (the "SQLC Liquidity Support Funding Agreement"), by and between SQLC LSA, SQLC, and Northwest Senior Housing Corporation ("NSHC"),[5] NSHC agreed to transfer $2,000,000 to SQLC, which in turn agreed to transfer said $2,000,000 to SQLC LSA for the purpose of advancing the amounts, on behalf of Barrington, that Barrington agreed to provide pursuant to the Liquidity Support Agreement.  In order to secure its obligations under the SQLC Liquidity Support Funding Agreement, Barrington provided SQLC LSA with an unsecured subordinated note dated August 30, 2012 in the amount of $2,000,000 (the "SQLC LSA Subordinated Note").  The SQLC LSA Subordinated Note is subordinated as to the Series 2012B Bonds, the Series 2012C Bonds, and the Series 2012D Bonds as defined in the Master Indenture.

### 3.     Loan Agreement with SQLC

36.     The Debtor and SQLC entered into a loan agreement on August 30, 2012 (the "Pre-Finance Loan Agreement"), pursuant to which SQLC agreed to advance $1,875,000 to Barrington for the construction and operation of the Facility, which funds were deposited into the Special Project Liquidity Support Fund. In order to secure its obligations under the Pre-Finance Loan Agreement, Barrington provided SQLC with an unsecured subordinated promissory note dated August 30, 2012 in the amount of $1,875,000 (the "Pre-Finance Subordinated Note").  The Pre-Finance Subordinated Note is subordinated as to the Series 2012B Bonds, the Series 2012C Bonds, and the Series 2012D Bonds as defined in the Master Indenture.

### 4.     The Pre-Permanent Financing Funding Agreement

37.     Pursuant to that pre-permanent financing funding agreement dated July 1, 2012 by and between Barrington, SQLC and NSHC (the "Pre-Permanent Financing Funding

---

[5]     It is my understanding that NSHC is another CCRC whose sole member is SQLC.

Agreement"), NSHC agreed to transfer up to $1,000,000 to SQLC, which in turn agreed to transfer up to said $1,000,000 to Barrington for the purpose of pursuing the development of the Facility. In order to secure its obligations under the Pre-Permanent Financing Funding Agreement, Barrington provided SQLC with an unsecured subordinated promissory note dated August 30, 2012 in the amount of $200,000 or such lesser sum as may become due under the Pre-Permanent Financing Funding Agreement (the "SQLC Subordinated Promissory Note"). The SQLC Subordinated Promissory Note is subordinated as to the Series 2012 Bonds as defined in the Master Indenture.

### 5.   Contingent Resident Refund Obligations

38.     The Debtor's liabilities also include contingent resident refund obligations.  As of the Petition Date, the Debtor has approximately $52 million of resident refund obligations, of which approximately $8.4 million may or will become due in the near future.

| Potential Refund Obligations | # of Residents | Amount |
|---|---|---|
| Out of IL – Out of Facility (Unit Sold) | 2 | $598,000 |
| Out of IL – Out of Facility (Unit Not Sold) | 2 | $528,000 |
| Out of IL – In Facility (Unit Sold) | 16 | $4.65 million |
| Out of IL – In Facility (Unit Not Sold) | 8 | $2.6 million |

39.     As explained above, a resident is entitled to a refund if he permanently leaves the Facility and the Facility has entered into a Continuing Care Contract with a new resident who has taken occupancy of such unit.  Thus, the chart above demonstrates the potential refund obligations that may become due in the near future once these foregoing conditions are met.

a.   Out of IL – Out of Facility (Unit Sold).  There are two former residents who have moved out of the Facility and the Facility has sold their units, but either (i) the full amount of the new resident Entrance Fee has not been received or (ii) the resident moved out of the Facility within the last ten days.  The Debtor will be obligated to

refund approximately $598,000 in the aggregate to these two former residents within ten days of when all refund conditions are met.

b. <u>Out of IL – Out of Facility (Unit Not Sold)</u>. There are two former residents who have moved out of the Facility but the Facility has not yet sold their units. These residents will be entitled to a refund once their units are sold, new residents take occupancy of their respective units, and the full amount of the new resident Entrance Fees have been received. When that occurs, the Debtor will be obligated to refund approximately $528,000 in the aggregate to these two former residents within ten days of when all refund conditions are met.

c. <u>Out of IL – In Facility (Unit Sold)</u>. There are sixteen residents who have moved out of the IL unit, the Facility has sold their units, but have remained within the Facility. Once new residents take occupancy of such units and the full amount of the new resident Entrance Fees have been received, the Debtor will be obligated to refund approximately $4.65 million in the aggregate to these residents within ten days of when all refund conditions are met.

d. <u>Out of IL – In Facility (Unit Not Sold)</u>. There are eight residents who have moved out of the IL unit, the Facility has not yet sold their units, but have remained within the Facility. These residents will be entitled to a refund once their units are sold, new residents take occupancy of their respective units. And the full amount of the new resident Entrance Fees have been received. When that occurs, the Debtor will be obligated to refund approximately $2.6 million in the aggregate to these eight residents within ten days of when all refund conditions are met.

## II.     EVENTS LEADING TO BANKRUPTCY

40.     The current situation Barrington finds itself in is unfortunate. The Facility has no operational or healthcare issues and has not found itself defending contentious litigation brought on by its residents or its estate. The issue is that Barrington simply cannot continue to maintain its current debt structure.

41.     The senior housing market in Carmel, Indiana is very competitive and has been since Barrington opened. Barrington competes with four (4) primary competitors all located within a ten (10) mile radius of the Facility.

42.     Notwithstanding the competition, in 2014, Barrington found itself exceeding its initial monthly occupancy budget by thirteen (13) residents per month. Following on its initial

success, Barrington explored various avenues to remain competitive in the market and provided a number of monthly rent pricing concessions that continued through 2017 (the "Rent Credits"). Occupancy in the IL units remained constant; however, the assisted living and memory support occupancy rates fell short of expectations, which, combined with the Rent Credits and market saturation, put downward pressure on operating margins. In 2017, Barrington found its average monthly occupancy in assisted living and memory support decrease by approximately 13 residents per month. To make matters worse, Barrington's operating costs are generally fixed (as is consistent with the CCRC industry); thus, operating costs remained relatively constant as occupancy rates declined.

43.     To address these issues, in March of 2018, SQLC retained a new Seniority management team, which immediately implemented a number of initiatives to control operating costs and improve service quality. However, due to market conditions and lower than expected occupancy, Barrington continued to face pressure on its margins. In July of 2018, Barrington retained Dixon Hughes Goodman to prepare net operating income projections and conduct a market assessment, which uncovered the following: Barrington's (i) net resident revenue was 17.9% less than initially projected; (ii) assisted living occupancy was lower than initially projected; (iii) implied monthly rent per occupant was lower than initially projected; and (iv) operating expenses were 27.5% greater than initially projected.

44.     Additionally, as detailed above, Barrington is saddled with a significant amount of debt. As a result of its lower than projected revenues and significant debt obligations, Barrington defaulted on the Series 2012 Obligations in November 2018.

45.     In December 2018, the Debtor's restructuring professionals engaged in discussions with the Bond Trustee's professionals regarding the terms of a forbearance

agreement and operating budget. The Debtor also interviewed several investment banker candidates and selected the real estate broker approved by the Bond Trustee. Despite the Debtor's good faith efforts to engage with the Bond Trustee, the Bond Trustee commenced the Receivership Action without any notice to the Debtor.

46. In the Bond Trustee's proposed order on the Receiver Motion (the "Proposed Receivership Order"), the Bond Trustee sought, among other relief, the following: (i) the ability to retain an investment banker on terms and conditions acceptable to the Bond Trustee in its sole discretion; (ii) the ability to conduct a sale of the Facility; (iii) a prohibition against the Debtor's ability to commence a bankruptcy proceeding; and (iv) the ability to reject or terminate any agreement or contract entered into by the Debtor.

47. The Debtor found the Proposed Receivership Order alarming for a number of reasons. First, the Bond Trustee sought to displace the Debtor's board and sole member. Second, without any notice to residents at the Facility, the Bond Trustee proposed to engage in a sale process that offered no protections to the residents currently living at the Facility. Third, the Bond Trustee sought an anti-suit injunction, thereby prohibiting the Debtor and its creditors from commencing any lawsuits against or affecting the Debtor in any other forum other than in Hamilton County. Fourth, the Bond Trustee sought the ability to reject all contracts, including, presumably, Continuing Care Contracts. Finally, the Bond Trustee sought to preclude the Debtor from commencing a bankruptcy case. I have been advised by Debtor's counsel that public policy assures access of any entity to seek bankruptcy relief as authorized by the Constitution and, as such, any prohibition against filing for bankruptcy in the Proposed Receivership Order is unconstitutional.

48. The Debtor was particularly appalled upon discovery of the Proposed Receivership Order's provisions regarding a receiver's ability to unilaterally reject all contracts, without exceptions, without any notice. The risk that a receiver could reject all Continuing Care Contracts, and all refund obligations (which are significant), which would endanger the lives of the residents, is not a risk that the Debtor takes lightly. It would be catastrophic to the Debtor's ability to operate and cause irreparable harm to the residents' health, safety and welfare who have been placed in the Debtor's care and who have chosen the Facility because of its mission to protect seniors and ensure adequate care. To make matters worse, the receiver would be solely accountable to the Bond Trustee, all cash would be diverted to the benefit of the Trustee, and all operating budgets would be subject to the Bond Trustee's approval. The Proposed Receivership Order is glaringly clear that the sole goal of the receivership is to seize all cash of the Debtor without regard to the consequences of the priceless lives of the residents. The Debtor could not stand by idly.

49. On January 23, 2019, the Debtor filed a response opposing the Bond Trustee's request for an expedited hearing on the Receiver Motion for the reasons discussed above. On January 25, 2019, the State Court scheduled a hearing on the Receiver Motion on January 28, 2019. On January 25, 2019, the Debtor filed a notice of removal of the receivership to the U.S. District Court for the Southern District of Indiana. After carefully considering the risks and benefits of a receivership and bankruptcy, the Debtor's board of directors, with the support of SQLC, concluded that it was in the best interests of the Debtor and its creditors, residents, employees and other interested parties to seek chapter 11 relief, in order to, among other things, potentially pursue a sale of the Facility.

## III.    FACTS IN SUPPORT OF FIRST DAY PLEADINGS

50.    Contemporaneously with the filing of its chapter 11 petition, Barrington has filed the First Day Pleadings.  The Debtor requests that each of the First Day Pleadings described below be granted, as they constitute a critical element in ensuring the stabilization of the Debtor's operations at the outset of this Chapter 11 Case.  Capitalized terms not otherwise defined in this section shall have the meanings ascribed to such terms in the relevant First Day Pleading.

### A.    Schedules Extension Motion

51.    Pursuant to the Schedules Extension Motion, the Debtor requests entry of an order extending the extending the required time for filing of its Schedules and Statements from February 13, 2019 (the "Initial Deadline") to a date that is four (4) business days prior to the meeting of creditors pursuant to section 341 of the Bankruptcy Code, without prejudice to the Debtor's ability to request additional extensions for cause shown.

52.    Although the Debtor has commenced preparation of its Schedules and Statements with the assistance of its advisors, the sudden need to file chapter 11 as a result of the receivership has forced the Debtor and its leanly staffed management to focus solely on preparing for a bankruptcy and ensuring that its operations remain stable as it transitions into chapter 11.

53.    As a result of the foregoing the Debtor submits that there is cause for an extension of the Initial Deadline to gather the significant amount of information that must be accumulated, reviewed, and analyzed to properly prepare the Schedules and Statements.

54.    Accordingly, on behalf of the Debtor, I respectfully submit that the Schedules Extension Motion should be approved.

### B. Donlin Recano Retention Application

55.     Pursuant to Donlin Recano Retention Application, the Debtor requests entry of an order authorizing the appointment of Donlin Recano & Company, Inc., ("Donlin Recano") as the claims and noticing agent for the Debtor in this Chapter 11 Case, including assuming full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim. The Debtor submits that Donlin Recano's rates are competitive and reasonable given Donlin Recano's quality of services and expertise, particularly its experience in HIPAA-certified handling of sensitive information in other healthcare bankruptcy cases.

56.     Accordingly, on behalf of the Debtor, I respectfully submit that the Donlin Recano Retention Application should be approved.

### C. Patient Confidentiality Motion.

57.     Pursuant to the Patient Confidentiality Motion, the Debtor requests entry of an order authorizing the implementation of procedures to protect confidential information of the Debtor's Patients as required by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

58.     In the ordinary course of providing care for its patients, the Debtor is required to maintain the confidentiality of patient information pursuant to HIPAA. However, the Debtor recognizes that such requirements may conflict with the duty to disclose certain information under the Bankruptcy Code. The Debtor believes that approval of the Patient Confidentiality Procedures) appropriately balances the need to maintain confidential patient information under HIPAA with the need for adequate disclosure under the Bankruptcy Code.

59.     Accordingly, on behalf of the Debtor, I respectfully submit that the Patient Confidentiality Motion should be approved.

22

### D. Cash Management Motion

60. Pursuant to the Cash Management Motion, the Debtor requests entry of an order (a) authorizing the Debtor to (i) continue to use its existing cash management system, (ii) maintain its existing bank accounts, and (iii) continue to use its existing business forms, and (b) granting an extension of time to comply with section 345(b) of the Bankruptcy Code, to the extent it is applicable.

The Debtor's Bank Accounts

61. As of the Petition Date, the Debtor's Cash Management System employed a total of five (5) bank accounts along with several trustee-held accounts (collectively, the "Bank Accounts") with the following financial institutions (collectively with any other institutions with which the Debtor maintains or established deposit accounts or investment accounts, the "Banks"): (a) Bank of America; (b) Commerce Bank; and (c) Old National Bank. Various trustee-held accounts are located at UMB Bank.

62. The table attached to the Cash Management Motion as Exhibit C sets forth for each of the Bank Accounts the name of the institution at which the account is maintained, the account number (last four digits only) and a description of the purpose of the account. The Debtor manages its cash receipts, transfers and disbursements through the Bank Accounts. In doing so, the Debtor routinely deposits, withdraws and otherwise transfers funds to, from and between the Bank Accounts by various methods including check, wire transfer, automated clearing house transfer and electronic funds transfer. On a daily basis, the Debtor processes large numbers of transactions through the Cash Management System as described below. The Debtor maintains current and accurate records of all transactions processed through the Cash Management System.

The Debtor's Cash Management System and Bank Accounts

63.     Prior to the Petition Date and in the ordinary course of business the Debtor utilized a relatively streamlined cash management system (the "Cash Management System"). All revenue and receipts (other than entrance fees) are deposited directly into an operating account at Bank of America and all disbursements, including payroll, is funded from such operating account.  Entrance Fees collected from new residents are deposited into an escrow account at Bank of America.  The Debtor also maintains a resident trust account and a separate investment account containing less than $6,000.  A chart depicting the flow of funds in the Cash Management System is attached to the Cash Management Motion as **Exhibit D**.

64.     Among other benefits, the Cash Management System permits the Debtor to accurately monitor cash availability at all times and permits the Debtor to centrally manage and track the collection and transfer of funds, which reduces administrative burden and expense and maximizes interest income.

65.     The Cash Management System consists of the following Bank Accounts:

    a.      Operating Account.  The Debtor maintains an operating account (the "Operating Account") at Bank of America.  As discussed above, all receipts, including government and private payor receipts, are deposited directly into the Operating Account.  Monthly Fees and receipts from Medicare and private payors, totaling between $1,200,000 and $1,300,000 each month, are deposited directly into the Operating Account. Approximately $1,100,000 to $1,200,000 of total deposits each month is comprised of Monthly Fees paid by the residents. The remaining $100,000.00 to $120,000.00 is comprised of receipts from Medicare and private payors.  In addition, Reservation Deposits and Entrance Fees are transferred from the Entrance Fee Escrow Account to the Operating Account, as discussed below.  As of the Petition Date, the Operating Account held approximately $3,500,000.

    b.      Entrance Fee Escrow Account.  The Debtor maintains a separate account at Bank of America to collect entrance fees and reservation deposits from new residents.  Historically, entrance fees are deposited into the Operating Account after a resident signs the residency agreement.  After the move-in date, reservation deposits and Entrance Fees are held in the

24

Entrance Fee Escrow Account for a short period before being transferred into the Operating Account. As of the Petition Date, there is approximately $50,000 to $60,000 in the Entrance Fee Escrow Account However, in order to provide comfort and assurance to new residents, the Debtor will be seeking as first day relief, authority to deposit all entrance fees received postpetition in a newly created escrow account, all as further described in the Escrow Motion

c. <u>Miscellaneous Deposit Account</u>. A few months prior to the Petition Date, the Debtor opened a deposit account with Bank of America which was intended to fund professional fees (the "<u>Miscellaneous Deposit Account</u>"). However, the Miscellaneous Deposit was never used and currently holds no funds. The Debtor was prepared to close the Miscellaneous Deposit Account but have decided to keep it open so that it can be used to hold the adequate assurance deposit, as described in further detail in the Utilities Motion.

d. <u>Resident Trust Account</u>. The Debtor maintains a resident trust account (the "<u>Resident Trust Account</u>") at Old National Bank for the benefit of its residents. The Resident Trust Account is an investment account that is made available to all residents if he/she wishes to deposit any of his/her funds for personal use. The Debtor is required to safeguard, manage and account for such resident's personal funds as federally mandated. When the account was initially opened, the Debtor deposited approximately $500 into the account and recently, it is has been paying dormant bank fees because there has been no activity in that account, which has approximately $200 remaining. The Debtor will continue to maintain the Resident Trust Account as needed but any funds that may be deposited in such account are not property of the Debtor's estate, but rather property of the Debtor's residents.

e. <u>Commerce Bank</u>. The Debtor maintains an investment account at Commerce Bank which currently holds less than $6,000. The Debtor believes that this account has been inactive for approximately two years.

f. <u>Trustee-Held Reserve Accounts</u>. A number of reserve accounts are held by UMB Bank, as Bond Trustee, pursuant to the Bond Indenture, Master Indenture, and the Liquidity Support Agreement. All but three of the reserve accounts have no balance. Approximately $450,000 is held in the liquidity reserve accounts and approximately $8 million is held in the debt service reserve.

<u>Business Forms</u>

66. In addition to the Cash Management System and Bank Accounts, the Debtor uses

in the ordinary course of its business numerous business forms (including but not limited to

checks, deposit slips, letterhead, contracts, purchase orders and invoices) (collectively, the "Business Forms").

67.     Most of the Business Forms are printed on an as-needed basis from an electronic template and therefore, the Debtor intends to designate "Debtor-in-Possession" on such forms. However, with respect to the preprinted Business Forms, the Debtor requests that it be authorized to continue to use these preprinted Business Forms on a postpetition basis and once its existing stock is depleted, the Debtor will then replace them with stock containing the "Debtor-in-Possession" designation.  The Debtor submits that it would be expensive and wasteful, and disruptive to the Debtor's business, to destroy all of these forms and order new ones.  Absent this relief, the estate will be required to bear a potentially significant expense that the Debtor believes is unwarranted, without any meaningful corresponding benefit, and would unnecessarily distract the Debtor away from its efforts from administering this Chapter 11 Case.

68.     The Cash Management System and Bank Accounts provide numerous benefits to the Debtor and its estate.  Among other benefits, the Cash Management System and Bank Accounts permit the Debtor to centrally control and monitor the collection and transfer of funds, to ensure cash availability, and to reduce administrative burden and expense.  Moreover, the Debtor has the ability to generate through the Cash Management System detailed and accurate reports.

69.     Given the nature of the Debtor's business, any disruption of its accounting and cash management procedures would be burdensome and disruptive, and could adversely impact (i) the Debtor's efforts to transition into chapter 11, and (ii) the Debtor's operations during the pendency of the bankruptcy which would impact its ability to provide the necessary care to its residents.  At this critical juncture, the Debtor must be able to conduct "business as usual" to the

26

extent possible. To this end, it is essential that the Debtor be permitted to continue to use its existing Cash Management System and Bank Accounts.

70. Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be approved.

### E. Escrow Motion

71. Pursuant to the Escrow Motion, the Debtor requests entry of an order authorizing the Debtor to (i) deposit all Entrance Fees paid by residents that are received by the Debtor postpetition into a newly established escrow account (the "Escrow Account"), and (ii) under certain circumstances pursuant to the terms of the Continuing Care Contracts, refund such Entrance Fees received postpetition to residents who move into the Facility during the pendency of this chapter 11 case and thereafter move out of the Facility.

72. The Debtor submits that the relief requested in the Escrow Motion is necessary because Entrance Fees required under the Continuing Care Contracts are the lifeblood of the Debtor's operations. Entrance Fees account for a significant portion of the Debtor's operating budget and the collection of such amounts is critical to the Debtor's ability to reorganize, including its ability to continue as a going-concern. Providing the relief requested in the Escrow Motion maintains the status quo pending a resolution of this case. The Debtor represents that it will not enter into any new Continuing Care Contracts or accept any deposits or other payments from prospective residents pending the entry of an order on this Motion and the opening of the Escrow Account.

73. Upon confirmation of a plan or a disposition of all or substantially all of the assets of the Debtor, the Entrance Fees will be disbursed by the Escrow Agent pursuant to further order of the Court. Moreover, upon a Refund Event, the Entrance Fees will be returned from the

Escrow Account to the respective resident who had made such payments. Any restriction preventing the Debtor from guaranteeing potential residents that their Entrance Fees will be escrowed would have a devastating effect on the Debtor's operations. Accordingly, the Debtor seeks authorization to escrow all Entrance Fees received postpetition in order to protect the residents' interest with respect thereto.

74. The relief requested is necessary to provide assurance to new residents that the Debtor's bankruptcy case will not affect such residents' rights to a refund. Any negative publicity suggesting that a community is in bankruptcy will necessarily deter prospective residents from entering into new Continuing Care Contracts, which are the precursors to the Debtor's receipt of future Entrance Fees.

75. The Debtor anticipates a decrease in the amount of Entrance Fees received from new residents during its bankruptcy case. The Debtor is hopeful, however, that the relief sought in the Escrow Motion will provide new residents with comfort that during the prepetition period, such new residents can elect to leave the Facility and receive a refund of their Entrance Fee, to the extent provided for in their Continuing Care Contracts. The Debtor believes that these modifications are critical to obtaining new Entrance Fees during this case.

76. A resident's ability to elect to leave the Facility is necessary to provide prospective residents with the peace of mind that, during the pendency of the Debtor's Chapter 11 Case, the residents are not held captive by their obligations under the Continuing Care Contracts. The current requirement that a new resident pay an Entrance Fee, execute a Continuing Care Contract, and move in to the Facility prior to the refund of an existing resident's Entrance Fee will necessarily deter prospective residents from entering into Continuing Care Contract while the Debtor's case is pending. Allowing prospective residents to have a "free

look" at whether or not the Facility is operating effectively while this case is pending should drastically increase the willingness of potential residents to pay an Entrance Fee. Because Entrance Fees are critical to the Debtor's operations, the provision regarding return of the Entrance Fees should be amended to encourage prospective residents to reside at the Facility.

77. Of significant importance to a prospective resident's peace of mind is the knowledge that should the Facility close, his or her Entrance Fee would be promptly refunded. Should a Refund Event happen, it is imperative that the residents have access to their Entrance Fees to the extent provided for in their Continuing Care Contract. The Entrance Fees are relatively large sums of money paid by each individual resident and would likely be necessary for the resident to secure alternative housing upon a Refund Event. If prospective residents were not certain that their Entrance Fees would be returned upon a Refund Event, such resident would be discouraged from choosing to reside at the Facility.

78. The Escrow Motion provides a practical approach to protect the interests of prospective residents in their Entrance Fees during the pendency of this case and provides for the proper transfer of the Entrance Fees upon a Refund Event or Trigger Event. The relief requested is reasonable under the circumstances and will maximize the value of the Debtor's estate by encouraging prospective residents to choose to live at the Facility and thereby pay an Entrance Fee.

79. Accordingly, on behalf of the Debtor, I respectfully submit that the Escrow Motion should be approved.

**F.      Refund Program Motion**

80. Pursuant to the Refund Program Motion, the Debtor requests entry of an order (a) authorizing the Debtor (i) to maintain, administer, modify, its Refund Program in connection

with overpayment of healthcare services, and make payments to residents and Third-Party Payors or to otherwise honor accrued prepetition obligations owed under its Refund Program (collectively, the "Refund Program Obligations") and (ii) to continue, replace, modify, or terminate any Refund Program in the ordinary course of business, and (b) granting certain related relief.

81.     In the ordinary course of business, the Debtor is required to make refunds to residents and third-party payors, including healthcare insurers, private pay sources ("Private Third Party Payors"), Medicare, and potentially other governmental and quasi-governmental agencies (and together with Private Third Party Payors, the "Third-Party Payors"), when overpayments are identified.   The Debtor routinely issues refunds for reimbursement of overpayments made by or on behalf of residents resulting from the interaction between the Debtor's billing procedures, resident medical insurance deductibles, and third-party payments, including payments made in connection with extended repayment plans with the applicable federal or state agencies overseeing Medicare (the "Refund Program").

82.     The case-by-case nature of the myriad of services provided to the residents makes the process of determining each resident's insurance coverage particularly complex.  As a result, whether due to data input errors during claims processing, or overpayments arising from coordination-of-benefits issues among multiple insurers, resident accounts—once fully processed and reconciled—may contain credit balances.  Once the Debtor receives payments from residents or insurers, the Debtor reviews accounts that have credit balances and refund any surplus to the resident or the Third-Party Payor who is due a refund based on an overpayment.

83.     When the Debtor discovers or otherwise verifies an overpayment from a resident or Private Third-Party Payor, the amount of the overpayment is entered into the Debtor's billing

system, which then administers refunds to the resident or Private Third-Party Payor, as appropriate. There is typically a significant lag between when the resident is treated, when the overpayment is recognized or determined, and when the overpayment is entered into the Debtor's billing system. After the overpayment amount is entered into the billing system, the Debtor issues a check or other form of payment to the resident or Private Third-Party Payor in the amount of the overpayment.

84.     At any given time, it is difficult to determine the amount of outstanding overpayments that have been made and identified, but for which a refund check has not yet been issued. Moreover, some refund checks issued to residents or Third-Party Payors before the Petition Date may not have been presented for payment or may not have cleared the Debtor's banking system and, accordingly, have not been honored and paid as of the Petition Date. Nonetheless, the Debtor is required, under the laws of various states, to reimburse residents and Third-Party Payors as overpayments are identified. Currently, the Debtor does not have any outstanding Refund Program Obligations, however, in an abundance of caution, the Debtor requests authority to continue to issue and pay the Refund Program Obligations to residents and Third-Party Payors, including refunds for overpayments made prepetition or resulting from prepetition services in the ordinary course of business, on a postpetition basis. In addition to penalties and damages if refunds are not paid, the failure to honor the Refund Program could erode the Debtor's hard-earned reputation and brand loyalty, adversely affecting the Debtor's business during the pendency of the bankruptcy.

85.     The necessity of the Refund Program in the healthcare services industry cannot be overstated. In addition to the incurrence of penalties and treble damages described above, failure to honor the Refund Program Obligations would likely cause the Debtor to lose a significant

31

number of payors and residents, which would damage its reputation for reliability, thereby resulting in a long-term decline in business. Third Party Payors may also seek to exercise setoff or recoupment against future amounts they would owe the Debtor, leading to undue accounting reconciliations or wasteful litigation. The failure to honor the Refund Program could erode the Debtor's hard-earned reputation and brand loyalty. Thus, the Refund Program is necessary for the Debtor to remain competitive and maintain its residents base at this critical juncture.

86.     Accordingly, on behalf of the Debtor, I respectfully submit that the Refund Program Motion should be approved.

### G.     Wage Motion

87.     Pursuant to the Wage Motion, the Debtor seeks entry of interim and final orders (i) authorizing the Debtor to pay prepetition wages, salaries, and other compensation, taxes and withholdings, reimbursable employee expenses, and any payroll related fees to third parties; (ii) authorizing the Debtor to honor and continue benefit programs for employees; and (iii) authorizing and directing the applicable banks and financial institutions at which the Debtor maintains disbursement and other accounts (collectively, the "Banks") to honor and process checks and transfers related to such employee obligations.

### The Debtor's Workforce, Compensation, and Benefits

Professional Employer Organization

88.     The Debtor retains Aureon HR, Inc., and its affiliates (collectively, "Aureon"), an accredited professional employer organization ("PEO") to act as a co-employer of the Employees. As is typical in the industry, Aureon provides services such as issuing payroll, processing direct deposits, filing W-2 forms, and remitting taxes and withholdings to the appropriate taxing and other governmental authorities (collectively, the "Authorities"). On any

32

given payroll date, the necessary and sufficient amounts to fund payroll are automatically deducted from the Debtor's operating account to Aureon (including fees paid to Aureon) for disbursement. The Debtor pays Aureon approximately $4,000 a month for these services based on the aggregate total of wages, salary and compensation paid during such payroll period. The Debtor seeks authority through the Wage Motion to continue to utilize the services of Aureon consistent with prepetition practice to avoid any disruption to payroll.

The Employees

89.     As of the Petition Date, the Debtor's workforce is comprised of a total of 212 Employees. 29 employees are full-time salaried (primarily managers), 148 employees are full-time hourly, and 35 employees are part time (collectively, the "Employees").

90.     Due to regulatory requirements of a certain ratio of nurses to residents, the Debtor may utilize the services of ATC Healthcare Services, Inc. to provide nursing staff and LGC Associates, LLC to provide dining staff (each, an "Employment Agency"). As of the Petition Date, there is no amount due and owing to the Employment Agency, though there may be accrued & unpaid amounts that may invoiced and become due postpetition. Except as otherwise noted, the employee benefits described in the Wage Motion are generally limited to the Full Time Salaried and Hourly Employees.

91.     The Employees are the lifeblood of the Debtor's operations and critical to the health and safety of the residents under the Debtor's care in the community. The Debtor relies upon the expertise of its management team to provide the strategic and operational direction of the Debtor's daily activities. These Employees are therefore vital to the Debtor's ability to accomplish its strategic goals and objectives and carry out its daily operations in order to meet resident expectations for the delivery of outstanding customer service. The Employees' skills

and its specialized knowledge and understanding of the Debtor's business are essential to the Debtor's continuing operations.

Prepetition Employee Obligations

The Debtor's Payroll Obligations

92.     The Debtor seeks an order authorizing the Debtor to honor all of its outstanding prepetition payroll obligations.  In the ordinary course of business, the Debtor pays its Employees bi-weekly.  As discussed above, payroll is processed by Aureon.  The most recent payroll was paid on January 18, 2019 and covered the period from December 30, 2018 through January 12, 2019.  The Debtor's next scheduled payroll date is February 1, 2019 and will be for the period from January 13, 2019 through January 26, 2019.  The Debtor funds approximately $250,000 on each payroll date for salaries, wages and other compensation of the Employees.

93.     As of the Petition Date, the Debtor estimates that approximately $140,000 in unpaid salary, wages and other compensation is owing to its Employees.  Although the majority of the Employees are paid by direct deposit, a small percentage of Employees are paid by manually issued checks, which may include expense reimbursements.  Therefore, it is likely that some Employees may not have cashed those checks (the "Uncashed Checks") prior to the commencement of the Debtor's Chapter 11 Case.

94.     In the ordinary course of business, the Debtor maintains a bonus program (the "Marketing Bonus Program") for Employees who work in its sales and marketing department. Quarterly bonuses of  $1,000 are paid based upon meeting or exceeding monthly targets set for occupancy.  Monthly bonuses range from $500-$1,500 depending on average daily census.  As of the Petition Date, the Debtor does not believe that any bonuses are due and owing under the Marketing Bonus Program.  The Debtor seeks authorization to continue to maintain the

34

Marketing Bonus Program and, and to the extent there exists accrued but unpaid prepetition amounts, authority to pay such amounts consistent with prepetition practices.

95. Given the critical role of the Employees in the Debtor's business operations, the Debtor seeks authority to honor its payroll obligations by paying, in the ordinary course, any prepetition amounts owed to the Employees. The Debtor believes there will be no Employees that will be owed more than the $12,850 priority limit on account of prepetition salaries or wages under section 507(a)(4)of the Bankruptcy Code (the "<u>Priority Limit</u>"), and are not seeking to pay any individual prepetition salaries or wages in excess of the Priority Limit. The Debtor also seeks authority to honor those Uncashed Checks that remain outstanding as of the Petition Date.

<u>Payroll Taxes and Other Withheld Amounts</u>

96. The Debtor deducts 401(k) and health savings account[6] deductions and other miscellaneous amounts from its Employees' paychecks (collectively, the "<u>Employee Deductions</u>"). The Employee Deductions comprise property of the Debtor's Employees and are forwarded by the Debtor to appropriate third-party recipients at varying times.

97. The Debtor is required by law to withhold from an Employee's wages amounts related to federal, state and local income taxes, social security and Medicare taxes, garnishments, child support payments, etc. (together with the Employee Deductions, the "<u>Payroll Taxes</u>") and remit the same to the appropriate taxing authorities (collectively, the "<u>Taxing Authorities</u>"). The Debtor's Payroll Taxes, including both the Employee and the employer portion, for a typical payroll total approximately $21,000. In the event that funds have been deducted from Employee wages but have not yet been forwarded to the appropriate third-party recipients, the Debtor seeks authority to pay and/or remit to the applicable Taxing Authorities any such Payroll Taxes

---

[6] Very few, if any, Employees participate in the health saving account program.

attributable to the period before the Petition Date. Absent such authority, the Debtor exposes its officers and directors to personal liability, which could be highly disruptive to the Debtor's efforts in chapter 11.

Employees' Reimbursable Business Expenses

98.     Prior to the Petition Date and in the ordinary course of business, the Debtor reimbursed Employees for certain business expenses incurred in the scope of its employment, including, without limitation, expenses for business travel, such as for mileage, meals, airfare, lodging and parking (collectively, the "Reimbursable Expenses"). All of the Reimbursable Expenses were incurred on the Debtor's behalf in connection with employment by the Debtor and in reliance upon the understanding that such expenses would be reimbursed.

99.     Prior to the Petition Date, Reimbursement Expenses were paid through either (i) a corporate card from Bank of America, or (ii) reimbursement to Employees upon submission of receipts. The Debtor also utilized pre-paid cards (of approximately $1,000 in the aggregate) for Employees to use for business expenses.

100.     As of the Petition Date, the Debtor does not believe that there are any outstanding Reimbursable Expenses owed, however, there may be reimbursement checks sent to Employees that have not yet been cashed. Accordingly, the Debtor seeks authority to honor the Debtor's Reimbursable Expense obligations by paying, in the ordinary course, any prepetition Reimbursable Expenses, and allowing the Banks to continue to honor such reimbursement checks postpetition.

Employee Benefits

101.     In the ordinary course of the Debtor's business, and as is customary for most companies, the Debtor provides its Employees with various benefits as described herein

36

(collectively, the "Employee Benefits Programs"). The Debtor seeks authority to pay and/or honor its unpaid Prepetition Employee Obligations under the Employee Benefits Programs that arose from services rendered within 180 days before the Petition Date (the "Prepetition Benefits"). The Employee Benefits Programs and corresponding unpaid Prepetition Benefits are described below:

Health Insurance (Medical, Prescription, Dental, and Vision)

102.     The Debtor provides its Full Time Employees with the option to purchase medical and prescription insurance through United Healthcare. A portion of the premiums are paid by the Employees which are deducted from their paychecks. Dental and vision insurance is provided through Metlife at no cost to the Full Time Employees. SQLC (as defined in the First Day Declaration) procures the insurance policies for the Debtor and its affiliates (at a discounted rate) and the Debtor pays its allocated portion of the premiums. The total medical/prescription, dental and vision premiums payable by the Debtor is approximately $60,000 per month on average.

103.     The Debtor seeks authority to pay, in the ordinary course of business, any unpaid premiums, deductibles, and prepetition claims relating to the foregoing medical, dental, and vision insurance that arose from services rendered within 180 days prior to the Petition Date (the "Prepetition Health Benefits").

104.     The Debtor, through Aureon, maintains an account with Discovery Benefits to provide health insurance benefits under the Consolidated Omnibus Budget Reconciliation Act ("COBRA") to employees who have been terminated. As of the Petition Date, there is only one former employee who participates in COBRA insurance. The Debtor does not pay for the COBRA insurance for these former employees; rather, such costs are paid by the former

37

employees. The Debtor does not owe any administrative fees to Discovery Benefits. The Debtor seeks authority to continue the COBRA insurance program.

Life, AD&D, Accident and Critical Illness, and Disability Insurance
("Life and Disability Benefits")

105.    Basic life insurance, accidental death and dismemberment insurance ("AD&D"), and long term disability insurance coverage is available at no cost to the Full Time Employees. Full Time Employees may also purchase (i) additional life insurance (including LifeTime Benefit Term Life Insurance), AD&D insurance, and voluntary short-term or long-term disability insurance through Dearborn National and (ii) accident insurance and critical illness insurance through Unum.

106.    As with the health insurance, SQLC procures these policies for the Debtor and its affiliates (at a discounted rate) and the Debtor pays its allocated portion of the premiums. A portion of these premiums is paid by the Employee and the Debtor pays its portion of the premiums of approximately $3,700 in the aggregate to SQLC.

107.    The Debtor seeks authority to pay, in the ordinary course of business, any outstanding unpaid premiums and deductibles relating to Life and Disability Benefits that arose before the Petition Date.

401(k) Plan

108.    The Debtor offers eligible Employees an opportunity to participate in a 401(k) plan administered by Slavic Integrated Administration Inc. The Debtor matches 25% of the employee contributions up to 6% of such employee's annual compensation. Currently, 62 active Employees participate in the 401(k) plan.

109.    As of the Petition Date, the Debtor has funded its participating Employees' contributions for prepetition pay periods. As described below, the Debtor deducts these

38

amounts from paychecks of the Employees. The Debtor's monthly contributions total approximately $2,000. The Debtor seeks authority to continue to maintain the 401(k) plan and pay any accrued but unpaid matching contributions and any fees and costs associated with the 401(k) plan.

PTO Policy

110.    All Full Time Employees are eligible for paid time off ("PTO"), which can be used for, but not limited to, vacation, holidays, sick time, bereavement leave, personal leave and jury duty. PTO is accrued based on years of employment:

| Years of Employment | PTO |
| --- | --- |
| 0-4 Years | 22 accrued days per year |
| 5-9 Years | 27 accrued days per year |
| 10 Years and Over | 32 accrued days per year |

111.    Full Time Employees may carry over up to 40 hours of PTO. As of the Petition Date, there are approximately 6,300 of hours of accrued and unused PTO by the Debtor's Full Time Employees. The Debtor estimates that the accrued, outstanding amount of unused time under the PTO Policy, if it were payable in cash, is approximately $124,000 as of the Petition Date. The Debtor makes cash payments for unused PTO on the Employee's anniversary date— 75% of accrued and unused PTO is paid in cash if such Employee carries over a minimum of 20 hours. For Full Time Employees who resign, 100% cash payment of accrued and unused PTO is paid only if such Employee provides the requisite notice for resignation.

112.    The Debtor seeks authorization, in its sole discretion, for the Debtor to continue honoring the PTO Policy and to continue its practice of making cash payments for unused PTO that has accrued prepetition.

*De Minimus* Employee Benefits

113.    The Debtor also provide other employee benefits that are *de minimus* (the "*De Minimus* Employee Benefits*") such as a stipend for cell phones (typically between $50-$100) and bonus cards (typically $50) for Employees who voluntarily take on additional shifts. The Debtor pays approximately $1,100 per month on these *De Minimus* Employee Benefits which boost morale and encourage teamwork. The Debtor seeks authorization (i) to pay any prepetition amounts owed in connection with these *De Minimus* Employee Benefits, and (ii) to continue such benefits postpetition consistent with prepetition practice.

**H.    Tax Motion**

114.    Pursuant to the Tax Motion the Debtor seeks entry of interim and final orders (i) authorizing the Debtor to pay, in its sole discretion, any sales, real property, licensing and other similar taxes subsequently determined to be owed, (collectively, the "Taxes") that accrued or that arose before the Petition Date that will become due during the pendency of this Chapter 11 Case to the Taxing Authorities (as defined in the Tax Motion) in the ordinary course of business, without prejudice to the Debtor's rights to contest the amounts and/or priority of any Taxes on any grounds they deem appropriate, and (ii) granting certain related relief.

115.    The Debtor is exempt from federal and state income taxation. However, the Debtor, in the ordinary course of its businesses, does incur various other tax liabilities, including sales taxes, real property taxes, licensing and permit fees (collectively, "Taxes"). In the ordinary course of Debtor's business, it pays Taxes to federal, state and local taxing, licensing, regulatory, and other governmental or quasi-governmental authorities (collectively, the "Taxing Authorities"). The Debtor's books and records reflect that it is current on the payment of all of their Taxes. However, the Taxing Authorities will continue to invoice the Debtor for Taxes

relating to periods prior to the Petition Date following the commencement of this Chapter 11 Case.

116. As of the Petition Date, there is approximately $1,000 in prepetition Taxes that will become due and payable within the first twenty-one (21) days of this Chapter 11 Case, which the Debtor seeks to pay pursuant to the Proposed Interim Order with any other remaining prepetition Taxes pursuant to the Proposed Final Order (the bulk of which will be the real property taxes as described below).

117. The Debtor is subject to the following Taxes:

    a. **Sales Taxes**. In the ordinary course of business, the Debtor collects sales taxes ("Sales Taxes") from the (i) sale of food and beverages to customers (usually visiting families of residents) sold on the premises (ii) occupancy of guest rooms on the premises by the residents' visitors. The Debtor typically pays Sales Taxes to the applicable Taxing Authorities on a monthly basis which average approximately $1,000 per month. The Debtor estimates that approximately $1,000 in prepetition Sales Taxes will become due and payable following the Petition Date for prepetition amounts owed.

    b. **Property Taxes**. Because of the Debtor's status as a tax exempt 501(c)(3) charitable organization, the Debtor and the City of Carmel have entered into a "Payment in Lieu of Taxes" agreement (the "PILOT Agreement") whereby the Debtor is obligated to pay adjusted real estate taxes but in an amount no less than $350,000 per year. This amount has historically been paid twice a year (March and December). The Debtor expects to receive the next real property tax statement of approximately $175,000 on or about May 1, 2019, which will cover the first half of 2019. The Debtor will have 30-days to make such payment. The Debtor also reports business tangible personal property taxes but no amount is due and owning for personal taxes. The Debtor seeks authorization to pay the Property Taxes required by the PILOT Agreement upon receipt of the real property tax statement pursuant to the Proposed Final Order on the Tax Motion.

    c. **Licensing Fees and Other Taxes**. Due to the nature of the Debtor's business, the Debtor incurs licensing and permit fees to various government and regulatory agencies which are *de minimus* in amount. The Debtor does not believe that any such fees are due

but, out of an abundance of caution, seek to pay such fees if due within the first twenty-one (21) days of the Petition Date and thereafter as necessary in the ordinary course of business.

d. **State and Local Taxes**. The Debtor may be subject to additional taxes and fees in the state and county in which it operates ("State and Local Taxes"). The Debtor does not believe that any such fees are due but, out of an abundance of caution, seek to pay such fees if due within the first twenty-one (21) days of the Petition Date and thereafter as necessary in the ordinary course of business.

e. **Provider Fees**. Every five (5) years, the Debtor pays a re-validation fee (the "Provider Fees") calculated by the number of Medicare certified beds at its facility. The last payment was made in October 2018 (so the next payment is not anticipated to be due until October 2023), but out of an abundance of caution, to the extent the Debtor discovers any unexpected Provider Fees that must be paid postpetition, the Debtor seeks authority to do so.

118. The continued payment of the prepetition Taxes on their normal due dates will ultimately preserve the resources of the Debtor's estate. If such obligations are not timely paid, the Debtor will be required to expend time and money to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws, including (a) whether the obligations are priority, secured, or unsecured in nature, (b) whether they are proratable or fully prepetition or postpetition, and (c) whether penalties, interest, attorneys' fees, and costs can continue to accrue on a postpetition basis, and if so, whether such penalties, interest, attorneys' fees, and costs are priority, secured, or unsecured in nature. The Debtor's desire to avoid unnecessary disputes with the Taxing Authorities — and expenditures of time and money resulting from such disputes — over a myriad of issues that are typically raised by such entities as they attempt to enforce their rights to collect taxes.

119. The Debtor may suffer immediate and irreparable harm if the prepetition Taxes are not paid when they become due and payable. If the Debtor does not pay such amounts in a timely manner, the Taxing Authorities may attempt to revoke the Debtor's licenses, suspend the

Debtor's operations, impose fees and penalties, or pursue other remedies that will harm the estate. In all cases, the Debtor's failure to pay Taxes could have a material adverse impact on their ability to operate in the ordinary course of business. Any disputes that could impact their ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtor's operations as a whole.

120. Moreover, certain of the Taxes may not be property of the estate, as they are collected from third parties and held in trust for payment to various Taxing Authorities. The jurisdiction in which the Debtor operates have laws providing that the Debtor's officers, directors, or other responsible employees could, under certain circumstances, be held personally liable for the nonpayment of such Taxes. To the extent any accrued Taxes of the Debtor was unpaid as of the Petition Date in these jurisdictions, the Debtor's officers and directors could be subject to lawsuits during the pendency of this chapter 11 case. In such events, collection efforts by the Taxing Authorities would be extremely distracting for the Debtor and its directors and officers in their efforts to bring this Chapter 11 Case to an expeditious conclusion.

121. Accordingly, on behalf of the Debtor, I respectfully submit that the Tax Motion should be approved.

I.     **Utilities Motion**

122. Pursuant to the Utilities Motion, the Debtor requests entry of interim and final orders (i) prohibiting the Debtor's Utility Providers from altering, refusing, or discontinuing service, (ii) deeming the Debtor's utility providers adequately assured of future performance, and (iii) establishing procedures for determining requests for additional adequate assurance by the Debtor's Utility Providers, and (iv) granting related relief.

43

123. To operate its business, the Debtor obtains various utility services, including, but not limited to, electricity, gas, water, sewer, telephone, other telecommunications services such as cable, and other similar type services (each, a "Utility Service" and collectively the "Utility Services") from approximately seven (7) utility providers (each, a "Utility Provider" and collectively, the "Utility Providers"). A list identifying the Utility Providers with relevant accounts for these companies (the "Utility Services List") is attached to the Utilities Motion as **Exhibit C**.

124. Prior to the Petition Date, the Debtor spent an average of approximately $50,000 each month on account of Utility Services. The Debtor's average monthly utility payments to each Utility Provider based on a three-month average is set forth on the Utility Services List.

125. Continued and uninterrupted Utility Services are vital to the Debtor's ability to sustain its operations during this Chapter 11 Case. Should any Utility Provider alter, refuse, or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted which would directly impact the elderly residents living in its facilities. Pursuant to the standard life care contracts with the Debtor's residents, certain utilities are included in the monthly fees paid by the residents and the Debtor, in turn, Debtor pays the Utility Provider for the Utility Services. For these reasons, the Debtor must ensure the continued provision of Utility Services.

126. The Debtor intends to pay all post-petition obligations owed to the Utility Providers in a timely manner. Nevertheless, to provide additional assurance of payment for future services to the Utility Providers, and in accordance with section 366(c)(2) of the Bankruptcy Code, the Debtor proposes to provide "assurance of payment" to the Utility Providers within thirty (30) days after the Petition Date by placing a cash deposit of $24,775 (the

44

"Deposit") into a segregated account (the "Utility Deposit Account") for the benefit of the Utility Providers. The amount of the Deposit equals approximately one-half of the Debtor's three-month average monthly cost of Utility Services (unless any Utility Provider agrees in writing to a lesser amount, is paid in advance for Utility Services, or already holds a deposit for the Utility Services—in which case, the deposit on account of such Utility Service would be reduced by the amount of the deposit or prepayment).

127. In addition, the Debtor requests approval of certain adequate assurance procedures as set forth in the Utilities Motion that balance the protections afforded the Utility Providers under Section 366 of the Bankruptcy Code and the Debtor's need for continuous and uninterrupted Utility Services.

128. The continued services provided by the Utility Providers are necessary to preserve the value of the Debtor's business and essential for the Debtor's ability to care for its residents. The relief requested in the Utilities Motion allows the Debtor to preserve the protections that the Utility Providers have under the Bankruptcy Code, while affording the Debtor an opportunity to provide and negotiate adequate protection without facing the threat of imminent termination of Utility Services. In particular, the Debtor requests approval of certain procedures that balance the protections afforded the Utility Providers under the Bankruptcy Code and the Debtor's need for continuous and uninterrupted Utility Services.

129. Accordingly, on behalf of the Debtor, I respectfully submit that the Utilities Motion should be approved.

**J.     Insurance Motion**

130. Pursuant to the Insurance Motion, the Debtor requests entry of interim and final orders authorizing the Debtor to (a) maintain existing Insurance Policies and pay all obligations

arising therefrom (collectively, the "Insurance Obligations"), including Premium Financing Payments, and (b) renew, revise, extend, supplement, change, or enter into new insurance policies as needed in its business judgment, and (c) granting certain related relief.

131.    In the ordinary course of business, the Debtor maintains various insurance programs (each, an "Insurance Program") in accordance with its respective insurance policies (collectively, the "Insurance Policies," and each, an "Insurance Policy") through several third party insurance carriers (collectively, the "Insurance Carriers"), including auto insurance, cyber insurance, property insurance, general liability insurance ("GL Policy"), directors and officers liability insurance ("D&O Policy"), and workers compensation insurance ("Workers Comp Policy").    The Debtor's parent, Senior Quality Lifestyles Corporation ("SQLC") procures the Insurance Policies for the Debtor (and other continuing care retirement communities it owns, which allows for a discounted premium).    SQLC pays the insurance premiums (or arranges for premium financing as the case may be) to the Insurance Carriers and the Debtor reimburses SQLC for the amount allocated to its community.

132.    A schedule of the Insurance Policies is attached to the Insurance Motion as **Exhibit C**.  Continuation of the Insurance Policies is essential to the preservation of the value of the Debtor's business, property, and assets.  Moreover, in many cases, the coverage provided by the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtor's business operations.

133.    The premiums for certain Insurance Policies are financed through premium financing arrangements as reflected on Exhibit C (such payments, the "Premium Financing Payments").    The Premium Financing Payment under the Workers Comp Policy is approximately $5,500 per month which is due on the first of each month from February 1, 2019

46

through August 1, 2019. The Premium Financing Payment under the GL Policy is approximately $11,000 every quarter with the next payments due on April 1, 2019, July 1, 2019, and October 1, 2019. Certain other Insurance Policies are also financed by SQLC with monthly payments allocated to the Debtor which are generally paid monthly as indicated on Exhibit C to the Insurance Motion.

134. The remainder of the Debtor's Insurance Policies were recently renewed in late 2018, some of which premiums have been fully paid. Accordingly, the Debtor believes that the only payments related to the Insurance Policies will be the Premium Financing Payments. However, out of an abundance of caution, the Debtor seeks authority to pay any other Insurance Obligations that may arise to avoid any disruption or adverse impact to its estate as a result of non-payment.

135. The Insurance Policies are essential to preserve the value of the Debtor's business, properties, and assets and are required by various regulations and laws that govern the Debtor's business operations. Furthermore, I understanding that the Debtor is required to maintain insurance coverage throughout its Chapter 11 Case pursuant to the UST Guidelines.

136. The Debtor has a strong business purpose for paying the Insurance Obligations (including the Premium Financing Payments). Failure to pay amounts related to the Insurance Policies as they come due may harm the Debtor's estate in several ways. Specifically, there is the potential for an insurance company to terminate coverage. Such termination would (i) bring the Debtor out of compliance with the UST Guidelines as well as any regulatory requirements of maintaining insurance, (ii) place additional strains on the Debtor's relationships with employees and residents who benefit from the Debtor's insurance coverage, and (iii) eviscerate the Debtor's ability to prevent loss in value caused by casualty, natural disaster, or another unforeseen event.

137.    Accordingly, on behalf of the Debtor, I respectfully submit that the Insurance Motion should be approved.

### K.    Cash Collateral Motion

138.    Pursuant to the Cash Collateral Motion, the Debtor requests entry of an order authorizing the Debtor to use cash against which it believes will assert a security interest.

139.    There are no agreements with Bank of America, Commerce Bank, or Old National Bank and the Trustee that allow the Trustee to direct the disposition of funds in those accounts, and the Trustee is not a customer of any of these banks with respect to the Operating Account, Entrance Fee Escrow Account, Investment Account, and Resident Trust Account.

140.    All of the Debtor's bank accounts are held at banks other than UMB. The Debtor has an emergency need for the immediate use of the Cash to, among other things, maintain ongoing day-to-day operations, fund its working capital needs, and satisfy its payroll obligations. Absent the use of the Cash, the Debtor will be forced to cease operations of its business, thereby putting in jeopardy the care, health and safety of its residents.  Such an abrupt cessation of the Debtor's business would have devastating effects on its elderly residents. This harm can be prevented only by allowing the Debtor to continue funding operations with the Cash.    In addition, absent the use of the Cash, the Debtor cannot fund payroll for its employees or satisfy other routine payable obligations.  Further, an inability to use such Cash would result in an immediate loss of value if the Debtor were forced to implement an emergency liquidation.

141.    Accordingly, on behalf of the Debtor, and the reasons set out more fully in the Cash Collateral Motion, I respectfully submit that this Motion should be approved.

48

## <u>CONCLUSION</u>

For all the foregoing reasons, I respectfully request that the Court grant the relief requested in the First Day Pleadings and such other and further relief as is appropriate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 31st day of January, 2019.

*/s/ Louis E. Robichaux IV*
Louis E. Robichaux IV
Chief Restructuring Officer