## <u>EXHIBIT B</u>

**Settlement Term Sheet**

**Mayflower Communities, Inc. (Case No. 19-30283)**
**Proposed Term Sheet**

This Term Sheet dated March 12, 2019 (the "Term Sheet"), sets forth certain terms and conditions relating to a proposed agreement of certain matters at issue in the chapter 11 bankruptcy case (Case No. 19-30283) (the "Bankruptcy Case") of Mayflower Communities, Inc. (the "Debtor"), pending in the United States Bankruptcy Court for the Northern District of Texas (the "Court").

This Term Sheet is expressly subject to the negotiation and execution of definitive documentation, including the approval of the Debtor and UMB Bank, N.A., in its capacity as successor master trustee and successor bond trustee (the "Bond Trustee"), and approval of the Court. Except as otherwise provided herein, all capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the *Declaration of Louis E. Robichaux IV in Support of Chapter 11 Petition and First Day Pleadings* [Docket No. 18] (the "Robichaux Declaration").

This Term Sheet is being circulated for discussion purposes only relating to a potential resolution of certain disputes between the Debtor and the Bond Trustee, and to place the Bankruptcy Case on a consensual path that will allow for the sale of substantially all of the Debtor's assets.

| Overview | The Debtor and the Bond Trustee propose to enter into a settlement agreement (the "Settlement Agreement"), pursuant to which they will resolve multiple disputes between the Debtor and the Bond Trustee and provide for a path towards resolution of the Bankruptcy Case. The Settlement Agreement will include submitting as exhibits: (i) a consensual final order for the Debtor's use of cash collateral during the pendency of the Bankruptcy Case (the "Final Cash Collateral Order"), including recognition of the liens asserted by the Bond Trustee, (ii) an agreed-upon budget (the "Cash Collateral Budget"), and (iii) consensual bidding procedures (the "Bidding Procedures") for the sale of the Debtor's Facility and related assets. |
|---|---|
| | The Bidding Procedures will require, among other things, that any bidder seeking to acquire the Debtor's assets by participating in the sale process assume (i) all of the Continuing Care Contracts with the residents living at the Facility on or after the Petition Date; and (ii) all past, present and future obligations to former and current residents. |
| | The Final Cash Collateral Order and the Bidding Procedures will each reference an agreed-upon timeline for the sale of the Debtor's Facility and related assets consisting of the following (the "Sale Timeline"): |

1

| | |
|---|---|
| | ➢ **March 8, 2019** – Deadline for the Debtor to distribute a Confidential Information Memorandum ("<u>CIM</u>"), which CIM shall be subject to review and approval by the Bond Trustee and consultation by the Official Residents' Committee (the "<u>Committee</u>") prior to such distribution; |
| | ➢ **April 26, 2019** – Deadline for submission of initial LOIs, which LOIs shall be provided to the Bond Trustee and the Committee within twenty-four (24) hours of receipt by the Debtor or its agents; |
| | ➢ **June 6, 2019** – Deadline for Debtor to execute a definitive agreement with Stalking Horse Bidder (as defined in the Bid Procedures), which (i) selection shall be upon approval of the Bond Trustee, which shall not be unreasonably withheld, and upon consultation of the Committee; and (ii) documentation shall be subject to review and approval by the Bond Trustee and consultation by the Committee; |
| | ➢ **July 19, 2019** – Deadline for auction; |
| | ➢ **August 8, 2019** – Target date for confirmation hearing; |
| | ➢ **August 23, 2019** – Target date for closing of sale. |
| | In addition, the Debtor agrees (i) not to pursue any challenge to the Bond Trustee's security interests in the Debtor's assets, including the challenges raised in the Debtor's motion to use cash [Dkt. 17 in the Bankruptcy Case], which includes a challenge to the Bond Trustee's security interest in cash held by the Debtor (such issue to be resolved by the contemplated Final Cash Collateral Order), and (ii) to acknowledge the validity, priority and extent of the Bond Trustee's pre-petition liens in and on substantially all of the Debtor's assets. The Bond Trustee agrees to withdraw its Venue Motion (defined below). |
| **Final Cash Collateral Order**[1] | The Debtor and the Bond Trustee shall agree to the terms of a Final Cash Collateral Order in a form that is substantially similar to the one attached hereto as <u>**Exhibit A**</u>, which includes the following: |
| | ➢ Authorization for the Debtor to use Cash Collateral (which includes all cash held in the Debtor's operating account at Bank of America), subject to the terms of the Cash Collateral |

---

[1] Capitalized terms used in this section that are not otherwise defined have the meanings given to them in the Final Cash Collateral Order attached as Exhibit A. The summary set forth in the term sheet does not include all terms set forth in the Final Cash Collateral Order attached as Exhibit A.

Budget (subject to certain variances);

➢ Findings that the Trustee-Held Funds are held in trust for the holders of the Bonds, that the Bond Trustee holds a validly perfected possessory security interest in the Trustee-Held Funds and that the Bond Trustee is granted, to the extent necessary, relief from the automatic stay with respect to the Trustee-Held Funds;

➢ As adequate protection, to the extent of Diminution, the Bond Trustee is granted (subject to certain exceptions): (i) a first priority lien in all of the Debtor's assets; and (ii) a Superpriority Claim pursuant to section 507(b) of the Bankruptcy Code;

➢ The Bond Claim of the Bond Trustee shall be an allowed claim for all purposes under the Bankruptcy Case;

➢ The express acknowledgement that the Bond Trustee has a first priority lien on the Collateral, which shall not be subject to challenge as to validity, extent or priority, and which lien encumbers substantially all of the Debtor's assets;

➢ The Debtor and its professionals shall be available once each week (subject to reasonable scheduling conflicts) for a telephonic conference call with the Bond Trustee and its representatives to discuss the status of the sale process (including the Sale Timeline), the results of operations, and other matters pertaining to the Facility and the Bankruptcy Case;

➢ The Bond Trustee may terminate the Debtor's authority to use Cash Collateral by providing notice to the Debtor upon the occurrence of specified events of default, including expenditures inconsistent with the terms of the Cash Collateral Budget (taking into account certain variances), and failure to adhere to the Sale Timeline;

➢ The Debtor waives all claims on behalf of itself and the Estate against the Bond Trustee and the Bondholders, and releases the Bond Trustee, all Bondholders and certain related parties from all claims related to the Bonds and the Bond Documents; and

➢ Waiver of claims under Section 506(c) and Section 552(b), in partial consideration of an agreed upon Carve Out that includes certain unpaid professional fee claims and the

| | statutory fees of the United States Trustee and fees of the Clerk of the Court. |
|---|---|
| **Cash Collateral Budget** | The Cash Collateral Budget shall be in a form substantially similar to the one attached hereto as **Exhibit B**. The Debtor shall make payments in accordance with the Cash Collateral Budget. In addition to the Cash Collateral Budget, the Debtor will submit to the Bond Trustee after the selection of a Stalking Horse Bidder (as defined in the Bid Procedures) or such other time after June 6, 2019, an appropriate wind down budget sufficient to pay mandatory plan obligations and perform post-closing and confirmation obligations that are essential for a plan process at which time the parties will discuss a wind down strategy for this Bankruptcy Case.<br><br>The Final Cash Collateral Order shall include the following provision:<br><br>"the payment of any expense that would cause aggregate actual expenditures on a cumulative basis in the Cash Collateral Budget measured during any consecutive four week period to exceed one hundred ten percent (110%) of the total budgeted expenses in the Cash Collateral Budget for such measuring period, <u>provided</u> <u>however</u>, professional fees (including all fees identified under the heading "Restructuring Disbursements" in the Cash Collateral Budget with the exception of U.S. Trustee fees) and any fees of Seniority, Inc.[1] shall not be subject to any such variance. This foregoing variances shall be measured on a bi-weekly basis. Any budgeted expenditures not paid in a particular budget period may be paid during a subsequent period and, for the purpose of calculating the variances set forth above, the Cash Collateral Budget will be revised to move such expenditures to the later period;"<br><br>The modification of the Seniority management fee shall be considered a settlement of all claims that Seniority and the Debtor's Estate may have against each other and shall be considered in full satisfaction of all such claims, including all rejection damages and prepetition claims. |

---

[1] The parties have agreed that the management fee shall be calculated at an agreed-to fee of 3.75 percent of revenues (which shall be accounted for by a true-up in subsequent budget periods if actual revenues are greater than or less than what is set forth in the Cash Collateral Budget) and subject to further proforma adjustment for entrance fee receipts and obligations that would be paid in the normal course outside of the current bankruptcy process which requires that entrance fee receipts be placed in escrow and entrance fee obligations be accrued as an administrative expense.

| | |
|---|---|
| **Bidding Procedures** | The Debtor and Bond Trustee shall agree to the terms of the Bidding Procedures in a substantially similar form as the summary attached hereto as **Exhibit C**. |
| **Motion to Transfer Venue** | Effective upon approval of the Final Cash Collateral Order and approval of the Bidding Procedures (following the expiration of all appeals periods), the Bond Trustee agrees to withdraw its motion to transfer venue to the Southern District of Indiana [Dkt. Nos 52, 53 and 62] (the "<u>Venue Motion</u>"). |
| **Process** | The parties agree to file a motion (the "<u>Rule 9019 Motion</u>") with the Court on or before March 7, 2019 seeking approval of the terms of the Settlement Agreement. If for any reason the parties do not file the Rule 9019 Motion by such date, they will use the March 8, 2019 hearing date as a status conference to inform the Court as to the status of the Settlement Agreement.<br><br>The parties will request the Court conduct a hearing on the Rule 9019 Motion on regular notice on April 5, 2019, or as soon thereafter as the Court can accommodate (the "<u>Hearing</u>"). At such Hearing, the parties will also ask the Court to approve the Final Cash Collateral Order and the Bidding Procedures. The parties will jointly request a continuance of the hearing on the Venue Motion pending the Court's approval of the Settlement Agreement. Upon approval (subject to any appeals period) of the Settlement Agreement, entry of the Final Cash Collateral Order and approval of the Bidding Procedures in the form agreed to under the Settlement Agreement, the Bond Trustee will withdraw the Venue Motion.<br><br>The Bond Trustee and the Debtor will agree to the Debtor's further use of cash until the Hearing in accordance with an interim cash collateral order that is substantially similar to the current interim cash collateral order. |
| **Disclosure Statement and Plan** | On or around June 1, 2019, the Debtor shall file a Plan of Liquidation (the "<u>Plan</u>") and related Disclosure Statement. The Plan shall provide for the creation of a liquidating trust to administer, liquidate and distribute the Debtor's assets remaining after the sale. It is anticipated that the Plan and confirmation order will contain ordinary and customary provisions for liquidating plans including, if appropriate, the exculpation and release of the Debtor, the Debtor's professionals, the Debtor's board of directors, the Bond Trustee, the Bond Trustee's professionals, the Committee and the Committee's professionals.<br><br>In the event a bidder submits an offer that provides for the assumption of (i) all or some of the Debtor's bond obligations; (ii) all of the |

| | Continuing Care Contracts with the residents living at the Facility on or after the Petition Date; and (iii) all past, present and future obligations to former and current residents, the Debtor, Bond Trustee and Committee will meet and confer regarding the terms of a proposed plan to effectuate such a transaction. |
|---|---|

[*Signature Page Follows*]

**DLA PIPER LLP (US)**

By: _/s/ Thomas R. Califano_
Thomas R. Califano, Esq. NY Bar No. 2286144
(admitted *pro hac vice*)
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Tel: (212) 335-4500
Fax: (212) 335-4501
E-mail: thomas.califano@dlapiper.com

- and -

Rachel Nanes, Esq. (admitted *pro hac vice*)
DLA Piper LLP (US)
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131
Tel: (305) 423-8563
Fax: (305) 675-8206
E-mail: rachel.nanes@dlapiper.com

**PROPOSED COUNSEL FOR THE DEBTOR**

**MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO, P.C.**

By: _/s/ Daniel Bleck_
Daniel Bleck, Esq. (#560328) (admitted *pro hac vice*)
Charles W. Azano, Esq. (#655775) (admitted *pro hac vice*)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO, P.C.
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 542-6000
Facsimile: (617) 542-2241
E-mail: dbleck@mintz.com
cwazano@mintz.com

- and -

Joseph R. Dunn, Esq. (#238069) (admitted *pro hac vice*)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO, P.C.
3580 Carmel Mountain Road
San Diego, CA 92130
Telephone: (858) 314-1500
Facsimile: (858) 314-1501
Email: jrdunn@mintz.com

**ATTORNEYS FOR UMB BANK, N.A., AS
TRUSTEE**

**<u>EXHIBIT A</u>**

**CASH COLLATERAL ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

In re:

MAYFLOWER COMMUNITIES, INC.,[1]

    Debtor.

§
§
§
§
§
§
§
§

Case No. 19-30283-hdh11

Chapter 11

**FINAL ORDER (1) AUTHORIZING THE DEBTOR TO USE THE CASH
COLLATERAL OF UMB BANK, N.A., AS BOND TRUSTEE; (2) PROVIDING
UMB BANK, N.A., AS BOND TRUSTEE, ADEQUATE PROTECTION;
AND (3) MODIFYING THE AUTOMATIC STAY**

This Final Order (1) Authorizing the Debtor to Use the Cash Collateral of UMB Bank,

N.A., as Bond Trustee; (2) Providing UMB Bank, N.A., as Bond Trustee, Adequate Protection;

and (3) Modifying the Automatic Stay (this "Final Order") is entered upon the motion (the

"Motion") of the above-captioned debtor (the "Debtor" or "Borrower") for the entry of an order

authorizing the Debtor to use certain cash in which UMB Bank, N.A., in its capacity as Bond

---

[1]      The last four digits of the Debtor's federal tax identification number are 6350.

Trustee (the "Bond Trustee"), asserts a security interest, and upon the terms agreed to by the Debtor and the Bond Trustee.

Upon the terms of the Motion, the stipulations, acknowledgements, statements and arguments of the Debtor and the Bond Trustee, including by their respective counsel at the interim and final hearings on the Motion, and based further on the record of these proceedings, the Court makes the following findings of fact and rulings of law:

**The Debtor's Chapter 11 Case; Procedural Background; Jurisdiction; Notice**

A.     On January 30, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and thereby commenced a case thereunder (the "Chapter 11 Case").  The Debtor is operating its business and managing its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner.  On February 11, 2019, the United States Trustee appointed the Official Residents' Committee (the "Residents' Committee").

B.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

C.     This Court held a hearing to consider granting the relief requested in the Motion on an interim basis on February 1, 2019, at which the Debtor and the Bond Trustee indicated to the Court that they had reached agreement on the terms of a consensual order that would allow the Debtor to use cash for an approximately two week period, which order was entered by the Court on February 7, 2019 (as such order was subsequently amended, the "Interim Order") [Docket No. 64].

D.     Following a hearing on February 19, 2019, the Debtor and the Bond Trustee agreed upon an extension of the Interim Order that allowed use of cash through March 8, 2019,

2

which agreement was set forth in a consensual amendment to the Interim Order approved by the Court on February 21, 2019 [Docket No. 101].

E.      Following a hearing on March 8, 2019, the Debtor and the Bond Trustee agreed upon an extension of the Interim Order that allowed use of cash through [April 5, 2019], which agreement was set forth in a consensual amendment to the Interim Order approved by the Court on [_____], 2019 [Docket No. ___].

F.      This Court held a hearing to consider the Motion on a final basis on [April 5, 2019] (the "Final Hearing").

G.      The Debtor has properly served notice of the Motion and the interim and final hearings thereon pursuant to sections 102, 361, 362 and 363 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 2002 and 4001, and the Local Bankruptcy Rules of this Court (the "Local Rules"), as applicable, as described more fully in Paragraph 3 hereof.

**The Secured Bond Obligations**

H.      On August 1, 2012, the City of Carmel, Indiana (the "Issuer") issued the bonds (the "Bonds") in the original principal amount of $112,020,000 pursuant to the Bond Trust Indenture dated as of August 1, 2012 (the "Bond Indenture") between the Issuer and The Bank of New York Mellon Trust Company, N.A., as predecessor to the Bond Trustee. The proceeds of the Bonds were loaned to the Borrower by the Issuer pursuant to a Loan Agreement dated August 1, 2012 (the "Loan Agreement") between the Issuer and the Borrower, and used by the Borrower to acquire, develop, market, equip, furnish and construct a continuing care retirement community known as "The Barrington of Carmel" (the "Facility").

I.      The Borrower's obligation to repay the amounts borrowed is evidenced by, among other things, a Direct Note Obligation, Series 2012A in the amount of $94,575,000 (the "Series 2012A Note") issued under the Master Trust Indenture between the Borrower and The

Bank of New York Mellon Trust Company, N.A., as predecessor to the Bond Trustee, dated as of August 1, 2012 (the "Master Indenture").

J.      The Bond Trustee has the right to enforce the Borrower's obligation to pay the amounts borrowed from the Issuer, pursuant to its rights under the Master Indenture, and by the fact that the Issuer's rights under the Loan Agreement (and its rights under the other Bond Documents) were assigned to the Bond Trustee pursuant to the granting clauses of the Bond Indenture.

K.      The Bond Trustee has a security interest, lien and mortgage on substantially all of the Borrower's assets.  Specifically, pursuant to a Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated August 1, 2012, between the Borrower and The Bank of New York Mellon Trust Company, N.A., as predecessor to the Bond Trustee (the "Mortgage"), the Bond Trustee has (i) a first mortgage lien on the Facility and the land on which the Facility is located, subject only to Permitted Encumbrances (as defined in the Master Indenture), and (ii) a security interest in the various personal property and fixtures located at the Facility (subject only to Permitted Encumbrances).  In addition, pursuant to the Master Indenture, the Borrower granted to the Bond Trustee a security interest in its Gross Revenues (as defined in the Master Indenture), which consist of substantially all of the revenues, income, and other moneys received or to be received by the Borrower.  In addition, all moneys and securities held by the Bond Trustee have been pledged and assigned to the Bond Trustee as security for the payment amounts owed on account of the Bonds.  All of the collateral described in this Paragraph J is referred to as the "Prepetition Collateral".  The Bond Trustee's liens on the Prepetition Collateral are referred to herein as the "Prepetition Liens".

L.      The Bond Indenture, the Master Indenture, the Loan Agreement, the Series 2012A Note, the Mortgage and any other documents executed in connection with such documents or the

4

Bonds are referred to herein as the "Bond Documents".

M.     In addition, under the terms of the Bond Documents, certain accounts were established and are held by the Bond Trustee, including, but not limited to the following funds, each as defined in the Bond Documents: the Revenue Fund, the Interest Fund, the Bond Sinking Fund, the Optional Redemption Fund, the Debt Service Reserve Fund, the Working Capital Fund, the Operating Reserve Fund, the Liquidity Support Fund, the Supplemental Liquidity Support Fund, and the Special Project Liquidity Support Fund (collectively, the "Trustee-Held Funds"). As of the Petition Date, the Trustee-Held Funds totaled approximately $8.071 million.

N.     The Debtor has acknowledged and agrees, and the Court finds, that the Trustee-Held Funds are held in trust for the holders of the Bonds (the "Bondholders"). Further, the Debtor reaffirms its acknowledgement that the Bond Trustee holds a validly perfected possessory security interest in the Trustee-Held Funds, and is entitled to access the Trustee-Held Funds in accordance with the terms of the Bond Documents. To the extent that the automatic stay applies to such Trustee-Held Funds pursuant to section 362(a) of the Bankruptcy Code, as adequate protection for the use of the Trustee's Cash Collateral (as defined below), the Debtor stipulates to relief from such stay for the purpose of allowing the Bond Trustee to administer and apply the Trustee-Held Funds in accordance with the Bond Documents. The Trustee-Held Funds shall be administered and applied as set forth in the Bond Documents and for the express purposes set forth therein, and shall not be used or made available to Debtor as Cash Collateral or otherwise pursuant to this Final Order or any other order entered in this Chapter 11 Case.

**The Bond Claim**

O.     The Debtor stipulates that as of the Petition Date, the amounts due and owing under the Bonds and Bond Documents are not less than:

(i)     unpaid principal in the amount of $92,735,000;

(ii)    accrued but unpaid interest on the Bonds in the amount of $1,361,671.88 (the aggregate of (i) and (ii) are referred to herein as the "<u>Bond Claim</u>"), which interest continues to accrue on the Bonds at a per diem rate of $18,155.63, which interest will be added to the Bond Claim only to the extent that the value of the Prepetition Collateral exceeds the amount of the Bond Claim; and

(iii)    unliquidated, accrued and unpaid fees and expenses of the Bond Trustee and its professionals incurred through the Petition Date (the "<u>Prepetition Expense Claim</u>"). Such amounts when liquidated shall be added to the Bond Claim.

The Bond Trustee reserves any and all rights to amend the Bond Claim. Nothing herein shall be deemed to be a waiver of such rights. In the event the Bond Trustee amends the Bond Claim to increase the amount of such claim, the Debtor may challenge any amounts in excess of (i) and (ii) above.

<u>**Use of Cash Collateral and Need for Adequate Protection**</u>

P.    The Debtor has requested the use of the Bond Trustee's Cash Collateral (as defined below) in connection with the Chapter 11 Case to preserve the value of its business. Pursuant to the Bankruptcy Code, the Debtor is required to provide adequate protection to the Bond Trustee for the use of such Cash Collateral. The Bond Trustee has informed the Debtor and the Court that the Bond Trustee does not consent to the use of Cash Collateral except upon the terms and conditions of this Final Order.

Q.    Without the use of Cash Collateral, the Debtor would suffer immediate and irreparable harm and would likely be required to cease operations immediately or, at a minimum, the Debtor's inability to use Cash Collateral would disrupt the Debtor as a going concern and would otherwise not be in the best interests of the Debtor or its creditors, including the Bondholders and residents of the Debtor's Facility. In lieu of giving the Bond Trustee relief from the automatic stay or attempting to obtain this Court's approval for use of Cash Collateral (as defined below) on a non-consensual basis, the Debtor wishes to provide adequate protection of the liens and security interests of the Bond Trustee in Cash Collateral and other Prepetition

Collateral on the terms set forth in this Final Order, reflecting the agreement of the Debtor and the Bond Trustee.

R.      The Bond Trustee is willing to consent to the use of its Cash Collateral by the Debtor on the terms set forth in this Final Order, including that Cash Collateral is used solely in the amounts and categories set forth in the Cash Collateral Budget (as defined below).

S.      The terms of the proposed use of Cash Collateral, and this Final Order are fair and commercially reasonable, reflect the Debtor's prudent exercise of business judgment consistent with its fiduciary duties and constitute reasonably equivalent value and fair consideration. Good cause has been shown for the entry of this Final Order.

T.      To the extent any portion of the foregoing constitute rulings of law, they shall constitute this Court's rulings with respect to the matters so-stated.

**NOW, THEREFORE, THE COURT HEREBY ORDERS AS FOLLOWS:**

1.      <u>Disposition</u>.  The Motion is granted on a final basis, on the terms set forth in this Final Order.  The date of this Final Order shall be known as the "<u>Effective Date</u>."  Any objections to the relief sought in the Motion that have not been previously resolved or withdrawn, and all reservations of rights contained therein, are overruled on the merits.

2.      <u>Jurisdiction</u>.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334, and this matter constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).  Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.  The Debtor has operated its business and managed its property as Debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.  The Residents' Committee was appointed on February 11, 2019.

3.      <u>Notice</u>.  The Debtor has properly served notice of the Motion and the final hearing thereon pursuant to Sections 102, 361, 362, and 363 of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001, and the Local Rules, which notice was sent to, among others:

(i) counsel to the Bond Trustee; (ii) each of the Debtor's twenty largest unsecured creditors as set forth in the list filed by the Debtor in the Chapter 11 Case pursuant to Bankruptcy Rule 1007(d); (iii) counsel to the Residents' Committee; (iv) the Indiana Securities Division; (v) the Indiana Department of Health; (vi) all known holders of liens on the Debtor's assets; (vii) all applicable governmental agencies to the extent required by the Bankruptcy Rules or Local Rules; (viii) all parties that have filed a notice of appearance in this Chapter 11 Case; (ix) the United States Trustee; and (x) those who have formally appeared and requested service in these proceedings pursuant to Bankruptcy Rule 2002. This notice is appropriate in the particular circumstances and is sufficient for all purposes under the Bankruptcy Code and the applicable Bankruptcy Rules and Local Rules in respect to the relief requested.

4. <u>Good Cause</u>. Good cause has been shown for entry of this Final Order.

5. <u>Authorization to Use Cash Collateral</u>. The Debtor is authorized to use, as cash collateral (as defined in Section 363 of the Bankruptcy Code), Gross Revenues (as defined in the Master Indenture) and other cash received by the Debtor in the ordinary course of operations of its business, including all amounts currently held in the Debtor's operating account at Bank of America (collectively, the "<u>Cash Collateral</u>"), until the earlier of (i) the Debtor's ability to use Cash Collateral terminates as the result of the occurrence of a Termination Event (as set forth below) or (ii) September 16, 2019. Such use of Cash Collateral is only permitted in accordance with the terms of this Final Order. Use of Cash Collateral shall be limited solely to the categories of expenses listed in the budget attached hereto as **<u>Exhibit A</u>** (the "<u>Cash Collateral Budget</u>"). Further, such use of Cash Collateral shall be limited solely to pay expenses in the amounts and at the times listed in the Cash Collateral Budget; <u>provided</u>, <u>however</u>, that the Debtor shall have authority to use Cash Collateral in excess of, and at times different from, the amounts set forth in the Cash Collateral Budget to the extent such a variance does not constitute a

8

Termination Event described in paragraph 15(i) of this Final Order.

6. _Exclusion from Cash Collateral_. No party, other than the Debtor, may use the Cash Collateral of the Bond Trustee. The Debtor is not authorized to use and shall not use any Gross Revenues not derived in the ordinary course of the Debtor's operations. Nothing in the Interim Order, this Final Order, or in any subsequent order concerning the extension of the use of Cash Collateral, or other order of this Court entitles the Debtor to use any Trustee-Held Funds. The Trustee-Held Funds are held in trust for the Bondholders. Further, the Bond Trustee holds a validly perfected possessory security interest in the Trustee-Held Funds, and is entitled to access the Trustee-Held Funds in accordance with the terms of the Bond Documents. The Bond Trustee is granted relief from the automatic stay pursuant to Section 362 of the Bankruptcy Code for the purpose of allowing the Bond Trustee to administer and apply the Trustee-Held Funds in accordance with the Bond Documents.

7. _Prohibited Use of Cash Collateral_. Except as expressly provided in this Final Order, no Cash Collateral or proceeds thereof shall be used for the purpose of: (i) objecting to, or contesting in any manner, or raising any defense to, the validity, amount, extent, perfection, priority, or enforceability of the Bonds, the Prepetition Collateral, the Bond Claim, or any liens or security interests with respect thereto, or any other rights or interests of the Bond Trustee therein or in the Trustee-Held Funds; (ii) asserting any claims or defenses or causes of action arising out of, based upon, or related to, in whole or in part, the Bonds or the Bond Documents, against the Bond Trustee, the Bondholders in their capacity as such, or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, including with respect to payments made pursuant to the Bond Documents; (iii) paying any material amounts on account of claims arising before the Petition Date, except to the extent provided for in the Cash

9

Collateral Budget and approved by the Court; (iv) seeking to modify any of the rights granted to the Bond Trustee hereunder; or (v) seeking to bifurcate any claims of the Bond Trustee; or (vi) pursuing confirmation of a plan of reorganization or liquidation other than a plan of reorganization or liquidation consummating or following a sale of the Debtor's Facility in accordance with the process (the "Solicitation Process") outlined in the term sheet referenced in the Joint Motion of the Debtor and the Trustee for Continuation of Hearing [Docket No. 126].

8. <u>Amendment or Extension of Budget</u>. The Debtor may, at any time, propose to the Bond Trustee in writing (including by email) an amended Cash Collateral Budget, for the period covered by this Final Order. Any such proposed amendment or modification of the terms and conditions, or any amendment, modification, roll-forward or replacement of the Cash Collateral Budget itself, shall be subject to the prior written consent of the Bond Trustee. At such time as the amended budget becomes the Cash Collateral Budget, the Debtor shall file a copy thereof with this Court and serve it upon all parties entitled to notice in accordance with Bankruptcy Rule 4001(b).

9. <u>Replacement Lien</u>. Except as otherwise provided in this Section 9, as further adequate protection for any diminution in the value of Cash Collateral and other Prepetition Collateral resulting from the Debtor's use thereof after the Petition Date ("Diminution"), and solely to the extent of any Diminution, the Bond Trustee shall have a valid, perfected, and enforceable replacement lien and security interest (the "Replacement Lien") in (i) all assets of the Debtor existing on or after the Petition Date of the same type as the Prepetition Collateral, together with the proceeds, rents, products, and profits thereof, whether acquired or arising before or after the Petition Date, to the same extent, validity, perfection, enforceability, and priority of the liens and security interests of the Bond Trustee as of the Petition Date (the "Postpetition Bond Collateral"); and (ii) all other assets of the Debtor of any kind or nature

10

whatsoever within the meaning of Section 541 of the Bankruptcy Code, whether acquired or arising prepetition or postpetition, together with all proceeds, rents, products, and profits thereof (the "Supplemental Collateral"; and, collectively with the Postpetition Bond Collateral, the "Collateral"); provided, however, Supplemental Collateral shall be exclusive of causes of action under Chapter 5 of the Bankruptcy Code and proceeds thereof with the exception of any causes of action pursuant to Section 542 of the Bankruptcy Code). The Replacement Lien shall be subject and subordinate to only the Carve Out (as defined below) and any valid and perfected liens existing on the Petition Date that are senior to Liens of the Bond Trustee against the Prepetition Collateral ("Prior Liens").

10. No Further Action Required. The approval of this Final Order by the Court shall be sufficient and conclusive evidence of the validity, extent, enforceability, and perfection of the Replacement Lien granted to the Bond Trustee, whether or not the Bond Trustee elects to file or record financing statements or any other documents that may otherwise be required under federal or state law in any jurisdiction, or to take such other steps as may otherwise be required to obtain, evidence, or perfect such liens under applicable law; provided, however, that upon the request of the Bond Trustee, the Debtor shall execute such other documents as may be reasonably requested to evidence and perfect such liens; that the Bond Trustee may, in its sole discretion, but shall not be required to, file a certified copy of this Final Order in any filing or recording office in any jurisdiction in which the Debtor has real or personal property; that the Debtor is authorized and directed to execute, or cause to be executed, all such financing statements or other documents upon the Bond Trustee's reasonable request; and that such filing or recording shall be accepted and shall constitute further evidence of perfection of the Bond Trustee's liens and security interests. No obligation, payment, transfer, or grant of security under this Final Order shall be stayed (other than by court order in an appeal from this Final Order),

restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any otherwise applicable state law, or subject to any defense, reduction, setoff, recoupment, or counterclaim.

11. <u>Superpriority Claim</u>. As additional adequate protection for any Diminution, the Bond Trustee shall have a superpriority administrative expense claim pursuant to Section 507(b) of the Bankruptcy Code with recourse to and payable from any and all assets of the Debtor's estate, including but not limited to rights of the Debtor, choses in action, or claims of any kind whatsoever, choate or inchoate, present or residual that for any reason cannot be made the subject of the Replacement Lien (the "<u>Superpriority Claim</u>"). The Superpriority Claim shall be subject only to Prior Liens and the Carve Out (as defined below) and shall have priority, pursuant to Section 507(b) of the Bankruptcy Code, over any and all administrative expenses, diminution claims, and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtor, any successor trustee, or any creditor in this Chapter 11 Case, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment.

12. <u>Allowance of Claim</u>. As set forth in paragraph 23 below, the entry of this Final Order by the Court shall be a conclusive and binding determination on all parties (x) as to the amount and validity of the Bond Claim, and (y) as to the scope, extent, perfection, validity, and enforceability, in all respects, of the Bond Trustee's security interests and liens in the Prepetition Collateral, including, without limitation, the Cash Collateral.

13. <u>Financial Information</u>. As further additional adequate protection of the Bond Trustee's security interests in the Cash Collateral and the Prepetition Collateral, the Debtor shall allow the Bond Trustee and its professionals and designees reasonable access, during normal business hours and on not less than 48 hours' notice, to the premises of the Debtor in order to conduct appraisals, analyses, and/or audits of the Prepetition Collateral and the Collateral, and shall otherwise reasonably cooperate in providing any other financial information reasonably requested by the Bond Trustee for this purpose. The Debtor shall provide to the Bond Trustee and the Residents' Committee bi-weekly on the same day of the week, and at the same time as any reports provided pursuant to paragraph 15(i), a report indicating all receipts received and disbursements made by the Debtor in the two weeks ending the prior Friday compared to the Cash Collateral Budget and detailing any variances of more than 10% and at least $10,000 from the expenditures and receipts in the Cash Collateral Budget. The Debtor and its professionals shall be available once each week (subject to reasonable scheduling conflicts) for a telephonic conference call with the Bond Trustee and its representatives and professionals to discuss the status of the Solicitation Process and any plan of reorganization, the results of operations, and other matters pertaining to the Facility and the Chapter 11 Case. The Debtor and its professionals shall be separately available once a week (subject to reasonable notice) for a telephone conference call with the Committee and its professionals to discuss matters related to the Chapter 11 Case. The Bond Trustee's financial advisor, RBC Capital Markets, LLC ("<u>RBC</u>") shall have independent access to the investment banker retained by the Debtor provided that either (i) RBC requests a call with the independent banker retained by the Debtor by making such request to the Debtor's Chief Restructuring Officer who shall then provide a date and time for such call within forty-eight (48) hours of the request by RBC, on a conference line to be provided by the investment banker, in order to allow the Debtor's Chief Restructuring Officer or his designee the opportunity to

13

participate on such call if desired, or (ii) the Debtor's Chief Restructuring Officer consents to RBC having such independent access to the investment banker for a particular call. The Debtor shall provide to the Bond Trustee and the Residents' Committee such other reports and information as the Bond Trustee may reasonably request from time to time.

14.     <u>Compliance With Bond Documents</u>. As further adequate protection against Diminution, the Debtor shall comply with those terms and provisions of the Bond Documents set forth on **<u>Exhibit B</u>**[2] attached hereto and incorporated herein. The requirements of this Final Order shall be in addition to, and not in substitution for, the terms and provisions of the Bond Documents set forth on Exhibit B; <u>provided</u>, <u>however</u>, in the event of any inconsistency between the Bond Documents and this Final Order, the terms of this Final Order shall control.

15.     <u>Termination of Use of Cash Collateral With Notice</u>. A Termination Event shall be deemed to have occurred five (5) business days after written notice sent by the Bond Trustee to the Debtor, its counsel, the Residents' Committee and the United States Trustee of the occurrence of any of the following (a "<u>Termination Event</u>"):

(i)     the payment of any expense that would cause aggregate actual expenditures on a cumulative basis in the Cash Collateral Budget measured during any consecutive four week period to exceed one hundred ten percent (110%) of the total budgeted expenses in the Cash Collateral Budget for such measuring period, <u>provided</u> <u>however</u>, professional fees (including all fees identified under the heading "Restructuring Disbursements" in the Cash Collateral Budget with the exception of U.S. Trustee fees) and any fees of Seniority, Inc.[3] shall not be subject to any such variance. This foregoing variances shall be measured on a bi-weekly basis. Any budgeted expenditures not paid in a particular budget period may be paid during a subsequent period and,

---

[2]     The Debtor has not yet reviewed the Trustee's proposed Exhibit B.

[3]     The parties have agreed that the management fee shall be calculated at an agreed-to fee of 3.75 percent of revenues (which shall be accounted for by a true-up in subsequent budget periods if actual revenues are greater than or less than what is set forth in the Cash Collateral budget) and subject to further proforma adjustment for entrance fee receipts and obligations that would be paid in the normal course outside of the current bankruptcy process which requires that entrance fee receipts be placed in escrow and entrance fee obligations be accrued as an administrative expense.

for the purpose of calculating the variances set forth above, the Cash Collateral Budget will be revised to move such expenditures to the later period;

(ii)   the failure of the Debtor to pay, within ten (10) days of the applicable due date, all undisputed administrative expenses in full in accordance with their terms as provided for in the Cash Collateral Budget except for any expenses under sections 503(b)(9) or 546(c) of the Bankruptcy Code;

(iii)  the failure of the Debtor to timely pay all fees due under 28 U.S.C. § 1930; and

(iv)   the failure of the Debtor to comply with, keep, observe, or perform any of its agreements or undertakings under this Final Order.

Unless prior to the expiration of the five (5) business day period described in this paragraph 15 the Debtor has cured the Termination Event(s) specified in the Bond Trustee's notice, or obtained an order of this Court, on notice to and with the opportunity to be heard by the Bond Trustee, that no such Termination Event has occurred, the authority of the Debtor to use Cash Collateral hereunder shall terminate without further action of any kind (the "Termination Date").

16.    <u>Termination of Use of Cash Collateral Without Prior Notice</u>.   The Debtor's authority to use Cash Collateral hereunder shall terminate without any further action by this Court, and a Termination Event shall occur without prior notice, upon the occurrence of any of the following (also a "Termination Event"):

(i)    the Chapter 11 Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(ii)   the earlier of (y) the date of the entry of an order of this Court appointing a Chapter 11 trustee or an examiner with enlarged powers (beyond those set forth in Sections 1104(c) and 1106(a)(3) and (4) of the Bankruptcy Code) for the Debtor; or (z) the date the Debtor files a motion, application, or other pleading consenting to or acquiescing in any such appointment;

(iii)  the Debtor fails to obtain an order approving bidding procedures relating to the sale of the Facility in the form attached hereto as **Exhibit**

15

**C** or otherwise acceptable to the Bond Trustee on or before April 10, 2019 (the "Approved Bidding Procedures") which date shall be subject to extension by the Bond Trustee without further order of the Court, and which Approved Bidding Procedures include the following deadlines and requirements (a failure to meet any deadlines set forth in the below (a) through (e) shall also constitute a "Termination Event"):

    (a) April 26, 2019 as the deadline for submission of initial letters of interest, which letters of interest shall be provided to the Bond Trustee and Residents' Committee within twenty-four (24) hours of receipt by the Debtor;

    (b) June 6, 2019, as the last date for the Debtor to execute an agreement with a stalking horse bidder, which date shall be subject to extension by the Bond Trustee without further order of the Court and which (i) selection shall be upon approval of the Bond Trustee, which shall not be unreasonably withheld, and upon consultation of the Residents' Committee; and (ii) documentation shall be subject to review and approval by the Bond Trustee and consultation by the Residents' Committee;

    (c) July 19, 2019 as the deadline for the Debtor to conduct an auction (the "Auction"), which date shall be subject to extension by the Bond Trustee without further order of the Court;

    (d) July 26, 2019, as the deadline for the Debtor to obtain an order approving the sale of the Debtor's Facility to the successful bidder at the Auction, which date shall be subject to extension by the Bond Trustee without further order of the Court; and

    (e) August 8, 2019, as the deadline for the Debtor to obtain an order confirming a plan of reorganization or liquidation, which shall be subject to extension by the Bond Trustee without further order of the Court;

(iv)    an order is entered in the Chapter 11 Case over the objection of the Bond Trustee approving financing pursuant to Section 364 of the Bankruptcy Code that would grant an additional security interest or a lien on any Collateral or granting a superpriority administrative claim that is equal or superior to the superpriority administrative claim granted to the Bond Trustee under this Final Cash Collateral Order; and

(v)    an adversary proceeding or contested matter is commenced or joined by either the Debtor or the Residents' Committee challenging the amount,

16

> validity, enforceability, priority, or extent of the Bond Trustee's liens, security interests, or claims.

Upon the occurrence of a Termination Event described in this paragraph 16, the Debtor's authority to use Cash Collateral hereunder shall automatically terminate, and all amounts owed under the terms of this Final Order and shall be accelerated and immediately due and payable, the Bond Trustee shall be permitted to exercise all available remedies without further notice or court order, and the Bond Trustee shall be automatically relieved of any further stay under Section 362 of the Bankruptcy Code, or other restriction on enforcement of its prepetition and postpetition liens and security interests in the Collateral to collect the amounts due (also a "Termination Date").

17. <u>Claims and Causes of Action</u>. On behalf of itself and the estate, the Debtor reaffirms, and hereby waives, releases, and discharges the Bond Trustee, all Bondholders in their capacity as such, and their respective affiliates, agents, attorneys, professionals, officers, directors, and employees (collectively, the "<u>Released Parties</u>"), from any and all claims and causes of action arising out of, based upon, or related to, in whole or in part, the Bonds and the Bond Documents; any aspect of the prepetition relationship between the Bond Trustee and/or the Bondholders, and the Debtor; and any other acts or omissions by the Bond Trustee and/or the Bondholders in connection with either the Bond Documents or the Bond Trustee's and/or Bondholders' prepetition relationship with the Debtor. Further, the Debtor reaffirms its waiver and hereby waives any and all rights to object to or contest the amount of the Bond Claim or the Bond Trustee's security interest in the Prepetition Collateral and agrees not to challenge that all such claims and security interests have been duly perfected and are in all respects valid and enforceable first priority security interests and liens.

18. <u>Failure of Adequate Protection</u>. Nothing herein shall constitute a waiver, release

or modification of the rights of the Bond Trustee to assert a claim under Sections 364(c) and 507(b) of the Bankruptcy Code.

19. <u>Deemed Request for Stay Relief</u>. This Final Order shall be deemed to constitute a request as of the Petition Date by the Bond Trustee for relief from the automatic stay with respect to the Prepetition Collateral for purposes of any request for adequate protection granted hereunder.

20. <u>No Charge on Collateral; Carve Out</u>. In partial consideration of the Debtor's continuing acknowledgement of the debt due and owing and the waiver of any claims under Section 506(c) and Section 552(b) of the Bankruptcy Code, the Bond Trustee consents to certain expenses and professional fees incurred during the pendency of this Chapter 11 Case that shall be superior in all instances to the liens and claims of the Bond Trustee and all other parties (the "<u>Carve Out</u>"). For purposes hereof, the "Carve Out" means (a) the statutory fees of the United States Trustee pursuant to 28 U.S.C. § 1930 and the fees of the Clerk of this Court; and (b) for a particular professional retained by the Debtor or the Residents' Committee, the fees and expenses of such professional solely to the extent such fees and expenses (i) have actually been incurred by the corresponding professional between the Petition Date and the Termination Date, (ii) are less than the aggregate amount provided for in the Cash Collateral Budget for such corresponding professional for the period between Petition Date and the Termination Date, and (iii) are Unpaid. The term "<u>Unpaid</u>" shall mean fees and expenses that (x) have been allowed by the Court; (y) have not been paid by the Debtor or any other party; and (z) for which no retainer, deposit, or other identified funds is available to pay such fees and expenses. Nothing herein shall constitute a waiver of any right of the Bond Trustee to object to fees and expenses of any professionals or to challenge any assertion that any amount of the fees and expenses are not Unpaid. The entry of this Final Order shall continue to be a conclusive and binding

18

determination on all parties that, except for the Carve Out, no costs or expenses of administration shall be imposed against the Bond Trustee or the Prepetition Collateral or the Collateral under Section 105 of the Bankruptcy Code or Section 506(c) or Section 552(b) of the Bankruptcy Code, or otherwise.

21.     <u>Escrowed Funds</u>.  To the extent the Debtor is holding post-petition entrance fees (the "<u>Entrance Fees</u>") in an escrow account pursuant to that *Agreed Order Authorizing Debtor to Escrow Certain Entrance Fees and Refund Certain Entrance Fees* (the "<u>Escrow Order</u>"), such Entrance Fees shall not be subject to the liens of the Bond Trustee until all conditions under that escrow are satisfied and the Debtor is authorized to release the funds from escrow pursuant to the Escrow Order or other order of the Court at which time the Bond Trustee's liens will attach to the Debtor's right to receive any Entrance Fees released from the escrow account.  The Debtor is authorized to make refund payments in accordance with the Escrow Order.

22.     <u>Modification of Stay</u>. The automatic stay imposed by Section 362 of the Bankruptcy Code is hereby vacated and modified insofar as necessary to permit the Bond Trustee to: (i) receive any payments or distributions made by the Debtor to the Bond Trustee for and on behalf of the Bondholders, (ii) apply, allocate, or make payments from any of the funds or accounts maintained by the Bond Trustee (including, without limitation, the Trustee-Held Funds) in accordance with the terms of the Bond Documents, and (iii) take any action authorized by the Interim Order or this Final Order.

23.     <u>Preservation of Rights</u>. If any or all of the provisions of this Final Order are, at any time, modified, vacated or stayed, such stay, modification, or vacation shall not affect the validity, extent, priority, and enforceability of any lien, priority, or other benefit conferred under the Interim Order, or this Final Order prior to such stay, modification, or vacation.

24.     <u>Binding Effect</u>.  This Final Order shall be binding on all creditors and parties in

19

interest in this Chapter 11 Case, including, but not limited to: the Debtor and any successors thereto, any Chapter 11 or Chapter 7 trustee that is appointed or elected in this Chapter 11 Case, and the Residents' Committee and any successors thereto.

25.     No Competing Liens.  Except as set forth herein, the Debtor shall not grant liens on, or security interests in, the Prepetition Collateral or the Collateral to any other party, pursuant to Section 364 of the Bankruptcy Code or otherwise, without the consent of the Bond Trustee.

26.     Reservation of Rights.  Except as provided in this Final Order, neither the Debtor nor the Bond Trustee waives any of its rights under the Bankruptcy Code, any applicable law, or the Bond Documents, including, without limitation, the right of the Debtor or the Bond Trustee at any time to seek any relief (or to oppose any such relief) under the Bankruptcy Code, or the right of the Debtor or the Bond Trustee to exercise any of its rights and remedies under the Bankruptcy Code at any time.

27.     Further Relief.  Nothing herein shall (i) preclude the Bond Trustee from seeking any other relief that it may deem appropriate, including relief from the automatic stay; or (ii) prevent the Bond Trustee from asserting at some later time that its liens and security interests in the Prepetition Collateral are not being adequately protected.

28.     No Third Party Beneficiaries. Except as expressly provided herein, no rights are created hereunder for the benefit of any third party, any creditor, or any direct, indirect or incidental beneficiary except for the Bondholders, as set forth herein.

29.     Effectiveness. The rights and obligations of the parties under this Final Order shall be effective and enforceable as of the date of the Petition Date, and, for the avoidance of doubt, Bankruptcy Rule 6004(h) shall not apply hereto.  If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur, or stay shall not affect (i) the validity, extent, priority, or enforceability of any

20

obligations incurred prior to the actual receipt of written notice by the Bond Trustee of the effective date of such reversal, modification, vacatur, or stay, or (ii) the validity, extent, or enforceability of the liens and claims granted hereunder.

30. <u>Notices</u>. All notices, requests, demands, waivers, and other communications required or permitted to be given under this Final Order shall be in writing and shall be deemed to have been duly given if (a) delivered personally, or (b) sent by email with a next-day or overnight mail or delivery:

(a) If to the Debtor to:

Ankura Consulting Group, LLC
Attn: Louis E. Robichaux IV
15950 Dallas Parkway, Suite 750
Dallas, TX 75248
Telephone: (214) 200-3689
E-mail: Louis.robichaux@ankura.com

with a copy sent contemporaneously by email to:

DLA Piper LLP (US)
Attn: Thomas R. Califano, Esq.
1251 Avenue of the Americas
New York, NY 10020-1104
Telephone: (212) 335-4500
E-mail: thomas.califano@dlapiper.com

(b) If to the Bond Trustee to:

UMB Bank, N.A.
Attn: Virginia A. Housum
Senior Vice President
120 Sixth Street South, Suite 1400
Minneapolis, MN 55403
E-mail: Virginia.housum@umb.com

with a copy sent contemporaneously by email to:

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
Attn: Daniel S. Bleck, Esq.
One Financial Center
Boston, MA 02111
Telephone: (617) 348-4498
E-mail: dsbleck@mintz.com

(c)     If to the Residents' Committee to:

Faegre Baker Daniels LLP
Attn: Jay Jaffe, Esq.
600 E. 96th Street, Suite 600
Indianapolis, IN 46240
Telephone:  (317) 569-4687
E-mail: Jay.Jaffe@FaegreBD.com

Faegre Baker Daniels LLP
Attn: George R. Mesires, Esq.
Wacker Drive, Suite 4300
Chicago IL 60606
Telephone:  (312) 356-5101
E-mail: George.Mesires@FaegreBD.com

Neligan LLP
Attn: Patrick J. Neligan, Jr.
325 N. St. Paul Street, Suite 3600
Dallas, TX 75201
Telephone:  (214) 840-5333
E-mail: pneligan@neliganlaw.com

**###END OF ORDER###**

## **EXHIBIT B**

## **CASH COLLATERAL BUDGET**

**Mayflower Communities, Inc. - The Barrington of Carmel**
Cash Collateral Budget
As of January 30, 2019
($ amounts presented in thousands)

| | Act | Act | Act | Act | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | |
| Date | 2/1/19 | 2/8/19 | 2/15/19 | 2/22/19 | 3/1/19 | 3/8/19 | 3/15/19 | 3/22/19 | 3/29/19 | 4/5/19 | 4/12/19 | 4/19/19 | 4/26/19 | 5/3/19 | 5/10/19 | 5/17/19 | 5/24/19 | 5/31/19 | 6/7/19 | 6/14/19 | 6/21/19 | 6/28/19 | 7/5/19 | 7/12/19 | 7/19/19 | 7/26/19 | 8/2/19 | 8/9/19 | 8/16/19 | 8/23/19 | |
| **Operating Cash Receipts** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Resident Receipts | $10 | $252 | $875 | $86 | $9 | $282 | $855 | $146 | $9 | $146 | $980 | $146 | $9 | $77 | $980 | $146 | $9 | $77 | $146 | $974 | $146 | $9 | $146 | $972 | $146 | $9 | $77 | $77 | $969 | $146 | $8,909 |
| Medicare Receipts | 1 | 0 | - | 19 | 83 | - | - | 21 | 83 | - | - | 21 | 83 | - | - | 21 | 83 | - | - | 10 | - | - | 10 | 83 | 10 | - | - | - | - | 10 | 641 |
| Entrance Fee Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | 6 | - | - | 177 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 183 |
| Total Operating Receipts | 17 | 253 | 875 | 282 | 92 | 282 | 855 | 166 | 92 | 146 | 980 | 166 | 92 | 77 | 980 | 166 | 92 | 77 | 156 | 974 | 156 | 92 | 156 | 972 | 156 | 92 | 88 | 77 | 969 | 156 | 9,733 |
| **Operating Cash Disbursements** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Payroll, Payroll Taxes, & Benefits | - | - | (237) | - | (376) | - | (275) | (36) | (256) | (60) | (256) | (36) | (256) | (60) | (256) | - | (292) | - | (316) | - | (292) | - | (316) | - | (292) | - | (316) | - | (256) | (292) | (4,472) |
| Dining Services | - | - | (3) | (13) | (40) | (17) | (87) | (17) | (40) | (17) | (17) | (40) | (17) | (40) | (17) | (40) | (17) | (40) | (17) | (40) | (17) | (40) | (17) | (40) | (17) | (40) | (17) | (40) | (17) | (40) | (811) |
| Administrative & Marketing | - | - | - | (8) | (62) | (5) | (305) | (5) | (45) | (5) | (5) | (148) | (34) | (5) | (5) | (148) | (34) | (5) | (5) | (148) | (45) | (5) | (5) | (148) | (29) | (5) | (5) | (148) | (177) | (1,533) | |
| Buildings, Grounds, & Utilities | - | - | (4) | (6) | (19) | (49) | (73) | (5) | (20) | (39) | (30) | (5) | (20) | (39) | (30) | (5) | (20) | (39) | (30) | (5) | (20) | (39) | (30) | (5) | (20) | (39) | (30) | (5) | (59) | (692) | |
| Ancillary & Therapy Services | - | - | (3) | (2) | (77) | (5) | (9) | (5) | (5) | (5) | (75) | (5) | (5) | (75) | (5) | (5) | (5) | (75) | (5) | (5) | (5) | (75) | (5) | (5) | (5) | (75) | (5) | (5) | (28) | (585) | |
| Capital Expenditures | - | - | - | - | (10) | (5) | (25) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (10) | (160) | |
| Management Fees | - | - | - | (77) | - | (64) | - | - | (64) | - | - | (64) | - | - | (64) | - | - | (64) | - | - | (64) | - | - | (47) | - | - | - | - | - | (444) | |
| Entrance Fee Disbursements | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Disbursements | - | - | (13) | (22) | (51) | (79) | (19) | (26) | (31) | (41) | (51) | (26) | (194) | (53) | (51) | (19) | (26) | (51) | (31) | (41) | (51) | (26) | (31) | (41) | (51) | (26) | (19) | (53) | (51) | (125) | (1,276) |
| Total Operating Disbursements | - | - | (259) | (50) | (690) | (131) | (917) | (91) | (382) | (277) | (367) | (315) | (347) | (464) | (379) | (279) | (347) | (115) | (532) | (135) | (547) | (126) | (532) | (111) | (571) | (86) | (527) | (123) | (535) | (738) | (9,974) |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Debtor Counsel - DLA | - | - | - | - | - | - | - | (132) | - | - | - | - | (152) | - | - | - | (112) | - | - | - | (154) | - | - | - | - | (245) | - | - | - | (52) | (847) |
| Debtor Chief Restructuring Officer | - | - | - | - | - | - | - | (15) | - | - | - | - | (25) | - | - | - | (20) | - | - | - | (25) | - | - | - | - | (20) | - | - | - | (40) | (145) |
| Debtor Financial Advisor - Ankura | - | - | - | - | - | - | - | (59) | - | - | - | - | (100) | - | - | - | (61) | - | - | - | (68) | - | - | - | - | (51) | - | - | - | (78) | (415) |
| Debtor Accounting Advisor - Larx | - | - | - | - | - | - | - | (48) | - | - | - | - | (76) | - | - | - | (26) | - | - | - | (33) | - | - | - | - | (76) | - | - | - | (14) | (272) |
| Claims Agent - Donlin Recano | - | - | - | - | - | - | - | (50) | - | - | - | - | (33) | - | - | - | (26) | - | - | - | (21) | - | - | - | - | (22) | - | - | - | (15) | (166) |
| Resident Counsel / UCC | - | - | - | - | - | - | - | (19) | - | - | - | - | (33) | - | - | - | (26) | - | - | - | (33) | - | - | - | - | (26) | - | - | - | (52) | (189) |
| Independent Board Member | - | - | - | (8) | - | - | (8) | - | - | - | - | - | - | - | - | - | - | - | (8) | - | - | - | - | - | - | (8) | - | - | (8) | - | (53) |
| Patient Ombudsman | - | - | - | - | - | - | (20) | - | - | (10) | - | - | - | - | - | - | - | - | (10) | - | - | - | - | - | - | (10) | - | - | (10) | - | (70) |
| 503(b)(9) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (115) | - | (115) |
| US Trustee and Filing Fees | - | - | - | - | - | - | - | - | - | - | - | - | (29) | - | - | - | - | - | - | - | - | - | - | - | - | (53) | - | - | - | (41) | (123) |
| Adequate Assurance - Utilities | - | - | (18) | - | - | - | (7) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 25 | (25) |
| Total Non-Operating Disbursements | - | - | (18) | - | (8) | - | (35) | (322) | - | (18) | - | - | (448) | (18) | - | - | (271) | - | (18) | - | (332) | - | (18) | - | (493) | (18) | - | - | (381) | | (2,395) |
| **Debt Service** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Net Cash Flow** | $17 | $253 | $598 | $232 | $(606) | $152 | $(97) | $(247) | $(290) | $(149) | $613 | $(149) | $(703) | $(404) | $601 | $(113) | $(526) | $(38) | $(394) | $839 | $(723) | $(34) | $(394) | $860 | $(415) | $(487) | $(457) | $(46) | $433 | $(963) | $(2,636) |
| (+) Beginning Book Cash Balance | 3,355 | 3,372 | 3,625 | 4,223 | 4,455 | 3,849 | 4,001 | 3,904 | 3,657 | 3,367 | 3,218 | 3,831 | 3,683 | 2,979 | 2,575 | 3,177 | 3,063 | 2,538 | 2,500 | 2,106 | 2,945 | 2,222 | 2,188 | 1,794 | 2,655 | 2,240 | 1,752 | 1,295 | 1,249 | 1,683 | 3,355 |
| **Ending Book Cash Balance** | $3,372 | $3,625 | $4,223 | $4,455 | $3,849 | $4,001 | $3,904 | $3,657 | $3,367 | $3,218 | $3,831 | $3,683 | $2,979 | $2,575 | $3,177 | $3,063 | $2,538 | $2,500 | $2,106 | $2,945 | $2,222 | $2,188 | $1,794 | $2,655 | $2,240 | $1,752 | $1,295 | $1,249 | $1,683 | $719 | $719 |

## EXHIBIT C

### BID PROCEDURES

| | |
|---|---|
| **Confidentiality Agreements** | Any person desiring to submit a bid for substantially all of the Debtor's assets (the "Assets") will be required to deliver to the Debtor an executed confidentiality agreement in form and substance satisfactory to the Debtor. |
| **Due Diligence** | The Debtor and its professionals will afford any person who executes a confidentiality agreement (a "Potential Bidder") such due diligence access or additional information as the Debtor, in its business judgment, determines to be reasonable and appropriate; *provided, however*, that the same access and information must also be made available to all Potential Bidders. Notwithstanding the foregoing, the Debtor shall have the right, in its sole discretion or at the request of the Bond Trustee, to require satisfactory evidence of any Potential Bidder's available funds for or firm commitment for financing sufficient to consummate the sale, prior to granting said Potential Bidder access to conduct due diligence. Additional due diligence will not be provided after the Bid Deadline (as defined below). |
| **Stalking Horse LOI Deadline** | On or before April 26, 2019 at 4:00 p.m. (prevailing Central Time), any Potential Bidder that desires to serve as a stalking horse shall submit a written letter of intent setting forth the terms and conditions of its offer which shall include, but not be limited to:<br><br>1. Cash purchase price;<br><br>2. A commitment to make a good-faith deposit, the amount of which shall be subject to further negotiation, which deposit shall be non-refundable upon execution of a Stalking Horse APA unless the Debtor is in breach of the Stalking Horse APA or another party is selected as the Successful Bidder (as defined below) or as otherwise set forth in the Stalking Horse APA;<br><br>3. General description of the executory contracts and unexpired leases it intends to assume;<br><br>4. Confirmation of the Potential Bidder's intent to commit to assumption of (i) the Continuing Care Contracts, including the benevolent care provision contained therein; and (ii) all past, current and future obligations |

1

|  | to current and former residents, including, but not limited to, those obligations arising under the Continuing Care Contracts.<br><br>5. Whether the Potential Bidder intends to continue operating as a not-for-profit entity;<br><br>6. The Potential Bidder's affiliations; and<br><br>7. Provide information on the Potential Bidder's ability to continue to operate the Facility, whether as a continuing care retirement community or otherwise.<br><br>The Debtor shall provide the Bond Trustee and Committee with a copy of all letters of intent no later than twenty-four (24) hours after receipt thereof. |
|---|---|
| **Stalking Horse APA Deadline** | On or before June 6, 2019, the Debtor, with the approval of the Bond Trustee (which shall not be unreasonably withheld) and after consulting with the Committee, may enter into a definitive asset purchase agreement (the "Stalking Horse APA") with a Potential Bidder (the "Stalking Horse").<br><br>As a component of the Stalking Horse APA, the Debtor may provide a break-up fee of up to 2% of the cash purchase price plus actual expenses in an amount not to exceed $250,000, a minimum bid increment for other bidders to submit competing bids, or other buyer protections (the "Bid Protections") requested by the Stalking Horse. |
| **Bid Deadline** | The deadline for any Potential Bidders to submit bids intending to compete with the Stalking Horse APA, if any, shall be July 16, 2019 at 4:00 p.m. (prevailing Central Time) (the "Bid Deadline"). Such bids must be received on or before the Bid Deadline by the following parties (collectively, the "Notice Parties"):<br><br>1. The Debtor, 15601 Dallas Parkway, Suite 200, Addison, Texas 75001, Attn: Scott Collier (scollier@sqlc.org);<br><br>2. counsel for the Debtor, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020, Attn: Thomas R. Califano (thomas.califano@dlapiper.com) and DLA Piper LLP (US), 1900 North Pearl Street, Suite 2200, Dallas, Texas 75201, Attn: Dan Prieto |

(dan.prieto@dlapiper.com);

3. the Debtor's Chief Restructuring Officer and restructuring advisor, Ankura Consulting Group LLC, 15601 Dallas Parkway, Suite 200, Dallas, Texas 75001, Attn: Louis E. Robichaux IV (louis.robichaux@ankura.com) and Michael Morton (michael.morton@ankura.com);

4. the Debtor's selling agent, Cushman & Wakefield, U.S., Inc., One Tampa City Center, Suite 3300, Tampa, Florida 33602, Attn: Allen McMurtry (allen.mcmurtry@cushwake.com);

5. counsel for UMB Bank, National Association, Jackson Walker LLP, 2323 Ross Avenue, Suite 600, Dallas, Texas 75201, Attn: Kenneth Stohner, Jr. (kstohner@jw.com) and Vienna F. Anaya (vanaya@jw.com), and Jackson Walker LLP, 112 E. Pecan Street, Suite 2400, San Antonio, Texas 78205, Attn: J. Scott Rose (srose@jw.com) and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, MA 02111, Attn: William W. Kannel (wwkannel@mintz.com) and Charles W. Azano (cwazano@mintz.com) and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., 3580 Carmel Mountain Road, San Diego, CA 92130, Attn: Joseph R. Dunn (jrdunn@mintz.com);

6. counsel for the Committee, Faegre Baker Daniels LLP, 600 E. 96th Street, Suite 600, Indianapolis, IN 46240, Attn: Jay Jaffe (Jay.Jaffe@FaegreBD.com); Faegre Baker Daniels LLP, 311 S. Wacker Drive, Suite 4300, Chicago IL 60606, Attn George R. Mesires (George.Mesires@FaegreBD.com); and Neligan LLP, 325 N. St. Paul Street, Suite 3600, Dallas, TX 75201; Attn: Patrick J. Neligan, Jr. (pneligan@neliganlaw.com);

7. Indiana Secretary of State, Securities Division, 302 West Washington Street E-111, Indianapolis, IN 46204, Attn: Aleksander M. Cirulis, Esq. (ACirulis@sos.IN.gov);

8. Indiana State Department of Health, Division of Long Term Care, 2 North Meridian Street, 4B, Indianapolis, IN 46204, Attn: Brenda Buroker

| | |
|---|---|
| | (bburoker@isdh.in.gov); and<br><br>9. Centers for Medicare and Medcaid Services, Legal Department, 7500 Security Blvd., Baltiore, MD 21244. |
| **Bid Requirements** | To be eligible to participate in the Auction (as such term is defined below), each bid and each Potential Bidder submitting such a bid must conform to the following requirements (collectively, the "Participation Requirements"):<br><br>1. offer to consummate the sale on terms no less favorable to the Debtor than those set forth in the Stalking Horse APA, if any (taking into account Bid Protections that must be paid);<br><br>2. include a marked copy of the Stalking Horse APA, or the form asset purchase agreement contained in the data room if no Stalking Horse APA has been entered into, to show any proposed amendments thereto (the "Modified APA") and a clean and executed Modified APA;<br><br>3. include a statement that there are no conditions precedent to the Potential Bidder's ability to enter into a definitive agreement, including that there are no financing contingencies to the bid, and that all necessary internal and shareholder approvals have been obtained prior to the bid;<br><br>4. state that such offer is binding and irrevocable until the approval of the Successful Bid by the Court unless designated as the Back-Up Bid (as defined below);<br><br>5. disclose the identity of each entity that will be bidding or otherwise participating in connection with such bid, and the complete terms of any such participation;<br><br>6. disclose the Potential Bidder's affiliations;<br><br>7. state whether the Potential Bidder intends to continue operating as a not-for-profit entity;<br><br>8. include the names and contact information of members of the Potential Bidder who will be available to answer questions regarding the offer, including advisors and related parties; |

9.  state that the Potential Bidder shall assume (i) all of the Continuing Care Contracts with the residents living at the Facility on or after the Petition Date, including the benevolent care provision contained therein; and (ii) all past, present and future obligations to former and current residents including, but not limited to, those obligations arising under the Continuing Care Contracts;

10. provide information on the operational and financial capabilities of the Potential Bidder sufficient to allow the Debtor and interested parties to determine such bidder's ability to assume the Continuing Care Contracts;

11. include a good-faith deposit in immediately available funds in at least the amount of the deposit provided by the Stalking Horse in the Stalking Horse APA ("Earnest Money Deposit") or if no Stalking Horse APA has been entered into, 5% of the proposed purchase price;

12. provide satisfactory written evidence of available funds, a firm commitment for financing sufficient to consummate the Sale, or if such proposal is seeking to assume the existing bond obligations, the terms and conditions of such assumption; and

13. provide information on the Potential Bidder's ability to continue to operate the Facility, whether as a continuing care retirement community or otherwise.

The Debtor, following consultation with the Bond Trustee and the Committee, shall determine whether bids submitted by Potential Bidders meet the Participation Requirements.

Bids are not required to adopt the business structure as set forth in the Stalking Horse APA, and may provide for either a for-profit or not-for-profit entity as the operator of the Facility. Bidders can also submit proposals for a plan of reorganization that provides for assumption of all or some of the Debtor's bond obligations, provided that such bid also provides for the assumption of (i) all of the Continuing Care Contracts with the residents living at the Facility on or after the Petition Date; and (ii) all past, present and future obligations to former and current residents.

| Qualified Bidders and Bids | Potential Bidders who have satisfied the Participation Requirements will be deemed "Qualified Bidders." Bids that contain all bid requirements, as determined by the Debtor, in consultation with the Bond Trustee and Committee, will be deemed "Qualified Bids." The Stalking Horse shall be entitled to credit bid the amount of its break-up fee and expense reimbursement. |
|---|---|
| | Potential Bidders may submit bids that provide for the assumption of all or some of the Debtor's bond obligations pursuant to a plan of reorganization, provided that such bid also provides for the assumption of (i) all of the Continuing Care Contracts with the residents living at the Facility on or after the Petition Date; and (ii) all past, present and future obligations to former and current residents. |
| | The Debtor will advise each Potential Bidder whether they are deemed to be a Qualified Bidder and whether their bid is a Qualified Bid before the Auction. The Stalking Horse is deemed a Qualified Bidder and the Stalking Horse Bid is a Qualified Bid in all respects. The Debtor will provide copies of the Qualified Bids to the Bond Trustee, the Committee, the Indiana Securities Division and Indiana Department of Health. The Stalking Horse will be notified, no later than 24 hours prior to the Auction, if any Qualified Bids have been received. |
| | The Debtor reserves the right to waive noncompliance with any one or more of the Participation Requirements to be a Qualified Bid and deem an otherwise not Qualified Bid to be a Qualified Bid if it reasonably determines, in its business judgment, after consultation with the Bond Trustee and Committee, that such waiver is consistent with its fiduciary duties. |
| | The Bond Trustee reserves its right to submit a credit bid for the Debtor's Assets. The parties reserve any and all rights as to the terms and conditions of such credit bid, including the Bond Trustee's right to fully participate at the Auction. In the event the Bond Trustee credit bids, the Bond Trustee shall be required to assume (i) all of the Continuing Care Contracts with the residents living at the Facility on or after the Petition Date; and (ii) all past, present and future obligations to former and current residents. |

| | |
|---|---|
| **Auction Participation** | Unless otherwise agreed to by the Debtor, only Qualified Bidders, members of the Committee, the Bond Trustee, representatives of holders of the Bonds, and their respective legal or financial professionals are eligible to attend or participate at the Auction. Subject to the other provisions of these Bid Procedures, if the Debtor does not receive any Qualified Bids other than Stalking Horse Bid or if no Qualified Bidder other than the Stalking Horse has indicated its intent to participate in the Auction, the Debtor will not hold an Auction and the Stalking Horse will be named the Successful Bidder (as defined below). |
| **Auction** | If any Qualified Bid has been received and any Qualified Bidder has indicated its intent to participate in the Auction, the Debtor will conduct an auction (the "<u>Auction</u>") for the sale of substantially all of its Assets. Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale. |
| | The Auction shall take place at 10:00 a.m. (prevailing Central Time) on July 19, 2019 at the offices of DLA Piper LLP (US), 1900 North Pearl Street, Suite 2200, Dallas, Texas 75201. At the Auction, only the Stalking Horse, if any, and other Qualified Bidders will be permitted to increase their bids or make any subsequent bids. The Debtor may conduct the Auction in the manner it reasonably determines, in its business judgment, after consultation with the Bond Trustee and Committee, will achieve the maximum value for its Assets and is not inconsistent with the provisions of these Bid Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith. |
| **Closing the Auction** | The Auction shall continue until there is only one offer that the Debtor determines, following consultation with the Bond Trustee and the Committee, subject to Bankruptcy Court approval, is the highest or best offer from among the Qualified Bidders (including the Stalking Horse) submitted at the Auction (the "<u>Successful Bid</u>"). The Qualified Bidder submitting such Successful Bid shall become the "<u>Successful Bidder</u>," and shall have such rights and responsibilities of a purchaser, as set forth in the Stalking Horse APA or Modified APA, as applicable. Immediately prior to the conclusion of the Auction, after consultation with the Bond Trustee and Committee, the Debtor shall (1) review each bid made at the Auction on the basis of financial and contractual terms and such other factors as may be relevant to the sale process, |

|  | including those factors affecting the Debtor's residents, mission as well as the speed and certainty of consummating the Sale; (2) identify the Successful Bid; and (3) notify all Qualified Bidders at the Auction, prior to its conclusion, of the name or names of the Successful Bidder and the amount and other material terms of the Successful Bid.<br><br>The Debtor shall also, following consultation with the Bond Trustee and the Committee, select a back-up bid (the "Back-Up Bid"), which shall remain open and irrevocable until one (1) business day after the closing of the sale with the Successful Bidder. In the event that, for any reason, the Successful Bidder fails to close the transaction contemplated by the Successful Bidder, the Debtor may, following consultation with the Bond Trustee and the Committee, elect to regard the Back-Up Bid as the highest or best bid for the Assets, and the Debtor will be authorized to consummate the transaction contemplated by the Back-Up Bid without further order of the Bankruptcy Court. |
|---|---|
| **Assumption of Executory Contracts and Unexpired Leases** | The Stalking Horse APA and Modified APA must designate which executory contracts and unexpired leases are to be assumed and assigned; *provided, however*, (i) all of the Continuing Care Contracts with the residents living at the Facility on or after the Petition Date; and (ii) all past, present and future obligations to former and current residents must be assumed by the Successful Bidder (the "Assigned Contracts"). In all circumstances, the Successful Bidder shall be responsible for all cure amounts relating to the Assigned Contracts under section 365 of the Bankruptcy Code. |

8