Dan Prieto, State Bar No. 24048744
dan.prieto@dlapiper.com
DLA Piper LLP (US)
1900 North Pearl Street, Suite 2200
Dallas, Texas 75201
Telephone: (214) 743-4500
Facsimile: (214) 743-4545

PROPOSED COUNSEL FOR THE DEBTOR

Thomas R. Califano (admitted *pro hac vice*)
thomas.califano@dlapiper.com
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile: (212) 335-4501

Rachel Nanes (admitted *pro hac vice*)
rachel.nanes@dlapiper.com
DLA Piper LLP (US)
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131
Telephone: (305) 423-8563
Facsimile: (305) 675-8206

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **CHAPTER 11** |
| **MAYFLOWER COMMUNITIES, INC.**[1] | § | |
| | § | **CASE NO. 19-30283 (HDH)** |
| Debtor. | § | |

## DEBTOR'S MOTION FOR ENTRY OF ORDERS (I) APPROVING BID PROCEDURES, (II) AUTHORIZING THE DEBTOR TO OFFER CERTAIN BID PROTECTIONS TO STALKING HORSE, (III) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (IV) AUTHORIZING (A) THE SALE OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (V) APPROVING THE FORMS OF NOTICES RELATED TO THE SALE, AND (VI) GRANTING RELATED RELIEF

The above-captioned debtor and debtor-in-possession (the "Debtor"), by and through its

proposed counsel, DLA Piper LLP (US), hereby submits this motion (the "Motion"), pursuant to

sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules

2002, 6004, 6006 and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

---

[1] The last four digits of the Debtor's federal tax identification number are 6350.

Rules") and Rules 2002-1(a)(2) and 9007-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas (the "Local Rules"), for entry of orders, including an order in substantially the form attached hereto as **Exhibit A** (the "Bid Procedures Order"), (i) approving the proposed bid procedures (the "Bid Procedures"); (ii) approving the Bid Protections (as defined below); (iii) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases; (iv) authorizing (a) the sale (the "Sale") of substantially all of the Debtor's assets (the "Assets") free and clear of liens, claims, interests and encumbrances (collectively, the "Encumbrances"), and (b) the assumption and assignment of certain executory contracts and unexpired leases; (v) approving the forms of notices of the Sale; and (vi) granting related relief. In support of the Motion, the Debtor relies upon, and incorporates by reference, the *Declaration of Louis E. Robichaux IV in Support of Chapter 11 Petition and First Day Pleadings* [Docket No. 18] (the "Robichaux Declaration"),[2] and states as follows:

## PRELIMINARY STATEMENT

The Bid Procedures and the process contemplated thereby provide the best opportunity for the Debtor to maximize the value of the estate (the "Estate") while protecting the well-being of its residents. Significantly, UMB Bank, N.A. (the "Bond Trustee") has reviewed and agreed to support the Bid Procedures, which are an integral part of the global settlement (the "Settlement") announced to the Court at the March 8, 2019 hearing and described in the *Motion of the Debtor for Entry of an Order (I) Approving the Settlement Between the Debtor and UMB Bank, N.A., as Trustee; and (II) Granting Related Relief* [Docket No. 139] (the "Settlement Motion"). The Debtor submits that the Bid Procedures are one of several measures which, taken together, provide for a resolution of this case. For the reasons that follow, the Debtor respectfully requests that the Court

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

approve the Bid Procedures in connection with other requests set forth in the Settlement Motion, which, collectively, will help achieve a resolution for the financial issues facing the Debtor and protect the residents of the Debtor's community.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over the Debtor, the Estate, and this Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### I.      General Background Regarding the Chapter 11 Case

3.      On January 30, 2019 (the "Petition Date"), the Debtor commenced this case (the "Chapter 11 Case") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtor remains in possession of its assets and continues to operate and manage its business as a debtor in possession pursuant to sections 1107 and 1108.

5.      On February 11, 2019, the Office of the United States Trustee (the "U.S. Trustee") appointed a committee of residents pursuant to section 1102(a)(1) of the Bankruptcy Code comprised of five (5) residents living at the Facility (as defined below) [Docket No. 79].  No trustee or examiner has been appointed in this Chapter 11 Case.

6.      Additional information regarding the Debtor and this Chapter 11 Case, including the Debtor's business operations, capital structure, and financial condition, and the reasons for and objectives of this Chapter 11 Case, is set forth in the Robichaux Declaration.

## II.   Overview of the Debtor's Business

### A.   Description of the Continuing Care Retirement Community and Affiliations

7.     The Debtor is a not-for-profit nonstock corporation that owns and operates a continuing care retirement community (a "CCRC") in Carmel, Indiana.  As a CCRC, the Debtor offers its residents a continuum of care in a campus-style setting, providing living accommodations and related health care and support services to a target market of seniors aged sixty two (62) and older.  The Debtor's facility features: (i) 137 independent living ("IL") apartments, (ii) 56 assisted living ("AL") units, (iii) 26 memory support ("MS") units, and (iv) 48 skilled nursing ("SNF") beds, all located on a 372,000 square foot, 19-acre campus (the "Facility").

8.     The life care benefits that the Facility provides include (i) assisted living services, (ii) memory support, and (iii) nursing services.

     a.     **Assisted Living**.  For those residents who so require, the Debtor provides assistance with daily activities, such as dressing, eating, bathing, medication administration and ambulating.  Services are provided under three levels of care: (i) basic, (ii) level 1, and (iii) level 2.  A resident's acuity level and the extent of services required are factors which determine the assigned level of care.

     b.     **Memory Support**.  The Debtor provides a monitored memory support suite with services designed to assist with the daily living and the special needs of memory support residents, in accordance with applicable law.

     c.     **Nursing Care**.  The Debtor provides licensed nursing care services which may include services required by applicable law to be supervised or administered by a professional licensed nursing staff, e.g., medication administration, condition and behavior observation and assessment, creation and administration of a care plan assistance with activities of daily living and communication with physicians and other care providers.

9.     At the Facility, seniors are offered a variety of residency options, including one-bedroom, one-bedroom-plus den and two-bedroom styles that range in size from 757 square feet to 1,384 square feet.  Living units include, among other things, designer kitchens with granite

4

countertops, full size stainless steel appliances, individually controlled heating and air conditioning, and washers and dryers. The Debtor also offers its residents a full roster of activities, wellness programs, fine dining, and trips within the City of Carmel. The Debtor provides its residents with a number of amenities in its 30,800 square foot common area including: (i) a multi-purpose room, (ii) a living room, (iii) a dining room, as well as a private dining room for special occasions, (iv) a bistro/café, (v) a wellness/fitness center, (vi) a library/business center, (vii) a beauty salon/barbershop, (viii) a creative arts center, (ix) a club room, (x) residential storage, and (xi) a mail alcove. Other amenities include concierge service, 24-hour security, landscaped courtyards, and a 53,600 square foot underground parking garage.

10. The Facility currently has a high occupancy rate, with 271 residents currently living in the Facility. As of January 18, 2019, occupancy in the IL, AL, MS, and SNF was 91.5%, 87.5%, 92.3%, and 77.1%, respectively. Among these residents, 24 reside in the Debtor's memory support unit, 37 in the Debtor's skilled nursing unit, and 49 in the Debtor's assisted living unit. Many of the residents, particularly those that reside in the memory support and skilled nursing units, depend on the physicians, nurses, and aides at the Facility for their day-to-day care and overall well-being.

11. The Debtor receives revenue from several sources, which include: (i) entrance fees ("Entrance Fees"), (ii) monthly service fees for IL, AL and MS, (iii) per diem rates for SNF services, (iv) fees for optional services, and (v) certain unit upgrade fees. Entrance Fees range from approximately $316,000 to $650,000. Monthly service fees range from $2,800 to $7,600. Per diem rates in the SNF range from approximately $150-$550.

**B.    Continuing Care Contracts**

12. As is common practice in the CCRC industry, a resident interested in occupying an independent living unit in the Facility enters into a continuing care contract (a "Continuing Care

Contract") with the Debtor.  Unlike a pure rental retirement community, whereby a resident pays monthly fees for services (which fees may increase as the resident's needs change), the Continuing Care Contract is a life care residency contract whereby a resident will pay an Entrance Fee and fixed monthly fees for the Debtor's commitment to provide care for the duration of the resident's life, regardless of whether (i) the resident's needs change over time which may require additional services to be provided by the Debtor, or (ii) the costs of providing such services increase for the Debtor.  Significantly, to the extent set forth in the Continuing Care Contracts, the Debtor's commitment to provide life care services continue even if the resident's financial condition deteriorates and is unable to continue to make its payments.  As a result, the right to such continued care, to the extent set forth in the Continuing Care Contracts, regardless of a resident's financial status or the costs of such services is a significant inducement to incoming residents.

13.     The Debtor offers different plans of Continuing Care Contracts, including, but not limited to, 90% refundable for single occupancy and 80% refundable for double occupancy with respect to IL units.  The Continuing Care Contract sets forth terms and conditions under which the resident will occupy a unit, including outlining the obligations for the payment of an Entrance Fee, the amount and timing of the refundable portion of that Entrance Fee, the amount of monthly fees to be charged, and other general matters.

14.     In general, a prospective resident must pay an Entrance Fee prior to occupying an IL unit.  Typically, in order to reserve the residence and, at the time of execution, a prospective resident provides a fully refundable deposit prior to executing the Continuing Care Contract.  The remaining balance is due on or before the move-in date, except in circumstances where a deferred portion of the Entrance Fee is negotiated.  Entrance Fees range from approximately $316,000 to approximately $650,000, depending on the unit selected by a resident.

15.     The Continuing Care Contract also requires residents to pay monthly service fees to the Debtor (the "Monthly Fee," together with the Entrance Fee, the "Fees"). In consideration for payment of Entrance Fees, Monthly Fees and other fees charged by the Debtor, residents are furnished with a residence and are given access to a wide array of services. Section 2.5 of the Continuing Care Contract provides that the Debtor "will provide the following services covered by the Monthly Fee and Entrance Fee," which services include: (i) dining service; (ii) housekeeping and laundry; (iii) utilities; (iv) security and emergency alert system; (v) maintenance; (vi) mail; (vii) transportation; (viii) social, educational, and wellness programs; (ix) property taxes and insurance; (x) storage area; (xi) a physician, to serve as a "Medical Director," as that term is defined under federal and Indiana State Department of Health regulations; and (xii) life care benefits. The Debtor uses the Fees to fund its operations, service its debt obligations, and make capital improvements to the Facility.

16.     If, after the move-in date set forth in the Continuing Care Contract, (i) a resident terminates the Continuing Care Contract and permanently leaves the Facility; (ii) a resident dies; or (iii) in rare instances, the Debtor terminates the Continuing Care Contract pursuant to the provisions therein, then such resident is entitled to the refundable portion of his or her Entrance Fee (the "Refund") pursuant to the terms of his or her Continuing Care Contract. The Refund is due after a resident physically and permanently leaves the Facility, including the removal of the resident's personal property, and is made within ten (10) days of the later of (i) the effective date of termination of the Continuing Care Contract, or (ii) the date a new Entrance Fee and executed Continuing Care Contract is received by the Facility and the new resident has taken occupancy of that resident's unit.

7

### C. **Sponsorship by SQLC**

17.     SQLC has been the sole corporate non-voting member and sponsor of the Debtor since May 7, 2012.  SQLC is a non-profit chartered under the laws of the State of Texas, a tax-exempt organization under section 501(c)(3) of the Tax Code, and a "supporting organization" and public charity under section 509(a)(3) of the Tax Code.

### D. **Management by Seniority**

18.     Seniority, Inc. ("Seniority") is a California corporation, based in Addison, Texas with expertise in developing, operating, and managing CCRCs.  SQLC is the sole owner of Seniority.  SQLC hired Seniority, pursuant to that Master Management Services Agreement dated as of September 7, 2017 (the "Management Agreement") pursuant to which Seniority would serve as exclusive manager (the "Manager") of the day-to-day operations of the Debtor.  Seniority provides a wide array of services to the Debtor.  In exchange for such services, the Debtor pays Seniority a monthly management fee and administrative fee for reimbursement of the Manager's out-of-pocket administrative expenses.

### E. **The Debtor's Prepetition Capital Structure**

19.     As of the Petition Date, on a book value basis, the Debtor had approximately $96.5 million in assets which consisted of approximately:

      i. $3.5 million in cash and cash equivalents;
     ii. $300,000 in accounts receivable;
   iii. $1.1 million of deferred entrance fee receivables;
   iv. $77 million in property and equipment;
    v. $8 million of restricted cash; and
   vi. $6.6 million of other assets.

20.    As of the Petition Date, the Debtor had approximately $151.9 million of liabilities, which consisted of approximately:

      i.    $300,000 of trade accounts payable;
      ii.    $2.4 million of oversight fees owed to SQLC;
      iii.    $52.4 million of contingent resident refund obligations;
      iv.    $92.7 million (plus accrued interest) of long-term municipal bond obligations; and
      v.    $4.1 million (plus accrued interest) of subordinated note obligations.

### 1.    Municipal Bond Debt

21.    Pursuant to that Master Trust Indenture, dated as of August 1, 2012 (the "Master Indenture"), between the Debtor, as the initial member of the Obligated Group (as defined in the Master Indenture), and The Bank of New York Mellon Trust Company, N.A. ("BNYM"), as prior master trustee (the "Master Trustee") and to UMB Bank, N.A. ("UMB"), as the successor bond trustee (the "Bond Trustee"), under that Bond Trust Indenture date as of August 1, 2012 (the "Bond Indenture"), between the City of Carmel, Indiana (the "Issuer") and BNYM, the Issuer issued revenue bonds in the aggregate principal amount of $119,020,000 (the "Bonds").  As security for the issuance of the Bonds, the Debtor issued the following note obligations: (i) $94,575,000 Direct Note Obligation, Series 2012A (the "Series 2012A Obligation"); (ii) $3,000,000 Direct Note Obligation, Series 2012B (the "Series 2012B Obligation"); (iii) $3,515,000 Direct Note Obligation, Series 2012C-1 (the "Series 2012C-1 Obligation"); (iv) $7,905,000 Series 2012C-2 (the "Series 2012C-2 Obligation"); (v) $3,025,000 Series 2012C-3 (the "Series 2012C-3 Obligation"); and (vi) $7,000,000 Direct Note Obligation, Series 2012D (the "Series 2012D Obligation") (collectively, the "Series 2012 Obligations").[3]

---

[3]    Capitalized terms not otherwise defined in this paragraph shall have the definition provided in the Master Indenture.

22.     Pursuant to that Loan Agreement, dated as of August 1, 2012 (the "Loan Agreement"), between the Debtor and the Issuer, the Issuer loaned the proceeds of the Bonds to the Debtor for the purpose of, among other things, (i) payment or reimbursement for the payment of certain costs of acquiring, constructing, renovating, remodeling, and equipping the Facility, (ii) payment or reimbursement for the payment of certain project costs incurred prior to the issuance of the Bonds, (iii) funding a debt service reserve fund, and (iv) paying a portion of the interest of the Bonds.

23.     The rights of the Issuer under the Loan Agreement were assigned to the Bond Trustee pursuant to the Bond Indenture. As security for its obligations with respect to the Bonds, the Debtor entered into the Master Indenture and a Mortgage, Assignment of Leases and Rents, Security Agreement, and Fixture Filing, dated as of August 1, 2012, between the Debtor and the Master Trustee (the "Mortgage and Security Agreement"), pursuant to which the Debtor granted the Bond Trustee a security interest in certain assets of the Debtor as described in the Master Indenture and the Mortgage and Security Agreement.[4]

24.     The Debtor defaulted on the Series 2012 Obligations by failing to make the required installments of principal and interest on November 10, 2018, December 10, 2018, and January 10, 2019 (collectively, the "Payment Defaults"). The Payment Defaults constitute an event of default under the Bond Documents.

### 2.     The Liquidity Support Agreement

25.     On August 1, 2012, SQLC LSA, LLC, ("SQLC LSA"), a Texas limited liability company whose sole member is SQLC, SQLC, the Debtor and the Master Trustee entered into that certain Liquidity Support Agreement, dated as of August 1, 2012 (the "Liquidity Support

---

[4]     The Bond Indenture, the Loan Agreement, the Master Indenture, and the Mortgage and Security Agreement are collectively referred to as the "Bond Documents."

Agreement"). Pursuant to the Liquidity Support Agreement, SQLC LSA agreed to transfer $2,000,000 to the Master Trustee for deposit into a Liquidity Support Fund, as defined in the Liquidity Support Agreement. Additionally, the Debtor agreed to make the following payments: (i) $2,375,000 to the Master Trustee for deposit into the Supplemental Liquidity Support Fund, as defined in the Liquidity Support Agreement, and (ii) $1,875,000 to the Master Trustee for deposit into the Special Project Liquidity Support Fund, as defined in the Liquidity Support Agreement.

26.    Pursuant to that liquidity support agreement dated as of August 30, 2012 (the "SQLC Liquidity Support Funding Agreement"), by and between SQLC LSA, SQLC, and Northwest Senior Housing Corporation ("NSHC"), NSHC agreed to transfer $2,000,000 to SQLC, which in turn agreed to transfer said $2,000,000 to SQLC LSA for the purpose of advancing the amounts, on behalf of the Debtor, that the Debtor agreed to provide pursuant to the Liquidity Support Agreement. In order to secure its obligations under the SQLC Liquidity Support Funding Agreement, the Debtor provided SQLC LSA with an unsecured subordinated note dated August 30, 2012 in the amount of $2,000,000 (the "SQLC LSA Subordinated Note"). The SQLC LSA Subordinated Note is subordinated as to the Series 2012B Bonds, the Series 2012C Bonds, and the Series 2012D Bonds as defined in the Master Indenture.

### 3.    Loan Agreement with SQLC

27.    The Debtor and SQLC entered into a loan agreement on August 30, 2012 (the "Pre-Finance Loan Agreement"), pursuant to which SQLC agreed to advance $1,875,000 to the Debtor for the construction and operation of the Facility, which funds were deposited into the Special Project Liquidity Support Fund. In order to secure its obligations under the Pre-Finance Loan Agreement, the Debtor provided SQLC with an unsecured subordinated promissory note dated August 30, 2012 in the amount of $1,875,000 (the "Pre-Finance Subordinated Note"). The Pre-

Finance Subordinated Note is subordinated as to the Series 2012B Bonds, the Series 2012C Bonds, and the Series 2012D Bonds as defined in the Master Indenture.

### 4. The Pre-Permanent Financing Funding Agreement

28.     Pursuant to that pre-permanent financing funding agreement dated July 1, 2012 by and between the Debtor, SQLC and NSHC (the "Pre-Permanent Financing Funding Agreement"), NSHC agreed to transfer up to $1,000,000 to SQLC, which in turn agreed to transfer up to said $1,000,000 to the Debtor for the purpose of pursuing the development of the Facility. In order to secure its obligations under the Pre-Permanent Financing Funding Agreement, the Debtor provided SQLC with an unsecured subordinated promissory note dated August 30, 2012 in the amount of $200,000 or such lesser sum as may become due under the Pre-Permanent Financing Funding Agreement (the "SQLC Subordinated Promissory Note"). The SQLC Subordinated Promissory Note is subordinated as to the Series 2012 Bonds as defined in the Master Indenture.

### 5. Contingent Resident Refund Obligations

29.     The Debtor's liabilities also include contingent resident refund obligations. As of the Petition Date, the Debtor had approximately $52 million of resident refund obligations, of which approximately $8.4 million may or will become due in the near future.

| Potential Refund Obligations | # of Residents | Amount |
|---|---|---|
| Out of IL – Out of Facility (Unit Sold) | 2 | $598,000 |
| Out of IL – Out of Facility (Unit Not Sold) | 2 | $528,000 |
| Out of IL – In Facility (Unit Sold) | 16 | $4.65 million |
| Out of IL – In Facility (Unit Not Sold) | 8 | $2.6 million |

30.     As explained above, a resident is entitled to a refund if he permanently leaves the Facility and the Facility has entered into a Continuing Care Contract with a new resident who has

taken occupancy of such unit.  Thus, the chart above demonstrates the potential refund obligations that may become due in the near future once these foregoing conditions are met.

a.      Out of IL – Out of Facility (Unit Sold).  There are two former residents who have moved out of the Facility and the Facility has sold their IL units.  The Debtor is obligated to refund approximately $598,000 in the aggregate to these two former residents.

b.      Out of IL – Out of Facility (Unit Not Sold).  There are two former residents who have moved out of the Facility but the Facility has not yet sold their IL units.  These residents will be entitled to a refund once their IL units are sold, new residents take occupancy of their respective IL units, and the full amount of the new resident Entrance Fees have been received.  When that occurs, the Debtor will be obligated to refund approximately $528,000 in the aggregate to these two former residents within ten days of when all refund conditions are met.

c.      Out of IL – In Facility (Unit Sold).  There are sixteen residents who have moved out of their IL units, the Facility has sold their IL units, but have remained within the Facility.  Once new residents take occupancy of such IL units, the full amount of the new resident Entrance Fees have been received and the residents permanently leave the Facility, the Debtor will be obligated to refund approximately $4.65 million in the aggregate to these residents within ten days of when all refund conditions are met.

d.      Out of IL – In Facility (Unit Not Sold).  There are eight residents who have moved out of their IL units, the Facility has not yet sold their IL units, but have remained within the Facility.  These residents will be entitled to a refund once their IL units are sold, new residents take occupancy of their respective IL units, the full amount of the new resident Entrance Fees have been received and the residents permanently leave the Facility.  When that occurs, the Debtor will be obligated to refund approximately $2.6 million in the aggregate to these eight residents within ten days of when all refund conditions are met.

## III.    The Debtor's Retention of a Real Estate Broker

31.    On January 23, 2019, the Debtor retained Cushman & Wakefield, U.S., Inc. ("Cushman") to conduct a robust marketing process in order to reach as many potential purchasers as possible and to elicit the best and highest offer possible.  On March 25, 2019, the Court approved the Debtor's retention of Cushman under sections 327 and 328 of the Bankruptcy Code [Docket

No. 162].   Under the terms of Cushman's engagement, the Debtor has granted Cushman the exclusive right to sell (i) the Facility, and (ii) the going concern business and all other tangible and intangible assets related to operating the Facility as a CCRC.

32.     To date, Cushman has, among other things, prepared and circulated a confidential information memorandum, assembled a virtual data room and began contacting prospective buyers that may be interested in either serving as a stalking horse or participating in an auction.

## IV.     **The Settlement**

33.     As discussed in greater detail in the Settlement Motion, the Debtor and the Bond Trustee engaged in extensive negotiations directed at resolving the disputes between them, which included the duration of the sale process for the Debtor's assets, the budget for that sale process, the treatment of Continuing Care Contracts as part of the proposed sale process, and the arguments raised in the Venue Motion (as that term is defined in the Settlement Motion).  Those negotiations resulted in the Settlement which provides for, among other things, (i) the consensual use of the Bond Trustee's cash collateral and the Debtor's adherence to an agreed-upon budget; (ii) a fulsome sale process that will allow sufficient time for the marketing and sale of the Debtor's assets; (iii) the withdrawal of the Venue Motion; and (iv) the Bond Trustee's consent to the Bid Procedures and the following timeline for the sale process:

- **March 8, 2019** – Deadline for the Debtor to distribute a Confidential Information Memorandum ("CIM"), which CIM shall be subject to review and approval by the Bond Trustee and consultation by the Committee prior to such distribution;[5]

- **April 26, 2019** – Deadline for submission of initial LOIs, which LOIs shall be provided to the Bond Trustee and the Committee within twenty-four (24) hours of receipt by the Debtor or its agents;

---

[5] The CIM was distributed by the Debtor's real estate broker as scheduled.

- **June 6, 2019** – Deadline for the Debtor to execute a definitive agreement with the Stalking Horse Bidder (as defined in the Bid Procedures), which (i) selection shall be upon approval of the Bond Trustee (which approval shall not be unreasonably withheld) and upon consultation of the Committee; and (ii) documentation shall be subject to review and approval by the Bond Trustee and consultation by the Committee;

- **July 19, 2019** – Deadline for auction; and

- **August 23, 2019** – Target date for closing of sale.

## PROPOSED BID PROCEDURES

34.     This section summarizes the key provisions of the Bid Procedures, which balance the need for a robust marketing process with the need to reach a resolution and protect the Debtor's residents.  Capitalized terms used, but not defined in this section, shall have the meanings provided in the Bid Procedures.  The descriptions of the Bid Procedures herein are qualified in their entirety by reference to the Bid Procedures attached to the Bid Procedures Order as **Exhibit 1**.

| Due Diligence Participation Requirements | Parties interested in conducting due diligence should contact the Debtor's advisors, Ankura Consulting Group LLC ("Ankura") and Cushman as follows: <br><br> • Ankura: Michael Morton, by telephone at (214) 200-3680 or by email at michael.morton@ankura.com <br><br> • Cushman: Allen McMurtry, by telephone at (813) 349-8349 or by email at allen.mcmurtry@cushwake.com, and David Kliewer, by telephone at (813) 349-8368 or by email at david.kliewer@cushwake.com <br><br> Any person desiring to submit a bid for substantially all of the Debtor's Assets will be required to deliver to the Debtor an executed confidentiality agreement in form and substance satisfactory to the Debtor.  The Debtor and its professionals will afford any person who executes a confidentiality agreement (a "Potential Bidder") such due diligence access or additional information as the Debtor, in its business judgment, determines to be reasonable and appropriate; *provided, however*, that the same access and information must also be made available to all Potential Bidders.  Notwithstanding the foregoing, the Debtor shall have the right, in its sole discretion or at the request of the |

| | |
|---|---|
| | Bond Trustee, to require satisfactory evidence of any Potential Bidder's available funds for or firm commitment for financing sufficient to consummate the Sale, prior to granting said Potential Bidder access to conduct due diligence. Additional due diligence will not be provided after the Bid Deadline (as defined below).<br><br>Notwithstanding the foregoing, the Debtor or its professionals are not required to provide confidential, business-sensitive, or proprietary information to any Potential Bidder if the Debtor reasonably believes that (i) such disclosure would be detrimental to the interests of the Estate, or (ii) such potential bidder does not intend in good faith, or have the capacity, to consummate its bid.<br><br>Each Potential Bidder shall be deemed to have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to due diligence, the submission of its bid, the Bid Procedures, the Auction and the Sale. |
| **Selection of a Stalking Horse Bidder** | Pursuant to the order approving the Bid Procedures (the "<u>Bid Procedures Order</u>"), and as set forth below, the Debtor is authorized to enter into a Stalking Horse APA (as defined below) with any Potential Bidder that desires to serve as a stalking horse bidder.<br><br>On or before April 26, 2019 at 4:00 p.m. (prevailing Central Time), any Potential Bidder that desires to serve as a stalking horse shall submit a written letter of intent setting forth the terms and conditions of its offer which shall include, but not be limited to:<br><br>1. Cash purchase price;<br><br>2. A commitment to make a good-faith deposit, the amount of which shall be subject to further negotiation, which deposit shall be non-refundable upon execution of a Stalking Horse APA unless the Debtor is in breach of the Stalking Horse APA or another party is selected as the Successful Bidder (as defined below) or as otherwise set forth in the Stalking Horse APA (the "<u>Stalking Horse Deposit</u>");<br><br>3. General description of the executory contracts and unexpired leases it intends to assume;<br><br>4. Confirmation of the Potential Bidder's intent to commit to assumption of (i) all of the Continuing Care Contracts with residents living at the Facility on or after the Petition Date, including the benevolent care provision contained therein; and (ii) all past, current and future obligations to current and former residents, including, but not limited to, those obligations arising under the Continuing Care Contracts; |

5. provide information on the operational and financial capabilities of the Potential Bidder sufficient to allow the Debtor and interested parties to determine such bidder's ability to assume the Continuing Care Contracts;

6. Statement as to whether the Potential Bidder intends to continue operating the Facility as a not-for-profit entity;

7. The Potential Bidder's affiliations; and

8. Information on the Potential Bidder's ability to continue to operate the Facility, whether as an entrance fee continuing care retirement community or otherwise.

The Stalking Horse must also comply with all other applicable Participation Requirements (as defined below).

The Debtor shall provide the Bond Trustee and the Committee with copies of all letters of intent no later than twenty-four (24) hours after receipt thereof.

On or before June 6, 2019, the Debtor, with the approval of the Bond Trustee (which shall not be unreasonably withheld) and after consulting with the Committee, may enter into a definitive asset purchase agreement (the "Stalking Horse APA") with a Potential Bidder (the "Stalking Horse").

As a component of the Stalking Horse APA, the Debtor may provide a break-up fee of up to 2% of the cash purchase price plus actual expenses in an amount not to exceed $250,000, a minimum bid increment for other bidders to submit competing bids, or other buyer protections (collectively, the "Bid Protections") requested by the Stalking Horse.

In the event that the Debtor enters into a Stalking Horse APA, the Debtor shall file with the Bankruptcy Court and serve (i) all parties that have requested notice in this Chapter 11 Case as of the date thereof; (ii) all persons identified by the Debtor's professionals as potential purchasers of the Assets; (iii) all counterparties to any of the Assigned Contracts (as defined below); (iv) the Bond Trustee; (v) all creditors of the Debtor; (vi) the Committee; (vii) Centers For Medicare & Medicaid Services; (viii) Indiana State Department of Health, Division of Long Term Care; (ix) Indiana Secretary of State, Securities Division; and (x) the Office of the United States Trustee (collectively, "All Parties in Interest") with a notice (the "Notice of Stalking Horse") that includes: (a) the identity of the Stalking Horse; (b) the purchase price to be paid by the Stalking Horse; (c) the Stalking Horse Deposit paid by the Stalking Horse; and (d) the amount and nature of the Bid Protections.

| Bid Deadline | The deadline for any Potential Bidders to submit bids intending to compete with the Stalking Horse APA, if any, shall be July 16, 2019 at 4:00 p.m. (prevailing Central Time) (the "Bid Deadline"). Such bids must be received on or before the Bid Deadline by the following parties (collectively, the "Notice Parties"): |
|---|---|

1. The Debtor, 15601 Dallas Parkway, Suite 200, Addison, Texas 75001, Attn: Scott Collier (scollier@sqlc.org);

2. counsel for the Debtor, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020, Attn: Thomas R. Califano (thomas.califano@dlapiper.com) and DLA Piper LLP (US), 1900 North Pearl Street, Suite 2200, Dallas, Texas 75201, Attn: Dan Prieto (dan.prieto@dlapiper.com);

3. the Debtor's Chief Restructuring Officer and restructuring advisor, Ankura Consulting Group LLC, 15601 Dallas Parkway, Suite 200, Dallas, Texas 75001, Attn: Louis E. Robichaux IV (louis.robichaux@ankura.com) and Michael Morton (michael.morton@ankura.com);

4. the Debtor's selling agent, Cushman & Wakefield, U.S., Inc., One Tampa City Center, Suite 3300, Tampa, Florida 33602, Attn: Allen McMurtry (allen.mcmurtry@cushwake.com);

5. counsel for UMB Bank, National Association, Jackson Walker LLP, 2323 Ross Avenue, Suite 600, Dallas, Texas 75201, Attn: Kenneth Stohner, Jr. (kstohner@jw.com) and Vienna F. Anaya (vanaya@jw.com), and Jackson Walker LLP, 112 E. Pecan Street, Suite 2400, San Antonio, Texas 78205, Attn: J. Scott Rose (srose@jw.com) and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, MA 02111, Attn: William W. Kannel (wwkannel@mintz.com) and Charles W. Azano (cwazano@mintz.com) and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., 3580 Carmel Mountain Road, San Diego, CA 92130, Attn: Joseph R. Dunn (jrdunn@mintz.com);

6. counsel for the Committee, Faegre Baker Daniels LLP, 600 E. 96th Street, Suite 600, Indianapolis, IN 46240, Attn: Jay Jaffe (jay.jaffe@faegrebd.com); Faegre Baker Daniels LLP, 311 S. Wacker Drive, Suite 4300, Chicago, IL 60606, Attn: George R. Mesires (george.mesires@faegrebd.com); and Neligan LLP,

| | |
|---|---|
| | 325 N. St. Paul Street, Suite 3600, Dallas, TX 75201; Attn: Patrick J. Neligan, Jr. (pneligan@neliganlaw.com); |
| | 7. Indiana Secretary of State, Securities Division, 302 West Washington Street E-111, Indianapolis, IN 46204, Attn: Aleksander M. Cirulis, Esq. (acirulis@sos.IN.gov); |
| | 8. Indiana State Department of Health, Division of Long Term Care, 2 North Meridian Street, 4B, Indianapolis, IN 46204, Attn: Brenda Buroker (bburoker@isdh.in.gov); |
| | 9. Centers for Medicare and Medicaid Services, Legal Department, 7500 Security Blvd., Baltimore, MD 21244; and |
| | 10. The Office of the United States Trustee, 1100 Commerce St, Room 976, Dallas, TX 75242-1699, Attn: Lisa Lambert. |
| **Bid Requirements** | To be eligible to participate in the Auction (as such term is defined below), each bid and each Potential Bidder submitting such a bid must conform to the following requirements (collectively, the "Participation Requirements"): |
| | 1. offer to consummate the sale on terms no less favorable to the Debtor than those set forth in the Stalking Horse APA, if any (taking into account Bid Protections that must be paid); |
| | 2. include a marked copy of the Stalking Horse APA, or the form asset purchase agreement contained in the data room if no Stalking Horse APA has been entered into, to show any proposed amendments thereto (the "Modified APA") and a clean and executed Modified APA; |
| | 3. include a statement that there are no conditions precedent to the Potential Bidder's ability to enter into a definitive agreement, including that there are no financing contingencies to the bid, and that all necessary internal and shareholder approvals have been obtained prior to the bid; |
| | 4. state that such offer is binding and irrevocable until the approval of the Successful Bid by the Court unless designated as the Back-Up Bid (as defined below); |
| | 5. disclose the identity of each entity that will be bidding or otherwise participating in connection with such bid, and the complete terms of any such participation; |

6.  disclose the Potential Bidder's affiliations;

7.  state whether the Potential Bidder intends to continue operating the Facility as a not-for-profit entity;

8.  include the names and contact information of members of the Potential Bidder who will be available to answer questions regarding the offer, including advisors and related parties;

9.  state that the Potential Bidder shall assume (i) all of the Continuing Care Contracts with the residents living at the Facility on or after the Petition Date, including the benevolent care provision contained therein; and (ii) all past, present and future obligations to former and current residents including, but not limited to, those obligations arising under the Continuing Care Contracts;

10. provide information on the operational and financial capabilities of the Potential Bidder sufficient to allow the Debtor and interested parties to determine such bidder's ability to assume the Continuing Care Contracts;

11. include a good-faith deposit in immediately available funds in at least the amount of the deposit provided by the Stalking Horse in the Stalking Horse APA ("Earnest Money Deposit") or if no Stalking Horse APA has been entered into, 5% of the proposed purchase price;

12. provide satisfactory written evidence of available funds, a firm commitment for financing sufficient to consummate the Sale, or if such proposal is seeking to assume the existing bond obligations, the terms and conditions of such assumption; and

13. provide information on the Potential Bidder's ability to continue to operate the Facility, whether as an entrance fee continuing care retirement community or otherwise;

14. represent and warrant that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the Debtor's business and the Assets prior to submitting its bid and a statement that the Potential Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Assets in making its bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether

|  | express or implied, by operation of law or otherwise, regarding the Debtor's business or the Assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Potential Bidder's Modified APA, ultimately accepted and executed by the Debtor; and<br><br>15. acknowledge that the Potential Bidder is not entitled to any of the Bid Protections.<br><br>The Debtor, following consultation with the Bond Trustee and the Committee, shall determine whether bids submitted by Potential Bidders meet the Participation Requirements.<br><br>The Debtor reserves the right to request additional information from a Potential Bidder in connection with its bid. The Debtor shall inform the Bond Trustee and the Committee of any such request within twenty-four (24) hours of the request.<br><br>Bids are not required to adopt the business structure as set forth in the Stalking Horse APA, and may provide for either a for-profit or not-for-profit entity as the operator of the Facility. Bidders can also submit proposals for a plan of reorganization that provides for assumption of all or some of the Debtor's bond obligations, provided that such bid also provides for the assumption of (i) the Continuing Care Contracts, including the benevolent care provision contained therein; and (ii) all past, current and future obligations to current and former residents, including, but not limited to, those obligations arising under the Continuing Care Contracts. |
|---|---|
| **Qualified Bidders and Bids** | Potential Bidders who have satisfied the Participation Requirements will be deemed "Qualified Bidders." Bids that contain all bid requirements, as determined by the Debtor, in consultation with the Bond Trustee and the Committee, will be deemed "Qualified Bids." The Stalking Horse shall be entitled to credit bid the amount of its break-up fee and expense reimbursement.<br><br>Potential Bidders may submit bids that provide for the assumption of all or some of the Debtor's bond obligations pursuant to a plan of reorganization, provided that such bid also provides for the assumption of (i) all of the Continuing Care Contracts with residents living at the Facility on or after the Petition Date, including the benevolent care provision contained therein; and (ii) all past, current and future obligations to current and former residents, including, but not limited to, those obligations arising under the Continuing Care Contracts.<br><br>The Debtor will advise each Potential Bidder whether they are deemed to be a Qualified Bidder and whether their bid is a Qualified Bid before the Auction. The Stalking Horse is deemed a Qualified Bidder and the |

| | |
|---|---|
| | Stalking Horse Bid is a Qualified Bid in all respects. The Debtor will provide copies of the Qualified Bids to the Bond Trustee, the Committee, the Indiana Securities Division and Indiana Department of Health. The Stalking Horse will be notified, no later than 24 hours prior to the Auction, if any Qualified Bids have been received.<br><br>The Debtor reserves the right to waive noncompliance with any one or more of the Participation Bid Requirements to be a Qualified Bid and deem an otherwise not Qualified Bid to be a Qualified Bid if it reasonably determines, in its business judgment, after consultation with the Bond Trustee and the Committee, that such waiver is consistent with its fiduciary duties.<br><br>The Bond Trustee reserves its right to submit a credit bid for the Debtor's Assets. The parties reserve any and all rights as to the terms and conditions of such credit bid, including the Bond Trustee's right to fully participate at the Auction. In the event the Bond Trustee credit bids, the Bond Trustee shall be required to assume (i) all of the Continuing Care Contracts with residents living at the Facility on or after the Petition Date, including the benevolent care provision contained therein; and (ii) all past, current and future obligations to current and former residents, including, but not limited to, those obligations arising under the Continuing Care Contracts.<br><br>All Qualified Bidders shall be deemed to have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to due diligence, the submission of its bid, the Bid Procedures, the Auction and the Sale. |
| **Auction Participation** | Unless otherwise agreed to by the Debtor, only Qualified Bidders, members of the Committee, the Bond Trustee, representatives of holders of the Bonds, and their respective legal or financial professionals are eligible to attend or participate at the Auction. Subject to the other provisions of these Bid Procedures, if the Debtor does not receive any Qualified Bids other than Stalking Horse Bid or if no Qualified Bidder other than the Stalking Horse has indicated its intent to participate in the Auction, the Debtor will not hold an Auction and the Stalking Horse will be named the Successful Bidder (as defined below). |
| **Auction** | If any Qualified Bid has been received and any Qualified Bidder has indicated its intent to participate in the Auction, the Debtor will conduct an auction (the "Auction") for the sale of substantially all of its Assets. Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.<br><br>The Auction shall take place at 10:00 a.m. (prevailing Central Time) on July 19, 2019 at the offices of DLA Piper LLP (US), 1900 North Pearl Street, Suite 2200, Dallas, Texas 75201. At the Auction, only the Stalking Horse, if any, and other Qualified Bidders will be permitted to |

|  | increase their bids or make any subsequent bids. The Debtor may conduct the Auction in the manner it reasonably determines, in its business judgment, after consultation with the Bond Trustee and the Committee, will achieve the maximum value for its Assets and is not inconsistent with the provisions of these Bid Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith. |
|---|---|
| **Closing the Auction** | The Auction shall continue until there is only one offer that the Debtor determines, following consultation with the Bond Trustee and the Committee, subject to Bankruptcy Court approval, is the highest and best offer from among the Qualified Bidders (including the Stalking Horse) submitted at the Auction (the "<u>Successful Bid</u>"). The Qualified Bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of a purchaser, as set forth in the Stalking Horse APA or Modified APA, as applicable. Immediately prior to the conclusion of the Auction, after consultation with the Bond Trustee and the Committee, the Debtor shall (1) review each bid made at the Auction on the basis of financial and contractual terms and such other factors as may be relevant to the sale process, including those factors affecting the Debtor's residents, mission as well as the speed and certainty of consummating the Sale; (2) identify the Successful Bid; and (3) notify all Qualified Bidders at the Auction, prior to its conclusion, of the name or names of the Successful Bidder and the amount and other material terms of the Successful Bid.<br><br>The Debtor shall also, following consultation with the Bond Trustee and the Committee, select a back-up bid (the "<u>Back-Up Bid</u>"), which shall remain open and irrevocable until one (1) business day after the closing of the Sale with the Successful Bidder. In the event that, for any reason, the Successful Bidder fails to close the transaction contemplated by the Successful Bidder, the Debtor may, following consultation with the Bond Trustee and the Committee, elect to regard the Back-Up Bid as the highest and best bid for the Assets, and the Debtor will be authorized to consummate the transaction contemplated by the Back-Up Bid without further order of the Bankruptcy Court. |
| **Assumption of Executory Contracts and Unexpired Leases** | The Stalking Horse APA and Modified APA must designate which executory contracts and unexpired leases are to be assumed and assigned; *provided, however*, (i) all of the Continuing Care Contracts with the residents living at the Facility on or after the Petition Date; and (ii) all past, present and future obligations to former and current residents must be assumed by the Successful Bidder (the "<u>Assigned Contracts</u>"). In all circumstances, the Successful Bidder shall be responsible for all cure amounts relating to the Assigned Contracts under section 365 of the Bankruptcy Code. |

35.      The Debtor proposes to send a notice (the "Auction and Sale Notice"), a copy of which is attached to the Bid Procedures Order as Exhibit 2, to all creditors and parties in interest, including all parties having expressed an interest in acquiring the Debtor's Assets within two (2) business days following entry of the Bid Procedures Order.

## PROPOSED ASSIGNMENT PROCEDURES

36.      The Debtor proposes to establish procedures to be employed in connection with the identification, assumption and assignment of the Assigned Contracts (the "Assignment Procedures") in accordance with the Stalking Horse APA or Modified APA, as applicable. Except with respect to Continuing Care Contracts, upon a determination of which of the Debtor's executory contracts and unexpired leases will be included in the list of Assigned Contracts, the Debtor will file with the Court a list identifying such Assigned Contracts and the amounts necessary to cure defaults thereunder. The Debtor will also serve all counterparties to the Assigned Contracts with a notice, substantially in the form attached to the Bid Procedures Order as Exhibit 3 (the "Assignment Notice"), specifically stating that the Debtor is seeking to assume and assign to the Successful Bidder the Assigned Contracts. The Assignment Notice shall provide that the deadline for objecting to the assumption and assignment of the Assigned Contracts shall be fourteen (14) days following service of the Assignment Notice.

37.      With respect to Continuing Care Contracts, the Debtor will provide each of its residents with a notice (the "Resident Notice") regarding the assumption and assignment of his or her Continuing Care Contract to the Successful Bidder, the Refund amount under such Continuing Care Contract, and the amount necessary to cure defaults thereunder, if any. The Resident Notice shall provide that the deadline for objecting to assumption and assignment of the Continuing Care Contract shall be fourteen (14) days following service of the Resident Notice.

38.     The Successful Bidder shall be responsible for paying all cure amounts required for the assumption and assignment of the Assigned Contracts, in accordance with section 365 of the Bankruptcy Code.

## RELIEF REQUESTED

39.     Due to the Debtor's ongoing liquidity issue and the need to provide ample time for prospective buyers to conduct due diligence and submit a bid, the Debtor and its professionals believe it is necessary to commence a sale process as described in the Bid Procedures.  By this Motion, the Debtor respectfully requests entry of two (2) orders:

(a)     the Bid Procedures Order approving, among other things, the (i) Proposed Bid Procedures, (ii) the proposed procedures for assumption and assignment of the Assigned Contracts, (iii) the Auction and Sale Notice; (iv) the Assignment Notice; and (v) the Notice of Stalking Horse; and

(b)     an order authorizing the sale of substantially all of the Debtor's Assets to the Successful Bidder pursuant to the Stalking Horse APA or Modified APA, as applicable, pursuant to the terms of the Bid Procedures, free and clear of all Encumbrances not expressly assumed, and the assumption and assignment of the Assigned Contracts pursuant to such sale.

40.     The Debtor and its professionals believe that the Bid Procedures and the proposed Sale are fair and reasonable under the circumstances of this Chapter 11 Case.

## BASIS FOR RELIEF

41.     The Debtor believes it is in the best interest of the Estate, creditors, residents and employees to commence a process for soliciting potential bidders and to complete a sale of the Debtor as a going concern in the near future.  The Bid Procedures were developed to further the Debtor's dual needs to expedite the sale process and to foster competitive bidding among financially capable bidders who demonstrate the ability to close a transaction.  The Bid Protections for the Stalking Horse will increase the likelihood that the Debtor can find a Stalking Horse and

realize the benefits afforded by a Stalking Horse. Additionally, by requiring the assumption and assignment of all Continuing Care Contracts to participate in the Auction and be deemed the Successful Bidder, the Debtor ensures the well-being of the residents and preserves one of the largest sources of value for the Estate. The ability to sell the Assets free and clear will help to generate interest in and bids on the Assets, thereby increasing the return to the Estate.

### A. The Bid Procedures Are in the Best Interest of the Debtor's Estate

42.     The Bid Procedures are designed to generate the best and highest bids from the market by eliciting as many bids from as many sufficiently-capitalized parties as possible. *Black v. Shor (In re BNP Petroleum Corp.)*, 642 F. App'x 429, 434 (5th Cir. 2016) (noting the debtor's "duty to entertain all serious offers in light of . . . [the] general obligation to 'demonstrate that the proposed sale price is the highest and best offer'") (quoting *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010)); *see also In re Integrated Res. Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988). Two provisions in particular foster this competitive bidding process to obtain the highest and best possible price for the Assets. The Bid Procedures allow for any party to conduct due diligence upon the execution of a confidentiality agreement. However, the Debtor has the sole discretion to deny any party seeking to conduct due diligence or to require evidence of available financing sufficient to consummate a sale. This provision is designed to both ensure that only serious, good-faith Potential Bidders conduct due diligence and to encourage Potential Bidders to participate by relieving them from the obligation to secure financing until such Potential Bidders are certain that they want to submit a bid. In addition, any Qualified Bid must include information on the operational and financial capabilities of the Potential Bidder sufficient to allow the Debtor and

interested parties to determine such bidder's ability to assume the Continuing Care Contracts, ensuring the preservation of the Debtor's value.  This provision ensures that the Debtor will only consider bids that will support the Court's approval of the Sale.

43.     The Bid Protections contained within the Bid Procedures will also assist the Debtor in fostering a competitive bidding environment.  The Bid Protections are an essential part of the Bid Procedures because the Bid Protections enable the Debtor to negotiate efficiently and effectively with prospective stalking horses.  The prospect of Bid Protections should encourage parties to serve as the Stalking Horse by providing reimbursement for expenditures during the due diligence process.  In turn, the Stalking Horse sets the minimum price and provides a basis for comparison to potential bidders.  Bankruptcy courts in the Fifth Circuit consistently and regularly recognize the benefits of bid protections as an important tool for obtaining a stalking horse, which in turn ensures that the debtor's estate is paid, at a minimum, the reasonable value of the assets. *See, e.g.*, *Ogle v. Comcast Corp. (In re Hous. Reg'l Sports Network, L.P.)*, 547 B.R. 717, 753 (Bankr. S.D. Tex. 2016) ("The purpose of a stalking horse bid is to set a floor for the value of a debtor's assets and avoid low bids during the auction process."); *In re Tex. Rangers Baseball Partners*, 431 B.R. 706, 715 n.28 (Bankr. N.D. Tex. 2010) (noting the benefit of having a stalking horse bidder to guarantee a floor price); *see also In re Sears Methodist Ret. Sys.*, No. 14-32821-11, 2015 Bankr. LEXIS 709 (Bankr. N.D. Tex. Mar. 5, 2015); *In re McGinnis Land Partners I, LP*, Nos. 10-BK-34654-SGJ, 10-bk-34655-SGJ, 2010 Bankr. LEXIS 6076 (Bankr. N.D. Tex. Sep. 23, 2010); *In re Tridimension Energy, L.P.*, No. 10-33565-SGJ, 2010 Bankr. LEXIS 4763  (Bankr. N.D. Tex. Oct. 28, 2010).[6]  The proposed Bid Protections, a "break-up fee of up to 2% of the cash

---

[6]      In fact, courts in the Fifth Circuit have approved the use of similar fees for all bidders when there is no stalking horse.  In the case *ASARCO, Inc. v. Elliott Mgmt. (In re Asarco, L.L.C.)*, 650 F.3d 593 (5th Cir. 2011), the Fifth Circuit agreed that the debtor had demonstrated "sound business justification" under section 363(b) where the

purchase price plus actual expenses in an amount not to exceed $250,000," are comparable to the terms of other bid protections routinely approved by bankruptcy courts. *See, e.g.*, *Tex. Rangers Baseball Partners*, 431 at 715 (noting that "the magnitude of the breakup fee is not excessive . . . at approximately 2% of the purchase price" and that the "court has found other bankruptcy cases in which breakup fees of as much as 4% have been approved" and listing cases).

**B.      The Required Assumption of the Continuing Care Contracts is Necessary and in the Best Interests of All Parties in Interest**

44.      Sections 365(a) and (b) authorize a debtor in possession to assume, subject to the court's approval, executory contracts or unexpired leases of the debtor. *See* 11 U.S.C. § 365(a), (b).  Under section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—(A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ; (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and (C) provides adequate assurance of future performance under such contract or lease.

45.      Once an executory contract has been assumed in accordance with sections 365(a) and (b), the debtor may assign it "only if . . . adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease."  11 U.S.C. § 365(f)(2).

---

reimbursements were "designed to maximize the value of ASARCO's estate, and w[ere] fair, reasonable, and appropriate." *Id.* at 603.

### 1. There is Sound Business Justification for Assumption and Assignment

46. The requirement that any Potential Bidder agree to the assignment of the Continuing Care Contracts is a crucial term of the Bid Procedures and Sale, designed to ensure the best outcome for all parties in interest and to prevent any harmful consequences that the residents could face if the Continuing Care Contracts were rejected. The Continuing Care Contracts are a key component of the Debtor's value, making the Debtor far more valuable than the value of the real estate and its improvements alone. In fact, it is the care and services provided under the Continuing Care Contracts that attract prospective residents in the first place. Rejection of the Continuing Care Contracts would not only negatively affect this value but would also be harmful to the residents who depend upon the care and services provided in them.

47. The parties have agreed that Potential Bidders must agree to assume the Continuing Care Contracts in order to participate in the Auction. This was a negotiated and crucial term of the Settlement and will ensure that the impact of this Chapter 11 Case on the residents is minimized. The Continuing Care Contracts are an integral component of the Debtor's value and make the Debtor far more valuable than its real estate and improvements alone. It is the Continuing Care Contracts that attract prospective residents to the Debtor's Facility. Rejection of the Continuing Care Contracts would not only negatively affect the Debtor's value but would also be harmful to the residents who depend upon the care and services provided in them.

48. The Debtor's determination that assumption of the Continuing Care Contracts is a requirement to participate in the Auction is entitled to deference as the Debtor's business judgment. *Advanced Contracting Sols., LLC v. Metallic Lathers & Reinforcing Ironworkers Local 46 (In re Advanced Contracting Sols., LLC)*, 582 B.R. 285, 310 (Bankr. S.D.N.Y. 2018) ("Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence . . . [and] will uphold the board's decisions as long as they are attributable to any

29

rational business purpose . . . .") (quoting *In re Genco Shipping and Trading Ltd.*, 509 B.R. 455, 464 (Bankr. S.D.N.Y. 2014). Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) ("As long as assumption of a lease appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to assume the lease should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code."); *In re Pilgrim's Pride Corp.*, 403 B.R. 413, 426 (Bankr. N.D. Tex. 2009) ("In applying the business judgment rule . . . a court is not adjured to blindly accept, but rather only to show proper deference to the business judgment of the debtor's management."). Such deference is warranted in this Chapter 11 Case, where the Debtor is acting in the best interest of the Estate to preserve value for all stakeholders.

49.    Moreover, rejection of the Continuing Care Contracts would negatively affect the Estate's value, which includes the Continuing Care Contracts because the services provided under those agreements attract people to live at the Facility. More than relieving the Debtor from providing those services, rejection would harm the Estate and the residents who rely on the services provided pursuant to the Continuing Care Contracts.

### 2.    Assumption Will Be in Accordance with Section 365

50.    As outlined above, assumption and assignment require the curing of any default under the executory contract and adequate assurances of future performance under the executory contract. The Bid Procedures require each Qualified Bidder to demonstrate the operational and financial capabilities of the proposed bidder sufficient to allow the Debtor and interested parties to determine such bidder's ability to assume the Continuing Care Contracts, subject to approval of the Court. In requiring the Successful Bidder to cure the Continuing Care Contracts, the Bid Procedures compel the party that will be benefitting from the value generated by the Continuing

Care Contracts to invest in such assets.  Accordingly, the Debtor submits that the assumption and assignment of the Continuing Care Contracts as set forth herein should be approved pursuant to section 365.

51.    To facilitate the assumption and assignment of executory contracts, the Debtor will be seeking a provision in the order approving the Sale which will provide that any anti-assignment provisions in such executory contracts, whether Continuing Care Contracts[7] or otherwise, shall not restrict, limit or prohibit the assumption, assignment and sale of said contracts, and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f).

**C.    The Court Should Approve the Sale of the Debtor as a Going Concern and Related Notices Thereof**

**1.    There is a Sound Business Justification for the Sale**

52.    Ample authority exists for approval of the Sale.  Section 363, which authorizes a debtor to sell assets of the estate other than in the ordinary course of business, provides, in relevant part that the "[debtor], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).

53.    Courts have held that approval of a proposed sale of property pursuant to section 363(b) is appropriate if the transaction represents the reasonable business judgment of the debtor. *See In re Quality Bev. Co.*, 181 B.R. 887, 895 (Bankr. S.D. Tex. 1995) ("There must be an articulated business justification, other than appeasement of major creditors, for the use, sale or lease of estate property outside the ordinary course of business."); s*ee also Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983); *In re Bombay Co.*, Case No. 07-44084-rfn-11, 2007 Bankr. LEXIS 3218, at *6-7 (Bankr. N.D. Tex. Sep. 26,

---

[7]    Section 9.9 of the Continuing Care Contract provides that it is binding upon the Debtor and its "successors and assigns."  The Debtor is seeking this relief as to the Continuing Care Contracts out of an abundance of caution.

2007) (stating that "there is also ample authority that section 363(b)(1) may be used to dispose of all or most of a chapter 11 debtor's assets through the sale in a going concern configuration or by liquidation"). Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *See, e.g.*, *In re CHC Grp. Ltd.*, No. 16-31854, 2017 Bankr. LEXIS 1016, at *74 (Bankr. N.D. Tex. Mar. 3, 2017); *In re T&M Aviation, Inc.*, No. 10-51520, 2010 Bankr. LEXIS 4722, at *4-5 (Bankr. W.D. La. Dec. 17, 2010).

54. The Sale satisfies all these factors. There is a sound business justification for the sale of the Debtor as a going concern because such Sale is critical to maintaining the value of the Debtor's business, maximizing the value of the Estate, and protecting the well-being of the residents. In order to conserve value, and based on the Debtor's limited funding and resources, the sale process needs to begin as quickly as possible in order to maintain confidence in the Debtor and its ability to serve its residents and honor its obligations. In addition, the Sale provides a realistic means for the continuation of certain resident care services for the residents with minimal interruption and inconvenience The notices that the Debtor plans to serve include all relevant information for any party wishing to participate in or object to any aspect of the Sale, in accordance with the Bankruptcy Rules and the Local Rules. As discussed above, the Bid Procedures were drafted in order to foster competitive bidding and to generate the highest price possible for the Assets. The Bid Procedures include terms that surpass the terms of bid procedures that are regularly approved by bankruptcy courts in the Fifth Circuit. Finally, the Debtor has conducted itself in good faith, both in filing this Chapter 11 Case and in preparing a process for the Sale to

Case 19-30283-hdh11 Doc 164 Filed 03/26/19 Entered 03/26/19 10:43:06 Page 33 of 35

achieve the best result possible for the Estate. Any concerns about the Debtor's actions to date or going forward may be raised at the hearing to approve the Sale. For the foregoing reasons, the Debtor submits that approval of the Sale, including any agreement with a Stalking Horse and the Bid Procedures, are appropriate and warranted under section 363.

55.     In the interest of obtaining the highest and best offer through the Auction, the Assets should be sold free and clear of any and all liens, claims, interests, and encumbrances, pursuant to section 363(f). A debtor may sell its assets free and clear under section 363(f) if any one of the following requirements is met:

> a.      applicable non-bankruptcy law permits sale of such property free and clear of such interests;
>
> b.      if the interest-holder consents;
>
> c.      such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;
>
> d.      such interest is in bona fide dispute; or
>
> e.      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Patriot Place, Ltd.*, 486 B.R. 773, 814-15 (Bankr. W.D. Tex. 2013) ("[I]f a debtor . . . can satisfy one of the five different conditions set forth in the subsections of §363(f), a debtor can sell its property . . . free and clear.").

56.     The Debtor submits that a sale of the Assets free and clear of the Encumbrances will satisfy one or more of the requirements under section 363(f). Furthermore, an order from this Court authorizing a sale free and clear of the Encumbrances will give prospective bidders assurance to price the Assets commensurately.

##### 2.    Notice of the Sale is Reasonable

57.    The Auction and Sale Notice, the Assignment Notice and the Notice of Stalking Horse provided for in the Bid Procedures are reasonably calculated to provide all of the Debtor's known creditors and all other parties in interest with adequate, timely notice of, among other things, the Bid Procedures, Auction, and the hearing to consider approving the Sale (the "Sale Hearing"), while reducing costs for the Estate.

## NOTICE

58.    Notice of this Motion shall be provided to: (a) the Office of the United States Trustee for the Northern District of Texas; (b) counsel to the Committee; (c) counsel to the Bond Trustee; (d) the Internal Revenue Service; (e) the Offices of the Attorney General of the States of Indiana and Texas; (f) the State of Indiana Department of Health; (g) the Indiana Secretary of State, Securities Division; and (h) those parties who have requested notice pursuant to Bankruptcy Rule 2002.  The Debtor respectfully submits that such notice is sufficient and that no further notice of this Motion is required.


[*Remainder of page intentionally blank*]

## CONCLUSION

**WHEREFORE,** the Debtor respectfully requests entry of (i) the Bid Procedures Order, substantially in the form attached hereto as **Exhibit A**, approving the Bid Procedures, the Bid Protections, the Assignment Procedures, the forms of notices of the Sale, and related relief; and (ii) following a subsequent hearing, entry of an order approving the sale of substantially all of the Debtor's Assets free and clear of Encumbrances, the assumption and assignment of certain executory contracts and unexpired leases, and related relief.

Dated: March 26, 2019
       Dallas, Texas

                                       **DLA PIPER LLP (US)**

                                       By: */s/ Daniel B. Prieto*
Daniel B. Prieto, State Bar No. 24048744
dan.prieto@dlapiper.com
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 743-4500
Facsimile: (214) 743-4545

- and -

Thomas R. Califano (admitted *pro hac vice*)
thomas.califano@dlapiper.com
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile: (212) 335-4501

- and -

Rachel Nanes (admitted *pro hac vice*)
rachel.nanes@dlapiper.com
DLA Piper LLP (US)
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131
Telephone: (305) 423-8563
Facsimile: (305) 675-8206

*Proposed Counsel for the Debtor*