

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 2, 2019**

~~Hardin DeWayne Hale~~

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **CHAPTER 11** |
| **MAYFLOWER COMMUNITIES, INC.[1]** | § | |
| | § | **CASE NO. 19-30283 (HDH)** |
| Debtor. | § | |

**ORDER (I) APPROVING THE ASSET PURCHASE AGREEMENT**
**BETWEEN THE DEBTOR AND PRAIRIE LANDING COMMUNITY, INC.;**
**(II) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S**
**ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND**
**ENCUMBRANCES, EXCEPT FOR CERTAIN ASSUMED LIABILITIES;**
**(III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF**
**CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN**
**CONNECTION THEREWITH; AND (IV) GRANTING RELATED RELIEF**

Upon the motion [Docket No. 164] (the "Motion") of the above-captioned debtor and

debtor-in-possession (the "Debtor"), pursuant to sections 105, 363 and 365 of title 11 of the

United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9007 of the Federal

---

[1] The last four digits of the Debtor's federal tax identification number are 6350. The mailing address for the Debtor is 1335 S. Guilford Road Carmel, Indiana 46032-2810.

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(a)(2) and 9007-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas, for entry of an order (i) authorizing and approving, among other things, the sale of substantially all of the Debtor's assets free and clear of all liens, claims, interests and encumbrances (collectively, the "Claims and Encumbrances"), other than those liabilities expressly assumed under the APA (as defined below); (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (iii) granting related relief; and the Court having entered the *Order (I) Approving Bid Procedures, (II) Authorizing the Debtor to Offer Certain Bid Protections to Stalking Horse, (III) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (IV) Approving the Forms of Notices Related to the Sale, and (V) Granting Related Relief* [Docket No. 223] (the "Bid Procedures Order"); and the Debtor having conducted a marketing process in compliance with the Bid Procedures Order and entering into that certain Asset Purchase Agreement (the "APA")[2] with Prairie Landing Community, Inc. (the "Successful Bidder"), pursuant to which the Successful Bidder has agreed to, among other things, purchase substantially all of the Debtor's assets (the "CCRC Assets") for a purchase price of Sixty-One Million Dollars ($61,000,000.00); and the Debtor having determined that the Successful Bidder has submitted the highest and best bid for the CCRC Assets; and the Court having conducted a hearing to approve the sale to the Successful Bidder upon the terms and conditions set forth in the APA on July 24, 2019 (the "Sale Hearing") at which time all interested parties were offered an opportunity to be heard; and all parties in interest having been heard, or having had the

---

[2]  Capitalized terms not otherwise defined in this Order shall have the meanings ascribed to them in the APA or the Motion.

opportunity to be heard, regarding entry of this Order (the "Sale Order") and approval of the Sale and APA; and it appearing that due and appropriate notice of the Motion, the Bid Procedures Order, the Bid Procedures, the Auction, the Sale Hearing and the Assignment Procedures having been given; and it appearing that no other notice of the relief granted by this Sale Order need be given; and this Court being fully advised in the premises; this Court, based upon the arguments, testimony and evidence presented to it, hereby makes the following findings of fact and conclusions of law: [3]

A. This Court has jurisdiction to hear and determine the Motion and to grant the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this Chapter 11 Case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B. This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

C. This proceeding is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(A), (N) and (O).

D. The statutory predicates for the Motion are sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9007.

E. As evidenced by the affidavits of service filed with the Court, and based upon the representations of counsel at the Sale Hearing: (i) proper, timely and adequate notice of the

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

Motion, the Bid Procedures Order, the Sale Hearing, the Sale, the Auction, the Bid Deadline and the Assignment Procedures has been provided in accordance with Bankruptcy Rules 2002, 6004, and 9007; (ii) such notice was good, sufficient and appropriate under the circumstances; and (iii) no other or further notice of the Motion, the Bid Procedures Order, the Sale Hearing, the Sale, the Auction, the Bid Deadline or the Assignment Procedures is necessary or shall be required.

F.     A reasonable opportunity to object or be heard with respect to the Motion and the Sale has been afforded to all interested persons and entities, including, without limitation: (i) the Office of the United States Trustee; (ii) counsel for the Committee; (iii) counsel for the Bond Trustee; (iv) all entities known by the Debtor to have expressed an interest in acquiring the CCRC Assets since the Petition Date; (v) the Indiana Secretary of State, Securities Division; (vi) the Indiana Department of Health, Division of Long Term Care; (vii) Centers for Medicare and Medicaid Services, Legal Department; and (viii) all other parties who filed requests for notice under Bankruptcy Rule 2002. The Debtor also gave due and proper notice of the Sale and assumption and assignment of each of the executory contracts (the "Assigned Contracts") listed on the *Notice of Filing of Amended Assigned Contracts and Related Cure Amounts Pursuant to the Bid Procedures Order* [Docket No. 309] (the "Assumption and Assignment Notice") to each non-Debtor party to such Assigned Contracts.

G.     Notice, as specified in the preceding paragraphs and as evidenced by the affidavits of service filed with the Court, has been provided in the form and manner specified in the Motion and required by the Bid Procedures Order, and the Court finds that the notice is adequate and sufficient in all respects to bind all creditors and parties in interest in this Chapter 11 Case.

4

H.      The process for the sale of the CCRC Assets was conducted in accordance with the Bid Procedures Order and in a non-collusive, fair and good faith manner.

I.      A reasonable opportunity has been given to any interested party to make a higher or better offer for the CCRC Assets.

J.      The Successful Bidder is purchasing the CCRC Assets in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the protection of that provision.

K.      The APA attached hereto as **Exhibit 1** was negotiated, proposed and entered into by the Debtor and the Successful Bidder without collusion, in good faith and from arms-length bargaining positions.  Neither the Debtor nor the Successful Bidder has engaged in any conduct that would cause or permit the Sale or any part of the transactions contemplated by the APA to be avoidable under section 363(n) of the Bankruptcy Code.

L.      As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing; and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtor afforded interested potential purchasers a full and fair opportunity to qualify as Qualified Bidders under the Bid Procedures and to submit an offer for the CCRC Assets.

M.      The Successful Bidder is not an "insider" of the Debtor as that term is defined in section 101(31) of the Bankruptcy Code.

N.      The consideration provided by the Successful Bidder for the CCRC Assets pursuant to the APA: (i) is fair and reasonable; (ii) is the highest and best offer for the CCRC Assets; (iii) will provide a greater recovery for all of the Debtor's stakeholders than would be provided by any other practical available alternative; and (iv) constitutes reasonably equivalent

value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act and all other applicable laws.

O.     The Debtor has demonstrated a sufficient basis and compelling circumstances requiring the Debtor to enter into the APA and sell the CCRC Assets under section 363 of the Bankruptcy Code, and such actions are appropriate exercises of the Debtor's business judgment and are in the best interests of the Debtor, its estate and its creditors.

P.     The marketing and bidding processes implemented by the Debtor and its advisors, as set forth in the Motion, were fair, proper, and reasonably calculated to result in the best value received for the CCRC Assets.

Q.     The Debtor has full authority and power to execute and deliver the APA and related agreements and all other documents contemplated by the APA, to perform its obligations therein and to consummate the Sale.  No additional consents or approvals, other than those provided in the APA, are necessary or required for the Debtor to enter into the APA, perform its obligations therein and consummate the Sale.

R.     The Successful Bidder would not have entered into the APA and would not consummate the transactions thereby, thus adversely affecting the Debtor and its residents, estate and creditors, if the CCRC Assets were not sold to it free and clear of all Claims and Encumbrances, except those expressly assumed by the Successful Bidder, or if the Successful Bidder would, or in the future could, be liable for any such Claims and Encumbrances, including based upon successor or vicarious liability or otherwise.  A sale of the CCRC Assets other than one free and clear of all such Claims and Encumbrances would adversely impact the Debtor's estate, residents and creditors, and would yield substantially less value to the Debtor's estate.

S.     The provisions of section 363(f) of the Bankruptcy Code have been satisfied pursuant to the terms of this Sale Order.

T.     The Bond Trustee has consented to the sale of the CCRC Assets pursuant to the APA free and clear of Claims and Encumbrances, including any Claims and Encumbrances of the Bond Trustee against the CCRC Assets, pursuant to the terms of this Sale Order.

U.     Subject to the right of parties to object pursuant to the terms of this Sale Order and the *Order (I) Approving Procedures to Determine Amounts Owed to Former Residents; and (II) Amending the Assignment Procedures With Respect to Current Residents Set Forth in the Bid Procedures Order* (the "Resident Claim Procedure Order"), the Debtor may assume each contract and lease listed on Schedules 2.01(c) and 2.01(d) of the APA, as such Schedules may be amended pursuant to the APA and this Sale Order (the "Assigned Contracts and Assigned Residency Agreements"), and assign each of them to the Successful Bidder pursuant to sections 363 and 365 of the Bankruptcy Code and this Sale Order notwithstanding any anti-assignment clause or other provision in the Assigned Contracts and Assigned Residency Agreements, as provided by section 365(f) of the Bankruptcy Code.

V.     The counterparties to the Assigned Residency Agreements that were not listed on the Assumption and Assignment Notice shall be provided notice of the assumption and assignment of the Assigned Residency Agreements and the proposed cure amounts in connection therewith, if any, pursuant to the procedures set forth in this Sale Order and the Resident Claim Procedure Order.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED, EFFECTIVE IMMEDIATELY, AS FOLLOWS:**

1.     The relief requested in the Motion is granted and approved in all respects.  The

Debtor's entry into the APA and the Sale is hereby approved in all respects. The terms and conditions of the APA are hereby approved in all respects.

2. All objections to the relief sought in the Motion that have not been previously resolved or withdrawn are hereby overruled on their merits and with prejudice; *provided, however*, that any Assumption Objections and Assignment Objections (as defined below) filed in connection with the Assigned Contracts and Assigned Residency Agreements shall be determined in accordance with paragraphs 19 and 20 of this Sale Order.

3. The Debtor is authorized and directed to take any and all actions necessary or appropriate to (i) consummate the Sale in accordance with the Motion, the APA and this Sale Order, and (ii) perform, consummate, implement and close fully the Sale, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA. After the date of entry of this Sale Order, the Debtor and the Successful Bidder may enter into any amendment, supplement, or modification to the APA that is not material or is not adverse to the Debtor's estate without the need of further notice, hearing or Court order.

4. Those holders of Claims and Encumbrances and other non-Debtor parties who did not object, or who withdrew their objections prior to entry of this Sale Order, the Motion, the Bid Procedures Order, the Sale Hearing, the Sale, or the APA are deemed to have consented to this Sale Order, the Bid Procedures Order, the Sale and the APA pursuant to section 363(f)(2) of the Bankruptcy Code and are enjoined from taking any action against the Successful Bidder, its affiliates, or any agent of the foregoing to recover any claim which such person or entity has against the Debtor. Those holders of Claims and Encumbrances and other non-Debtor parties who did object, if any, fall within one or more of the other subsections of section 363(f) of the

Bankruptcy Code and are adequately protected by having their Claims and Encumbrances, if any, attach to the proceeds of the Sale ultimately attributable to the property against or in which they assert a Claim and Encumbrance.

### Sale and Transfer of the CCRC Assets

5.     The APA, the Transaction Documents, all transactions contemplated thereby and all of the terms and conditions thereof are hereby approved.

6.     Upon closing of the Sale with the Successful Bidder (the "Closing"), the CCRC Assets transferred, sold and delivered to the Successful Bidder pursuant to the APA shall be free and clear of all Claims and Encumbrances of any person or entity, except those Claims and Encumbrances expressly assumed by the Successful Bidder, with all such Claims and Encumbrances attaching automatically to the proceeds of the Sale in the same manner, validity and priority that they attached to the CCRC Assets prior to the Closing.  The transfer of the CCRC Assets to the Successful Bidder constitutes a legal, valid and effective transfer of the CCRC Assets and shall vest the Successful Bidder with all right, title and interest in and to the CCRC Assets described in the APA.

7.     Upon Closing, this Sale Order shall be construed as, and shall constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the CCRC Assets pursuant to the terms of the APA.

8.     Notwithstanding anything in this Sale Order or the APA to the contrary, the CCRC Assets sold to the Successful Bidder pursuant to the APA and this Sale Order shall not include any charitable funds held by or on behalf of the Debtor, the SQLC Foundation and/or the Barrington Foundation.

9.     Upon Closing, except as permitted by the APA, all persons and entities, including,

but not limited to, the Debtor and its creditors, residents, employees, former employees and shareholders, administrative agencies, tax and regulatory authorities, governmental departments, secretaries of state, federal, state and local officials, and their respective successors or assigns, including, but not limited to, persons asserting any Claims and Encumbrances against the CCRC Assets, shall be permanently and forever barred, restrained and enjoined from commencing or continuing in any manner any action or other proceeding of any kind against the CCRC Assets or the Successful Bidder (or its members, representatives, or affiliates) as alleged successor or otherwise, with respect to (i) any Claims and Encumbrances on or in respect of the CCRC Assets, and (ii) recovering from any claim which such person or entity had solely against the Debtor or any of the Debtor's subsidiaries, affiliates, directors, officers, agents, representatives, employees, investors, owners, shareholders, partners, or joint venturers.

10.     The terms and provisions of this Sale Order shall be binding in all respects upon all entities, including, but not limited to the Debtor, the Successful Bidder, creditors, residents, employees, former employees and shareholders, administrative agencies, governmental departments, secretaries of state, federal, state and local officials and their respective successors or assigns, including, but not limited to, persons asserting any Claim and Encumbrance against or interest in the Debtor's estate or the CCRC Assets, including any subsequent appointment of a trustee or other fiduciary under any section of the Bankruptcy Code.

11.     Upon Closing, except to the extent such liability is expressly assumed by the Successful Bidder under the APA, all entities holding a Claim and Encumbrance of any kind and nature against the CCRC Assets hereby are barred from asserting such Claim and Encumbrance against the Successful Bidder and/or the CCRC Assets and, effective upon the transfer of the CCRC Assets to the Successful Bidder upon Closing, the Claims and Encumbrances shall attach

to the proceeds of the Sale with the same force, validity, priority and effect, if any, as against the CCRC Assets.

12.     This Sale Order (i) is and shall be effective as a determination that, upon Closing, all Claims and Encumbrances existing as to the CCRC Assets conveyed to the Successful Bidder have been and hereby are adjudged to be unconditionally released, discharged and terminated, with all such Claims and Encumbrances attaching automatically to the proceeds in the same manner, extent, validity and priority as they existed at Closing, and (ii) shall be binding upon and govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the CCRC Assets conveyed to the Successful Bidder.  All Claims and Encumbrances of record as of the date of this Sale Order shall be removed and stricken as against the CCRC Assets in accordance with the foregoing.  All entities are authorized and specifically directed to strike all such recorded Claims and Encumbrances against the CCRC Assets from their records, official or otherwise.

13.     If any person or entity which has filed financing statements, mortgage, lis pendens or other documents or agreements evidencing Claims and Encumbrances on the CCRC Assets shall not have delivered to the Debtor prior to Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements and any other documents necessary for the purpose of documenting the release of all

Claims and Encumbrances which the person or entity has or may assert with respect to the CCRC Assets, the Debtor is hereby authorized and directed upon Closing, and the Successful Bidder is hereby authorized upon Closing, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the CCRC Assets. Upon Closing of the Sale, each of the Debtor's creditors is authorized and directed to execute such documents and take all such actions as may be necessary to release their respective Claims and Encumbrances against the CCRC Assets.

14. Upon a Closing, the Successful Bidder shall not be deemed to be (i) a successor to the Debtor, (ii) party to a *de facto* merger of the Successful Bidder and the Debtor or (iii) a mere continuation of the Debtor. Without limiting the generality of the foregoing, and except as specifically provided in the APA, the Successful Bidder shall not be liable for any claims against the Debtor or any of its predecessors or affiliates, other than as expressly provided for in such APA. Further, except as expressly provided in the APA, the Successful Bidder is not assuming nor shall it in any way be liable or responsible, as successor or otherwise, for any claims, debts, obligations, Claims or Encumbrances of the Debtor or its estate of any kind or character in any way whatsoever relating to or arising from the CCRC Assets or the Debtor's operation or use of the CCRC Assets prior to the Closing, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, under the laws of the United States, any state, territory, or possession of the United States, the District of Columbia or any other country or foreign jurisdiction.

## Sale Proceeds

15. Except as set forth in Paragraph 16, the Holdback Escrow Amount and payments made on account of Cure Amounts (as defined below), all amounts received by the Debtor at

Closing shall be paid directly to the Bond Trustee, and the Debtor is authorized and directed to pay such amounts directly to the Bond Trustee in an amount up to the aggregate amount of outstanding prepetition and postpetition obligations of the Debtor to the Bond Trustee for indefeasible application by the Bond Trustee to all outstanding obligations to the Bond Trustee; *provided, however*, that funds will be withheld and reserved from such payment to the Bond Trustee by the Debtor in the total amount of $5.0 million (the "<u>Distribution Reserve</u>") for payment by the Debtor of administrative expenses, certain tax liabilities, statutory fees, and other amounts required to be paid by the Debtor's proposed chapter 11 plan to the extent the Debtor is not anticipated to have cash to pay such amounts on the anticipated effective date of such plan, with the Bond Trustee retaining its claim and lien against such Distribution Reserve and all rights and claims with respect to the ultimate amount reserved for the payments set forth above.

16.     In accordance with the APA and subject to the Former Resident Claim Procedures (as defined in the Resident Claim Procedure Order), the Successful Bidder shall pay to the Debtor at Closing an amount equal to the Non-Contingent Former Residents Liabilities owed by the Debtor under those certain Non-Contingent Former Life Care Agreements to the Non-Contingent Former Residents as determined by the Bankruptcy Court or as set forth in Schedule 2.03(a)(iii) of the APA (the "<u>Non-Contingent Former Resident Funds</u>") to be held in trust by the Debtor and distributed to the Non-Contingent Former Residents by no later than five (5) Business Days after the Closing.  The Non-Contingent Former Resident Funds are earmarked for the Non-Contingent Former Residents, payable solely to the Non-Contingent Former Residents, and shall be free and clear of any Claims and Encumbrances of the Bond Trustee and any other party.

17.     With respect to the Non-Contingent Former Residents Liabilities, the Debtor shall

comply with the Former Resident Claim Procedures approved pursuant to the Resident Claim Procedure Order. If a Former Resident (as defined in the Resident Claim Procedure Order) does not assert a Claim Objection (as defined in the Resident Claim Procedure Order) by the deadline set forth in the Former Resident Letter (as defined in the Resident Claim Procedure Order), the Court shall treat the Claim Amount (as defined in the Resident Claim Procedure Order) as the total amount due to that particular Former Resident for all purposes in the Chapter 11 Case and under the APA. Additionally, the failure to assert a Claim Objection in accordance with the Former Resident Letter shall be deemed a waiver and release of any right to assert an objection and forever bar and estop a Former Resident from asserting or claiming against the Debtor, the Successful Bidder or any other assignee that any additional amounts are due under his or her Non-Contingent Former Life Care Agreement.

**Assumption and Assignment of Assigned Contracts and Assigned Residency Agreements**

18.    Notwithstanding any provisions in the APA to the contrary, the Successful Bidder may not add or remove executory contracts and unexpired leases to the list of Assigned Contracts.

19.    If, as to any Assigned Contract, a counterparty does not assert an Assumption Objection by the Objection Deadline, such Assigned Contract shall be deemed assumed by the Debtor and assigned to the Successful Bidder pursuant to section 365 of the Bankruptcy Code without further order of the Court, effective as of the later of (i) the Objection Deadline; (ii) payment of the applicable cure amount, if any; and (iii) the Closing Date. If, however, an Assumption Objection is received by the Objection Deadline, and the Debtor and/or the Successful Bidder is unable to resolve such objection consensually, the proposed assumption and assignment which is the subject of the Assumption Objection shall be subject to further order of

the Court, and the Debtor and/or the Successful Bidder shall promptly schedule a hearing to consider the Assumption Objection.

20.     With respect to the Assigned Residency Agreements, the Debtor shall comply with the Amended Assignment Procedures set forth in the Resident Claim Procedure Order.  If a counterparty to an Assigned Residency Agreement does not assert an Assignment Objection (as defined in the Resident Claim Procedure Order) by the deadline set forth in the Current Resident Claim Letter (as defined in the Resident Claim Procedure Order), the Current Resident (as defined in the Resident Claim Procedure Order) shall be deemed to waive and release any right to assert an objection and be forever barred and estopped from asserting or claiming against the Debtor, the Successful Bidder or any other assignee that any additional amounts are due, including, but not limited to, under his or her Assigned Residency Agreement, as applicable, or that such Assigned Residency Agreement cannot be assumed by the Debtor and assigned to the Successful Bidder under section 365 of the Bankruptcy Code.  If, as to any Assigned Residency Agreement, a counterparty does not assert an Assignment Objection by the deadline set forth in the Current Resident Claim Letter, such Assigned Residency Agreement shall be deemed assumed by the Debtor and assigned to the Successful Bidder pursuant to section 365 of the Bankruptcy Code without further order of the Court, effective as of the later of (i) the objection deadline set forth in the Current Resident Letter; (ii) payment of the applicable cure amount, if any; and (iii) the Closing Date.

21.     The Debtor has demonstrated that assuming and assigning the Assigned Contracts and Assigned Residency Agreements in connection with the Sale is an exercise of its sound business judgment, and that such assumption and assignment is in the best interests of the Debtor's estate.  Pursuant to the Assignment Procedures and procedures set forth in the Resident

Claim Procedure Order, the Debtor will cure, or will provide adequate assurance of cure of, any defaults existing prior to the Closing Date, which is the effective date of the assumption of the Assigned Contracts and Assigned Residency Agreements, and will provide for compensation or adequate assurance of compensation to any non-Debtor party to such contracts for any of their actual pecuniary losses resulting from any default arising prior to the Closing Date under the Assigned Contracts and Assigned Residency Agreements, within the meaning of section 363(b)(1)(B) of the Bankruptcy Code (collectively, the "Cure Amounts"). Pursuant to the APA, all Cure Amounts shall be funded by the Successful Bidder to the Debtor.

22.     Subject to paragraphs 19 and 20 and payment of the Cure Amounts (which amounts may be satisfied or waived in part or whole according to any separate agreements with any non-Debtor party thereto), each Assigned Contract and Assigned Residency Agreement will be in full force and effect and enforceable by the Successful Bidder against any non-Debtor party thereto in accordance with its terms upon the Closing of the Sale. The Debtor shall be relieved from any further liability with respect to the Assigned Contracts and Assigned Residency Agreements after such assignment to and assumption by the Successful Bidder.

23.     Unless otherwise agreed by any party potentially entitled to a Cure Amount, on the Closing Date or such other date as determined by the Court, the Debtor will pay in full all Cure Amounts in respect of all undisputed cure claims and all Cure Amounts that have been determined by this Court or resolved by agreement. Any agreements regarding Cure Amounts shall be binding as if and have the same effect as if the Court had made a final determination of such Cure Amounts pursuant to this Sale Order and the motion or notice filed by the Debtor regarding assumption and assignment of such Assigned Contracts and Assigned Residency Agreements.

24.     Subject to paragraphs 19 and 20, except for the obligation to pay the Cure Amounts, each nondebtor party to an Assigned Contract or Assigned Residency Agreement hereby is forever barred, estopped, and permanently enjoined from asserting against the Debtor or the Successful Bidder, or the property of any of them, any default existing as of the date of the Sale Hearing, whether declared or known or unknown.

25.     Any provisions in any Assigned Contracts or Assigned Residency Agreements that prohibit or condition the assignment of any Assigned Contracts or Assigned Residency Agreements or allow the non-debtor party to such Assigned Contract or Assigned Residency Agreement to terminate, recapture, impose any penalty, condition a renewal or extension, or modify or limit any term or condition upon the assignment of such Assigned Contract or Assigned Residency Agreement, constitutes unenforceable anti-assignment provisions that are void and of no force and effect.  Subject to paragraphs 19 and 20, all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to the Successful Bidder of the Assigned Contracts and Assigned Residency Agreements have been satisfied.

26.     Subject to paragraphs 19 and 20, the Successful Bidder has provided adequate assurance of its future performance under the Assigned Contracts and Assigned Residency Agreements within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

27.     Assumption of the Assigned Contracts and Assigned Residency Agreements shall include any ancillary or related agreements, or rights appurtenant thereto, pursuant to which the Debtor has rights or licenses granted in connection with or under the Assigned Contracts and Assigned Residency Agreements, so long as such ancillary or related agreements do not create

17

additional obligations of the Debtor or Successful Bidder beyond those set out in the Assigned Contracts and Assigned Residency Agreements (unless Successful Bidder subsequently agrees to such obligations).

28. The Debtor and the Successful Bidder shall jointly file and serve a Notice of Closing and Schedule of Assigned Contracts and Assigned Residency Agreements (the "Closing Notice") within two (2) business days following the Closing, and service of such Closing Notice by CM/ECF shall be deemed sufficient in all regards. No assumption and assignment of any Assigned Contracts and Assigned Residency Agreements shall be binding on the Debtor and the Successful Bidder until the Closing of the APA pursuant to this Sale Order.

## Additional Provisions

29. The provisions of this Sale Order and the APA and any actions taken pursuant hereto or thereto shall survive entry of any order which may be entered (i) confirming or consummating any plan of reorganization or liquidation of the Debtor; (ii) converting the Debtor's bankruptcy case from chapter 11 to chapter 7; (iii) dismissing the Debtor's bankruptcy case; or (iv) appointing a chapter 11 trustee or examiner, and the terms and provisions of the APA as well as the rights and interests granted pursuant to this Sale Order and the APA shall continue in this Chapter 11 Case or any superseding case and shall be binding upon the Debtor, the Successful Bidder and their respective successors and permitted assigns. The post-closing obligations under the APA shall be unaffected and fully preserved, so that any successor, liquidating trust, Chapter 7 trustee, or the like shall be obligated and required to comply with all post-Closing duties, including without limitation further assurances and any obligations under management and sublease agreements regardless of the status of this Chapter 11 Case, without cost to, or the necessity of a motion or administrative claim from, the Successful Bidder.

18

30. Each and every federal, state and governmental agency or department and any other person or entity is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

31. Pursuant to section 1146(a) of the Bankruptcy Code, the sale of the CCRC Assets shall not be taxed under any law imposing a stamp tax or similar tax.

32. Upon Closing, the Successful Bidder shall pay to the Debtor the Cash Purchase Price less the Deposit. Additionally, upon Closing, the Deposit shall be paid by the Title Company to the Debtor. On the twelve (12) month anniversary of the Closing Date, any remaining funds from the Holdback Escrow Amount shall be disbursed in accordance with the APA and the Holdback Escrow Agreement.

33. Pursuant to the APA, upon the Closing, the Successful Bidder shall be deemed to have assumed all Contingent Former Residents Liabilities and shall pay such amounts to the Contingent Former Residents as they become due in accordance with the Contingent Former Life Care Agreements.

34. Nothing contained in any order of any type or kind entered in this Chapter 11 Case or any related proceeding subsequent to entry of this Sale Order, nor in any chapter 11 plan confirmed in this Chapter 11 Case, shall conflict with or derogate from the provisions of the APA or the terms of this Sale Order, which shall be expressly preserved under the terms of such plan. To the extent, if any, anything contained in this Sale Order conflicts with a provision in the APA, this Sale Order shall govern and control.

35. The Successful Bidder is purchasing the CCRC Assets in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the protection of that provision. The consideration provided by the Successful Bidder

for the CCRC Assets is fair and reasonable, and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

36.     This Court retains jurisdiction, even after conversion of this Chapter 11 Case to a case under chapter 7, to: (i) interpret, implement and enforce the terms and provisions of this Sale Order (including any injunctive relief provided in this Sale Order) and the terms of the APA, all amendments thereto and any waivers and consents thereunder and of each of the agreements executed in connection therewith; (ii) protect the Successful Bidder and the CCRC Assets from and against any of the Claims and Encumbrances, other than those expressly assumed by the Successful Bidder; (iii) resolve any disputes arising under or related to the APA or the Sale; (iv) adjudicate all issues concerning (alleged) pre-Closing Claims and Encumbrances and any other (alleged) interest(s) in and to the CCRC Assets, including the extent, validity, enforceability, priority and nature of all such (alleged) Claims and Claims and Encumbrances and any other (alleged) interest(s); (v) adjudicate any disputes related to the Assigned Contracts and Assigned Residency Agreements between the Debtor and the Successful Bidder or the Debtor and a counterparty to the Assigned Contracts and Assigned Residency Agreements; and (vi) adjudicate any and all issues and/or disputes relating to the Debtor's right, title or interest in the CCRC Assets, the Motion, the APA and/or the Holdback Escrow Amount.

37.     From and after the date hereof, the Debtor and the Successful Bidder shall act in accordance with the terms of the APA.

38.     This Sale Order shall be binding in all respects upon all creditors (whether known or unknown) of the Debtor, all successors and assigns of the Successful Bidder, the Debtor and its affiliates and subsidiaries, the CCRC Assets, and any subsequent trustees appointed in this Chapter 11 Case or upon (i) a conversion of this Chapter 11 Case to a case under chapter 7 or (ii)

dismissal of the Debtor's Chapter 11 Case.

39.     The failure specifically to include any particular provisions of the APA in this Sale Order shall not diminish or impair the efficacy of such provisions, it being the intent of the Court that the APA with the Successful Bidder and each and every provision, term and condition thereof be, and therefore is, authorized and approved in its entirety.

40.     The provisions of this Sale Order are nonseverable and mutually dependent.

41.     The automatic stay of section 362(a) of the Bankruptcy Code shall not apply to and otherwise shall not prevent the exercise or performance by any party of its rights or obligations under the APA with the Successful Bidder, including, without limitation, with respect to any cash held in escrow pursuant to the provisions thereof.

42.     This Sale Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 6004(g), 6004(h), 6006(d), 7062, or otherwise.

**###End of Order###**

Order submitted by:

**DLA PIPER LLP (US)**

By: _/s/  Daniel B. Prieto_____
Daniel B. Prieto, State Bar No. 24048744
DLA Piper LLP (US)
1900 North Pearl Street, Suite 2200
Dallas, Texas 75201
Tel: (214) 743-4500
Fax: (214) 743-4545
E-mail:  dan.prieto@dlapiper.com

- and -

Thomas R. Califano, NY Bar No. 2286144 (admitted *pro hac vice*)
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Tel:  (212) 335-4500
Fax:  (212) 335-4501

E-mail:  thomas.califano@dlapiper.com

- and -

Rachel Nanes (admitted *pro hac vice*)
DLA Piper LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Tel:  (305) 423-8563
Fax:  (305) 675-8206
E-mail:  rachel.nanes@dlapiper.com

*Counsel for the Debtor*

# **EXHIBIT 1**

## **APA WITH SUCCESSFUL BIDDER**

**EXECUTION VERSION**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF JUNE 13, 2019,**
**BY AND BETWEEN**

**MAYFLOWER COMMUNITIES, INC. D/B/A THE BARRINGTON OF CARMEL,**
**A DELAWARE NONPROFIT CORPORATION**
as Seller

**AND**

**PRAIRIE LANDING COMMUNITY, INC.,**
**AN INDIANA NONPROFIT CORPORATION**
as Buyer

# TABLE OF CONTENTS

**Page**

**ARTICLE I.** DEFINITIONS ............................................................................................ 2

    **Section 1.01**    Defined Terms.................................................................. 2
    **Section 1.02**    Other Definitions and Interpretive Matters ......................... 18

**ARTICLE II.** PROPERTY DESCRIPTION AND BANKRUPTCY CASE ........................... 19

    **Section 2.01**    CCRC Assets.................................................................. 19
    **Section 2.02**    Excluded Assets. ............................................................ 22
    **Section 2.03**    Assumption of Liabilities. ............................................... 24
    **Section 2.04**    Excluded Liabilities. ...................................................... 26
    **Section 2.05**    Further Assurances. ........................................................ 27
    **Section 2.06**    Bankruptcy Court Approval. ............................................ 28
    **Section 2.07**    Assigned Contracts and Cure Costs. .................................. 29

**ARTICLE III.** PURCHASE PRICE ................................................................................ 30

    **Section 3.01**    Purchase Price. .............................................................. 30
    **Section 3.02**    Good Faith Deposit. ....................................................... 30
    **Section 3.03**    Adjustment of Purchase Price. ......................................... 31

**ARTICLE IV.** REPRESENTATIONS AND WARRANTIES OF SELLER ........................... 33

    **Section 4.01**    Organization; Good Standing of Seller. .............................. 33
    **Section 4.02**    Authority; Validity; Consents.. ........................................ 33
    **Section 4.03**    No Conflict.................................................................... 33
    **Section 4.04**    [RESERVED]. ................................................................ 33
    **Section 4.05**    Contracts ...................................................................... 34
    **Section 4.06**    Title; Sufficiency of Assets; No Outstanding Rights ........... 34
    **Section 4.07**    Financial Information ...................................................... 35
    **Section 4.08**    Permits and Approvals. ................................................... 35
    **Section 4.09**    Government Program Participation/Accreditation/Cost Reports........ 36
    **Section 4.10**    Compliance with Applicable Laws. ................................... 38
    **Section 4.11**    Health Regulatory Compliance. ....................................... 38
    **Section 4.12**    Information Privacy and Security Compliance. ................... 39
    **Section 4.13**    Compliance Programs. ................................................... 40
    **Section 4.14**    Proceedings; Judgments. ................................................. 40
    **Section 4.15**    Labor Matters. .............................................................. 41
    **Section 4.16**    Employee Benefits. ........................................................ 42
    **Section 4.17**    Real Property................................................................. 43
    **Section 4.18**    [RESERVED]. ................................................................ 45
    **Section 4.19**    Residency Agreements .................................................... 45
    **Section 4.20**    Insurance. ..................................................................... 46
    **Section 4.21**    Intellectual Property. ...................................................... 47
    **Section 4.22**    Tax Matters .................................................................. 47
    **Section 4.23**    Environmental Matters .................................................... 48
    **Section 4.24**    Affiliate Transactions ..................................................... 49
    **Section 4.25**    Broker's or Finder's Fees................................................. 49

# TABLE OF CONTENTS

**Page**

**Section 4.26**  No Other Representation and/or Warranty. ........................................ 49

**ARTICLE V.** REPRESENTATIONS AND WARRANTIES OF BUYER ............................... 49

**Section 5.01**  Organization and Good Standing. ........................................ 49
**Section 5.02**  Authorization and Binding Effect of Transaction Documents............ 49
**Section 5.03**  Absence of Conflicts. ........................................ 50
**Section 5.04**  Consents. ........................................ 50
**Section 5.05**  Broker's or Finder's Fees. ........................................ 50
**Section 5.06**  Ability to Perform. ........................................ 50
**Section 5.07**  Diligence. ........................................ 50
**Section 5.08**  Healthcare Regulatory and Exclusion. ........................................ 52
**Section 5.09**  No Other Representation and/or Warranty. ........................................ 52

**ARTICLE VI.** COVENANTS ........................................ 52

**Section 6.01**  Continuing Inspection Rights ........................................ 52
**Section 6.02**  Conduct of Business Prior to the Closing ........................................ 53
**Section 6.03**  Notification of Certain Matters. ........................................ 54
**Section 6.04**  Additional Financial Information ........................................ 54
**Section 6.05**  Title; Additional Documents. ........................................ 55
**Section 6.06**  Licensing. ........................................ 55
**Section 6.07**  Confidentiality ........................................ 55
**Section 6.08**  Publicity. ........................................ 56
**Section 6.09**  Commercially Reasonable Efforts ........................................ 56
**Section 6.10**  Reports. ........................................ 56
**Section 6.11**  Post-Closing Records Obligations of Seller ........................................ 56
**Section 6.12**  Permits and Approvals. ........................................ 56
**Section 6.13**  Casualty ........................................ 56
**Section 6.14**  Overpayments ........................................ 57

**ARTICLE VII.** OTHER AGREEMENTS ........................................ 57

**Section 7.01**  Taxes. ........................................ 57
**Section 7.02**  Allocation of Purchase Price. ........................................ 58
**Section 7.03**  Bulk Sales ........................................ 59
**Section 7.04**  Adequate Assurance and Performance; Security Arrangements. ....... 59
**Section 7.05**  Employee Matters. ........................................ 60
**Section 7.06**  Post-Closing Books and Records and Personnel ........................................ 62
**Section 7.07**  Condemnation. ........................................ 63
**Section 7.08**  Payment of Broker and Finder's Fees. ........................................ 63
**Section 7.09**  Billing and Collection of Accounts Receivable. ........................................ 63

# TABLE OF CONTENTS

**Page**

**ARTICLE VIII.** CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER
TO CLOSE ................................................................................................ 64

| | | |
|---|---|---|
| **Section 8.01** | Accuracy of Representations and Warranties; Closing Certificate. ............................................................................... 64 |
| **Section 8.02** | Performance of Agreement ................................................. 64 |
| **Section 8.03** | Seller Closing Certificate ................................................... 65 |
| **Section 8.04** | Conveyance of Property...................................................... 65 |
| **Section 8.05** | Bond Financing and Subordinated Financing and Release of All Liens. ................................................................................... 65 |
| **Section 8.06** | Delivery of Closing Documents.......................................... 65 |
| **Section 8.07** | Required Approvals ............................................................ 65 |
| **Section 8.08** | Governmental Approvals. ................................................... 65 |
| **Section 8.09** | Cure Costs of Assigned Contracts....................................... 65 |
| **Section 8.10** | Entry of Sale Order ............................................................ 65 |
| **Section 8.11** | No Material Adverse Effect ................................................ 65 |
| **Section 8.12** | Management Agreement. ..................................................... 65 |
| **Section 8.13** | Environmental Reports........................................................ 65 |
| **Section 8.14** | Estoppel Certificates. ......................................................... 66 |
| **Section 8.15** | Additional Deliveries ......................................................... 66 |

**ARTICLE IX.** CONDITIONS PRECEDENT TO THE  OBLIGATION OF SELLER
TO CLOSE ................................................................................................ 66

| | | |
|---|---|---|
| **Section 9.01** | Accuracy of Representations and Warranties ...................... 66 |
| **Section 9.02** | Performance of Agreements................................................. 66 |
| **Section 9.03** | Buyer Closing Certificate................................................... 66 |
| **Section 9.04** | Delivery of Closing Documents.......................................... 66 |
| **Section 9.05** | Operations Transfer Agreement.......................................... 66 |
| **Section 9.06** | Interim Management Agreement. ........................................ 67 |
| **Section 9.07** | Sublease.............................................................................. 67 |
| **Section 9.08** | Unfavorable Action or Proceeding...................................... 67 |
| **Section 9.09** | Final Sale Order. ................................................................ 67 |
| **Section 9.10** | Cure Costs .......................................................................... 67 |
| **Section 9.11** | Governmental Approval...................................................... 67 |

**ARTICLE X.** CLOSING ................................................................................ 67

| | | |
|---|---|---|
| **Section 10.01** | Closing Date and Place ...................................................... 67 |
| **Section 10.02** | Deliveries of Seller............................................................. 67 |
| **Section 10.03** | Deliveries of Buyer ............................................................ 69 |

**ARTICLE XI.** SURVIVAL OF REPRESENTATIONS, WARRANTIES AND
COVENANTS ......................................................................................... 70

| | | |
|---|---|---|
| **Section 11.01** | Survival. ............................................................................. 70 |
| **Section 11.02** | Holdback Escrow Agreement ............................................. 70 |

# TABLE OF CONTENTS

**Page**

**Section 11.03**     Claims Against the Holdback Escrow Agreement.............................. 71

**ARTICLE XII.** DEFAULT AND TERMINATION.................................................. 71

**Section 12.01**     Termination Events ........................................................... 71
**Section 12.02**     Effect of Termination......................................................... 73
**Section 12.03**     Remedies Upon Default. ..................................................... 73
**Section 12.04**     Alternative Transaction ...................................................... 73
**Section 12.05**     Obligations Upon Termination .......................................... 74
**Section 12.06**     Sole and Exclusive Remedy............................................... 74

**ARTICLE XIII.** MISCELLANEOUS ......................................................... 74

**Section 13.01**     Further Actions ................................................................. 74
**Section 13.02**     Notices.............................................................................. 74
**Section 13.03**     Entire Agreement .............................................................. 75
**Section 13.04**     Binding Effect; Benefits.................................................... 75
**Section 13.05**     Assignment....................................................................... 75
**Section 13.06**     Amendments and Waivers; Governing Law; Consent to
                        Jurisdiction and Venue; Jury Trial Waiver. ....................... 76
**Section 13.07**     Amendments; Waivers ...................................................... 77
**Section 13.08**     Severability....................................................................... 77
**Section 13.09**     Counterparts. .................................................................... 77
**Section 13.10**     References ......................................................................... 77
**Section 13.11**     Disclosure Schedules; Schedules; Exhibits........................ 77
**Section 13.12**     Closing Costs .................................................................... 77
**Section 13.13**     Attorneys' Fees ................................................................ 77
**Section 13.14**     Limited Liability .............................................................. 77
**Section 13.15**     Survival of Defined Terms................................................ 78
**Section 13.16**     Time of Essence ............................................................... 78
**Section 13.17**     No Third-Party Beneficiary.............................................. 78

EAST\166812324.12

## <u>TABLE OF CONTENTS OF DISCLOSURE SCHEDULES</u>

**SCHEDULES**

<u>Schedule 2.01(a)</u> - Real Property (Description of Real Property)

<u>Schedule 2.01(c)</u> - Assigned Contracts

<u>Schedule 2.01(d)</u> - Assigned Residency Agreements

<u>Schedule 2.02(a)</u> - Excluded Personal Property

<u>Schedule 2.02(b)</u> - Excluded Intellectual Property Licenses

<u>Schedule 2.02(o)</u> - Excluded Equipment Agreements

<u>Schedule 2.03(a)(ii)</u> - Contingent Former Life Care Agreement Liabilities

<u>Schedule 2.03(a)(iii)</u> - Non-Contingent Former Life Care Agreement Liabilities

<u>Schedule 2.07(b)</u> – Assigned Contract Cure Costs

<u>Schedule 2.07(d)</u> – Executory Contract Cure Costs

<u>Schedule 4.03</u> - No Conflict

<u>Schedule 4.05</u> - All Contracts in Effect on Execution Date

<u>Schedule 4.06(b)</u> - No Outstanding Rights

<u>Schedule 4.06(c)</u> – Disposition of Personal Property in Excess of $15,000

<u>Schedule 4.06(d)</u> - Sufficiency of Assets

<u>Schedule 4.07</u> - Historical Financial Information

<u>Schedule 4.08(a)</u> - Permits or Approvals

<u>Schedule 4.08(b)</u> - Permit or Approval Revocation

<u>Schedule 4.09(a)</u> - Government Program Participation/Accreditation/Cost Reports

<u>Schedule 4.09(b)</u> - Payments or Reimbursements in Excess of Amounts Allowed by Applicable Law

<u>Schedule 4.10</u> - Compliance with Applicable Laws

<u>Schedule 4.10(c)</u> - Threatened or Pending Proceedings by Governmental Authority

<u>Schedule 4.12</u> - Information Privacy and Security Compliance

Schedule 4.13 - Compliance Programs

Schedule 4.14 - Proceedings; Judgments

Schedule 4.15(a) - List of Employees

Schedule 4.15(b) - Service Providers

Schedule 4.15(f) - Employees on COBRA

Schedule 4.16(a) - Benefit Plans

Schedule 4.16(b) - Benefit Plans Compliance

Schedule 4.17(a) – Real Property Legal Descriptions

Schedule 4.17(b) - Tenant Leases

Schedule 4.17(g) – Management, Service, Equipment, Supply Maintenance, Concession or Other Agreements

Schedule 4.19(a) - Form of Executory Residency Agreements

Schedule 4.19(b) - Residency Agreements - Financial Concessions

Schedule 4.19(c) - Residency Agreements - Leases, Occupancies or Tenancies or Rights of Possession

Schedule 4.19(c) - Residency Agreements - Monetary Defaults

Schedule 4.19(e) – Deposits – Executory Life Care Agreements

Schedule 4.19(f) – Deposits – Non-Life Care Agreements

Schedule 4.20 - Insurance

Schedule 4.21 - Intellectual Property

Schedule 4.22 - Tax Matters

Schedule 4.23 - Environmental Matters

Schedule 4.24 - Affiliate Transactions

Schedule 4.25 - Broker's or Finder's Fees

Schedule 7.02 - Allocation of Purchase Price

Schedule 7.04(c) - Security Arrangements

Schedule 7.05 - Employee Matters

Schedule 8.07 - Required Approvals


**EXHIBITS**

Exhibit A    -    Bill of Sale, Assignment and Assumption Agreement

Exhibit B    -    Deed Conveying Real Property

Exhibit C    -    Certificate of Non-Foreign Status

EAST\166812324.12

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "<u>Agreement</u>") is dated the 13th day of June, 2019 (the "<u>Execution Date</u>"), by and between Mayflower Communities, Inc. d/b/a The Barrington of Carmel, a Delaware nonprofit corporation ("<u>Seller</u>"), and Prairie Landing Community, Inc., an Indiana nonprofit corporation ("<u>Buyer</u>").

## <u>RECITALS:</u>

A.     Seller is the owner of certain real, personal and intangible property constituting that certain continuing care retirement facility known as "The Barrington of Carmel" which includes independent living apartments, assisted living units, memory care units, and a licensed and Medicare certified skilled nursing facility and which is located at 1335 South Guilford Road, Carmel, Indiana 46032 (the "<u>Facility</u>");

B.     On January 30, 2019 (the "<u>Petition Date</u>"), Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Northern District of Texas (the "<u>Bankruptcy Court</u>"), thereby commencing the case captioned <u>In re Mayflower Communities, Inc.</u>, Case No.: 19-30283 (the "<u>Bankruptcy Case</u>");

C.     Seller desires to sell, transfer, convey and assign to Buyer, and Buyer desires to purchase, acquire, accept and assume from Seller pursuant to this Agreement, the Bid Procedures, the Bid Procedures Order, the Sale Order, the Sale Motion and Sections 105, 363, and 365 of the Bankruptcy Code, the CCRC Assets and Assumed Liabilities of the Seller as specifically provided herein;

D.     The execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order;

E.     The parties acknowledge, understand and agree that the terms of the Contemplated Transactions are the result of arm's length negotiations;

F.     Seller has solicited bids for the Facility and the Business to obtain the highest and best stalking horse offer for the Facility and the Business in accordance with the Bid Procedures and the Bid Procedures Order; and

G.     Seller has determined that the Buyer's offer to purchase the Facility and the Business is the highest and best stalking horse offer received to date for the Facility and Business and constitutes a fair and adequate purchase price for the Facility and Business.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer, intending to be legally bound, agree as follows:

EAST\166812324.12

# ARTICLE I.
## DEFINITIONS

**Section 1.01    Defined Terms**.  For purposes of this Agreement, the following terms shall have the meanings indicated:

"Accounts Receivable" means all accounts, notes, accounts receivable, and other rights to receive payment for goods and services provided by Seller in connection with the Business prior to the Effective Time, including any such accounts receivable that have been charged off as bad debts, whether billed or unbilled, or recorded or unrecorded, or collected after the Effective Time.

"Accrued PTO" shall have the meaning set forth in Section 7.05(f).

"Acquired Avoidance Actions" shall have the meaning set forth in Section 2.06(e).

"Action" means any legal action, suit or arbitration, or any inquiry, proceeding, or investigation, by or before any Governmental Authority.

"Adequate Assurance Utility Deposits" shall have the meaning set forth in Section 2.02(o).

"Additional Financial Statements" shall have the meaning set forth in Section 6.04.

"Affiliate" means with respect to any specified Person, any other Person which, directly or indirectly controls, is controlled by, or is under common control with, the specified Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" shall have the meaning set forth in the introductory paragraph.

"Allocated Value" shall have the meaning set forth in Section 7.02.

"Alternative Transaction" means any agreement or transaction, whether pursuant to a plan or otherwise, involving the sale or other transfer (in a single transaction or a series of related transactions) of all or substantially all of the CCRC Assets, or the issuance, sale or other transfer (in a single transaction or series of related transactions) of all or substantially all of the member interests of Seller or any of its successors, to any party other than Buyer or a designee of Buyer.

"Applicable Law" means any federal, state, municipal, county, local, foreign or other statute, law, ordinance, code, constitution, treaty, common law, rule or regulation, standard, administrative interpretation, or any order, writ, injunction, judgment, plan, decree or other requirement or rule of law of any Governmental Authority.

"Approval" means any approval, authorization, consent, notice, qualification or registration, or any extension, modification, amendment or waiver of any of the foregoing, of or

from, or any notice, statement, filing or other communication to be filed with or delivered to, any Governmental Authority.

"<u>Asset Taxes</u>" means all real estate, ad valorem, property, excise, severance, production or similar Taxes, but not franchise, income or similar Taxes.

"<u>Assigned Contracts</u>" shall have the meaning set forth in <u>Section 2.01(c)</u>.

"<u>Assumed Liabilities</u>" shall have the meaning set forth in <u>Section 2.03</u>.

"<u>Assigned Residency Agreements</u>" means the Executory Life Care Agreements and Non-Life Care Agreements as set forth on <u>Schedule 2.01(d)</u> which, subject to the entry of the Sale Order, shall be assumed by the Seller and assigned to the Buyer on the Closing Date without modification.

"<u>Avoidance Actions</u>" means any and all Claims for relief of Seller under chapter 5 of the Bankruptcy Code.

"<u>Balance Sheet</u>" shall have the meaning set forth in <u>Section 4.07(a)</u>.

"<u>Balance Sheet Date</u>" shall have the meaning set forth in <u>Section 4.07(a)</u>.

"<u>Bankruptcy Case</u>" shall have the meaning set forth in the Recitals.

"<u>Bankruptcy Code</u>" shall have the meaning set forth in the Recitals.

"<u>Bankruptcy Court</u>" shall have the meaning set forth in the Recitals.

"<u>Benefit Plans</u>" means (i) all "employee benefit plans", as defined in Section 3(3) of ERISA (whether or not such plan is subject thereto), (ii) all employment, consulting or other individual compensation Contracts, and (iii) all bonus or other incentive, deferred or other compensation, profit sharing, pension, change-in-control, severance pay, separation, retention, sick leave, vacation pay, day or dependent care, salary continuation, disability, hospitalization, medical, life insurance, retiree healthcare, retiree life insurance, other retirement, scholarship, legal services, cafeteria, life, health, accident, disability, workers' compensation, paid time off, fringe benefit or other insurance or employee benefit programs, plans, policies or arrangements, whether written or oral, single employer, multiemployer or multiple employer, or whether for the benefit of a single individual or more than one individual, to which Seller or any of its ERISA Affiliates contributes, has an obligation to contribute, or has any Liability (including through its ERISA Affiliates, former or current), contingent or otherwise, with respect to, or otherwise provides to, any current or former Employee or Service Provider, their beneficiaries and/or dependents.

"<u>Bid Procedures</u>" means the procedures set forth in the Bid Procedures Order governing the sale of the CCRC Assets.

"<u>Bid Procedures Order</u>" means the *Order (I) Approving Bid Procedures, (II) Authorizing the Debtor to Offer Certain Bid Protections to Stalking Horse, (III) Approving Procedures for*

-3-

*the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (IV) Approving the Forms of Notices Related to the Sale and (V) Granting Related Relief* entered by the Bankruptcy Court on April 22, 2019 [Docket No. 223].

"Bond Financing" means, collectively, the Series 2012A Bond, Series 2012B Bonds, Series 2012C-1 Bonds, Series 2012C-2 Bonds, Series 2012C-3 Bonds and Series 2012D Bonds originally issued in the aggregate principal amount of $119,020,000 for the benefit of the Seller and currently outstanding in the approximate aggregate principal amount of $92,700,000 (plus accrued interest).

"Bond Trustee" shall mean UMB Bank, N.A.

"Break-Up Fee" shall have the meaning set forth in Section 12.04.

"Business" means the business of and operations of the Facility, which is a senior living continuing care retirement community in Carmel, Indiana known as "The Barrington of Carmel", which includes independent living apartments, assisted living units, memory care units, and a licensed and Medicare certified skilled nursing facility, and which provides housing, personal care services, health care and related services to its Residents.

"Business Day" means any day other than (i) a Saturday, Sunday or any United States federal legal holiday, or (ii) any day on which banks in Indiana are not open for business.

"Buyer" shall have the meaning set forth in the Preamble.

"Buyer Closing Certificate" shall have the meaning set forth in Section 9.03.

"Buyer Employer" shall have the meaning set forth in Section 7.05(b).

"Cash Purchase Price" shall have the meaning set forth in Section 3.01(a).

"CCRC" means continuing care retirement community.

"CCRC Assets" shall have the meaning set forth in Section 2.01.

"Claim" has the meaning set forth in Section 101(b) of the Bankruptcy Code, and any and all demands, losses, liabilities, damages, obligations, expenses, fines, penalties, costs, claims, causes of action and judgments for: (a) breaches of Contract; (b) loss or damage to Personal Property, injury to or death of persons (including illness and disease), and other tortious injury; or (c) violation of Applicable Laws, orders, or any other legal right or duty actionable at law or in equity. The term "Claims" also includes reasonable attorneys' fees, court costs, and other reasonable costs resulting from the investigation or defense of any claim.

"Closing" means the consummation of the purchase and sale of the CCRC Assets and Assumed Liabilities in accordance with the terms of this Agreement on the Closing Date, or at such earlier or later date and time as may be agreed upon between Buyer and Seller.

"Closing Date" shall have the meaning set forth in Section 10.01.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"Code" means the Internal Revenue Code of 1986, as amended.

"Committee" means the Official Residents' Committee appointed in the Bankruptcy Case.

"Contemplated Transactions" shall have the meaning set forth in Section 2.01.

"Contingent Former Residents" shall have the meaning set forth in Section 2.03(a)(ii).

"Contingent Former Residents Liabilities" shall have the meaning set forth in Section 2.03(a)(ii).

"Contingent Former Life Care Agreement" means all admission, occupancy, residency, leases, tenancy, parking and similar written agreements entered into in the Ordinary Course of Business with Contingent Former Residents of the Facility, including any amendments, modifications, supplements, renewals and extensions thereof, existing as of the Closing Date.

"Contract" means any written contract, agreement, indenture, note, bond, note, sublease, lease (including any Personal Property lease or capital lease), conditional sales contract, mortgage, license, sublicense, franchise agreement, obligation, promise, undertaking, commitment, or other legally binding agreement, primarily pertaining to or used in connection with the Business (in each case, whether written or oral), along with any additional Contracts that are entered into after the date hereof but prior to the Closing, including the Residency Agreements.

"Contract Notice" shall have the meaning set forth in Section 2.07(e).

"Contractual Resident Obligation" means all financial obligations of Seller under the Residency Agreements; provided, however, financial obligations shall not include any other obligation (financial or otherwise) arising out of or relating to (i) any breach of representation and warranty or covenant in the Residency Agreements or (ii) tort Claim relating to the Residency Agreements.

"Copyrights" means all United States and foreign copyright rights in any original works of authorship, whether registered or unregistered, including all copyright registrations and applications.

"Cure Costs" shall have the meaning set forth in Section 2.07(b).

"Cure Cost Cap" shall mean the aggregate Cure Costs for Assigned Contracts as set forth in Schedule 2.07(b) plus $50,000.

"Current Resident" means a Person (i) occupying the Real Property or any part thereof pursuant to a Residency Agreement as of the Closing Date or (ii) who has executed a Residency

Agreement or Reservation Agreement, but has yet to occupy the Real Property, as of the Closing Date.

"Deed" means the special warranty deed in the form attached hereto as Exhibit B, which will be used to convey the Real Property to Buyer at the Closing.

"Deposit" shall have the meaning set forth in Section 3.02(a).

"Designation Deadline" means 5:00 p.m., Eastern Standard Time, on the date that is five (5) Business Days prior to the Closing Date or such later date as Buyer and Seller shall mutually agree and as the Bankruptcy Court may authorize; *provided* that the Designation Deadline for any Executory Contract with respect to which a dispute regarding a Cure Cost exists on such date shall be five (5) Business Days after the date of the resolution of such dispute.

"Disclosure Schedules" means the disclosure schedules provided by Seller in connection with this Agreement.

"Effective Time" means 12:01 a.m.  on the calendar day immediately following the Closing Day, unless otherwise agreed in writing by Seller and Buyer.

"Employee" means any individual employed by Seller and/or Manager or other third party to provide services to Seller in connection with the Business.

"Environmental Defect" means any condition of, in, on or under any of the CCRC Assets that either (i) requires monitoring, reporting, removal, restoration, remediation or resolution under applicable Environmental Laws or (ii) if known by a federal or state regulatory agency of competent jurisdiction, would reasonably be expected to cause such federal or state regulatory agency to assert that the CCRC Assets require monitoring, reporting, removal, restoration, remediation or resolution under applicable Environmental Laws.

"Environmental Laws" means any federal, state, or local Applicable Law relating to the prevention of pollution, protection of health or the environment or natural resources, restoration of environmental quality, or Releases of or exposure to Hazardous Substances or the handling, generation, treatment, transportation, storage, use, arrangement for disposal or disposal, manufacture, distribution, formulation, packaging or labeling of Hazardous Substances, including the following federal statutes and the regulations promulgated thereunder: the Comprehensive Environmental Response, Compensation and Liability Act of 1980; the Emergency Planning and Community Right-To-Know Act; the Resources Conservation and Recovery Act; the Clean Air Act; the Clean Water Act; the Safe Drinking Water Act; the Oil Pollution Act; the Toxic Substances Control Act; the Hazardous Materials Transportation Act; the Federal Insecticide, Fungicide, and Rodenticide Act; and the regulations promulgated pursuant thereto and analogous State and local Applicable Laws.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any entity that, together with Seller, may be treated as a single employer under Section 4001 of ERISA or Section 414 of the Code.

"ERISA Affiliate Liability" means any actual or contingent Liability of Seller or its ERISA Affiliates under or in respect of any employee benefit plan pursuant to any statute or regulation that imposes Liability on a "controlled group" or similar basis as a result of being an ERISA Affiliate or successor prior to the Closing Date with respect to any other Person.

"Escrow Agent" means U.S. Bank National Association, a national banking association.

"Excluded Assets" shall have the meaning set forth in Section 2.02.

"Excluded Contracts" means every Contract that is not an Assigned Contract, including those listed on Schedule 2.01(c) of the Disclosure Schedules.

"Excluded Employee Liabilities" means each of the following, except as otherwise expressly set forth in Section 7.05:

(a) any and all Liabilities arising out of, relating to or resulting from or with respect to any current or former Employee or Service Provider (and their services), based on facts occurring prior to or as of the Closing (even if not known until after the Closing), including relating to his/her employment or services, transition of employment or services, or termination of employment or services, with Seller, Manager, a Third Party Employer or any of their respective Affiliates, including as a result of the consummation of the Contemplated Transactions including Liabilities related to unemployment benefits;

(b) any and all actual or contingent Liabilities under, arising out of, relating to or resulting from any Benefit Plans;

(c) any ERISA Affiliate Liability;

(d) any and all Liabilities for any misclassification of any Person performing services for or on behalf of Seller prior to the Closing as an independent contractor rather than as an employee; and

(e) any and all other Liabilities arising out of, relating to or resulting from the employment or prospective employment of or the termination of any relationship with any current, former or prospective Employees (including any Employee who does not accept an offer of employment with Buyer)) or Service Providers, based on facts occurring prior to or as of the Closing (even if not known until after the Closing).

"Excluded Equipment Agreements" shall have the meaning set forth in Section 2.02(o).

"Excluded Intellectual Property Licenses" shall have the meaning set forth in Section 2.02(b).

"Excluded Liabilities" shall have the meaning set forth in Section 2.04.

"Excluded Personal Property" shall have the meaning set forth in Section 2.02(a).

"Execution Date" shall have the meaning set forth in the Preamble.

-7-

"Executory Contract" means any executory Contract related to the Business or to which Seller is a party.

"Executory Life Care Agreements" means all admission, occupancy, residency, leases, tenancy, parking and similar written agreements that provide for, among other things, life care entered into in the Ordinary Course of Business with Current Residents of the Facility, including any amendments, modifications, supplements, renewals and extensions thereof, existing as of the Closing Date.

"Facility" has the meaning set forth in the Recitals.

"Final Cash Collateral Order" means the *Final Order (I) Authorizing the Debtor to Use the Cash Collateral of UMB Bank, N.A., as Bond Trustee; (2) Providing UMB Bank, N.A., as Bond Trustee, Adequate Protection; and (3) Modifying the Automatic Stay* entered by the Bankruptcy Court on April 11, 2019.

"Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as to which the time for appeal, Petition for *Certiorari* or move for re-argument or re-hearing has expired, and as to which no appeal, Petition for *Certiorari*, or other proceeding for re-argument or re-hearing shall then be pending, or as to which any appeal, Petition for *Certiorari*, re-argument or re-hearing shall have been waived in writing, in form and substance reasonably satisfactory to the Seller and the Buyer, or in the event that an appeal, Writ of *Certiorari* or re-argument or re-hearing thereof has been sought, such order of the Bankruptcy Court, or other court of competent jurisdiction, shall have been determined by the highest Court to which such order was approved, or no stay pending appeal is in effect regarding such appeal, or *certiorari*, re-argument or re-hearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, Petition for *Certiorari* or move for re-argument or re-hearing shall have expired; provided however, that the possibility that a motion under Section 502(i) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous bankruptcy Applicable Law or applicable state court rules of civil procedure, may be, but have not been, filed with respect to such order shall not cause such order not to be a Final Order.

"Flow of Funds Memorandum" means the memorandum that outlines the receipt of the Purchase Price and the distributions of funds.

"Former Residents Liabilities" shall have the meaning set forth in Section 2.03(a)(iii).

"Furniture and Equipment" means all furniture, fixtures, furnishings, machinery, appliances and other equipment (including medical equipment) and leasehold improvements owned by Seller, used by Seller in the conduct of the Business and located in the Ordinary Course of Business at the Facility, including all such desks, chairs, tables, Hardware, copiers, telephone lines, telecopy machines and other telecommunication equipment (and, to the extent assignable by Seller, the telephone numbers associated therewith used in the Ordinary Course of Business), cubicles and miscellaneous office furnishings.

"GAAP" means generally accepted accounting principles in the United States.

"Governing Document" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs. For example, the "Governing Documents" of a corporation would be its certificate of incorporation and bylaws, the "Governing Documents" of a limited partnership would be its certificate of formation and its limited partnership agreement and the "Governing Documents" of a limited liability company would be its certificate of formation and its limited liability company agreement or operating agreement.

"Governmental Authority" means any federal, state, municipal or local government, agency, court, arbitrator, department, commission, board, bureau, subdivision, authority, instrumentality or other body, including any Person exercising executive, legislative, judicial, regulatory or administrative governmental powers or functions, in each case to the extent the same has jurisdiction over the Person, property or service in question.

"Government Programs" has the meaning set forth in Section 4.09(a).

"Guaranty Actions" has the meaning set forth in Section 2.01(i).

"Hardware" means any and all computer and computer-related hardware, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Hazardous Substance" means petroleum and its byproducts, asbestos and any other material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" or words of similar import or regulatory effect under Environmental Laws or for which Liability can be imposed under any Environmental Laws.

"Healthcare Regulatory Consents" means in respect of Seller or Buyer, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Authority as shall be required to be obtained and such notifications to any Governmental Authority as shall be required to be given by such party in order for it to consummate the Contemplated Transactions in compliance with all Applicable Law relating to health care or healthcare services of any kind.

"Healthcare Regulatory Laws" means: (i) all state and federal healthcare fraud and abuse laws and regulations, including: (A) the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, 42 C.F.R. § 1001.952, (B) the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a, (C) the federal physician self-referral prohibition, 42 U.S.C. § 1395nn, 42 C.F.R. § 411.351 et seq., and (D) the False Claims Act, 31 U.S.C. § 3729 et seq.; (ii) Department of Health and Human Services, Office of Inspector General Exclusion regulations at 42 C.F.R. part 1001; (iii) applicable state licensing regulations and rules; (iv) federal or state laws related to billing or claims for reimbursement submitted to any third party payor; (v) the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, the regulations promulgated pursuant thereto and comparable state privacy and security laws and regulations; and (vi) the regulations promulgated pursuant thereto

-9-

and comparable state laws and regulations relating to any and all registration of practitioners to practice nursing and other related professional services.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as codified at 42 U.S.C. Sections 1320d through d-8, as amended by the Health Information Technology for Economic and Clinical Health Act.

"Historical Financial Information" shall have the meaning set forth in Section 4.07(a).

"Holdback Escrow Agreement" shall have the meaning set forth in Section 11.02.

"Holdback Escrow Amount" shall have the meaning set forth in Section 3.01(b).

"Improvements" shall have the meaning set forth in Section 2.01(a)(i).

"Inactive Employee" means an Employee who is on an employer-approved leave of absence on the Closing Date as a result of military service, pregnancy or parental leave, disability leave, medical leave or any other leave provided under Applicable Law.

"Indebtedness" means, without duplication, the outstanding principal amount of, accrued and unpaid interest on and other payment obligations (including any prepayment premiums or similar breakage costs payable as a result of the consummation of the Contemplated Transactions) with respect to (a) indebtedness for borrowed money or (b) indebtedness evidenced by any note, bond, debenture or other debt security. Notwithstanding anything to the contrary in the foregoing, "Indebtedness" shall not include: (i) trade payables and accrued expenses arising in the Ordinary Course of Business, (ii) deferred revenue, (iii) any obligations under any capital lease, (iv) any undrawn letters of credit, (v) any payment or performance bonds, and (vi) any Former Residents Liabilities.

"Information Privacy or Security Laws" means all Applicable Laws and self-regulatory guidelines that apply to the Seller concerning the privacy, protection or security of Personal Information (as defined in such Applicable Laws), including, where applicable, the HIPAA, and state data breach notification Laws.

"Intellectual Property" means all intellectual property, including all Copyrights, Patents, Trademarks, industrial designs, trade secrets, proprietary know-how and confidential business information owned, used or licensed by Seller and used or held for use in conducting the Business.

"Interim Balance Sheet" shall have the meaning set forth in Section 4.07(a).

"Interim Balance Sheet Date" shall have the meaning set forth in Section 4.07(a).

"Inventory" means all drugs, medications, food, janitorial, housekeeping and office supplies and other consumables located in or used in connection with the operation of the Business and or the operation of the Real Property.

"Knowledge" means (i) with respect to Seller, the actual knowledge of Louis E. Robichaux IV, the Seller's Chief Restructuring Officer, after reasonable inquiry, which shall include, but not be limited to, discussions with Joe Anderson, the Manager's Chief Executive Officer, and Jesse Silas, the Seller's Executive Director; or (ii) with respect to Buyer, the actual knowledge of any of the following individuals: John Dattilo, the Buyer's Chief Executive Officer, or Roger Weideman, the Buyer's Chief Financial Officer, in each case after reasonable inquiry.

"Labor Laws" means all Applicable Laws relating to employment, employment standards and practices, hiring, background investigations, employment of minors, equal employment opportunity, employment discrimination (including harassment and retaliation), employee classification, employment-related immigration and employment verification/authorization, workplace health and safety, workers' compensation, unemployment compensation and benefits, collective bargaining and/or labor relations, plant closings/mass layoffs, employment tax withholding, wages, hours, overtime, wage payment, vacation and paid time off, family and medical and other leave of absence, postings and recordkeeping, privacy and confidentiality, and termination.

"Land" shall have the meaning set forth in Section 2.01(a)(i).

"Liability" means any debt, obligation, duty or liability of any nature (including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability), regardless of whether such debt, obligation, duty or liability would be required to be disclosed on a balance sheet prepared in accordance with GAAP and regardless of whether such debt, obligation, duty or liability is immediately due and payable.

"Licensing Surveys" means survey reports, waivers of deficiencies, plans of correction, and any other investigation reports issued by the applicable Governmental Authority with respect to the Real Property in respect of any Permits.

"Lien" means any mortgages, deeds to secure debt, deeds of trust, hypothecations, securities, charges, Claims, encumbrances, interests, pledges, security interests, rights of set-off, restrictions or limitations on use, successor liabilities, conditions, rights of first refusal, options or liens of any kind, obligations to allow participation, agreements or rights, rights asserted in litigation matters, rights asserted in adversary proceedings in the Bankruptcy Case, competing rights of possession, obligations to lend, matters filed of record that relate to, evidence or secure an obligation of the Seller (and all created expenses and charges) of any type under, among other things, any document, instrument, regulation, or administrative governmental powers or functions, in each case the same has jurisdiction over the Person or property in question, whether voluntarily incurred or arising by operation of law or otherwise, affecting any assets or property, including any agreement to give or grant any of the foregoing, any conditional sale or other title retention agreement, and the filing of or agreement to give any financing statement with respect to any assets or property under the Uniform Commercial Code or Applicable Law.

"Loss" or "Losses" means any and all costs, obligations, liabilities, demands, settlement payments, awards, judgments, fines, penalties, damages and reasonable out-of-pocket expenses,

including court costs and reasonable attorneys' fees, whether or not arising out of a third-party Claim.

"Management Agreement" means that certain Master Management Services Agreement dated as of September 7, 2017, between SQLC and Manager, including any addendum relating to the Business, as amended from time to time.

"Manager" means Seniority, Inc., a California corporation and wholly-owned subsidiary of SQLC.

"Marks" means all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof.

"Material Adverse Effect" means any event, occurrence, fact, condition or change that is materially adverse to (i) the Business, including its assets, properties, results of operations or financial condition, taken as a whole, or (ii) the ability of Seller to consummate the Contemplated Transactions or to perform its obligations under this Agreement; *provided*, *however*, that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (a) general business or economic conditions (including local competitive dynamics), (b) substantial changes to Medicare or Third Party Payor reimbursements which are of general applicability and not specifically directed at the Business, (c) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (d) earthquake, tornado, hurricane, flood or other natural disaster except to the extent that such event results in material damage to the CCRC Assets, (e) changes in GAAP, (f) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Buyer, (g) any effect resulting from the public announcement of this Agreement, compliance with terms of this Agreement or consummation of the Contemplated Transactions, (h) any failure by the Business to meet any internal or published projections, forecasts or revenue or earnings predictions (provided that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded), (i) any existing event, occurrence or circumstance with respect to which the Buyer has Knowledge as of the date hereof, and (j) the filing of the Bankruptcy Case and any event or occurrence attributable to the filing of the Bankruptcy Case.

"Material Contracts" means the following Contracts to which Seller is a party or as to which any portion of any such CCRC Assets is subject:

(i)     all Contracts involving aggregate consideration in excess of $5,000 or requiring performance by any party more than six (6) months from the Execution Date;

(ii)     all Contracts that cannot be cancelled without penalty or without more than thirty (30) days' notice;

-12-

(iii)    all Contracts that relate to the acquisition of any business, a material amount of stock or assets of any other Person or any real property (whether by merger, sale of stock, sale of assets or otherwise) but excluding purchases of Inventory in the Ordinary Course of Business;

(iv)    all Contracts with any Employee, officer, director or Service Provider;

(v)    all Contracts that contain non-competition or non-solicitation provisions restricting the conduct of the Business, or restricting the conduct of any Person potentially competing with the Business, in any geographic area or during any period of time;

(vi)    all Contracts granting any exclusive rights, rights of first refusal, rights of first negotiation or similar rights to any Person;

(vii)    except for agreements relating to trade receivables, all Contracts relating to indebtedness (including guarantees), or imposing any Lien on any CCRC Asset;

(viii)    all managed care or Third Party Payor Contracts;

(xi)    all Contracts with any physician, any practitioner or licensed health care facility;

(x)    all Contracts for medical direction, the provision of professional health care services, or medical supervision of the performance of health care services at the Facility;

(xi)    all Contracts pursuant to which payments in excess of $15,000 are required upon a sale of all or substantially all the assets that constitute the Business;

(xii)    all Contracts that provide for severance pay or any other material post-employment payment by, or financial obligation of, Seller to Employees or Service Providers;

(xiii)    all joint venture, partnership or similar Contracts that provide for the sharing of profits relating to the Business (excluding the organizational documents of Seller);

(xiv)    all Contracts for the sale of any of the Assets or for the grant to any Person of any option, right of first refusal or preferential or similar right to purchase any of the CCRC Assets;

(xv)    all Contracts that provide for the indemnification of any Person or the assumption of any Tax, environmental or other Liability of any Person;

(xvi)    all Executory Life Care Agreements, Contingent Former Life Care Agreements, Non-Contingent Former Life Care Agreements and Non-Life Care Agreements;

(xvii)    all Tenant Leases;

(xviii)    all confidentiality agreements, non-disclosure agreements or similar agreements;

(xix)    all agency agreements and powers of attorney; and

(xx)    all other Contracts material to the CCRC Assets or the operation of the Business and not previously listed in a category set forth in subsections (i)-(xix) of this definition.

-13-

"<u>Multiemployer Plan</u>" has the meaning set forth in Section 3(37)(A) of ERISA.

"<u>Non-Contingent Former Residents</u>" means those residents who have permanently left the Facility as of the Closing Date (or their successor) and Seller has received full payment of an entrance fee with respect to that resident's unit as required under the Non-Contingent Former Life Care Agreements as of the Closing Date.

"<u>Non-Contingent Former Residents Liabilities</u>" shall have the meaning set forth in <u>Section 2.03(a)(iii)</u>.

"<u>Non-Contingent Former Life Care Agreements</u>" means all admission, occupancy, residency, leases, tenancy, parking and similar written agreements that provided for, among other things, life care entered into in the Ordinary Course of Business with Non-Contingent Former Residents of the Facility, including any amendments, modifications, supplements, renewals and extensions thereof, existing as of the Closing Date.

"<u>Non-Life Care Residency Agreements</u>" means all admission, occupancy, residency, leases, tenancy, parking and similar written agreements entered into in the Ordinary Course of Business with Current Residents of the Facility, including any amendments, modifications, supplements, renewals and extensions thereof, existing as of the Closing Date that do not provide for life care.

"<u>NPI</u>" means national provider identifier.

"<u>OIG</u>" has the meaning set forth in <u>Section 4.13</u>.

"<u>Offered Employees</u>" shall have the meaning set forth in <u>Section 7.05(b)</u>.

"<u>Order</u>" means any award, decision, writ, injunction, judgment, order or decree entered, issued, made, or rendered by any Governmental Authority, or by any arbitrator.

"<u>Ordinary Course of Business</u>" means the ordinary and usual course of normal day-to-day operations of the Business through the Execution Date consistent with past practice, subject, and, in respect of the period after the Execution Date, to those actions necessary in connection with the Bankruptcy Case.

"<u>OTA</u>" means the Operations Transfer and Transition Services Agreement, to be dated as of the Closing Date by and between Seller and Post-Closing Licensee, which the parties agree to use commercially reasonable efforts to negotiate the form of and add as soon as practical, but in no event more than twenty (20) days after the Execution Date.

"<u>Outside Date</u>" shall have the meaning set forth in <u>Section 12.01(c)</u>.

"<u>Patents</u>" means all patents and application therefor, including continuations, divisionals, continuations-in-part, or reissues or patent applications and patents issuing thereon.

"<u>Paying Party</u>" shall have the meaning set forth in <u>Section 7.01(c)</u>.

"Permits" means all certificates, licenses, and permits which under Applicable Law are required to be held in connection with the ownership, use, occupancy, operation, and maintenance of the Real Property as a licensed assisted living facility, an independent living facility and a skilled nursing facility or the CCRC Assets.

"Permitted Buyer-Assignee" shall have the meaning set forth in Section 13.05.

"Permitted Exceptions" means the Assigned Residency Agreements (to the extent an Assigned Contract), the Tenant Leases (to the extent an Assigned Contract), all Title Exceptions and Survey Defects to which Buyer has not objected, and all title objections which Buyer has waived or accepted in writing.

"Permitted Liens" means (a) Liens for Taxes not yet due and payable or which, as of the Closing Date are being contested in good faith by appropriate Proceedings; (b) any Lien that will be released by the Sale Order or otherwise discharged at or prior to the Closing; and (c) the Permitted Exceptions.

"Person" means any natural person, firm, corporation, company, general or limited partnership, limited liability company, association, joint venture, business enterprise, trust, estate, Governmental Authority or other legal entity, in each case whether in its own or a Representative capacity.

"Personal Property" shall have the meaning set forth in Section 2.01(b)(i).

"Petition Date" shall have the meaning set forth in the Recitals.

"Post-Closing Licensee" means Buyer or its designee to whom all transferrable Permits will be transferred or otherwise obtained in accordance with Applicable Law for the operation of the Real Property as an assisted living, skilled nursing, and independent living facility.

"Post-Petition Entrance Fees" has the meaning set forth in Section 2.01(e)

"Practitioners" shall have the meaning set forth in Section 4.10(d).

"Proceeding" means any Action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Program Agreements" shall have the meaning set forth in Section 4.09(a).

"Proration Date" shall have the meaning set forth in Section 3.03(a).

"Proration Schedule" shall have the meaning set forth in Section 3.03(a).

"Purchase Price" shall have the meaning set forth in Section 3.01.

"Real Property" shall have the meaning set forth in Section 2.01(a)(i).

"Records" means the books, records, accounts, files, logs, information, databases, ledgers, in-place policies and training materials, journals and architectural, mechanical and electrical plans and specifications pertaining to or used in the operation of the Business, however such data is stored, including, to the extent assignable under Applicable Law, patient and medical staff records held or used in the Business.

"Regulatory Approvals" has the meaning set forth in Section 6.06.

"Reimbursable Claims" has the meaning set forth in Section 11.03.

"Reimbursing Party" shall have the meaning set forth in Section 7.01(c).

"Release" means any past or present actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping abandonment, disposing or allowing to escape or migrate into or through the environment (including ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"Rent Roll" shall have the meaning set forth in Section 4.19(a).

"Representatives" means employees, officers, directors, consultants, agents, contractors, counsel, accountants, investment advisers, regulators, lenders, partners, potential partners, investors and potential investors.

"Residency Agreements" means collectively the Executory Life Care Agreements, the Contingent Life Care Agreements, the Non-Contingent Life Care Agreements, and the Non-Life-Care Residency Agreements.

"Resident" means a Person occupying the Real Property or any part thereof pursuant to a Residency Agreement.

"Sale Order" means an Order of the Bankruptcy Court in form and substance approved by the Buyer and the Seller, and acceptable to the Bond Trustee in its reasonable discretion, pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code (i) authorizing and approving, *inter alia*, the sale of the CCRC Assets to Buyer on the terms and conditions set forth herein, free and clear of all Liens and Liabilities (other than Permitted Liens and Assumed Liabilities) to the extent permissible under Section 363(f) of the Bankruptcy Code, (ii) finding that notice of the hearing concerning approval of this Agreement and of the Contemplated Transactions was given in accordance with the Bankruptcy Code and that such notice is appropriate under the particular circumstances, (iii) authorizing and approving the assumption and assignment of the Assigned Contracts and Assigned Residency Agreements to Buyer, (iv) containing a finding that Buyer has acted in "good faith" within the meaning of, and is entitled to the protections of, Section 363(m) of the Bankruptcy Code, (v) containing a finding that this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions, (vi) containing a finding that Seller and Buyer have not engaged in any conduct that would cause or permit this Agreement to be avoidable under Section 363(n) of the Bankruptcy Code, (vii) providing that this Agreement and the Contemplated Transactions may, subject to the terms set forth herein, be specifically enforced

-16-

against and binding upon, and not subject to rejection or avoidance by Seller or its estate or any chapter 7 or chapter 11 Bankruptcy Code trustee of Seller or other Representative of its estate, (viii) providing that the Bankruptcy Court shall retain jurisdiction to resolve any controversy or Claim arising out of or relating to this Agreement or the breach thereof, (ix) providing that neither Buyer nor any of its Affiliates shall be deemed a successor in interest to Seller, and (x) providing that, upon Buyer's payment of the consideration provided hereunder, Seller shall have received fair and reasonably equivalent value for the CCRC Assets.

"Security Arrangements" shall have the meaning set forth in Section 7.04(c).

"Seller" shall have the meaning set forth in the Preamble.

"Seller Closing Certificate" shall have the meaning set forth in Section 8.03.

"Seller's Obligations" shall have the meaning set forth in Section 7.04(c).

"Service Provider" means any Person that is engaged by Seller or Manager to provide personal services to Seller pursuant to a consulting or other independent contractor relationship, directly related to the Business or the CCRC Assets.

"Software" means, except to the extent generally available for purchase from a third Person, any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates; menus, buttons and icons, and (iv) all documentation including user manuals and other training documentation related to any of the foregoing, in each case, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business.

"Subordinated Financing" means, collectively, the unsecured subordinated note of the Seller dated August 30, 2012, currently outstanding in the principal amount of $2,000,000 (plus accrued interest) and the unsecured subordinated note of the Seller dated August 30, 2012, currently outstanding in the principal amount of $1,875,000 (plus accrued interest).

"Survey" means an ALTA survey of the Real Property from a surveyor chosen by Buyer, meeting minimum standard detail requirements, and depicting only those Survey Defects that are reasonably satisfactory to Buyer.

"Survey Defects" has the meaning set forth in Section 5.07(b)(iii).

"SQLC" means Senior Quality Lifestyles Corporation, a Texas nonprofit corporation.

"Straddle Periods" shall have the meaning set forth in Section 7.01(b).

"Tax Allocation" shall have the meaning set forth in Section 7.02.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, excise taxes, unrelated business income taxes, an estimated taxes, whether disputed or not, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in subsection (i) of this definition.

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed with any Governmental Authority in respect of any Taxes.

"Tenant Leases" means a lease pursuant to which a Person (other than a Resident) leases all or a portion of the Real Property, and any amendments, modifications, supplements, renewals and extensions thereof.

"Third Party Employer" shall have the meaning set forth in Section 4.15(b).

"Third-Party Payor" shall have the meaning set forth in Section 2.04(j).

"Title Commitment" means a title commitment issued by Title Company and addressed to Buyer for an ALTA title policy (with coverage insuring over the printed exceptions normally found in such title policy) insuring fee simple title to the Real Property in the amount of the Purchase Price allocated to Real Property.

"Title Company" means First American Title Insurance Company, Attn: Monica Chavez, 211 N. Pennsylvania Street, Suite 1250, Indianapolis, Indiana, 46204.

"Title Exceptions" means the exceptions set forth in the Title Commitment.

"Transaction Documents" means this Agreement, the OTA, all exhibits hereto, the Disclosure Schedules, and each other agreement, certificate or instrument to be delivered pursuant to this Agreement.

"Transferred Employees" shall have the meaning set forth in Section 7.05(b).

"Transfer Taxes" shall have the meaning set forth in Section 7.01(a).

"Transition Patients" shall have the meaning set forth in Section 3.03(g).

"Unaudited Financial Information" has the meaning set forth in Section 4.07(a)(ii).

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988.

**Section 1.02  Other Definitions and Interpretive Matters**.  Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(a)     Calculation of Time Period.   When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period (or if any other date specified in this Agreement for giving any notice or taking any action) is a day other than a Business Day, then the period (or date) in question shall end on (or be deemed to be) the next succeeding Business Day.

(b)     Dollars.   Any reference in this Agreement to $ means United States dollars.

(c)     Gender and Number.   Any reference in this Agreement to gender includes all genders, and words imparting only the singular number include the plural and vice versa.

(d)     Headings.   The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement.  All references in this Agreement to any "*Section*" or "*Article*" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(e)     Herein.   Words such as "*herein*," "*hereof*" and "*hereunder*" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(f)     Including.   The word "*including*" or any variation thereof means "*including, without limitation,*" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(g)     No Strict Construction.   Buyer, on the one hand, and Seller, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Seller, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE II.
## PROPERTY DESCRIPTION AND BANKRUPTCY CASE

**Section 2.01   CCRC Assets**.   Upon and subject to the terms and conditions of this Agreement on the Closing Date and subject to entry of the Sale Order, Seller will sell, transfer, assign, convey and deliver to Buyer, and Buyer will purchase, acquire, assume and accept from Seller all of Seller's respective right, title and interest in, to and under the CCRC Assets, free and clear of all Liens and Liabilities to the extent permissible under Section 363(f) of the Bankruptcy Code, other than Permitted Liens and any Assumed Liabilities (the "Contemplated

Transactions"). The term, "CCRC Assets" means Seller's assets, right and properties pertaining to or used in connection with the Business as existing on the Closing Date wherever located and whether or not carried or reflected on the books and records of Seller of the following types, other than the Excluded Assets, including all right, title and interest of Seller in, to or under the following:

    (a)    Real Property.

        (i)    Fee title in and to the land, which is described on Schedule 2.01(a) of the Disclosure Schedules (the "Land"), and all buildings, structures, improvements and fixtures placed, located, constructed or installed on the Land, including the senior living facility, commonly known as "Barrington of Carmel" consisting of (A) 48 licensed and Medicare-certified skilled nursing beds, (B) 137 independent living units, (C) 56 assisting living units, and (D) 26 memory-support (dementia care) units, together with related common areas, and all other improvements located thereon (collectively, the "Improvements," together with the Facility and the Land, are herein sometimes referred to as the "Real Property"). As used in this Agreement, the term "Real Property" shall be deemed to include all beneficial easements, rights and appurtenances related to the Real Property, including Seller's right, title and interest as landlord (whether named as such therein, or by assignment or otherwise) in the Residency Agreements and Tenant Leases, and all amendments, modifications, supplements, renewals and extensions thereof, and the residence deposits, security deposits and any other refundable deposits, if any, held thereunder by Seller for Residents who are scheduled to move-in after Closing pursuant to Residency Agreements.

        (ii)    To the extent transferable, all existing warranties and guaranties (express or implied) issued to Seller in connection with the Improvements.

    (b)    Personal Property.

        (i)    All Furniture and Equipment (whether movable or attached to the Real Property), motor vehicles, Hardware, supplies, Inventory, linens, medicine, foodstuffs, consumable and other personal property of any type or description, including all beds, chairs, sofas, wheelchairs, tables, kitchen and laundry equipment associated with the Business and/or present at the Real Property (collectively, the "Personal Property"), excluding the Excluded Personal Property.

        (ii)    To the extent transferable, all existing warranties and guaranties (express or implied) issued to Seller in connection with the Personal Property described in Section 2.01(b)(i) above.

        (iii)    All signs, marks, supplies, trademarks and materials located on or used in the operation of the CCRC Assets bearing the name "Barrington of Carmel" and all of Seller's right, title and interest in and to such name.

        (iv)    To the extent transferable and in Seller's possession, all site plans, surveys, geological and environmental and soils studies and reports, market

studies and surveys and reports, architectural renderings and models, plans and specifications, engineering plans and studies, floor plans and other similar plans and diagrams relating thereto.

(v)     To the extent transferable and in Seller's possession, all site plans, surveys, geological and environmental and soils studies and reports, market studies and surveys and reports, architectural renderings and models, plans and specifications, engineering plans and studies, floor plans, landscaping plans and other similar plans and diagrams relating thereto.

(c)     <u>Assigned Contracts</u>.   To the extent transferable, all of the Contracts specifically listed on <u>Schedule 2.01(c)</u> of the Disclosure Schedules (the "<u>Assigned Contracts</u>").   Notwithstanding the foregoing, as used in this Agreement, the term "Assigned Contracts" expressly excludes (i) any contracts, leases, agreements, commitments and other arrangements, and any amendments, modifications, supplements, renewals and extensions entered into by Seller after the Execution Date and prior to the Closing in breach of <u>Section 6.02</u>, (ii) the Contingent Former Life Care Agreements, and (iii) the Non-Contingent Former Life Care Agreements.   Buyer shall have no obligations under the Assigned Contracts unless such Assigned Contracts are listed on <u>Schedule 2.01(c)</u> of the Disclosure Schedules or otherwise agrees to assume such Assigned Contracts.

(d)     <u>Assigned Residency Agreements</u>.   All rights of Seller in, to, and under the Assigned Residency Agreements listed on <u>Schedule 2.01(d)</u> assigned to Buyer pursuant to this Agreement and the Sale Order, and all deposits, security deposits and rents and proceeds accruing therefrom as of the Closing Date.

(e)     <u>Post-Petition Entrance Fees</u>.   All rights of Seller in and to security deposits, reservation deposits, entrance fees and similar deposits received by Seller following the Petition Date from Current Residents having entered into Residency Agreements after the Petition Date and any entrance fee paid to Seller following the Petition Date by the Current Residents who are occupying or who will occupy the units formerly occupied by the Contingent Former Residents (collectively, the "<u>Post-Petition Entrance Fees</u>").

(f)     <u>Tenant Leases</u>.   Except as otherwise provided herein, all rights of Seller in, to, and under the Tenant Leases assigned to Buyer pursuant to this Agreement, and all security deposits and rents and proceeds accruing therefrom as of the Closing Date.

(g)     <u>Records</u>.   Subject to Applicable Law, Seller's right, title and interest to copies of all Records.

(h)     <u>Permits</u>.   To the extent transferable, Seller's or Manager's right, title and interest to any and all Permits now held in the name of Seller, or any Affiliate(s) of Seller, and any renewals, extensions, amendments or modifications thereof.

(i)     <u>Claims and Causes of Action</u>.   To the extent transferable, all rights in and to any Claims to the extent they are in the nature of enforcing a guaranty, warranty, or a

-21-

contract obligation to complete improvements, make repairs, or deliver services to the Seller, CCRC Assets or the Business (the "Guaranty Actions").

(j) Intellectual Property. To the extent transferable, with the exception of the Excluded Intellectual Property Licenses, any and all rights of Seller or its Affiliates with respect to the use of (i) all Intellectual Property, Marks, Software, operating manuals, marketing brochures, or other proprietary material used by Seller or its Affiliates in the operation of the CCRC Assets or the Business, and (ii) all registrations, applications and licenses for any of the foregoing.

(k) Name. Seller's right, title and interest to the name "Barrington of Carmel" and any derivative name in the operation of the Facility.

(l) Acquired Avoidance Actions. All of Seller's rights to the Acquired Avoidance Actions in accordance with Section 2.06(e).

**Section 2.02 Excluded Assets**. Nothing herein contained shall be deemed to sell, transfer, assign or convey the following assets to Buyer, and Seller shall retain all right, title and interest to, in and under the following assets (the "Excluded Assets"):

(a) The Personal Property identified on Schedule 2.02(a) of the Disclosure Schedules (the "Excluded Personal Property");

(b) The Intellectual Property identified on Schedule 2.02(b) of the Disclosure Schedules (the "Excluded Intellectual Property Licenses");

(c) The Excluded Contracts, which include any and all Contracts (other than Assigned Residency Agreements) that are not listed as an Assigned Contract on Schedule 2.01(c) of the Disclosure Schedules ( the "Excluded Contracts");

(d) All deposit accounts, all pre-closing Accounts Receivable, all cash, cash equivalents, bank deposits or similar cash items of Seller (other than escrowed entrance fees or such Post-Petition Entrance Fees that should have been escrowed) associated with the Executory Life Care Agreements and Post-Petition Entrance Fees), all marketable securities owned by Seller and all documents related thereto;

(e) Any other Contract to which Seller is a party or under which it has rights, in each case, that is not used primarily in the Business;

(f) Any (i) personnel files, except those relating to Transferred Employees; (ii) files or communications subject to the attorney-client or similar privilege; (iii) other books and records that Seller is required by Applicable Law to retain; (iv) documents which Seller is not permitted to transfer pursuant to any contractual confidentiality obligations owed to any third party (other than any patient confidentiality obligation referred to in the foregoing clause (ii)); (v) books and records and other documents related to malpractice prevention programs, credentialing, incident reporting or quality assurance to the extent confidential under Applicable Law that Seller elects or is required to retain; (vi) documents relating to proposals to acquire the Business by Persons other

-22-

than Buyer; (vii) any documents primarily related to or that are required to realize the benefits of any Excluded Assets; (viii) documents necessary to prepare Tax Returns and cost reports for periods prior to the Closing; (ix) Seller's Governing Documents and other organizational record books and minute books; and (x) documents relating exclusively to an Excluded Asset; *provided*, *however*, that Buyer shall have the right to make copies of such retained books and records referenced in Section 2.02(f)(i), (iii), (v) or (viii), or of portions thereof, that relate to the Business as conducted before the Closing (except for privileged materials or as prohibited by Applicable Law);

(g)     any pre-Closing claim, right or interest, of Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom;

(h)     all insurance policies (except as set forth in Section 4.20);

(i)     rights for refunds for unearned insurance premiums and rights to proceeds with respect to Excluded Assets and other Excluded Liabilities;

(j)     all of Seller's deposits or prepaid charges, interests, ownership and expenses paid in connection with or relating to any Excluded Assets;

(k)     all Claims of Seller, including any Claims of Seller against third parties relating to the Excluded Assets, and any and all Claims under Sections 544, 545, 547, 548, 549, 550, 551 and 724(a) of the Bankruptcy Code, but excluding the Acquired Avoidance Actions and the Guaranty Actions;

(l)     any right to receive or expectancy of Seller in any charitable gift, grant, bequest or legacy (including any income or remainder interest in or under any trust or estate);

(m)     any Claims of Seller against third parties arising out of events occurring prior to the Closing, including and, for the avoidance of doubt, arising out of events occurring prior to the Petition Date, and including any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to Seller, but excluding the Acquired Avoidance Actions and the Guaranty Actions; *provided*, *however*, that to the extent Buyer is subject to any third party Liability resulting from the Contemplated Transactions arising out of events that occurred prior to Closing, Buyer may assert any Claim of Seller against third parties that relate to such Liability;

(n)     all deposits remaining at the Closing Date (other than with respect to the Assigned Contracts) and prepaid charges and expenses of Seller;

(o)     all deposits (the "Adequate Assurance Utility Deposits") paid by the Seller pursuant to that certain *Agreed Final Order (I) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service, (II) Deeming the Utility Providers Adequately Assured of Future Performance, and (III) Establishing Procedures for*

*Determining Requests for Additional Adequate Assurance* [Docket No. 150] entered by the Bankruptcy Court on March 21, 2019;

(p) any Contract that relates to the purchase or leasing of Equipment that is identified on Schedule 2.02(o) of the Disclosure Schedules (the "Excluded Equipment Agreements");

(q) except as otherwise set forth herein, the Contingent Former Life Care Agreements and Non-Contingent Former Life Care Agreements;

(r) all Benefit Plans;

(s) the Purchase Price and all rights of Seller under this Agreement;

(t) all Claims of Seller and its Affiliates with respect to periods prior to the Effective Time, and any payments, awards or other proceeds resulting therefrom, subject to the rights of Buyer established in subsection (m) above;

(u) all licenses or Permits that are not transferrable; and

(v) all rights with respect to Proceedings pending at the Effective Time.

At any time prior to the Closing, Buyer may, in its discretion by written notice to Seller, designate any of the CCRC Assets (other than the Assigned Residency Agreements) as additional Excluded Assets, which notice shall set forth in reasonable detail the CCRC Assets so designated. Buyer acknowledges and agrees that there shall be no reduction in the Purchase Price if it elects to designate any CCRC Assets as Excluded Assets. Except with respect to Former Residents Liabilities, notwithstanding any other provision thereof, all Liabilities of Seller under or related to any CCRC Asset excluded as an Excluded Asset at any time will constitute Excluded Liabilities.

Excluded Assets shall include the Debtor's interest, if any, in the Trustee-Held Funds as such term is defined in the Final Cash Collateral Order.

**Section 2.03    Assumption of Liabilities**.  Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Buyer shall execute and deliver to Seller the Bill of Sale, Assignment and Assumption Agreement in the form attached hereto as Exhibit A, pursuant to which Buyer shall assume and agree to discharge when due (in accordance with their respective terms and subject to the respective conditions thereof), only the following Liabilities of Seller (except to the extent constituting and excluding for all purposes, the Excluded Liabilities) and no other Liabilities (collectively, the "Assumed Liabilities") set forth in the following:

(a) Resident Obligations.

(i) Executory Life Care Agreements and Non-Life Care Agreements. Those Liabilities of Seller related to future payment or performance under the Executory Life Care Agreements and Non-Life Care Agreements, including Contractual Resident Obligations.

-24-

       (ii)    <u>Contingent Former Life Care Agreements</u>. Contractual Resident Obligations of Seller to those former Residents of the Facility, or their successor(s) (the "<u>Contingent Former Residents</u>"), that are counterparties to the Contingent Former Life Care Agreements (the "<u>Contingent Former Residents Liabilities</u>"). The Contingent Former Resident Liabilities are set forth on <u>Schedule 2.03(a)(ii)</u>, which may be subject to update prior to Closing in the event of a Current Resident's death or other termination of a Current Resident's Executory Life Care Agreement or a determination by the Bankruptcy Court.

       (iii)    <u>Non-Contingent Former Life Care Agreements.</u> Contractual Resident Obligations under those certain Non-Contingent Former Life Care Agreements to the Non-Contingent Former Residents as determined by the Bankruptcy Court and as set forth on <u>Schedule 2.03(a)(iii)</u> (the "<u>Non-Contingent Former Residents Liabilities</u>" and, together with the Contingent Former Residents Liabilities, the "<u>Former Residents Liabilities</u>"). The Non-Contingent Former Residents Liabilities are set forth on <u>Schedule 2.03(a)(iii)</u>, which may be subject to change based upon a Current Resident's death or other termination of a Current Resident's Executory Life Care Agreement or a determination by the Bankruptcy Court.

Upon Seller's assumption and assignment to Buyer, the Assigned Residency Agreements will remain in full force and effect, and the Resident counterparties to such contracts shall retain all of their rights and privileges under their respective Assigned Residency Agreements, including any right to be paid on account of any Contractual Resident Obligations. Following the Closing, the Buyer shall discharge the Contingent Former Residents Liabilities when due (in accordance with the respective terms and subject to the respective conditions of the Contingent Former Life Care Agreements), and Buyer shall discharge its obligations related to the Non-Contingent Former Residents Liabilities by making the payment to the Seller as set forth in <u>Section 3.01(c)</u>. Following Buyer's payment to Seller as set forth in <u>Section 3.01(c)</u>, Buyer assumes no Liability and has no further obligation related to the Non-Contingent Former Residents as the result of any failure by Seller to properly remit payment for the Non-Contingent Former Residents Liabilities within five (5) Business Days after the Closing or for any other matter.

       (b)    <u>Assigned Contracts</u>. All of Seller's Liabilities under the Assigned Contracts, except such Liabilities that are satisfied or discharged by payment of Cure Costs (including, for the avoidance of doubt, any Assigned Contracts for which the Cure Costs were set at $0.00 and approved as such by virtue of the Sale Order or such other order authorizing the assumption by Seller and assignment to Buyer of such Assigned Contracts).

       (c)    <u>Cure Costs</u>. All Cure Costs related to the Assigned Contracts and Assigned Residency Agreements as set forth on <u>Schedule 2.07(b)</u>.

The assumption by Buyer of the Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.

**Section 2.04    Excluded Liabilities**.  Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of Seller, and Seller shall retain and be solely and exclusively liable with respect to, all Liabilities of Seller, except for only the Assumed Liabilities (such Liabilities other than Assumed Liabilities, collectively, the "Excluded Liabilities"), which Excluded Liabilities shall include the following:

(a)    any Liabilities to the extent based upon any wrongful or negligent act or omission of Seller prior to the Closing;

(b)    any Liability associated with any Excluded Assets, other than the Former Residents Liabilities as set forth herein;

(c)    all Indebtedness of Seller, other than the Former Resident Liabilities; all guarantees of third party obligations by Seller and reimbursement obligations to guarantors of Seller's obligations or under letters of credit; and all Liabilities of Seller to any owner or former owner of capital stock or warrants, or holder of Indebtedness of Seller;

(d)    all operating expenses of the Business or the CCRC Assets, to the extent attributable or otherwise related to the ownership, operation, use, or maintenance of any of the CCRC Assets prior to the Effective Time;

(e)    all Taxes of Seller, other than as set forth in Section 7.01 and Taxes related to the ownership, operation, use, or maintenance of any of the CCRC Assets from and after the Effective Time with the understanding that Buyer shall be responsible for all Transfer Taxes (if any), including any Transfer Taxes related to the transfer of the Real Property or the Personal Property to Buyer;

(f)    all Actions and Proceedings set forth on Schedule 4.14 of the Disclosure Schedules;

(g)    all Excluded Employee Liabilities;

(h)    all Liabilities under the WARN Act with respect to plant closings or mass layoffs of Employees that occur prior to or at the time of the Closing;

(i)    any Liability to the extent relating to any breach of contract, breach of warranty, tort, infringement, or violation of Applicable Law by Seller;

(j)    any Liability to the extent arising out of events or omissions occurring prior to the Closing Date from or relating to any overpayment, duplicate payment, refunds, discounts or adjustments due to any healthcare cost reimbursement program, health plan or insurance coverage or under any Government Program (each a "Third-Party Payor");

(k)    any Liability related to Claims of medical malpractice and/or other professional Liability of Seller, or any of its employees, attending physicians, agents or

-26-

independent contractors to the extent arising out of events or omissions occurring prior to the Closing Date;

(l) any Liability arising out of or in connection with any Proceedings (whether instituted prior to or after Closing) to the extent arising from acts or omissions by Seller which occurred or alleged to have occurred prior to the Closing Date;

(m) any Liability related to penalties, fines, settlements, interest, costs and expenses to the extent arising out of or incurred as a result of any violation by Seller prior to the Closing Date of any Applicable Law;

(n) all Liabilities relating to amounts required to be paid by Seller hereunder;

(o) all Claims, Liabilities or obligations arising out of any duty or violation of any Applicable Law, including any Environmental Law, by Seller or the Business, or related to the CCRC Assets to the extent occurring on or prior to the Closing Date;

(p) all Liabilities of Seller to Buyer under this Agreement or with respect to or arising out of the Contemplated Transactions;

(q) all Liabilities consisting of legal, accounting, financial advisory, valuation, investment banking and other third party advisory or consulting fees and expenses incurred by or on behalf of Seller in connection with or arising from the Bankruptcy Case or the Contemplated Transactions or the other Transaction Documents;

(r) all Liability related to or arising out of the Bond Financing, Subordinated Bond Financing, the Securities Act of 1933, as amended and the rules and regulations promulgated thereunder, the Internal Revenue Code of 1986, as amended or any Internal Revenue Service audits related thereto;

(s) all Liabilities other than Former Residents Liabilities arising under the Contingent Former Life Care Agreements and Non-Contingent Former Life Care Agreements;

(t) all Liabilities existing prior to the filing of the Bankruptcy Case that are discharged under the Bankruptcy Case; and

(u) all Liabilities of Seller under this Agreement and the other Transaction Documents.

**Section 2.05  Further Assurances**. From time to time following the Closing, Seller and Buyer shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and shall take such further actions, as may be reasonably necessary or appropriate (a) to assure fully to Buyer and its respective successors or assigns, all of the CCRC Assets and properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement, (b) to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the Assumed Liabilities by Buyer under this Agreement, and (c) to otherwise

-27-

make effective the Contemplated Transactions; *provided*, *however*, that nothing in this <u>Section 2.05</u> shall require Buyer or any of their respective Affiliates to assume any Liabilities other than the Assumed Liabilities. Notwithstanding the foregoing, nothing in this <u>Section 2.05</u> shall prohibit Seller from ceasing operations or winding up its affairs following the Closing. Each of the Buyer and Seller acknowledges that subsequent to the Closing each party may need access to information or documents in the control or possession of the other parties with respect to the Business (including, patient medical records for patients of the Business prior to the Closing Date), the CCRC Assets and the Assumed Liabilities, including for the purposes of post-closing operations of the Business by the Buyer, any pending or threatened audits, inquiries or investigations (including any of the same undertaken by any Governmental Authority), compliance with Laws and the prosecution or defense of third party claims as may be related to the Business, and each party shall provide such reasonable access.

**<u>Section 2.06</u>   <u>Bankruptcy Court Approval</u>.**

(a)     Seller and Buyer acknowledge that this Agreement and the sale of the CCRC Assets and the assumption and assignment of the Assigned Contracts and Assigned Residency Agreements are subject to Bankruptcy Court approval. Seller and Buyer acknowledge that they are aware of the relevant legal requirements and will proceed in good faith to satisfy such requirements.   Seller acknowledges that it has consulted with the Residents' Committee with respect to this Agreement and obtained the consent of the Bond Trustee to enter into this Agreement and the Bond Trustee's approval of the Break-Up Fee set forth in Section 12.04 all in accordance with the Bid Procedures Order.  Within two days of entry into this Agreement, Seller shall serve the Notice of Stalking Horse (as defined in the Bid Procedures Order) in accordance with the Bid Procedures Order.

(b)     From and after the Execution Date and prior to the Closing or the termination of this Agreement in accordance with <u>Article XII</u>, Seller shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, prevent entry of the Sale Order or approval of this Agreement; *provided, however*, Seller may act in accordance with the Bid Procedures Order.

(c)     In the event that the entry of a Sale Order is appealed or a stay pending appeal is sought, Seller shall oppose the appeal or the stay pending appeal and seek the dismissal of any appeal (including a petition for certiorari, motion for rehearing, re-argument, reconsideration or revocation).

(d)     Notwithstanding the foregoing, any resulting changes to this Agreement or any other Transaction Document or resulting material changes to the proposed Sale Order shall be subject to the approval of Buyer in its reasonable discretion.  Seller shall (i) provide Buyer with drafts of any and all other pleadings and proposed orders to be filed or submitted in connection with this Agreement and the Contemplated Transactions, and such pleadings and proposed orders shall be in form and substance reasonably acceptable to Buyer and (ii) make best efforts to consult and cooperate with Buyer regarding any

discovery taken in connection with seeking entry of the Sale Order (including any depositions).

(e)     During the Bankruptcy Case, Seller shall not commence, assign, convey or abandon any Avoidance Actions against any of Seller's ordinary course vendors, contract counterparties, contractors and other suppliers of services related to the Business (the "Acquired Avoidance Actions") without the prior written consent of Buyer.

(f)     Seller shall use its best efforts to obtain entry of the Sale Order on or before August 1, 2019.

**Section 2.07     Assigned Contracts and Cure Costs**.

(a)     Subject to the approval of the Bankruptcy Court by Final Order, and effective on the Closing Date, the Assigned Contracts and Assigned Residency Agreements will be assumed by the Seller and assigned to the Buyer on the Closing Date, in accordance with Section 365 of the Bankruptcy Code.  The final determination of which Contracts (other than Assigned Residency Agreements) shall be Assigned Contracts shall be within the Buyer's sole discretion.  The Cure Costs of the Assigned Contracts and Assigned Residency Agreements shall be paid by the Buyer in accordance with the provisions herein.

(b)     At the Closing (or, if the applicable Assigned Contract is not assigned to Buyer at Closing pursuant to the terms of this Agreement, then at the time of the assignment of such Assigned Contract to Buyer, if ever), Buyer shall pay, pursuant to Section 365 of the Bankruptcy Code and the Sale Order, any and all cure and reinstatement costs or expenses that are required to be paid under Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts and Assigned Residency Agreements (the "Cure Costs").  For the avoidance of doubt, (i) Buyer shall pay all Cure Costs as set forth on Schedule 2.07(b) in cash at Closing, (ii) the Cure Costs are separate and apart from, and in addition to, the Purchase Price and, (iii) except with respect to the Assumed Liabilities, Buyer shall not be required to make any payment of Cure Costs for, and shall not assume any Liabilities with respect to, any Contract that is not an Assigned Contract or an Assigned Residency Agreement.  In the event the aggregate Cure Costs (not including any Former Residents Liabilities not due and owning as of the Closing) exceed the Cure Cost Cap, such amounts above the Cure Cost Cap shall be Reimbursable Claims as set forth in Section 11.03.

(c)     Notwithstanding anything in this Agreement to the contrary, a Contract that is validly rejected or otherwise not assumed and assigned to the Buyer pursuant to this Section 2.07 shall constitute an Excluded Asset.

(d)     Schedule 2.07(b) of the Disclosure Schedules sets forth each Executory Contract, except Executory Life Care Agreements and Non-Life Care Residency Agreements, Seller's good faith estimate of the amount of the Cure Costs payable in respect of each such Executory Contract (and if no Cure Cost is estimated to be payable

in respect of any particular Executory Contract, the amount of such Cure Cost designated for such Contract shall be "$0.00").

(e)    At any time prior to the Designation Deadline, Buyer shall have the right, which may be exercised in Buyer's sole discretion, to provide written notice to Seller (each such notice, a "Contract Notice") of Buyer's election to designate any Executory Contract (including any Contract that is an Assigned Contract immediately before such designation but excluding the Assigned Residency Agreements) (1) as an Excluded Contract, and upon such designation, such Contract shall constitute an Excluded Contract and, if applicable, shall cease to constitute an Assigned Contract or (2) to the extent not already rejected, as an Assigned Contract, and upon such designation, such Contract shall constitute an Assigned Contract and shall cease to constitute an Excluded Contract.

(f)    If Buyer exercises its rights in Section 2.07(e) above to designate a Contract, including a Contract that was an Assigned Contract immediately before such designation, as an Excluded Contract, there shall be no reduction in the Purchase Price as a result of such designation or change in designation.

## ARTICLE III.
## PURCHASE PRICE

**Section 3.01    Purchase Price**.  As full consideration for the sale of the CCRC Assets by Seller to Buyer, at the Closing, Buyer shall assume the Assumed Liabilities as provided in Section 2.03 and shall pay to the Seller as provided herein the following amounts, subject to adjustment as provided in Section 3.03 below (the "Purchase Price"):

(a)    Cash in an amount equal to Sixty Million and No/100 Dollars ($60,000,000.00) (the "Cash Purchase Price");

(b)    plus, an amount equal to One Million Dollars ($1,000,000.00) to be deposited by Buyer into a third-party escrow account at Closing and utilized to provide a source of payment of Reimbursable Claims and to provide partial security for any amounts owed with respect to an adjustment that results in a reduction of the Purchase Price as provided in Section 3.03 ("Holdback Escrow Amount"); and

(c)    plus, an amount equal to the Non-Contingent Former Residents Liabilities owed by Seller under those certain Non-Contingent Former Life Care Agreements to the Non-Contingent Former Residents as determined by the Bankruptcy Court and as set forth on Schedule 2.03(a)(iii) to be held by Seller and distributed to the Non-Contingent Former Residents by no later than five (5) Business Days after the Closing.

**Section 3.02    Good Faith Deposit**.

(a)    Buyer has deposited the sum of Three Million Fifty Thousand and No/100 Dollars ($3,050,000.00) (the "Deposit") with the Title Company at the time this Agreement is executed.

(b)     Notwithstanding anything to the contrary contained herein, if the Closing does not occur, the Deposit, including any interest earned thereon, shall be paid to the party entitled hereto pursuant to the terms of this Agreement.

(c)     Upon the Closing, the Deposit shall be paid by the Title Company to Seller and shall reduce the amount of the Cash Purchase Price to be paid by Buyer at Closing.

**Section 3.03     Adjustment of Purchase Price**.

(a)     All income and expenses (including prepaid expenses) of the CCRC Assets and Business shall be prorated on a daily basis between Seller and Buyer as of 11:59 p.m. on the date (the "Proration Date") immediately preceding the Closing.  Such items to be prorated shall include:

(i)     Utility charges, if any, based on utility charges for the month immediately preceding the Closing; and

(ii)     Asset Taxes.

Buyer and Seller shall prepare a proposed Schedule (the "Proration Schedule") prior to Closing that shall include the items listed above and any other applicable income and expenses with regard to the CCRC Assets and Business.  Seller and Buyer will use all reasonable efforts to finalize and agree upon the Proration Schedule at least two (2) Business Days prior to Closing.

(b)     Except with respect to Adequate Assurance Utility Deposits, any escrow accounts held by any utility companies, and any cash deposits made by Seller or Manager on behalf of Seller to any utility company prior to Closing to secure obligations under Assumed Liabilities shall be assigned to Buyer and Seller shall receive a credit at Closing for any such deposits.  Seller and Buyer shall finalize and agree upon the cash deposits and credits due Seller at least two (2) Business Days prior to Closing.  Buyer will not issue a credit or make any cash payment after the Closing for Seller utility deposits.

(c)     Seller shall receive all income from and shall be responsible for all expenses of the CCRC Assets and Business attributable to the period prior to the Proration Date, subject to the treatment of such claims under the Bankruptcy Code and by order of the Bankruptcy Court, including accounts payable whether known or unknown, and Accounts Receivable, unless otherwise provided for in this Agreement.  In the event Buyer or Buyer's Affiliates receive any payment pursuant to a Tenant Lease for rent due for any period prior to the Proration Date or payment of any other receivable of Seller, Buyer shall apply such payment first to the obligations then owing from Seller to Buyer for its period of ownership and to costs of collection, remitting the balance, if any, promptly to Seller.  Buyer shall provide Seller with evidence of the obligations owing from the Seller to Buyer that have been offset.  To the extent Seller fails to make timely payment of any undisputed accounts payable incurred after the Petition Date and to the extent attributable to services provided prior to the Proration Date, related to an Assigned

Contract and not intended to benefit the Buyer, such amounts may be made by Buyer and considered a Reimbursable Claim pursuant to Section 11.03.

(d)     Buyer shall receive all income from and shall be responsible for all expenses of the CCRC Assets and Business attributable to the period from and after the Proration Date, unless otherwise provided for in this Agreement.  In the event Seller or Seller's Affiliates receive any payment pursuant to a Tenant Lease for rent due for any period or from a Resident or other amount paid on behalf of or directly for a Resident, in each case, from and after the Proration Date, Seller shall apply such payment first to the obligations then owing from Buyer to Seller for its period of ownership and to costs of collection, remitting the balance, if any, promptly to Buyer.  Seller shall provide Buyer with evidence of the obligations owing from the Buyer to Seller that have been offset.

(e)     Buyer and Seller shall be liable for, on an equal basis (fifty percent (50%) each), any escrow fees with respect to the Title Company and the Holdback Escrow Agreement.

(f)     Notwithstanding the foregoing provisions, there shall be no prorations under this Agreement for employment related matters, as such matters are governed by, and shall be prorated pursuant to, the terms of the OTA.

(g)     As necessary with respect to patients admitted to the Facility's skilled nursing facility before the Closing but who are discharged after Closing (the "Transition Patients"), the parties shall take measures to ensure that Seller and Buyer each receive an appropriately pro-rated portion of any payment for items and services furnished to such Transition Patients.  Following the Closing, Buyer shall submit Claims for Transition Patients in accordance with the requirements of the applicable Government Programs or Third Party Payor programs, and shall pay to Seller the fraction of the payment attributable to items and services furnished by Seller prior to the Closing.

(h)     The parties agree that any amounts that may become due under this Section 3.03 shall be paid at Closing as can best be determined.  A post-Closing reconciliation of pro-rated items shall be made by Buyer and Seller within ninety (90) days after Closing and any amounts due at that time shall be promptly forwarded to the respective party in a lump sum payment.  Any additional amounts which may become due after such determination shall be forwarded at the time they are received.  Any amounts due under this Section 3.03 which cannot be determined within ninety (90) days after Closing shall be reconciled as soon thereafter as such amounts can be determined.  Notwithstanding anything herein, neither party shall have any obligation to the other under this Section 3.03 one hundred twenty (120) days after Closing.

(i)     This Section 3.03 shall survive the Closing.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF SELLER

As of the Execution Date and as of the Closing Date, and as a material inducement to Buyer entering into this Agreement and to consummate the Contemplated Transactions, Seller represents and warrants to Buyer, as follows:

**Section 4.01    Organization; Good Standing of Seller**.  Seller is a nonstock, nonprofit corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  Seller has the requisite corporate power and authority to own or lease and to operate and use its properties and to operate the Business as currently conducted.  Seller is duly qualified or licensed to do business and is in good standing in each jurisdiction where the operation of the Business as currently conducted or the nature of its properties makes such qualification or licensing necessary, except where the failure to be so qualified or licensed or in good standing as would not have, individually or in the aggregate, a Material Adverse Effect.  Seller does not own any wholly owned or partially owned subsidiary, or any minority interests in any Person.

**Section 4.02    Authority; Validity; Consents**.  Seller has the requisite corporate power and authority necessary to enter into this Agreement and the other Transaction Documents to which Seller is a party.  Seller's obligations to perform under this Agreement and the other Transaction Documents are subject to requisite Bankruptcy Court approval.  Upon entry of the Sale Order, the execution, delivery and performance of this Agreement and such other Transaction Documents by Seller and the consummation by Seller of the Contemplated Transactions have been duly and validly authorized by all requisite corporate action, none of which actions have been modified or rescinded and all of which actions remain in full force and effect.  This Agreement has been duly and validly executed and delivered by Seller and each other Transaction Document required to be executed and delivered by Seller at the Closing will be duly and validly executed and delivered by Seller at the Closing.  Subject to requisite Bankruptcy Court approval and assuming due authorization, execution and delivery by Buyer, this Agreement and the other Transaction Documents constitute the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms (subject to the effect of bankruptcy, insolvency fraudulent conveyance, reorganization, moratorium and similar laws affecting creditor's rights and remedies generally, and to limitations imposed by general principles of equity, whether applied by a court of law or of equity).

**Section 4.03    No Conflict**.  Other than as set forth in Schedule 4.03 of the Disclosure Schedules, and except for any notices, filings and consents required in connection with the consummation of the Contemplated Transactions, and subject to obtaining requisite Bankruptcy Court approval, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the Contemplated Transactions will not result in the breach of any terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Seller under (a) any material Permit or Material Contract by which Seller or any CCRC Asset is bound, (b) the Governing Documents of Seller, (c) subject to entry of the Sale Order, any applicable Order or Applicable Law.

**Section 4.04    [RESERVED]**.

-33-

**Section 4.05** **Contracts**. Schedule 4.05 of the Disclosure Schedules lists all Contracts, except Residency Agreements, in effect as of the Execution Date. Seller has made available to Buyer accurate and complete copies of each Contract listed on Schedule 4.05 of the Disclosure Schedules. The Assigned Contracts are listed on Schedule 2.01(c) of the Disclosure Schedules. Except as separately described on Schedule 4.05 of the Disclosure Schedules, (i) each Assigned Contract is a valid and binding agreement of Seller enforceable in accordance with its terms against Seller, and to Seller's Knowledge, against each other party thereto. No written notice of default or breach has been received or delivered by Seller under any Assigned Contract, the resolution of which is currently outstanding. As of the Execution Date and subject to update as of the Closing Date, Seller is not in receipt of any effective written notice concerning the exercise of any premature termination, material price redetermination, market-out, shut-in or material curtailment of or under any of the Assigned Contracts.

**Section 4.06** **Title; Sufficiency of Assets; No Outstanding Rights**.

(a) The Facility includes 137 independent living units, 56 assisted living units, 26 memory support assisted living units, and 48 skilled nursing beds.

(b) Except as set forth on Schedule 4.06(b) of the Disclosure Schedules, there are no outstanding rights (including any rights of first refusal or offer) or rights of reverter, options, or Contracts giving any Person any current or future right to require Seller or, following the Closing Date, Buyer, to sell or transfer to such Person or to any third party, any interest in Seller or any of the CCRC Assets.

(c) Upon entry of the Sale Order, Seller will deliver good and marketable title to, or a valid leasehold interest in, all Personal Property (except for the Excluded Personal Property) included in the CCRC Assets free and clear of all Liens, other than Permitted Liens to the extent permissible under Section 363(f) of the Bankruptcy Code. Seller is the sole record and beneficial owner of the CCRC Assets. No Person other than Seller owns any Personal Property, except for (i) items leased by Seller or improvements to items leased by Seller pursuant to a lease agreement identified on Schedule 2.01(c) of the Disclosure Schedules, and (ii) personal property of Seller's employees, Residents, tenants, patients or visitors. Except as disclosed on Schedule 4.06(c) of the Disclosure Schedules, since the Interim Balance Sheet Date, Seller has not sold or otherwise disposed of any Personal Property having a value (individually or in the aggregate) in excess of $15,000 (other than Inventory items sold, used or disposed of in the Ordinary Course of Business).

(d) Except as set forth on Schedule 4.06(d) of the Disclosure Schedules, the CCRC Assets, together with the OTA, are sufficient and adequate for the continued conduct of the Business after the Closing in substantially the same manner in which it has been conducted prior to the Closing and constitute all of the rights, property and assets necessary to conduct the Business as currently conducted. To Seller's Knowledge, there are no facts or conditions affecting the CCRC Assets that could, individually or in the aggregate, materially interfere with the use, occupancy or operation of the CCRC Assets as currently used, occupied or operated, or their adequacy for such use. All tangible CCRC Assets are in good operating condition and repair, normal wear and tear excepted.

**Section 4.07    Financial Information**.

(a)    Schedule 4.07 of the Disclosure Schedules hereto contains the following financial statements and financial information (collectively, the "Historical Financial Information"):

(i)    audited financial statements consisting of the balance sheet of the Business as at December 31 in each of the years 2017, 2016 and 2015 and the related statements of income and net surplus/deficit, and cash flow for the years then ended; and

(ii)    Unaudited financial statements consisting of the balance sheet of the Business as of March 31, 2019, and the related statements of income and net surplus/deficit, and cash flow for the 12-month period ended on December 31, 2018 (the "Unaudited Financial Information").

The financial statements included in the Historical Financial Information are true, correct and complete in all material respects and have been prepared, and the Additional Financial Statements required to be delivered pursuant to Section 6.04 will be true, correct and complete in all material respects and have been and will be prepared, in accordance with GAAP, applied on a consistent basis throughout the periods indicated except that the Unaudited Financial Information and the Additional Financial Statements may not include required footnote disclosures or reflect normal year-end adjustments, including the future service obligation adjustment, and the Additional Financial Statements may not reflect adjustments that may be required as a result of the Contemplated Transactions, and Seller has not changed in any material respects any accounting policy or methodology in calculating reserves, including reserves for uncollected accounts receivable, throughout all periods presented.  Except as set forth on Schedule 4.07 of the Disclosure Schedules, the financial statements contained in the Historical Financial Information present fairly, in all material respects, and the financial statements contained in the Additional Financial Statements present fairly and will present fairly, in all material respects, the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated.  The balance sheet of the Business as of December 31, 2018, is referred to herein as the "Balance Sheet" and the date thereof as the "Balance Sheet Date" and the balance sheet of the Business as of April 30, 2019, is referred to herein as the "Interim Balance Sheet" and the date thereof as the "Interim Balance Sheet Date".

(b)    Except as set forth on Schedule 4.07 of the Disclosure Schedules and except for Liabilities that are disclosed in this Agreement, the Historical Financial Information and the Additional Financial Statements, Seller has not incurred any material Liabilities relating to the CCRC Assets or the Business of the type required by GAAP to be reflected on the Interim Balance Sheet except Liabilities incurred in the Ordinary Course of Business since the Interim Balance Sheet Date.

**Section 4.08    Permits and Approvals**.

(a)     The Facility is duly licensed in accordance with the Applicable Laws of the State of Indiana, and all other ancillary departments or services located at or operated for the benefit of, a Facility that are required to be separately licensed are duly licensed by the appropriate Governmental Authority, except where the failure to be so licensed would not have a Material Adverse Effect.  Schedule 4.08(a) of the Disclosure Schedules sets forth a complete list of Permits and Approvals currently issued or granted by a Governmental Authority and owned or held by or issued to Seller in connection with the CCRC Assets or the Business, and such Permits and Approvals constitute all material Permits and Approvals necessary for the conduct of the Business and operation of the CCRC Assets as currently conducted and for the ownership of the CCRC Assets by Seller and operation and use of the CCRC Assets by Seller or the Post-Closing Licensee, all of which are in full force and effect.  Seller has provided accurate and complete copies to Buyer of each Permit and Approval described on Schedule 4.08(a) of the Disclosure Schedules.

(b)     Seller is in compliance in all material respects with the terms of all Permits and Approvals that are required by Applicable Law with respect to the CCRC Assets and the Business, and there are no provisions in, or agreements relating to, any such Permit or Approval that preclude or limit Seller from operating the CCRC Assets and carrying on the Business as currently conducted.  There are no pending or, to the Knowledge of Seller, threatened Proceedings or Actions by or before any Governmental Authority to revoke, cancel, rescind, suspend, restrict, modify or refuse to renew any of the Permits or Approvals, and all of the material Permits and Approvals are unrestricted, in good standing, in full force and effect.  Except as set forth on Schedule 4.08(b), no event has occurred and, to Seller's Knowledge, no facts exist with respect to the Permits or Approvals that allows, or after notice or the lapse of time or both, would allow the suspension, revocation, termination or restriction of any such Permit or Approval, or would result in any other material impairment in the rights of any holder thereof.  Seller has not received any written notice or communication from any Governmental Authority regarding any material violation of any Permit or Approval (other than any surveys or deficiency reports for which Seller has submitted a plan of correction that has been accepted or approved by the applicable Governmental Authority).  Seller has delivered to Buyer accurate and complete copies of all survey reports, deficiency notices, plans of correction, and related correspondence received by Seller since January 1, 2016, in connection with the Permits and Approvals owned or held by Seller that are relevant to the CCRC Assets and the Business.

### Section 4.09   Government Program Participation/Accreditation/Cost Reports.

(a)     Seller is a "provider" with valid and current provider agreements (such provider agreements, the "Program Agreements") and with one or more provider numbers with the Medicare program and Seller and the CCRC Assets are certified for participation in the Medicare programs.  Seller has delivered accurate and complete copies of all such Program Agreements to Buyer.  The Program Agreements are each in full force and effect and, to the Knowledge of Seller, no events or facts exist that would cause any Program Agreement to be suspended, terminated, restricted or withdrawn. Except as set forth on Schedule 4.09(a) of the Disclosure Schedules, Seller and the CCRC

-36-

Assets are in compliance with the conditions of participation for the Medicare program in all material respects. Seller has timely filed all cost reports that were required to be filed with the Medicare program ("Government Programs") for all fiscal years through fiscal year end December 31, 2018. Seller has made available to Buyer accurate and complete copies of Seller's cost reports for the three (3) most recent fiscal years of Seller. Except as set forth on Schedule 4.09(a) of the Disclosure Schedules, there are no pending or, to the Knowledge of Seller, any threatened Proceedings, surveys, investigations or other Actions under or related to the Government Programs or any other Third Party Payor programs involving Seller or the CCRC Assets. All cost reports filed by or on behalf of Seller accurately reflect the information required to be included therein, and such cost reports do not claim, and neither Seller nor the Facility have received, reimbursement in any amount in excess of the amounts allowed by Applicable Law or any applicable Contract, including the Program Agreements. To Seller's Knowledge, there are no facts or circumstances that would give rise to any disallowance under any such cost reports. Except as disclosed on Schedule 4.09(a) of the Disclosure Schedules, there are no Claims pending before any Governmental Authority, with respect to any Program cost reports or Claims filed on behalf of Seller with respect to the Business on or before the Execution Date and the Closing Date, or any disallowances by any Governmental Authority in connection with any audit of such cost reports. Except as disclosed on Schedule 4.09(a) of the Disclosure Schedules, no validation review or program integrity review (including any recovery audit contract review) related to the Facility, the Business, or the consummation of the Contemplated Transactions, has been conducted by any Governmental Authority in connection with the Government Programs, and to the Knowledge of Seller, no such reviews are scheduled, pending or threatened against or affecting Seller with respect to the Facility, the Business, or the consummation of the Contemplated Transactions. Schedule 4.09(a) of the Disclosure Schedules indicates which of such cost reports have not been audited and finally settled and includes a brief description of any and all notices of program reimbursement, proposed or pending audit adjustments, disallowances, appeals of disallowances, and any and all other unresolved Claims in respect of such cost reports. Neither Seller nor, to the Knowledge of Seller, any of Seller's respective employees, officers or directors have committed a material violation of any Applicable Law relating to payments and reimbursements under the Government Programs or any other Third Party Payor program. Schedule 4.09(a) of the Disclosure Schedules contains a list of all NPIs and all provider numbers under the Government Programs issued to and held by Seller and the Facility, all of which are in full force and effect.

(b)     Billing practices of Seller with respect to the Facility and the Business to all Government Programs and Third Party Payors, have been in compliance in all material respects with all Applicable Laws, policies and billing requirements of such Third Party Payors and Government Programs, and except as set forth on Schedule 4.09(b) of the Disclosure Schedules and to Seller's Knowledge, neither Seller nor the Facility has billed or received any material payment or reimbursement in excess of amounts allowed under Applicable Laws, policies and billing requirements of Third Party Payors and Government Programs.

(c)     The Seller does not and has not participated in the Medicaid program, and does not have any obligations owing to any Governmental Authority with respect to the Medicaid program.

**Section 4.10     Compliance with Applicable Laws.**

(a)     Except as set forth on <u>Schedule 4.10</u> of the Disclosure Schedules, Seller, the CCRC Assets, and the Facility have been since January 1, 2016 and are presently in material compliance with all Applicable Laws.

(b)     Neither Seller nor the Facility has received any written communication from a Governmental Authority that alleges, that Seller, the Facility or the CCRC Assets are not in compliance with any Applicable Law, other than statements of deficiencies from a Governmental Authority received in the Ordinary Course of Business.  Seller has timely filed all material and relevant reports, data, and other information required to be filed with such Governmental Authorities regarding the Facility, the Business and the CCRC Assets.

(c)     Neither Seller, nor any of its Representatives has, for or on behalf of Seller, as applicable, at any time, (i) made or caused to be made or provided, directly or indirectly, any type of payment, gift, contribution or similar item to a governmental official, political party, or candidate for office for the purpose of inducing a government official to violate their lawful duty or inducing an official to use their influence to violate any Applicable Law, or (ii) accepted or received any unlawful payments, gifts, contributions or similar items.

(d)     Neither Seller nor any of its Affiliates, nor to Seller's Knowledge, any agent acting on behalf of or for the benefit of any of the foregoing, has directly or indirectly in connection with the Facility, offered or paid any remuneration, in cash or in kind, to, or made any financial arrangements with, any past, present or potential Residents, past or present suppliers, patients, physicians and other health care providers ("<u>Practitioners</u>"), contractors or Third Party Payors of Seller or the Facility that would violate Healthcare Regulatory Laws, except as otherwise permitted under Healthcare Regulatory Laws.  Neither Seller, the Facility, nor to Seller's Knowledge, any officer, director, employee or independent contractor of Seller or the Facility (whether an individual or entity), has been excluded from participating in any Federal Health Care Program, subject to sanction pursuant to 42 U.S.C. § 1320a-7a or § 1320a-8 or been convicted of a crime described at 42 U.S.C. § 1320a-7b, nor, to Seller's Knowledge, are any such exclusions, sanctions or charges threatened or pending.

**Section 4.11     Health Regulatory Compliance.**

(a)     The Facility is certified for participation and reimbursement under and has current provider numbers and provider agreements for each material Third Party Payor program under which it is presently receiving payments.  To Seller's Knowledge, there is no threat in writing, existing or pending revocation, suspension, termination, probation,

-38-

restriction, limitation, or nonrenewal proceeding by any Third Party Payor, to which Seller may presently be subject with respect to any CCRC Asset or Business.

(b)     Except for the matters set forth on <u>Schedule 4.10(c)</u> of the Disclosure Schedules and to the Seller's Knowledge, there are no threatened in writing or pending proceedings by any Governmental Authority or written notices thereof received by Seller that would (i) have a material impact on Seller's ability to accept and/or retain Residents or operate such CCRC Assets and Business for its current use or result in the imposition of a lower rate certification or a lower reimbursement rate for services rendered to eligible patients or residents, (ii) materially modify, limit or result in the transfer, suspension, revocation or imposition of probationary use of any of the material Permits or Approvals, or (iii) adversely and materially affect, as applicable, Seller's continued participation in any material Third Party Payor programs.

(c)     Accurate and complete copies (redacted to the extent required to comply with applicable privacy laws and regulations) of all Licensing Surveys for the last three (3) years which are currently in Seller's possession or control have been delivered or made available to Buyer.

(d)     Seller has timely filed or caused to be filed all material reports and billings required to be filed by it prior to the Execution Date and the Closing Date in order to receive payment from the Government Programs, Third Party Payors and Residents and all such reports and billings are complete and accurate in all material respects and have been prepared in material compliance with all Applicable Laws governing reimbursement and payment of Claims.  To Seller's Knowledge, accurate and complete copies of such reports and billings have previously been made available to Buyer.  To Seller's Knowledge, except as disclosed on <u>Schedule 4.10(c)</u> of the Disclosure Schedules, Seller has paid or caused to be paid all known and undisputed refunds, overpayments, discounts or adjustments which have become due pursuant to such reports and billings, has not claimed or received reimbursements from Government Programs, Third Party Payors or Residents in excess of amounts permitted by Applicable Law, and has no Liability under any Third Party Payor program for any refund, overpayment, discount or adjustment.

(e)     The Facility is being operated as a skilled nursing facility, assisted living facility, independent living facility and memory care facility, having the number of beds or Residents as set forth on the Rent Roll.

<u>Section 4.12</u>     <u>Information Privacy and Security Compliance</u>.

(a)     Seller has provided to Buyer accurate and complete copies of the compliance policies and/or procedures and privacy notices of the Facility relating to Information Privacy and Security Laws.  All of Seller's workforce (as such term is defined in 45 C.F.R. § 160.103) who works with information subject to Information Privacy and Security Laws has received training with respect to compliance with Information Privacy and Security Laws.

(b)     Except as set forth in <u>Schedule 4.12</u> of the Disclosure Schedules, Seller has entered into business associate agreements with all third parties acting as a business associate as defined in 45 C.F.R. § 160.103.  To Seller's Knowledge, Seller is not under investigation by any Governmental Authority for a violation of any Information Privacy or Security Laws, including receiving any notices from the United States Department of Health and Human Services Office for Civil Rights, FTC or Justice Department relating to any such violations.

(c)     Seller has provided to Buyer accurate and complete copies of any written complaint(s) delivered to Seller or the Facility during the past three (3) years alleging a violation of any Information Privacy and Security Laws.

(d)     Except as set forth in <u>Schedule 4.12</u> of the Disclosure Schedules and to Seller's Knowledge, no breach or potential breach has occurred with respect to any "Unsecured Protected Health Information" (as such term is defined in 45 C.F.R. § 164.402) maintained by or for Seller or the Facility, and no information security or privacy breach event has occurred that would require notification under any other applicable Information Privacy and Security Laws.

**Section 4.13   Compliance Programs**.  Seller has provided to Buyer an accurate and complete copy of each of the current compliance program materials applicable to the Business and the Facility, including all program descriptions, compliance officer and committee descriptions, ethics and risk area policy materials, training and education materials, auditing and monitoring protocols, reporting mechanisms and disciplinary policies.  Seller has granted Buyer access to logs and other information maintained by Seller under their respective compliance programs.  Seller (a) is not a party to a Corporate Integrity Agreement with the Office of the Inspector General of the U.S. Department of Health & Human Services (the "<u>OIG</u>"); (b) does not have any reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority; (c) to Seller's Knowledge, has not been the subject of any Government Program investigation conducted by any Governmental Authority; (d) except as set forth on <u>Schedule 4.13</u> of the Disclosure Schedules has not been a defendant in any qui tam/False Claims Act litigation (other than by reason of a sealed complaint of which Seller has no Knowledge); (e) has not been served with or received any search warrant, subpoena, civil investigation demand, contact letter, by or from any Governmental Authority related to any violations of Healthcare Regulatory Laws; and (f) except as disclosed in <u>Schedule 4.13</u> of the Disclosure Schedules has not received any complaints with respect to the Facility through such Seller's compliance "hotline" from Employees, Service Providers, vendors, Residents, or any other persons that could reasonably be considered to indicate that such Seller has violated, or is currently in violation of, any Applicable Law.  For purposes of this Agreement, the term "compliance program" refers to provider programs of the type described in the compliance guidance published by the OIG.

**Section 4.14   Proceedings; Judgments**.  Except for the Bankruptcy Case and as set forth on <u>Schedule 4.14</u> of the Disclosure Schedules, (a) there are no Proceedings pending or, to Seller's Knowledge, threatened against Seller with respect to any of the CCRC Assets or the Business; (b) there is no Proceeding pending or, to Seller's Knowledge, threatened, before or by any Governmental Authority with respect to any CCRC Assets or the Business; and (c) there has

been no settlement or other similar agreement or Order with respect to the ownership or operation of the CCRC Assets or the Business that is material. Except as set forth on Schedule 4.14 of the Disclosure Schedules, there are no judgments presently outstanding and unsatisfied against the CCRC Assets and Business, Seller or any of Seller's assets. Seller has not received any written notice or written claim for tort or violation of any applicable Order, or an investigation thereof with respect to its ownership or operation of the CCRC Assets or the Business.

**Section 4.15   Labor Matters**.

(a)      Schedule 4.15(a) of the Disclosure Schedules sets forth an accurate and complete list as of the Execution Date of each Employee's (i) name, (ii) employer, (iii) job title/position or function, (iv) job location, (v) salary or wage rate, (vi) bonus, commission or incentive compensation accrued in 2017 and 2018 and estimated for 2019, (vii) date of hire, (viii) exempt v. non-exempt classification, (ix) full-time versus part-time status, (x) temporary or regular status and (xi) active or leave status. Except as set forth on Schedule 4.15(a) of the Disclosure Schedules, no Employee works outside the United States. There are no employment Contracts between each Employee, on the one hand, and Seller and/or Manager, on the other hand, except for offer letters, copies of which Seller will provide to Buyer within ten (10) Business Days following the Execution Date.

(b)      Schedule 4.15(b) of the Disclosure Schedules sets forth a true, correct and complete list of each Service Provider's (i) name, (ii) function or services provided, (iii) job location, and (iv) current compensation structure. Seller is, and at all times heretofore has been, in compliance in all material respects with all applicable Labor Laws for all Employees and Service Providers. Except as set forth on Schedule 4.15(b) of the Disclosure Schedules, there is no pending, nor, to the Seller's Knowledge, threatened, Proceeding reasonably likely to give rise to a Liability asserting that Seller, Manager or any third party utilized by Seller to provide leased employees (a "Third Party Employer") has committed an unfair labor practice or any other violation of applicable Labor Laws with respect to any Employee or former employee or Service Provider or former Service Provider. With respect to the employment and labor practices and policies of Seller, Manager or Third Party Employer, (a) there is no investigation, audit or review pending of which Seller or Manager, has been notified in writing (or, to the Knowledge of the Seller, threatened in any manner) by any Governmental Authority, (b) there are no actions, suits, charges, complaints, inquiries, investigations, arbitrations, mediations or proceedings pending (or, to the Knowledge of the Seller, threatened in any manner) against Seller or Manager, and (c) there are no orders, judgments or decrees of, or before, any Governmental Authority to which Seller or Manager is a named party. There is no agreement of any kind which restricts the Seller or Manager from selling, transferring, relocating, closing, or terminating any of its operations or facilities or employees. Seller or Manager, as applicable, has maintained workers' compensation coverage as required by Applicable Law. To the Knowledge of Seller, no current Employee has any current or immediate plans to terminate his or her employment and neither Seller nor Manager has the present intention to terminate the employment of any Employee. Neither Seller nor Manager have sponsored any Employee to work in the United States or any other country

-41-

under a visa or work authorization, and no petition for admission of any alien under a non-immigrant or other visa, or for transfer of sponsorship of any such Employee, is currently pending. Each Employee is lawfully authorized to work in the United States in the position held. Seller and/or Manager has current Forms I-9 for all Employees, and has complied in all material respects with required processes with respect to obtaining such Forms I-9.

(c)      Neither Seller nor Manager is a party to any labor, collective bargaining, union and similar Contracts with respect to any Employee or Service Provider. No collective bargaining or any other labor-related Contract with any labor union or labor organization is currently being negotiated by Seller or Manager with respect to any Employee or Service Provider. There is no pending or, to the Knowledge of Seller, threatened organizing effort, charge, demand, petition, or representation proceeding for recognition or certification or attempt to organize the Employees, or demand bargaining, by any labor organization with respect to any Employee. During the past four (4) years, there have been no organizing activities, strikes, slow-downs, work stoppages, walkouts, lockouts, other labor disturbance or other concerted action by any union or other group of employees or other persons against or involving Seller or Manager with respect to any Employee nor is there any such organizing activity, strike, slow-down, work stoppage, walkout, lockout, other labor disturbance or other concerted action by any union or other group of employees, to the Knowledge of Seller, threatened against or involving Seller or Manager with respect to any Employee.

(d)      There has been no "mass layoff" or "plant closing" (as defined by the WARN Act or any similar state or local law) with respect to the Seller since January 2013.

(e)      With respect to any Service Provider performing services prior to the Closing, to Seller's Knowledge there is no Liability, nor is there a reasonable basis therefore, with respect to any misclassification of such Service Provider as an independent contractor rather than as an employee (within the meaning of the Fair Labor Standards Act of 1938, as amended, and any other similar state or local law), or with respect to such Service Provider's status as a leased employee.

(f)      Schedule 4.15(f) sets forth an accurate and complete list of Employees as of the Execution Date (subject to update prior to Closing) of all Employees on COBRA.

**Section 4.16    Employee Benefits**.

(a)      Schedule 4.16(a) of the Disclosure Schedules sets forth an accurate and complete list of each material Benefit Plan.

(b)      Except as set forth on Schedule 4.16(b) of the Disclosure Schedules each Benefit Plan has been established and administered in accordance with its terms and in material compliance with the applicable provisions of ERISA, the Code and all other Applicable Law.

(c)     Neither Seller nor any of its ERISA Affiliates sponsors, maintains, contributes to or has any Liability in respect of, or has in the past six (6) years sponsored, maintained, contributed to or had any Liability in respect of, any defined benefit pension plan (as defined in Section 3(35) of ERISA) or plan subject to Section 412 of the Code or Section 302 of ERISA.

(d)     No Benefit Plan is a Multiemployer Plan, and neither of Seller nor its ERISA Affiliates has at any time in the past six (6) years maintained or contributed to, or had any Liability in respect of, any Multiemployer Plan.  No Benefit Plan is a "*multiple employer welfare arrangement*" as defined in Section 3(40) of ERISA.  Neither Seller nor any ERISA Affiliate has incurred any Liability in connection with any withdrawal under Sections 4203 or 4205 of ERISA.  There is no lien pursuant to Sections 303(k) or 4068 of ERISA or Section 430(k) of the Code in favor of, or enforceable by the Pension Benefit Guaranty Corporation or any other entity with respect to any of the assets of Seller.

**Section 4.17   Real Property**.

(a)     Schedule 4.17(a) of the Disclosure Schedules contains an accurate and complete legal description, street address and tax parcel identification number for the Real Property.  Seller holds good and indefeasible fee simple title to all of the Real Property, and shall convey the Real Property in accordance with the Sale Order free and clear of all Liens (other than the Permitted Liens).  Seller does not lease any portion of the Real Property as a tenant or subtenant.  Seller agrees that title to the Real Property shall not be altered between the date of this Agreement and Closing.  Except as set forth on Schedule 4.17(a), other than the right of Buyer pursuant to this Agreement, there are no outstanding agreements, options, rights of first offer, rights of first refusal, or any other grant to third party to sell, purchase, lease, sublease, use, occupy, or enjoy the Real Property or any portion thereof or interest therein.

(b)     Schedule 4.17(b) of the Disclosure Schedules sets forth an accurate and complete list of all Tenant Leases, and Seller has made available to Buyer true, correct and complete copies of the Tenant Leases, together with all amendments and modifications thereto, extension notices and other material correspondence, fair market value analyses, estoppel certificates, and subordination, non-disturbance and attornment agreements related thereto.  Except as set forth in Schedule 4.17(b) of the Disclosure Schedules, (i) to Seller's Knowledge, each Tenant Lease is valid, binding and enforceable in accordance with its terms and is in full force and effect, (ii) to Seller's Knowledge, there are no assignments or subleases of any of the Tenant Leases, and each Tenant Lease was validly authorized and entered into, (iii) the Contemplated Transactions shall not require the consent of any other party to such Tenant Lease, and to Seller's Knowledge, the Contemplated Transactions will not otherwise cause such Tenant Lease to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing; (iv) there are no ongoing disputes with respect to any Tenant Lease and to Seller's Knowledge, no tenant thereunder has a defense to enforcement of such Tenant Lease, (v) none of Seller, or to Seller's Knowledge, any other party to such Tenant Lease is in breach or default under such Tenant Lease and, no event has occurred or circumstance exists which, with notice or the passage of time, would result in a breach or

-43-

default by such Seller or the other party thereunder, (vi) no rent, additional rent, fees or any other changes, after being billed therefor, payable under any of the Tenant Leases is more than thirty (30) days in arrears of the date that the same is required to be paid under the terms of such Tenant Lease, (vii) no tenant under such Tenant Leases is entitled to any allowance or free rent period, (viii) no rents due under any Tenant Lease is presently assigned, hypothecated or encumbered by Seller, other than in connection with any mortgage encumbering the Real Property.

(c)      Seller has not received written notice from any Governmental Authority of (and otherwise has no Knowledge of): (i) any pending or threatened condemnation Proceedings affecting the Real Property, or any part thereof; (ii) asserting or alleging any material violations or potential violations of any Applicable Laws (including zoning and land use ordinances, building codes and similar requirements) with respect to the Real Property, or any part thereof, which have not heretofore been cured; or (iii) any pending or threatened Proceedings, nor any Claims or Actions against Seller or any Affiliate of Seller or the Real Property, relating to the ownership, lease, use or occupancy of such Real Property or any portion thereof which is reasonably likely to result in a material change in the condition of the Real Property or the ownership or operation of the Real Property.  Seller has not received any written notice of any pending zoning or other land use change affecting the real property.

(d)      Neither Seller nor, to Seller's Knowledge, any other person is in violation of a condition or agreement contained in any easement, restrictive covenant or any similar instrument or agreement affecting any of the Real Property in any material respect.

(e)      To Seller's Knowledge, there is no proposed reassessment of any Real Property by any taxing authority and there is no threatened or pending special assessment or Litigation that could give rise to a material increase in real property Taxes or assessments against any of the Real Property.

(f)      No brokerage or leasing commissions or other compensation are due or payable to any Person, firm, corporation or other entity with respect to, or on account of, any Tenant Lease, or any extensions or renewals thereof.

(g)      Except as set forth in Schedule 4.17(g) of the Disclosure Schedules, Seller has no management, service, equipment, supply, maintenance, concession, or other agreements with respect to or affecting the Real Property, which will be binding upon Buyer after Closing or which are not terminable upon thirty (30) days' notice without penalty.

(h)      To Seller's Knowledge, there are no special or other assessments for public improvements or otherwise now affecting or pending with respect to the Real Property.

(i)      To the Seller's Knowledge, the location, construction, occupancy, operation and use of the Real Property (including the improvements which are a part of

-44-

the Real Property) are in compliance in all material respects with Applicable Laws or determinations of any Governmental Authority, judicial precedent or any restrictive covenant or deed restriction (recorded or otherwise) affecting the Real Property or the location, construction, occupancy, operation or use thereof, including all Applicable Laws. Seller has not received any notice from any Governmental Authority requiring any work, repairs, construction, alterations, or installations on or in connection with the Real Property.

(j)     To Seller's Knowledge, Seller has paid for all work, labor and materials furnished to Seller or its Affiliates in connection with the Real Property prior to the Closing Date, and there is no mechanic's or materialmen's lien, filed or otherwise claimed, in connection with any such work, labor and materials performed on or furnished in connection with the Real Property prior to the Closing Date.

(k)     To the Knowledge of Seller, there are not any material structural or latent defects in any of the buildings or other Improvements which are a part of the Real Property.

(l)     Seller is not a "foreign person" within the meaning of Section 1445 of the Code and the Regulations issued thereunder.

**Section 4.18    [RESERVED]**.

**Section 4.19    Residency Agreements**.

(a)     Schedule 4.19(a) of the Disclosure Schedules includes an accurate and complete list of (i) each type of Executory Life Care Agreement, Contingent Former Life Care Agreement, Non-Contingent Former Life Care Agreement and Non-Life Care Agreement used by Seller during the past seven (7) years and (ii) a list of all Executory Life Care Agreements, Contingent Former Life Care Agreement, Non-Contingent Former Life Care Agreement and Non-Life Care Agreements (redacted to the extent required to comply with applicable privacy laws and regulations) in effect as of the date indicated therein (the "Rent Roll"), and true, correct and complete copies of Executory Life Care Agreements, Contingent Former Life Care Agreements, Non-Contingent Former Life Care Agreements, Non-Life Care Agreements and all guaranties and other documents relating thereto have been made available to Buyer.

(b)     Except as set forth on Schedule 4.19(b), no Assigned Residency Agreement currently in effect with respect to the Real Property contains any material financial concession from the standard forms of Residency Agreement for the Real Property attached to Schedule 4.19(a). Except as set forth on Schedule 4.19(b), Seller has not given or received any written notice of any breach or default under any Residency Agreement that has not been cured. No rents due under any of the Residency Agreements are presently assigned, hypothecated or encumbered by Seller, other than in connection with any mortgage encumbering the Real Property. Subject to the entry of the Sale Order, the Real Property will be sold to the Buyer free and clear of all Liens, except

-45-

Permitted Liens, to the extent permissible under Section 363(f) of the Bankruptcy Code.

(c)     Except as set forth in Schedule 4.19(c) of the Disclosure Schedules and for any parties in possession pursuant to, and any rights of possession granted under, the Executory Life Care Agreements and Non-Life Care Agreements shown on the Rent Roll (as of the date indicated therein) or the updated Rent Roll to be delivered at Closing (as of the date indicated therein), and Tenant Leases, and except for subleases or licenses for *de minimis* spaces used for ancillary services which may be provided at the Real Property and which are terminable upon no more than thirty (30) days' notice and without penalty or otherwise in the Ordinary Course of Business, Seller has not granted any leases, occupancies or tenancies or rights of possession of any part of the Real Property. Except for any Permitted Liens, as of Closing, no interest of Seller in the Residency Agreements or, the Tenant Leases or in any of the rentals due or to become due thereunder will be subject to any lien created by Seller, or to Seller's Knowledge, any other Person.

(d)     Each of the Assigned Residency Agreements is in full force and effect in accordance with its terms. Except as set forth on Schedule 4.19(d), as it may be updated prior to Closing, no party (including Seller) to any Assigned Residency Agreement is in monetary default in any material respect under any of its obligations under such Assigned Residency Agreement.

(e)     Schedule 4.19(e) of the Disclosure Schedules sets forth an accurate and complete list (in all material respects) of the deposits paid pursuant to the Executory Life Care Agreements and deposits paid pursuant to any Reservation Agreements.

(f)     Schedule 4.19(f) of the Disclosure Schedules sets forth an accurate and complete list (in all material respects) of the deposits paid pursuant to Non-Life Care Agreements.

(g)     Other than as set forth on the Rent Roll and Schedules 4.19(e) and 4.19(f): (i) no Resident has paid any rent for more than one (1) month in advance; (ii) no Resident has any right of first refusal, option or other preferential right to purchase the applicable Real Property or any portion thereof or any interest therein; (iii) Seller has not received written notice that there are any subtenants of any Resident under any Residency Agreement; and (iv) Seller is not holding any security deposit with respect to a Residency Agreement.

**Section 4.20    Insurance**.    Schedule 4.20 of the Disclosure Schedules sets forth an accurate and complete list of all insurance policies or self-insurance funds maintained by Seller, Manager or SQLC with respect to the Facility and Seller as of the Execution Date covering the ownership and operation of the Business, indicating the types of insurance, policy numbers, terms, identity of insurers and amounts and coverages (including applicable deductibles). Seller has made available to Buyer accurate and complete copies of all of such policies to Buyer. All of such policies or similar replacement policies in the case of current policies expiring prior to the Closing Date are now and will be until the Closing in full force and effect on a claims made basis, with no premium arrearages. Seller shall, with no additional consideration paid by Buyer,

-46-

to the extent assignable, assign to Buyer, on a non-recourse basis and with no warranty or representation other than provided in this Section 4.20 and by general form of assignment, all insurance policies and/or self-insurance funds which do or may provide to Seller or Buyer, as assignee, any benefits in regard to Environmental Liabilities or environmental matters as described in Section 4.23 of this Agreement.

**Section 4.21    Intellectual Property**.  Seller owns or has the right to use all Intellectual Property used in connection with the ownership or operation of the CCRC Assets.  Schedule 4.21 of the Disclosure Schedules lists all of the registered Intellectual Property owned by Seller. Except as set forth on Schedule 4.21 of the Disclosure Schedules or as would not have, individually or in the aggregate, a Material Adverse Effect on the Business, the conduct of the Business does not infringe or otherwise violate any Intellectual Property or other proprietary rights of any other Person, and there is no action pending or, to the Knowledge of Seller, threatened, alleging any such infringement or violation or challenging Seller's rights in or to any of its Intellectual Property.

**Section 4.22    Tax Matters.**    Except as set forth on Schedule 4.22 of the Disclosure Schedules:

(a)    All Taxes due and owing by Seller (whether or not shown on any Tax Return) have been timely paid when due (taking into account any applicable extensions), including all Taxes with respect to the CCRC Assets.

(b)    There are no Tax liens on any of the CCRC Assets other than liens for Taxes not yet due and payable.

(c)    To Seller's Knowledge, proper and accurate amounts have been withheld by Seller in compliance with the payroll Tax and other withholding provisions of all Applicable Laws, and all of such amounts have been timely remitted to the proper taxing authority.

(d)    Seller has timely filed all Tax Returns required to be filed by it, including all Tax Returns relating to the CCRC Assets (all of which are true, complete and correct in all material respects).  Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency, which currently remains in effect.  Seller is not currently the beneficiary of any extension of time within which to file any Tax Return.

(e)    To Seller's Knowledge, no deficiencies for Taxes have been claimed, proposed or assessed by any Governmental Authority for which Seller may have any Liability or which may attach to the CCRC Assets.  There are no pending or, to Seller's Knowledge, threatened proceedings for or relating to any Liability in respect of Taxes for which Seller may have any Liability or which may attach to the CCRC Assets.  There are no matters under discussion by Seller with any Governmental Authority with respect to Taxes that may result in an additional amount of Taxes for which Seller may have any Liability or which may attach to the CCRC Assets.  No Governmental Authority has notified Seller that it has conducted an audit of any Taxes that may be due and owing by

-47-

Seller or as the result of the Business audited by Seller, which currently remains outstanding or unresolved.

(f)     None of the CCRC Assets is an interest in a joint venture, partnership or other arrangement that is or should be treated as a partnership for Tax purposes.

(g)     Seller (i) is an organization described in Section 501(c)(3) of the Code and exempt from taxation to the extent described in Section 501(a) of the Code, (ii) is not a private foundation within the meaning of Section 509(a) of the Code, (iii) is in possession of a determination letter from the Internal Revenue Service regarding its federal income Tax exemption, which determination letter has not been revoked or otherwise modified, (iv) is in compliance in all material respects with all Applicable Laws pertaining to the operation of an organization described in Section 501(c)(3) of the Code, including, requirements as to private benefit, private inurement, unrelated business use and other applicable requirements, and (v) has not entered into any transaction which has constituted or may constitute an "*excess benefit transaction*" within the meaning of Section 4958 of the Code and the Treasury Regulations thereunder.

(h)     Seller has received an exemption from all real property Taxes for the Real Property and additionally has received an exemption from all personal property Taxes for the Personal Property.

(i)     Seller has obtained a sales tax exemption certificate from any applicable Governmental Authority, including the Indiana Department of Revenue, exempting Seller from paying Indiana sales or use tax on articles purchased for its charitable activities, invoice directly to Seller and paid directly from Seller's funds, and such exemption certificate(s) are still in effect, and furthermore Seller has properly provided such sales tax exemption certificate in the purchase of any Personal Property that would otherwise be subject to any gross retail (sales) tax, use tax, or any other similar tax imposed on the purchase of tangible property or services.

**Section 4.23    Environmental Matters.**   Except as set forth on Schedule 4.23 of the Disclosure Schedules: (a) there are no material Environmental Liabilities on or affecting any of the CCRC Assets, (b) except for any noncompliance that has been remediated in accordance with applicable Environmental Law, to the Knowledge of Seller, Seller has at all times operated the CCRC Assets and conducted the Business and, during the period that Seller owned the CCRC Assets and any third party operated any such CCRC Assets, such third party operated the CCRC Assets, in each case, in compliance with all applicable Environmental Laws and all Permits required thereunder or issued pursuant thereto; (c) to Seller's Knowledge, there are no Proceedings pending or threatened before any Governmental Authority with respect to Seller's ownership or operation of the Real Property alleging violations of Environmental Laws, or claiming material remediation obligations under applicable Environmental Laws, and Seller has not received any written notice of any alleged or actual violation or non-compliance with any Environmental Law or of non-compliance with the terms or conditions of any environmental Permits, arising from, based upon, associated with or related to the Real Property or the ownership or operation thereof; and (d) Seller has provided Buyer access to accurate and complete copies of all final written environmental reports, studies and notices prepared by any

-48-

third party on behalf of, or delivered by a Governmental Authority to, Seller with respect to the Real Property, that identify or allege any Environmental Defect on or affecting the Real Property.

**Section 4.24** **Affiliate Transactions.** Except as set forth on Schedule 4.24 of the Disclosure Schedules or for Contracts or arrangements that will terminate or be waived on or prior to Closing, no current or, to the Knowledge of Seller, former director, officer, employee, Affiliate or Representative of Seller (nor any spouse or child of any of such Persons, or any trust, partnership or corporation in which any of such Persons has a material economic interest) (a) owns any property, assets, interests and rights, tangible or intangible, that is a CCRC Asset or that is otherwise material to the conduct of the Business as currently conducted, (b) has filed or otherwise has pending any Proceeding against the Business, or (c) except pursuant to any Benefit Plan, is a party to or the beneficiary of any Contract with the Business.

**Section 4.25** **Broker's or Finder's Fees.** Except as disclosed on Schedule 4.25 of the Disclosure Schedules, no agent, broker, investment banker, or other person or firm acting on behalf of Buyer or any of its Affiliates or under its authority, is or will be entitled to any broker's or finder's fee or any other commission or similar fee, directly or indirectly, from Buyer or any of its Affiliates in connection with the Contemplated Transactions.

**Section 4.26** **No Other Representation and/or Warranty**. Except for the representations and warranties contained in this Article IV (including the related portions of the Disclosure Schedules), Seller has not made and does not make any other express or implied representation or warranty, either written or oral, on behalf of or with respect to Seller, the CCRC Assets, the Facility or the Business, including any representation or warranty arising from statute or otherwise in law.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as of the Execution Date and as of the Closing as follows:

**Section 5.01** **Organization and Good Standing**. Buyer is a nonprofit corporation duly organized, validly existing and in good standing under the laws of the State of Indiana. Buyer has all requisite corporate power to own, operate, and lease the Facility and carry on the Business as it is now being conducted and as the same will be conducted following the Closing.

**Section 5.02** **Authorization and Binding Effect of Transaction Documents**. Buyer has the requisite corporate power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which Buyer is a party and to consummate the Contemplated Transactions. The execution and delivery of this Agreement and the other Transaction Documents and the performance of Buyer's obligations hereunder and thereunder (including consummation of the Contemplated Transactions) has been duly authorized by all requisite corporate action of Buyer, and this Agreement constitutes the valid and binding obligation and agreement of Buyer, enforceable in accordance with its terms (subject to the effect of bankruptcy, insolvency fraudulent conveyance, reorganization,

moratorium and similar laws affecting creditor's rights and remedies generally, and to limitations imposed by general principles of equity, whether applied by a court of law or of equity).

**Section 5.03 Absence of Conflicts**. Neither the execution and delivery or performance of this Agreement, nor compliance with the terms and provisions hereof, will (i) conflict with or result in any breach of any of the terms, conditions or provisions of, (ii) constitute a default under, (iii) result in a violation of, or (iv) give any third party the right to modify, terminate, or accelerate any obligation under, the provisions of the Governing Documents of Buyer and/or its Affiliates, any indenture, mortgage, lease, loan agreement or other agreement or instrument to which Buyer and/or its Affiliates is bound or affected, or any Applicable Law to which Buyer and/or its Affiliates is subject or any Applicable Law.

**Section 5.04 Consents**. The execution, delivery and performance by Buyer and/or its Affiliates of this Agreement and the other Transaction Documents, and consummation by Buyer and/or its Affiliates of the Contemplated Transactions and thereby, do not and will not require the authorization, consent, approval, exemption, clearance or other action by or notice or declaration to, or filing with, any court or administrative or other Governmental Authority, or the consent, waiver or approval of any other person or entity, excluding consents that Seller is obligated to obtain under Section 8.06 below.

**Section 5.05 Broker's or Finder's Fees**. No agent, broker, investment banker, or other person or firm acting on behalf of Buyer or any of its Affiliates or under its authority, is or will be entitled to any broker's or finder's fee or any other commission or similar fee, directly or indirectly, from Buyer or any of its Affiliates in connection with the Contemplated Transactions.

**Section 5.06 Ability to Perform**. As of the Execution Date, Buyer has the ability to obtain funds in cash in amounts equal to the Purchase Price by means of credit facilities or otherwise and will at the Closing have immediately available funds in cash, which are sufficient to pay the Purchase Price and to pay any other amounts payable pursuant to this Agreement and to consummate the Contemplated Transactions.

**Section 5.07 Diligence**.

(a) Except as set forth in Section 5.07(b), Buyer has conducted its own independent investigation, review and analysis of the business, results of operations, prospects, condition (financial or otherwise) and assets of the Seller and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of the Seller, the Manager and SQLC for such purpose. Nothing herein shall relieve Seller of any of its obligations under this Agreement, including, but limited to, in connection with its representations and warranties.

(b) **Title Insurance Commitment.** Within ten (10) days following the full execution of this Agreement, Seller shall procure a commitment to issue ALTA Standard Coverage Owner's Policy of Title Insurance ("Title Commitment") issued by Title Company, subject only to the Permitted Exceptions, and which shall delete the standard exceptions, insuring fee simple title to the Real Property in Buyer, for the full amount of

the Cash Purchase Price and Holdback Escrow Amount, each in a form available in the State of Indiana (the "Title Insurance Policy"). Seller shall pay for any endorsements to the Title Insurance Policy required to cure any objections of Buyer to the Title Commitment or Survey which are not otherwise resolved in the Sale Order, and Buyer shall pay for any other endorsements required by it or its lender.

(i)     **Survey.**  Seller has provided Buyer with a survey of the Real Property (the "Survey").  If Buyer desires an updated Survey of the Real Property), Buyer shall pursue and obtain such updated Survey at its sole cost and expense by no later than the date that is ten (10) days after the date of this Agreement.

(ii)    **Correction of Title and Survey Defects.**    If the Title Commitment discloses adverse exceptions to title which cannot be resolved by the Sale Order ("Title Exceptions") or the Survey discloses matters that, in the reasonable judgment of Buyer, render the title uninsurable or unmarketable or otherwise adversely affect the use of the Real Property ("Survey Defects"), Buyer shall notify Seller thereof in writing not later than five (5) Business Days after its receipt of such Title Commitment and Survey, as applicable.  Buyer shall be deemed to have accepted the condition of title and any such Title Exceptions and Survey Defects unless it has given Seller timely notice as herein provided, after which time any such Titled Exceptions and Survey Defects shall be Permitted Exceptions.  Seller shall then have three (3) Business Days to notify Buyer as to whether it intends to have such Title Exceptions removed from the Title Commitment, or to correct such Survey Defects or, with Buyer's prior written approval at Closing, have the Title Company commit to insure over such Title Exceptions or Survey Defects.  If Seller, in Seller's sole discretion, determines not to remove or correct such Title Exceptions or Survey Defects and does not have the Title Company commit to insure over such Title Exceptions and Survey Defects, then as Buyer's sole remedy Buyer may elect upon written notice to Seller made within two (2) Business Days after the Seller's response as aforesaid: (a) to terminate this Agreement by written notice to Seller, in which event the Deposit shall be refunded to Buyer and neither Party shall have any further liability to any other party under this Agreement, except as otherwise provided in this Agreement; or (b) to take the Real Property subject to such Title Exceptions and/or Survey Defects, without adjustment to the Purchase Price.  Buyer's failure to prove written notice to Seller within such two (2) Business Day period shall be deemed its election to proceed pursuant to clause (b) of the preceding sentence.  Notwithstanding the foregoing, all Seller Encumbrances (as defined below) must be satisfied by Seller on or before the Closing, including, but not limited to, by providing in the Sale Order that Seller shall transfer and convey to Buyer good and indefeasible fee simple title to the Real Property, free and clear of such Seller Encumbrances, or, if not so satisfied, shall be satisfied at Closing out of the proceeds otherwise payable to Seller and in any event such Seller Encumbrances shall not be Permitted Exceptions.   As used herein, the term "Seller Encumbrance" shall mean (i) any mortgage or deed of trust or other monetary lien encumbering the Real Property, (ii) any monetary judgment against Seller and

encumbering the Real Property (e.g. as a matter of law, or by being identified as an exception in the Title Commitment or any update thereto), (iii) any real property taxes and assessments which are delinquent as of the Closing, and (iv) any mechanic's, materialmen's or other similar liens.

**Section 5.08    Healthcare Regulatory and Exclusion**.

(a)    To Buyer's Knowledge, it has been in material compliance with Healthcare Regulatory Laws and has not received any communication from a Governmental Authority or Third Party Payors that would prohibit or delay the Buyer from consummating the Contemplated Transactions or obtaining the Regulatory Approvals necessary to operate the Facility.

(b)    Neither Buyer, nor to Buyer's Knowledge, any of its Representatives has, at any time, been excluded by a Governmental Authority to conduct business with Government Programs.

**Section 5.09    No Other Representation and/or Warranty**.    Except for the representations and warranties contained in this Article V, Buyer has not made and does not make any other express or implied representation or warranty, either written or oral, on behalf of or with respect to Buyer, including any representation or warranty arising from statute or otherwise in law.

## ARTICLE VI.
## COVENANTS

**Section 6.01    Continuing Inspection Rights**.    Seller shall, commencing on the Execution Date of this Agreement, provide reasonable access to Buyer of all of Seller's assets, books, accounting records, correspondence and files of Seller (to the extent related to the operation of the CCRC Assets) for examination by Buyer, its Representatives, with the right to make copies of such books, records and files or extracts therefrom.   Such access will be available to Buyer during normal business hours, upon reasonable notice, in such manner as will not unreasonably interfere with the conduct of the Business of the CCRC Assets.  Seller will make available to Buyer and its Representatives such additional data and other available information regarding the CCRC Assets as Buyer deems necessary or desirable to comply with Buyer's internal requirements or the requirements of Buyer's lenders, investors or members, including further inspection of title, survey, environmental and structural aspects, assessments of the compliance of the CCRC Assets or Business with all Applicable Laws, and customary pre-closing walk-throughs.  Those books, records and files which relate to Seller's assets that are not transferred to Buyer shall be preserved and maintained by Seller for one (1) year after the Closing, or such greater amount of time required by Applicable Law, and those books, records and files relating to the CCRC Assets the possession of which is being transferred to Buyer hereunder shall be maintained and preserved by Buyer for a period of two (2) years after the Closing, or such greater amount of time required by Applicable Law.  Notwithstanding anything to the contrary in the foregoing, Seller shall transfer all patient Records to Buyer in the format requested by Buyer.

**Section 6.02  Conduct of Business Prior to the Closing**. Seller covenants and agrees, from the Execution Date through the Closing, unless Buyer provides its prior written consent thereto, to:

(a)  operate the CCRC Assets and Business diligently and in the Ordinary Course of Business consistent with past practices, but shall not pre-bill for any reimbursement for services to be provided post-Closing;

(b)  confer with Buyer prior to implementing material operational decisions other than in the Ordinary Course of Business;

(c)  use commercially reasonable efforts to cause SQLC to maintain all existing insurance policies with the same coverages and amounts as of the Execution Date;

(d)  operate, maintain and repair the Real Property and otherwise conduct business in material compliance with the terms or conditions of the Permits listed on Schedule 4.08(a) of the Disclosure Schedules, all Applicable Laws having jurisdiction over any aspect of the operation of the Real Property and all applicable insurance requirements;

(e)  maintain the books and records for the CCRC Assets and the Business;

(f)  not sell, lease, grant any rights in or to or otherwise dispose of, or agree to sell, lease or otherwise dispose of, the Real Property in whole or in part, except to Residents of the Facility in the Ordinary Course of Business using a form of Residency Agreement materially consistent with the forms of Residency Agreement attached as Schedule 4.19(a) to the Disclosure Schedules;

(g)  use commercially reasonable efforts to maintain the Personal Property currently in use in reasonably good operating condition and repair, except for ordinary wear and tear and damage by casualty, in a manner consistent with past practices;

(h)  not materially amend or modify the Assigned Contracts, enter into new Assigned Contracts, or take or fail to take any action thereunder outside the Ordinary Course of Business;

(i)  not make any alterations or improvements to the Real Property or make any capital expenditure with respect to the CCRC Assets in excess of Ten Thousand Dollars ($10,000.00) individually, other than those that are required by Applicable Law, required by Section 6.13, for health, welfare or safety, that are necessary to preserve the coverage under or comply with the terms of any insurance policy with respect to the CCRC Assets, or with Buyer's consent which shall not be unreasonably withheld;

(j)  other than Residency Agreements or agreements with respect to reimbursements for insurance policies, not enter into any agreement which calls for annual payments in excess of Twenty-Five Thousand Dollars ($25,000.00) or for a term

in excess of one (1) year, unless such agreement can be terminated by Buyer without Liability on or after the Closing Date;

(k) provide Buyer with a current Rent Roll on the twenty-first (21st) day of each month;

(l) notify Buyer within two (2) Business Days of the death of a Current Resident or other termination of an Executory Life Care Agreement;

(m) not enter into any lease or Residency Agreement for less rent or with a smaller deposit than that currently being charged for similar units included within the CCRC Assets, except in Seller's Ordinary Course of Business;

(n) not grant any bonus, free months' rental, or other concession to any present or future tenant or Resident of the Real Property (except (i) in the Ordinary Course of Business and (ii) to the extent that all such bonuses or concessions shall be paid or credited prior to Closing unless otherwise approved by Buyer);

(o) not negotiate, enter into or amend any collective bargaining agreement, labor contract, or other Contract with any labor organization or union;

(p) not terminate the employment of any Employee other than for cause, or hire any employee who would be an Employee, in each case, other than in the Ordinary Course of Business; and

(q) not increase the level of wages, bonus, compensation on other benefits of any Employee in any material respect, except for increases in the Ordinary Course of Business, or otherwise materially change any terms or conditions of employment of Employees.

**Section 6.03** **Notification of Certain Matters**. From the Execution Date to the Closing Date, Seller shall give prompt written notice and/or provide documents to Buyer of (a) the occurrence, or failure to occur, of any event that causes any representation or warranty of Seller contained in this Agreement to be untrue, and (b) any failure of Seller to comply with or satisfy, in any material respect, any covenant, condition or agreement to be complied with or satisfied by it under this Agreement. Such notice shall provide a reasonably detailed description of the relevant circumstances and shall include the amount that such Seller believes, based on facts known to such Seller, would impact the Contemplated Transactions. The content of any notice or update delivered by Seller to Buyer prior to the Closing pursuant to this Section 6.03 shall not be deemed to modify the applicable representations, warranties and covenants for purposes of determining whether applicable conditions precedent in Article VIII are satisfied, or whether Buyer is entitled to any rights to the Holdback Escrow Amount set forth in Article XI.

**Section 6.04** **Additional Financial Information**. Seller has delivered to Buyer copies of the unaudited balance sheets, statements of operations, statements of changes in net assets, and statements of cash flows (including the accompanying consolidating schedules of balance sheet information and statement of operation information) of Seller for the month of March 2019, and within forty-five (45) days following the end of each calendar month prior to the

Closing Date, Seller will deliver to Buyer copies of the unaudited balance sheets and statements of operations of Seller for each month then ended (all such financial statements are referred to herein as the "Additional Financial Statements"). The Additional Financial Statements shall be prepared from and in accordance with Seller's books and records, shall fairly present the financial position and results of operations of Seller relating to the CCRC Assets of the date and for the period indicated, and shall be prepared in accordance with GAAP, consistently applied, except that such Additional Financial Statements need not include required footnote disclosures, nor reflect normal yearend adjustments or adjustments that may be required as a result of the Contemplated Transactions.

**Section 6.05** **Title; Additional Documents**. At the Closing, Seller shall transfer and convey to Buyer good and indefeasible fee simple title to the Real Property, free and clear of any Liens except Permitted Liens to the extent permissible under Section 363(f) of the Bankruptcy Code. At the Closing, Seller's right, title and interest to all warranties and guaranties, to the extent assignable or transferable, relating to the Real Property shall be assigned and transferred by Seller to Buyer and shall be held and owned by Buyer.

**Section 6.06** **Licensing**. Buyer shall, or shall cause, Post-Closing Licensee to use, commercially reasonable efforts to obtain prior to the Closing Date (or as soon thereafter as practicable): all necessary consents, approvals and licenses necessary to permit the consummation of the transactions contemplated by this Agreement including such licensure and certification approval as may be necessary to enable Post-Closing Licensee to lawfully operate the Facility as it is operated by Seller effective as of the Effective Time ("Regulatory Approvals"). Commercially reasonable efforts shall include, but not be limited to, requiring Buyer to apply for all such Regulatory Approvals no later three (3) Business Days after entry of the Sale Order. Seller shall cooperate in all reasonable respects with Buyer and Post-Closing Licensee in their efforts to obtain such consents, approvals and licenses. Seller and Buyer shall provide the other party and the Bond Trustee with all correspondence concerning the Regulatory Approvals within one (1) Business Day of receipt of such correspondence.

**Section 6.07** **Confidentiality**. Any and all nonpublic information, materials, documents, and instruments delivered to Buyer by Seller or its agents or Affiliates and any and all nonpublic information, documents, and instruments delivered to Seller by Buyer or its agents or Affiliates are of a confidential and proprietary nature. Buyer and Seller agree that prior to Closing, each will maintain the confidentiality of all such confidential information, documents or instruments delivered to each by the other party or its agents in connection with the negotiation of, or in compliance with, this Agreement, and only disclose such information, documents, and instruments to their duly authorized officers, directors, representatives and agents, or as otherwise required by Applicable Law, including the Bankruptcy Code. Buyer and Seller further agree that if the Contemplated Transactions are not consummated and this Agreement is terminated, each will return all such documents, materials and instruments and all copies thereof in their possession to the other party or provide confirmation of destruction related to such documents, materials and instruments. This Section 6.07 shall survive as to both Seller and Buyer in the event this Agreement is terminated prior to Closing and shall survive as to Seller (and not Buyer) following Closing.

**Section 6.08** **Publicity**. The parties agree that no public release or announcement concerning the Contemplated Transactions shall be issued by any party prior to Closing except as required by the Bid Procedures Order, the Bankruptcy Court or Applicable Law, including the Bankruptcy Code, or as mutually agreed by the Buyer and Seller. Buyer and Seller will jointly prepare and approve announcements to staff and Residents. After the Execution Date, Seller shall be permitted to schedule a meeting of Residents to discuss the Agreement and the Contemplated Transactions and Buyer may attend any such meetings.

**Section 6.09** **Commercially Reasonable Efforts**. Seller and Buyer shall use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Contemplated Transactions, including using commercially reasonable efforts to accomplish the following: (a) the taking of all reasonable acts necessary to cause the conditions precedent set forth in Article VIII and Article IX to be satisfied, (b) the obtaining, at the earliest practicable date, of all necessary Approvals and the making of all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and the taking of all reasonable steps as may be necessary to avoid any Proceeding by any Governmental Authority, and (c) the execution or delivery of any additional instruments necessary to consummate the Contemplated Transactions and to fully carry out the purposes of this Agreement.

**Section 6.10** **Reports**. Seller shall file on a current and timely basis until the Closing, all reports and documents required to be filed with respect to the Permits set forth in Schedule 4.08(a) of the Disclosure Schedules. Accurate and complete copies of all such reports filed as of the Execution Date and continuing through the Closing shall be promptly supplied to Buyer by Seller.

**Section 6.11** **Post-Closing Records Obligations of Seller**. Following Closing, Seller shall use, and shall cause Seller's Affiliates to use, reasonable diligent efforts to cooperate with Buyer and its Affiliates to the extent not previously transferred to Buyer, to provide any records in Seller's custody or control which may be requested of Buyer by any authorized Governmental Authority. This Section 6.11 shall survive the Closing.

**Section 6.12** **Permits and Approvals**. Seller and Manager shall be responsible for facilitating the transfer of all transferred Permits and Approvals from Seller to Buyer or, at Buyer's request, to Post-Closing Licensee, and Buyer and Post-Closing Licensee shall be responsible for obtaining all other new licenses and permits (to the extent the existing Permits and Approvals are not transferable). Seller shall, at its sole cost and expense, promptly submit after the Sale Order (unless earlier as otherwise agreed by Seller and Buyer) all necessary applications and other materials to the appropriate Governmental Authority and take such other actions to effect the transfer of the transferred Permits or issuance of new permits as of the Closing, and Seller shall reasonably cooperate with Buyer to cause the transferred Permits to be transferred or new permits to be issued to Buyer or Post-Closing Licensee.

**Section 6.13** **Casualty**. The risk of any loss or damage to the CCRC Assets by fire or other casualty before the Closing shall continue to be borne by Seller. Seller shall promptly give

-56-

Buyer written notice of any fire or other casualty (in any event within five (5) days after Seller first has knowledge of the occurrence of same), which notice shall include a description thereof in reasonable detail and an estimate of the cost of time to repair. If any portion of the CCRC Assets is damaged by fire or casualty after the Execution Date in excess of $500,000.00, Buyer may, at Buyer's option, either: (a) terminate this Agreement by notice to Seller on or before the earlier of the Closing or the tenth (10th) day after receipt of such notice described above, in which event no party shall have any further liability to the party under this Agreement, or (b) receive from Seller at Closing (I) an assignment, without representation or warranty by or recourse against Seller, of all insurance claims and proceeds with respect thereto, plus (II) an amount equal to Seller's insurance deductible. The parties' obligations, if any, under this Section 6.13 shall survive the expiration or any termination of this Agreement.

**Section 6.14   Overpayments**.  In the event of a determination by any Governmental Authority or Third-Party Payor that payments to Seller or the Facility resulted in an overpayment or other determination that funds previously paid by any Government Program or Third Party Payor to Seller or the Facility must be repaid, and Buyer is required following the Closing to pay such amounts for services rendered prior to the Effective Time or Buyer suffers any offsets against reimbursement under Government Program or any Third-Party Payor programs due to Buyer, relating to or as the result of amounts received by Seller under any such programs by Seller and absent fraud and/or intentional misconduct, Buyer's sole remedy shall be to make a claim against the Holdback Escrow Amount for such amounts.

**ARTICLE VII.**
**OTHER AGREEMENTS**

**Section 7.01   Taxes**.

(a)   Any transfer, documentary, sales, use, stamp, registration and other similar non-income Taxes, and all conveyance fees, recording charges and other similar fees and charges (including any penalties and interest) incurred in connection with the consummation of the Contemplated Transactions, but excluding for all purposes, the Asset Taxes (collectively, the "Transfer Taxes") shall be borne by Buyer.  Seller and Buyer shall use commercially reasonable efforts and cooperate in good faith to exempt the sale and transfer of the CCRC Assets from any Transfer Taxes, including under Section 1146(a) of the Bankruptcy Code.  Seller will, at its own expense, file all necessary Tax Returns and other documentation with respect to all Transfer Taxes, and, if required by Applicable Law, the parties will, and will cause their Affiliates to, join in the execution of any such Tax Returns and other documentation.

(b)   Seller shall retain responsibility for, and shall bear and pay, all Asset Taxes based upon operation or ownership of the CCRC Assets and the Business for (i) any period ending prior to the Proration Date and (ii) the portion of any Straddle Period ending prior to the Proration Date.  Buyer shall bear and pay all Asset Taxes assessed with respect to the CCRC Assets for (i) any taxable period beginning on or after the Proration Date and (ii) the portion of any Straddle Period beginning on or after the Proration Date.  For purposes of allocation between the Parties of Asset Taxes assessed with respect to the CCRC Assets that are payable with respect to any Tax periods

-57-

beginning before and ending after the Proration Date ("Straddle Periods"), the portion of any such Taxes that are attributable to the portion of the Straddle Period that ends prior to the Proration Date shall be allocated pro rata per day between the period prior to the Proration Date (which shall be Seller's responsibility) and the period from and after the Proration Date (which shall be Buyer's responsibility). At the Closing, Asset Taxes with respect to each Asset for the applicable Straddle Period shall be prorated in accordance with the foregoing provisions based on (i) the Asset Tax assessment for such CCRC Asset for such Straddle Period, if available, (ii) if clause (i) is not available, then upon the assessed value for the applicable Straddle Period as of the Proration Date and applying either the applicable tax rate for such Straddle Period or to the extent the applicable tax rate for such Straddle Period is not available, the applicable tax rate for the immediately preceding Tax year, and (iii) if neither clause (i) nor (ii) is available, then, based on the Asset Taxes paid with respect to such Asset during the preceding Tax period. With respect to any not yet delinquent Taxes relating to a Tax year ending after the Closing Date, Buyer will assume responsibility for the actual payment of all such Taxes to the applicable Governmental Authority.

(c)     Seller, on the one hand, or Buyer, on the other hand, as the case may be (the "Reimbursing Party"), shall provide reimbursement for any Tax paid by the other (the "Paying Party") all or a portion of which is the responsibility of the Reimbursing Party in accordance with the terms of Section 7.01(b) or which represents an overpayment for Taxes by the Paying Party. Within a reasonable time prior to the payment of any such Tax, the Paying Party shall give notice to the Reimbursing Party of the Tax payable and the Paying Party's and Reimbursing Party's respective Liability therefor, although failure to do so will not relieve the Reimbursing Party from its Liability hereunder except to the extent the Reimbursing Party is prejudiced thereby.

(d)     Buyer and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the CCRC Assets (including access to books and records and Tax Returns and related working papers dated before Closing) as is reasonably necessary for the preparation and filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing authority, the prosecution or defense of any Claims, Actions or Proceedings relating to any Tax, and the claiming by Buyer of any federal, state or local business Tax credits or incentives that Buyer may qualify for in any of the jurisdictions in which any of the CCRC Assets are located; *provided*, *however*, that neither Buyer nor Seller shall be required to disclose the contents of its income Tax Returns to any Person. Any expenses incurred in furnishing such information or assistance pursuant to this Section 7.01(d) shall be borne by the Party requesting it.

**Section 7.02    Allocation of Purchase Price**. Within ten (10) days prior to the Closing Date, the Buyer shall deliver a proposed Schedule 7.02 of the Disclosure Schedules setting forth a proposed allocation of the Purchase Price (and other items properly treated as consideration for federal income tax purposes) among the CCRC Assets, and Buyer and Seller will use commercially reasonable efforts to agree prior to the Closing Date on a final Schedule 7.02 of the Disclosure Schedules. The portion of the Purchase Price allocated to each CCRC Asset is referred to herein as the "Allocated Value" of such CCRC Asset. For purposes of this

Agreement, Seller and Buyer agree to be bound by the Allocated Values set forth in any final Schedule 7.02 of the Disclosure Schedules, as required by Applicable Law. Seller and Buyer further agree that for the purpose of making any filings required to be made pursuant to Section 1060 of the Code, and the regulations thereunder, the purchase price as determined for federal income tax purposes shall be allocated among the CCRC Assets in a manner consistent with the Allocated Values, as set forth on any final Schedule 7.02 of the Disclosure Schedules (the "Tax Allocation"). If required to make any such filing, Seller and Buyer each agree (i) to report, and to cause their respective Affiliates to report, the federal, state and local income and other Tax consequences of the transactions contemplated herein as required by Section 1060(b) of the Code, and (ii) if required by U.S. federal income tax law, to jointly prepare Form 8594 (Asset Acquisition Statement under Section 1060 of the Code) as promptly as possible following the Closing Date and in a manner consistent with the Tax Allocation as revised to take into account subsequent adjustments to the purchase price as determined for applicable purposes, and (iii) to not take any position inconsistent with any such required Tax return, or any Contractual Resident Obligation, Action, Proceeding or otherwise, unless required to do so by any Applicable Order after notice to and discussions with the other Party, or with such other Party's prior consent; *provided, however,* that nothing contained herein shall prevent Buyer or Seller from settling any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of the Tax Allocation, and neither Buyer nor Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Authority challenging the Tax Allocation.

Section 7.03 **Bulk Sales**. To the extent applicable, Buyer and Seller hereby waive compliance with all "bulk sales," "bulk transfer" and similar Applicable Law that may otherwise be applicable with respect to the sale and transfer of any or all of the CCRC Assets to Buyer.

Section 7.04 **Adequate Assurance and Performance; Security Arrangements**.

(a) Buyer shall provide adequate assurance as required under the Bankruptcy Code of the future performance by Buyer of the Assigned Contracts and the Assigned Residency Agreements. Buyer and Seller agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts and the Assigned Residency Agreements, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's and Seller's employees and Representatives available to testify before the Bankruptcy Court.

(b) Buyer shall pay, perform or satisfy the Assumed Liabilities from time to time and as such Assumed Liabilities become due and payable or are required to be performed or satisfied in accordance with their respective terms.

(c) Without limiting the provisions of Section 7.04(a) and Section 7.04(b), Buyer acknowledges that the bonds, surety bonds, letters of credit, guarantees, and/or cash deposits, set forth on Schedule 7.04(c) of the Disclosure Schedules (collectively the "Security Arrangements") have been provided by Seller and/or its Affiliates to secure the

payment and/or performance of certain obligations related to the CCRC Assets. Buyer acknowledges that Seller has no duty to maintain any Security Arrangements after the Closing. To the extent Seller and/or any of their Affiliates have any obligations pursuant to any Security Arrangement or have pledged or otherwise provided any property that secures any such Security Arrangement (collectively, the "Seller's Obligations"), Seller shall take such actions, prior to Closing, as are necessary to cause Seller's Obligations and the Security Arrangements to be released and terminated, and any of Seller's property pledged or otherwise provided to secure such Security Arrangements returned to Seller, concurrent with the Closing. Notwithstanding the foregoing, Seller agrees the Post-Petition Entrance Fees are not part of a Security Arrangement, except as set forth in paragraph 21 of the Final Cash Collateral Order, provided, however, the parties agree the Sale Order shall direct the Post-Petition Entrance Fees be paid over to Buyer at Closing.

**Section 7.05    Employee Matters**.

(a)    No later than ten (10) Business Days before the Closing Date, Seller shall update the list of Employees on Schedule 4.15(a) of the Disclosure Schedules to reflect any and all employment hirings or terminations occurring prior to the Closing Date. In connection therewith, Seller will provide Buyer with Schedule 7.05 of the Disclosure Schedules, which is the list of all Employees hired or terminated after the Execution Date and prior to the Closing Date. In addition, Seller shall provide Buyer no later than five (5) Business Days following the Closing Date, with an accurate and complete list of any and all employment losses (within the meaning of the WARN Act) incurred during the ninety (90) day period prior to the Closing Date.

(b)    Seller shall cause Buyer to receive, after the Sale Order, access to the Employees at times and in a manner requested by Buyer and reasonably acceptable to Seller, and with information reasonably requested by Buyer with respect to compensation, benefits and other employment terms and conditions with respect to the Employees. Subject to Buyer's, its Affiliate's or its vendor's standard employment policies, and such employees' successful completion of its respective hiring processes, including criminal background checks, drug screening, verification of licensure (to the extent required for the job), and excluded persons screening, no fewer than ten (10) Business Days prior to the Closing Date, Buyer shall offer (or shall cause one of its Affiliates or vendors to offer) employment effective as of the Closing (or with respect to Inactive Employees, from and after the date any such Inactive Employee returns to active employment) to substantially all of the Employees, the identities of whom, it shall determine in its sole discretion, and on such terms and conditions as it shall determine in its sole discretion (the "Offered Employees"). All such Employees, if any, who (i) are offered employment from Buyer, one of its Affiliates or vendors providing services at the Facility (the "Buyer Employers"), (ii) accept such offer of employment from the Buyer Employer and (iii) commence employment with the Buyer Employer shall be referred to herein as the "Transferred Employees."

(c)    To the extent commercially practicable, the employment of each Transferred Employee with the Buyer Employer shall commence immediately upon the Closing (except for Inactive Employees whose employment with the Buyer Employer

-60-

shall commence from and after the day any such Inactive Employee returns, if at all, to active employment with Buyer Employer; *provided, however*, that any Inactive Employee who accepts an offer of employment from the Buyer Employer shall not be considered a Transferred Employee unless and until such Inactive Employee returns to active status pursuant to the following sentence, and notwithstanding anything herein to the contrary, Buyer and its Affiliates shall only be responsible for Liabilities relating to the Inactive Employee from and after the date such Inactive Employee becomes a Transferred Employee. The employment of any Inactive Employee with the Buyer Employer shall be effective upon his or her return to active work, *provided that* the Inactive Employee reports to work with the Buyer Employer within fifteen (15) days after the end of any such approved leave and, to the extent permitted by Applicable Law, in no event later than three hundred sixty-five (365) days following the Closing Date, and, as of such date, such Inactive Employee shall be a Transferred Employee. Each Transferred Employee shall be hired on an "*at will*" basis unless otherwise agreed by Buyer. For the avoidance of doubt, the foregoing provision shall not be construed to restrict a Transferred Employees rights under the Uniformed Services Employment and Reemployment Rights Act of 1994, as amended.

(d)     Seller shall, or, when applicable, cause the Manager to, terminate the employment of all Transferred Employees effective as of immediately before the Closing or, with respect to any Inactive Employee who becomes a Transferred Employee after the Closing Date in accordance with Section 7.05(c), upon their return to active work with the Buyer Employer. Subject to, and effective as of, the Closing, Seller hereby waives and releases each of the Transferred Employees from any and all contractual, common law or other restrictions related to non-competition or non-solicitation enforceable by Seller with respect to the employment, of such individuals by Buyer Employer after their termination of employment with Seller or Manager, as the case may be, except with respect to obligations related to confidentiality owed to, and trade secrets belonging to, Seller, or Manager, as the case may be.

(e)     Pursuant to the "Standard Procedure" provided in Section 4 of Revenue Procedure 2004-53, 2004-2 C.B.  320, (i) Buyer and the Seller shall report on a predecessor/successor basis as set forth therein, (ii) neither Seller nor Manager will be relieved from filing a Form W-2 with respect to any Transferred Employees for any tax period ending immediately prior to the Closing Date and the tax year including the Closing Date with respect to the portion of such year that such Transferred Employee was employed by Seller or Manager, as the case may be, and (iii) Buyer will undertake to file (or cause to be filed) a Form W-2 for each such Transferred Employee with respect to the portion of the year during which such Transferred Employees are employed by Buyer that includes the Closing Date, excluding the portion of such year that such Transferred Employee was employed by Seller and its Affiliates.

(f)     With respect to any accrued but unused vacation, paid time-off or similar benefits ("Accrued PTO") to which any Transferred Employee is entitled pursuant to the vacation policy or other arrangement applicable to such Transferred Employee immediately prior to the Closing, Buyer Employer shall (i) credit, to the extent permissible under the Buyer's PTO policies (and, if applicable, Seller's PTO policies),

such Transferred Employee's Accrued PTO under Buyer Employer's applicable paid time-off policy following the Closing Date in accordance with such policy (including any terms relating to rollover and forfeiture of Accrued PTO) and/or (ii) pay or cause Seller and/or Manager to pay (with reimbursement from Buyer) any or all of the value of such Accrued PTO to such Transferred Employee in cash; *provided, however*, if clause (i) is not permitted under Applicable Law or if Applicable Law requires Seller and/or Manager to cash out such Accrued PTO upon or in connection with Seller's termination of such Transferred Employee's employment with Seller or Manager, as the case may be, Buyer shall pay or cause Seller to pay such Accrued PTO (with reimbursement from Buyer) in accordance with clause (ii).

(g)     Nothing herein, express or implied, shall confer upon any other Persons (including any current or former employee or contractor of Seller, Buyer or any of their respective Affiliates) any rights or remedies hereunder, including any right to employment or continued employment for any specified period or continued participation in any Benefit Plan or other benefit plan, or any nature or kind whatsoever under or by reason of this Agreement.  Nothing herein restricts or precludes the right of Buyer to terminate the employment of any Transferred Employee.  Buyer and Seller agree that the provisions contained herein are not intended to be for the benefit of or otherwise be enforceable by, any third party, including any current or former Employee or Service Provider.

(h)     Buyer shall provide COBRA continuation coverage (within the meaning of Section 4980B of the Code and the Treasury regulations thereunder) to all individuals who are "M&A qualified beneficiaries" (within the meaning of Treasury Regulation Section 54.4980B-9, Q&A-4) with respect to the Contemplated Transactions for the duration of the period to which such individuals are entitled to such coverage.

(i)     Buyer shall direct that its 401(k) plan accept rollovers by Transferred Employees of their account balances and outstanding loans from Seller's 401(k) plan.

**Section 7.06    Post-Closing Books and Records and Personnel**.  At Closing, Seller will make available to Buyer all electronic copies of the Records that are maintained by or in the control of Seller, and, promptly following Closing and in any event no later than five (5) Business Days following Closing, Seller shall make available to Buyer all originals of the Records; *provided*, *however*, that Seller shall be entitled to retain any originals of the Records that are required to be retained as a result of the Bankruptcy Case, for such period of time sufficient to allow all matters under the Bankruptcy Case to be finally determined, and provided further that Buyer shall promptly receive copies of such originals that are required to be retained by Seller as a result of the Bankruptcy Case at its sole cost and expense.   Subject to the foregoing, Seller shall be entitled to retain a copy of the Records delivered to Buyer, at Seller's sole cost and expense.  For one (1) year after the Closing Date (or such longer period as may be required by any Governmental Authority or ongoing Claim or Proceeding), (a) Buyer shall not destroy or dispose of any material Records received hereunder and (b) Buyer shall allow Seller (including, for clarity, any trust established under a chapter 11 plan of Seller or any other successors of Seller) and any of their Representatives reasonable access during normal business hours, at Seller's sole expense and upon reasonable advance notice, to all Records included in

the CCRC Assets and in the possession or control of Buyer, for purposes relating to the Bankruptcy Case, the wind-down of the operations of Seller, the functions of any such trusts or successors, or other reasonable business purposes, and Seller (including any such trust or successors) and such Representatives shall have the right to make copies of any Records.

**Section 7.07    Condemnation**.    The risk of any Loss to the Real Property by condemnation before the Closing shall continue to be borne by Seller.   In the event any condemnation Proceeding is commenced or threatened prior to the Closing, Seller shall promptly give Buyer written notice thereof (in any event within five (5) days after Seller first has knowledge of the occurrence of same), together with such reasonable details with respect thereto as to which Seller may have knowledge.  If, prior to Closing, there is a material taking by eminent domain at the Real Property, Buyer shall have the right to treat this Agreement as null and void by providing Seller with written notice within ten (10) days of receiving written notice of a material taking by eminent domain at the Real Property of Buyer's election to treat the Agreement as null and void.  If Buyer elects to proceed and to consummate the Contemplated Transactions despite said material taking, or if there is less than a material taking prior to Closing, there shall be no reduction in or abatement of the Purchase Price and Buyer shall be required to purchase the Real Property in accordance with the terms of this Agreement, and Seller shall assign to Buyer, without representation of warranty by or recourse against Seller, all of Seller's right, title and interest in and to any award made or to be made in the condemnation Proceeding (in which event Buyer shall have the right to participate in the adjustment and settlement of any insurance-related Claim relating to said Loss).  For the purpose of this Section 7.07, the term "material" shall mean any taking which would have the effect of (a) reducing the square footage of the Facility such that the reduction prevents operation of the Facility as currently operated, (b) reasonably requiring the demolition, reconstruction, or reconfiguration of the Facility, (c) materially impairing the operation of the Facility for independent living apartments, assisted living units, memory care units, and licensed and certified skilled nursing purposes, or (d) or reducing the gross acreage of the Real Property by at least fifteen percent (15%).  The parties' obligations, if any, under this Section 7.07 shall survive the expiration or any termination of this Agreement.

**Section 7.08    Payment of Broker and Finder's Fees**.  Seller shall pay all of the fees and costs and expenses due to its brokers, finders, and investment bankers, at the Closing.  The Seller's obligations under this Section 7.08 shall survive the expiration or any termination of this Agreement.

**Section 7.09    Billing and Collection of Accounts Receivable**.

(a)    Reimbursements and charges for items and services rendered by Buyer after the Closing Date that are subject to reimbursement by a Third-Party Payor shall be handled as follows:

(i)    Medicare Accounts Receivable.  Following Closing until such time as (A) a tie-in notice is issued by CMS to link Seller's existing Medicare provider number for the Facility to Buyer, and (B) a CMS Form 588 is processed by CMS to authorize Medicare payments for the Facility to be deposited into a bank account maintained and controlled by Buyer, Buyer will continue to bill Medicare

-63-

using Seller's existing Medicare provider number and the Medicare receipts will continue to be deposited into Seller's existing bank account that currently receives payments from Medicare for the Facility.

(ii)     <u>Non-Medicare Third-Party-Payor Accounts Receivable</u>. Following Closing, (A) to the extent a Third-Party-Payor (other than Medicare) permits Buyer to continue to bill such program using Seller's existing provider numbers until new provider numbers can be issued to Buyer, Buyer will handle billing and receipts for such Third-Party-Payor program in a manner similar to <u>Section 7.09(a)(i)</u>, and (B) to the extent a Third-Party-Payor (other than Medicare) does not permit Buyer to continue to bill such program using Seller's existing provider numbers, Buyer shall not bill such Third-Party-Payor using Seller's provider numbers for any items or services rendered by Buyer at the Facility after the Closing Date. Buyer will not commence billing such Third-Party-Payors for any items or services rendered by Buyer at the Facility after the Closing Date until Buyer has obtained new provider numbers and, at such time, Third-Party-Payor receipts will be deposited into bank accounts maintained and controlled by Buyer.

(b)     Following the Closing, Buyer shall bill Medicare and all other Third-Party Payor programs in full compliance with the applicable conditions for participation and Healthcare Regulatory Laws.

(c)     Seller shall cooperate with Buyer as reasonably required in order to permit Buyer to collect the Accounts Receivable.

# ARTICLE VIII.
## CONDITIONS PRECEDENT TO THE
## OBLIGATION OF BUYER TO CLOSE

Buyer's obligation to consummate the Contemplated Transactions pursuant to the terms of this Agreement is subject to the satisfaction, on or prior to the Closing, of each of the following conditions, unless waived by Buyer in writing:

**Section 8.01     Accuracy of Representations and Warranties; Closing Certificate**. Except for any changes permitted by the terms of this Agreement or consented to in writing by Buyer, each of the representations and warranties made by Seller in this Agreement or in any Transaction Document shall be true and correct, in all material respects (other than any representation or warranty which is qualified by materiality, which shall be true and correct in all respects), on the Execution Date and shall be true and correct, in all material respects (other than any representation or warranty which is qualified by materiality, which shall be true and correct in all respects), as of the Closing Date as though such representations and warranties were made or given on and as of the Closing Date, unless such representation and warranty speaks only as of a specific date in which case it shall be true and correct as of such date.

**Section 8.02     Performance of Agreement**.     Seller shall have performed in all material respects all of its covenants, agreements and obligations required by this Agreement to be performed or complied with by it prior to or upon the Closing.

**Section 8.03    Seller Closing Certificate**.  Buyer shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Seller, that each of the conditions set forth in Section 8.01 and Section 8.02 have been satisfied (the "Seller Closing Certificate").

**Section 8.04    Conveyance of Property**.  Seller shall have conveyed to Buyer the Real Property, free and clear of all Liens, except Permitted Liens, to the extent permissible under Section 363(f) of the Bankruptcy Code.

**Section 8.05    Bond Financing and Subordinated Financing and Release of All Liens**.  Seller shall have caused the Sale Order to provide that the sale of the CCRC Assets shall be free and clear of all Liens on the CCRC Assets, to the extent permissible under Section 363(f) of the Bankruptcy Code, including the Liens related to the Bond Financing and Subordinated Financing.

**Section 8.06    Delivery of Closing Documents**.  Seller shall have delivered or caused to be delivered to Buyer on the Closing each of the Transaction Documents required to be delivered pursuant to Section 10.02.

**Section 8.07    Required Approvals**.  All of consents and approvals of any Person set forth in Schedule 8.07 of the Disclosure Schedules shall have been received.

**Section 8.08    Governmental Approvals**.   Seller shall have obtained all necessary authorizations, Permits, Approvals, consents, orders, or approvals of, shall have made all declarations or filings with, and shall have allowed the expiration of waiting periods imposed by, any Governmental Authority or other third party necessary for the consummation of the Contemplated Transactions and the continued operation of the Business.

**Section 8.09    Cure Costs of Assigned Contracts**.  If the Cure Costs in connection with the assumption of the Assigned Contracts, in the aggregate, exceeds the Cure Cost Cap, then Buyer shall have the option to (a) recover such amounts as Reimbursable Claims and/or (b) remove one or more agreements from the Assigned Contracts list up to and until the aggregate amount of the Cure Costs is equal to or less than the aggregate Cure Cost Cap and thereupon such Contract shall be deemed to be an Excluded Contract.

**Section 8.10    Entry of Sale Order**.  The entry of Sale Order on or before August 1, 2019, and such Sale Order becoming a Final Order on or before August 15, 2019.

**Section 8.11    No Material Adverse Effect**.  No Material Adverse Effect shall have occurred with respect to the Business or the CCRC Assets prior to the Closing.

**Section 8.12    Management Agreement.**  The Management Agreement shall have been rejected in the Bankruptcy Case prior to the Closing Date.

**Section 8.13    Environmental Reports**.  If Buyer shall have obtained an environmental site assessment of the Real Property and buildings from an environmental consultant selected by Buyer (which shall include a Phase I, air quality test and mold contamination tests) within thirty (30) days of this Agreement, such site assessment shall indicate that the Real Property is free

-65-

from any material environmental hazards or contamination. The cost of the site assessment obtained by Buyer, and any subsequent testing, shall be paid by Buyer.

**Section 8.14 Estoppel Certificates**. Buyer shall have received estoppel certificates executed by the tenants under the Tenant Leases set forth on Schedule 4.17(b), evidencing whether or not (a) the Tenant Lease is in full force and effect, (b) the Tenant Lease has been amended in any way, (c) there are any existing defaults on the part of Seller thereunder and specifying the nature of such defaults, if any, (d) the date to which rent, and other amounts due thereunder, if any, have been paid, and (e) such other information as may be reasonably requested by Buyer.

**Section 8.15 Additional Deliveries**. Seller shall have delivered to Buyer such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the Contemplated Transactions.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO THE
## OBLIGATION OF SELLER TO CLOSE

The obligation of Seller to consummate the Contemplated Transactions pursuant to the terms of this Agreement is subject to the satisfaction, on or prior to the Closing, of each of the following conditions, unless waived by Seller in writing:

**Section 9.01 Accuracy of Representations and Warranties**. The representations and warranties of Buyer contained in this Agreement shall be true and correct, in all material respects (other than any representation or warranty which is qualified by materiality, which shall be true and correct in all respects), on the Execution Date and shall be true and correct, in all material respects (other than any representation or warranty which is qualified by materiality, which shall be true and correct in all respects), as of the Closing Date as though such representations and warranties were made or given on and as of the Closing Date, unless such representation and warranty speaks only as of a specific date in which case it shall be true and correct as of such date.

**Section 9.02 Performance of Agreements**. Buyer shall have performed in all material respects all of its covenants, agreements, and obligations required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or upon the Closing.

**Section 9.03 Buyer Closing Certificate**. Seller shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in Section 9.01 and Section 9.02 have been satisfied (the "Buyer Closing Certificate").

**Section 9.04 Delivery of Closing Documents**. Buyer shall have delivered or caused to be delivered to Seller on the Closing each of the Transaction Documents required to be delivered pursuant to Section 10.03.

**Section 9.05 Operations Transfer Agreement**. Post-Closing Licensee shall have entered into the OTA.

-66-

**Section 9.06** **Interim Management Agreement**. If required under the terms of the OTA, Seller, on the one hand, and Buyer or Post-Closing Licensee, on the other hand, shall have entered into the Interim Management Agreement. Any fees Buyer may be entitled to under the terms of the Interim Management Agreement shall be reduced from the Cash Purchase Price at Closing.

**Section 9.07** **Sublease**. If required under the terms of the OTA, Post-Closing Licensee and Seller shall have entered into a Sublease.

**Section 9.08** **Unfavorable Action or Proceeding**. On the Closing Date, no Orders, decrees, judgments or injunctions of any court or Governmental Authority shall be in effect, and no Claims, Proceedings or Actions shall be pending, which challenge or seek to challenge, or which could prevent or cause the rescission of, the consummation of the Contemplated Transactions.

**Section 9.09** **Final Sale Order**. The Sale Order (a) shall have been entered by the Bankruptcy Court, and (b) shall have become a Final Order.

**Section 9.10** **Cure Costs**. At the Closing, Buyer shall have paid the Cure Costs of (a) the Assigned Residency Agreements, and (b) the Assigned Contracts, together with any additional Cure Costs it has elected to pay.

**Section 9.11** **Governmental Approval**. Buyer shall coordinate and cooperate with Seller to obtain all necessary authorizations, Permits, Approvals, consents, orders, or approvals of, shall have made all declarations or filings with, and shall have allowed the expiration of waiting periods imposed by, any Governmental Authority or other third party necessary for the consummation of the Contemplated Transactions and operation of the Business.

## ARTICLE X.
## CLOSING

**Section 10.01** **Closing Date and Place**. The Closing shall take place on the date that is two (2) Business Days after the satisfaction of all conditions to Closing contained in Article VIII and Article IX, which the parties anticipate shall be August 30, 2019, or at such earlier or later date and time as may be expressly agreed upon in writing by Buyer and Seller (the "Closing Date"). Time is of the essence in the performance of this Agreement. The Closing shall be accomplished by Buyer and Seller depositing the Closing Documents into escrow with the Title Company and Buyer and Seller issuing their respective instructions to the Title Company without the need for attending in person unless the parties mutually agree otherwise.

**Section 10.02** **Deliveries of Seller**. At the Closing, Seller shall deliver or cause to be delivered to Buyer and/or other Persons the following, in each case in form and substance reasonably satisfactory to Buyer, and to the extent required, executed by a duly authorized officer of Seller:

      (a)    a governmental certificate, dated as of a date as near as practicable to the Closing, showing that Seller (i) is duly organized and in good standing in the state of

organization of Seller, and (ii) is qualified to do business in the state in which the Real Property is located;

(b)  a certificate of the secretary (or the equivalent thereto if none) of Seller attesting as to the incumbency of each manager, officer, and authorized Representative of Seller who executes this Agreement and any of the other Transaction Documents to which it is a party, certifying that resolutions and consents necessary for Seller to act in accordance with the terms of this Agreement have been adopted or obtained (with copies thereof attached) and to similar customary matters;

(c)  a copy of the Sale Order;

(d)  a Deed conveying the Real Property, free and clear of all Liens other than the Permitted Liens, to the extent permissible under Section 363(f) of the Bankruptcy Code, in substantially the form attached hereto as Exhibit B;

(e)  a Bill of Sale, Assignment and Assumption Agreement transferring the CCRC Assets (other than the Real Property) and Assumed Liabilities to Buyer, free and clear of all Liens other than the Permitted Liens, in substantially the form attached hereto as Exhibit A;

(f)  the OTA;

(g)  a certificate of non-foreign status under Section 1445 of the Code, complying with the requirements of the Income Tax Regulations promulgated pursuant to such Section, in substantially the form attached hereto as Exhibit C;

(h)  the Seller Closing Certificate;

(i)  a true, correct and complete Rent Roll for the Real Property five (5) days prior to Closing, certified by Seller, listing each Resident as of the Closing, the unit, bed or room number of such Resident, the amount of monthly fees to be paid by such Resident, the amount of security deposit, and the date of the Residency Agreement;

(j)  the Holdback Escrow Agreement;

(k)  a base owner's title insurance policy to Buyer at Closing (the expense of such policy to be paid by Seller), in the amount of the Cash Purchase Price and Holdback Escrow Amount in accordance with the Title Commitment, subject only to the Permitted Exceptions, and which shall delete the standard exceptions, insuring fee simple title to the Real Property in Buyer, for the full amount of the Cash Purchase Price and Holdback Escrow Amount, each in a form available in the State of Indiana (the "Title Insurance Policy").  Seller shall pay for any endorsements to the Title Insurance Policy required to cure any objections of Buyer to the Title Commitment or Survey, and Buyer shall pay for any other endorsements required by it or its lender;

(l)  a certificate or affidavit in form and substance reasonably required by the Title Company to delete the standard non-survey exceptions to the Title Insurance Policy;

-68-

(m)  Seller's counterpart to the Indiana Sales Disclosure Form;

(n)  All electronic copies of the Records that are maintained by or in the control of Seller, and, promptly following Closing and in any event no later than five (5) Business Days following Closing, Seller shall make available to Buyer all originals of the Records; *provided however*, that Seller shall be entitled to retain any originals of the Records that are required to be retained as a result of the Bankruptcy Case, for such period of time sufficient to allow all matters under the Bankruptcy Case to be finally determined; and *provided further*, that Buyer shall promptly receive copies of such originals that are required to be retained by Seller as a result of the Bankruptcy Case at its sole cost and expense;

(o)  the Flow of Funds Memorandum;

(p)  all Consents and Approvals from all third parties, Governmental Authority, and the Bankruptcy Court necessary for consummation of the Contemplated Transactions;

(q)  such additional information, materials, affidavits and certificates as Buyer shall reasonably request to evidence the satisfaction of the conditions to Seller's obligations hereunder, including title affidavits, such affidavits and indemnities as the Title Insurer may reasonably require to issue the Title Insurance Policy, the gap coverage and all endorsements and any other documents expressly required by this Agreement to be delivered by Seller at Closing, or as may be reasonably required by the Title Company; and

(r)  amounts due and owing to Seller's broker, which will be paid by Seller to Seller's broker out of proceeds from the Cash Purchase Price.

**Section 10.03 Deliveries of Buyer**.  At the Closing, Buyer shall deliver or cause to be delivered to Seller and/or other Persons, the following, in each case in form and substance reasonably satisfactory to Seller, and to the extent required, executed by a duly authorized officer of Buyer:

(a)  the Purchase Price by wire transfer in accordance with Section 3.01, subject to the adjustments under Section 3.03;

(b)  the Cure Costs in accordance with Section 2.07;

(c)  the Bill of Sale, Assignment and Assumption Agreement transferring the CCRC Assets (other than the Real Property) and the Assumed Liabilities to Buyer, free and clear of all Liens other than the Permitted Liens, in substantially the form attached hereto as Exhibit A;

(d)  the OTA;

(e)  the Buyer Closing Certificate;

(f)     the Holdback Escrow Agreement;

(g)     Buyer's counterpart to the Indiana Sales Disclosure Form;

(h)     a governmental certificate, dated as of a date as near as practicable to the Closing, showing that Buyer is (i) duly organized and in existence in the state of its formation, and (ii) is qualified to do business in the state where the Real Property is located;

(i)     a certificate of the secretary (or the equivalent thereto if none) of Buyer attesting as to the incumbency of each manager, officer, and authorized Representative of Buyer who executes this Agreement and any of the other Transaction Documents to which it is a party, certifying that resolutions and consents necessary for Buyer to act in accordance with the terms of this Agreement have been adopted or obtained (with copies thereof attached) and to similar customary matters;

(j)     the Flow of Funds Memorandum; and

(k)     such additional information, materials, affidavits and certificates as Seller shall reasonably request to evidence the satisfaction of the conditions to Seller's obligations hereunder, including any documents expressly required by this Agreement or the other Transaction Documents to be delivered by Buyer or its Affiliates at Closing.

## ARTICLE XI.
## SURVIVAL OF REPRESENTATIONS,
## WARRANTIES AND COVENANTS

**Section 11.01  Survival**.  All covenants and agreements contained in this Agreement or any other Transaction Document which by their terms are to be performed in whole or in part, or which prohibit actions, at or subsequent to the Closing shall survive the Closing hereunder until all applicable statute of limitations or for such shorter period explicitly specified therein.  The party that breaches such covenants and agreements (the "Breaching Party") shall be liable to, and shall hold harmless, the other party after the Closing for any Losses suffered or incurred by such other party as the result of the breach of such covenants and agreements by such Breaching Party.  If the Breaching Party is the Seller, Buyer shall only recover such Losses as a Reimbursable Claim.  Subject to the foregoing, and excluding in the case of fraud or intentional misconduct, all other covenants and agreements contained in this Agreement to be performed prior to the Closing, and all representations and warranties contained in this Agreement or in any certificates delivered at Closing, shall not survive the Closing and shall thereupon terminate, excluding any Proceedings for Losses in respect of any breach thereof.

**Section 11.02  Holdback Escrow Agreement**.  As set forth more fully in and subject to the Holdback Escrow Agreement, the Holdback Escrow Amount shall be held in escrow and disbursed by the Escrow Agent pursuant to an escrow agreement consistent with the terms of this Agreement and acceptable to the Seller, Buyer, Escrow Agent and Bond Trustee (the "Holdback Escrow Agreement").  As set forth in Section 3.01(b), the Holdback Escrow Amount shall be paid from the Cash Purchase Price otherwise due to Seller at Closing.  On the twelve (12) month anniversary of the Closing Date, the Holdback Escrow Amount, minus any amount due to the

-70-

Buyer pursuant to Section 11.03 for Reimbursable Claims, shall be disbursed to the Seller, subject to and in accordance with the terms of the Holdback Escrow Agreement.

**Section 11.03 Claims Against the Holdback Escrow Agreement**. Buyer, acting in good faith, shall have the right to be reimbursed and made whole by the Escrow Agent from the Holdback Escrow Amount under the Holdback Escrow Agreement in the event that Buyer suffers or incurs any Losses directly resulting from, or arising directly out of, the following ("Reimbursable Claims"): (a) any inaccuracy or breach of any of the representations or warranties of Seller in this Agreement, the Transaction Documents or in any certificate or instrument delivered by or on behalf of Seller pursuant to this Agreement, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date), (b) any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement, the Transaction Documents or any certificate or instrument delivered by or on behalf of Seller pursuant to this Agreement, provided that Buyer had no Knowledge or such breach or non-fulfillment prior to the Closing Date, (c) any Excluded Asset or any Excluded Liability, (d) if Buyer pays or is required to pay any Liabilities of Seller arising under the Government Programs or any Third Party Payor and attributable to Claims for payments, cost reports or other documents filed or created by Seller in connection with the Business or the CCRC Assets, (e) overpayments under Section 6.14, or (f) any and all Proceedings, demands, assessments, audits or judgments arising out of any of the foregoing. Buyer shall have the right to notify the Escrow Agent, with a copy to the Seller and Bond Trustee and subject to the procedures set forth in the Holdback Escrow Agreement, of any Reimbursable Claim at any time prior to the one (1) year anniversary of the Closing Date, and shall specify in reasonable detail the nature of such Reimbursable Claim, the amount, if known, or if not known, a good faith estimate of the amount of the Reimbursable Claim. Unless properly objected to by the Seller or the Bond Trustee in accordance with the terms of the Holdback Escrow Agreement, Escrow Agent shall reimburse Buyer the amount of the Reimbursable Claim pursuant to the terms set forth in the Holdback Escrow Agreement. Excluding any Losses resulting from fraud or intentional misconduct, recovery against the Holdback Escrow Agreement shall be Buyer's sole remedy for Reimbursable Claims.

## ARTICLE XII.
## DEFAULT AND TERMINATION

**Section 12.01 Termination Events**. This Agreement may be terminated at any time prior to the Closing:

(a)     by either Seller or Buyer, if a Governmental Authority issues a final, non-appealable ruling or Order prohibiting the Contemplated Transactions where such ruling or Order was not requested, encouraged or supported by any of Seller or Buyer;

(b)     by mutual written consent of Seller and Buyer;

(c)     by either Seller or Buyer, if the Closing shall not have occurred by 5:00 p.m. Central Prevailing Time on December 31, 2019 (the "Outside Date"); *provided,*

*however*, (i) Buyer shall be permitted to terminate this Agreement pursuant to this Section 12.01(c) only if Buyer is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein (or in breach at all with respect to those representations, warranties, covenants and agreements that are qualified as to materiality or Material Adverse Effect or similar expressions), and (ii) Seller shall be permitted to terminate this Agreement pursuant to this Section 12.01(c) only if Seller is not in material breach of any of its representations, warranties, covenants or agreements contained herein (or in breach at all with respect to those representations, warranties, covenants and agreements that are qualified as to materiality or Material Adverse Effect or similar expressions);

(d)      by either party, if the Bankruptcy Court enters an Order dismissing, or converting the Bankruptcy Case into a case under chapter 7 of the Bankruptcy Code;

(e)      by Buyer in the event of any material breach by Seller of any of Seller's agreements, covenants, representations or warranties contained herein and where such breach (i) has a material impact on the Contemplated Transactions and (ii) has not been cured by the earlier of (A) fifteen (15) Business Days after the giving of written notice thereof by Buyer to Seller (which notice shall specify the nature of such breach and be given as promptly as practicable) or (B) the Outside Date; *provided*, *however*, that Buyer shall not be permitted to terminate this Agreement pursuant to this Section 12.01(e) if Buyer is itself in breach of any of its representations, warranties, covenants or agreements contained herein (or in breach at all with respect to those representations, warranties, covenants and agreements that are qualified as to materiality or Material Adverse Effect or similar expressions);

(f)      by Seller in the event of any material breach by Buyer of any of Buyer's agreements, covenants, representations or warranties contained herein and such breach (i) would result in the material failure of a condition set forth in Section 9.01 or Section 9.02 to be satisfied and (ii) has not been cured by the earlier of (A) fifteen (15) Business Days after the giving of written notice thereof by Seller to Buyer (which notice shall specify the nature of such breach and be given as promptly as practicable) and (B) the Outside Date; *provided*, *however*, that Seller shall not be permitted to terminate this Agreement pursuant to this Section 12.01(f) if Seller is itself in breach of any of Seller's representations, warranties, covenants or agreements contained herein (or in breach at all with respect to those representations, warranties, covenants and agreements that are qualified as to materiality or Material Adverse Effect or similar expressions);

(g)      by Buyer if Sale Order is not entered by the Bankruptcy Court on or before August 1, 2019, or the Sale Order does not become a Final Order by August 15, 2019;

(h)      by Buyer if Seller enters into an Alternative Transaction;

(i)      by Seller if Buyer is not pursuing the Closing in a reasonably diligent manner so that the Closing can occur by the Outside Date as determined by the Bankruptcy Court; or

-72-

(j)    by Buyer if any material Permit issued to the Seller has been revoked by such Governmental Authority prior to the Closing as the result of the Seller's insolvency and such revocation materially impacts or would likely to materially impact the Buyer's ability to obtain such Permit to operate the CCRC Assets after the Closing.

**Section 12.02  Effect of Termination**.   Subject to <u>Section 6.07</u>, <u>Section 6.13</u>, <u>Section 12.01</u>, <u>Section 12.03</u>, <u>Section 12.04</u>, <u>Section 12.05</u> and <u>Section 12.06</u>, in the event of termination of this Agreement by Buyer or Seller pursuant to this <u>Section 12.02</u>, all rights and obligations of the parties under this Agreement (except for any obligations pursuant to their terms are to continue post-Closing or after the termination of this Agreement) shall terminate without any Liability of any party to any other party.  The provisions of this <u>Section 12.02</u> (and, to the extent applicable to the interpretation or enforcement of such provisions, <u>Article I</u> and <u>Article VIII</u>) shall expressly survive the termination of this Agreement.  Notwithstanding the foregoing, in the event of termination of this Agreement for any reason pursuant to <u>Section 12.01</u> other than <u>Section 12.01(f)</u>, Buyer, in each case, shall receive a refund of the Deposit so long as Buyer is not otherwise in material breach of any of its obligations under this Agreement; and in the event of termination pursuant to <u>Section 12.01(h)</u>, Buyer shall also receive the Break-Up Fee upon closing of such Alternative Transaction, which Break-Up Fee shall be paid solely from the proceeds of such Alternative Transaction and Seller agrees that any court order related to the sale of the CCRC Assets shall include a carve-out from the Bond Trustee's collateral permitting the Break-Up Fee. Upon any termination of this Agreement, the OTA shall automatically terminate.

**Section 12.03  Remedies Upon Default**.

(a)    If Seller defaults on its obligation to consummate the Contemplated Transactions and Buyer is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein, Buyer shall be entitled to terminate this Agreement and obtain a refund of its Deposit; *provided*, *however*, that if such default of Seller or failure to consummate the Contemplated Transactions is the result of intentional fraud, or the willful misconduct of Seller, Buyer shall also be entitled to seek all remedies against Seller available at law or in equity.

(b)    If Buyer defaults on its obligation to consummate the Contemplated Transactions and Seller is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein, Seller shall be entitled to either (i) terminate this Agreement and retain the Deposit; or (ii) the remedy of specific performance, as Seller may elect; *provided*, *however*, that if such default of Buyer or failure to consummate the Contemplated Transactions is the result of intentional fraud, or the willful misconduct of Buyer, Seller shall also be entitled to seek all remedies against Buyer available at law or in equity.  Notwithstanding the foregoing, in the event Buyer breaches <u>Section 5.06</u>, Seller shall be entitled to terminate this Agreement and retain the Deposit, but shall not be entitled to specific performance or any other remedies, whether legal or equitable, so long as such breach is not the result of intentional fraud or the willful misconduct of Buyer.

**Section 12.04  Alternative Transaction**.   As authorized by the Bid Procedures, in the event of termination pursuant to <u>Section 12.01(h)</u>, (a) the Deposit shall be returned to Buyer, and

in connection therewith, Seller shall promptly take all action necessary to cause the Title Company to pay the Deposit to Buyer, and (b) Seller shall pay to Buyer an additional amount equal to (i) two percent (2%) of the Cash Purchase Price *plus* (ii) up to Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) of actual expenses reasonably incurred by Buyer (collectively, the "Break-Up Fee"), which Break-Up Fee shall be paid solely from the proceeds of the sale of the CCRC Assets to a third party and shall be paid on the closing of such Alternative Transaction and Seller agrees that any court order related to the sale of the CCRC Assets shall include a carve-out from the Bond Trustee's collateral permitting the Break-Up Fee. Neither the Deposit nor the Break-Up Fee shall be due to Buyer if the Alternative Transaction was pursued as the result of a material breach by Buyer under this Agreement or Buyer's failure or refusal to consummate the Contemplated Transactions after the satisfaction or waiver of all Closing conditions by Seller and Buyer under this Agreement.

**Section 12.05 Obligations Upon Termination**.  Except as otherwise provided herein, if this Agreement is terminated, each of the parties shall bear its own costs incurred in connection with the Contemplated Transactions.

**Section 12.06 Sole and Exclusive Remedy**.  Except for the obligations of Seller and Buyer set forth in Article XI, and except in the event of fraud or willful misconduct, Seller and Buyer each acknowledge and agree that prior to the Closing, such party's sole and exclusive remedy with respect to any and all Claims made prior to the Closing for any breach of this Agreement or otherwise relating to the subject matter of this Agreement and the Contemplated Transactions shall be solely in accordance with, and limited to, Section 12.01, Section 12.02, Section 12.03 and Section 12.04.  In addition, in no event shall the provisions of this Section 12.06 limit the non-prevailing party's obligation to pay the prevailing party's reasonable attorneys' fees and costs pursuant to Section 13.12 hereof.

## ARTICLE XIII.
## MISCELLANEOUS

**Section 13.01 Further Actions**.  From time to time before, at and after the Closing, each party will execute and deliver such other documents as reasonably requested by Buyer, Seller or Escrow Agent to consummate the Contemplated Transactions.

**Section 13.02 Notices**.  All notices, demands or other communications given hereunder shall be in writing and shall be sufficiently given if delivered by facsimile (with written confirmation of receipt), by courier (including overnight delivery service), by email (as to communications that are not required notices or demands hereunder), or sent by registered or certified mail, first class, postage prepaid, addressed as follows:

If to Seller, to:

Mayflower Communities, Inc.
15950 Dallas Parkway, Suite 750, Dallas, TX 75248
Attn: Louis E. Robichaux IV
Telephone No.: 214-200-3689
Email: Louis.Robichaux@ankura.com

*with copies to*:

DLA Piper LLP (US)
1251 Avenue of the Americas, New York, NY 10020
Attn: Thomas R. Califano
Telephone No.: 212-335-4990
Email: thomas.califano@dlapiper.com

If to Buyer, to:

Prairie Landing Community, Inc.
5415 Bearberry Lane,
Indianapolis, IN 46268
Attn: John Dattilo
Email: JDattilo@bhiseniorliving.org

*with copies to*:

Ice Miller LLP
One American Square, Suite 2900, Indianapolis, IN 46282
Attn: Kevin C. Woodhouse
Email: Kevin.Woodhouse@icemiller.com

or such other address as a party may from time to time notify the other parties in writing (as provided above). Any such notice, demand or communication shall be deemed to have been given (a) if so sent by facsimile, upon receipt as evidenced by the sender's written confirmation of receipt, (b) if so mailed, as of the date delivered, (c) if emailed, when sent (provided that e-mail does not constitute delivery of any communication that is a required notice or demand hereunder), or (d) if so delivered by courier, on the date received.

**Section 13.03 Entire Agreement**. This Agreement and the other Transaction Documents constitute the entire agreement and understanding between the parties with respect to the subject matter hereof and supersede any prior negotiations, agreements, understandings, or arrangements between the parties hereto with respect to the subject matter hereof, including the Letter of Intent.

**Section 13.04 Binding Effect; Benefits**. Except as otherwise provided herein, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors or permitted assigns. Except to the extent specified herein, nothing in this Agreement, express or implied, shall confer on any person other than the parties hereto and their respective successors or permitted assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement.

**Section 13.05 Assignment**. This Agreement may not be assigned by any party prior to Closing without the written consent of the other party, which consent may be given or withheld in each such party's sole and absolute discretion, except that Buyer may assign this Agreement

-75-

and its rights and obligations hereunder without the consent of, and upon written notice to, Seller (a) to an Affiliate of Buyer, (b) to a partnership in which Buyer or any Affiliate of Buyer is a general partner, or (c) a limited liability company in which Buyer or any Affiliate of Buyer is a manager or managing member (each, a "Permitted Buyer-Assignee").

**Section 13.06 Amendments and Waivers; Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver**.

(a)     Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of Indiana applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Indiana applicable hereto.

(b)     Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims, Actions or Proceedings which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Contemplated Transactions and (ii) any and all Claims, Actions or Proceedings relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Claim, Action or Proceeding; *provided*, *however*, that, if the Bankruptcy Case is closed, all Claims, Actions or Proceedings arising out of or relating to this Agreement shall be heard and determined in an Indiana state court or a federal court sitting in Indianapolis, Indiana, and the parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Claim, Action or Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding.  The parties consent to service of process by mail (in accordance with Section 13.02) or any other manner permitted by Applicable Law.

(c)     **EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR ANY OTHER AGREEMENT CONTEMPLATED HERETO AND THERETO OR THE CONTEMPLATED TRANSACTIONS OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS**

**AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

**Section 13.07 Amendments; Waivers**. No term or provision of this Agreement may be amended, waived, discharged, or terminated orally, except by an instrument in writing signed by Buyer and Seller with respect to any provision contained herein. Any waiver shall be effective only in accordance with its express terms and conditions.

**Section 13.08 Severability**. Any provision of this Agreement which is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions hereof, and any such unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by Applicable Law, the parties hereto hereby waive any provision of Applicable Law now or hereafter in effect which renders any provision hereof unenforceable in any respect.

**Section 13.09 Counterparts**. This Agreement may be executed and accepted in one or more counterparts for the convenience of the parties, each of which will be deemed an original and all of which, taken together, shall constitute one and the same instrument. Delivery of a counterpart hereof via facsimile transmission or by electronic mail transmission shall be as effective as delivery of a manually executed counterpart hereof.

**Section 13.10 References**. All references in this Agreement to Articles and Sections are to Articles and Sections contained in this Agreement unless a different document is expressly specified.

**Section 13.11 Disclosure Schedules; Schedules; Exhibits**. All Disclosure Schedules and Exhibits referred to herein form an integral part of this Agreement and shall be deemed to be part of this Agreement to the same extent as if set forth in the text of this Agreement. All statements contained in certificates and other instruments attached hereto or delivered or furnished on behalf of any party hereto shall be deemed representations and warranties of that party pursuant to this Agreement.

**Section 13.12 Closing Costs**. Except as set forth in Section 13.12, Buyer and Seller shall each pay (a) their respective attorneys' fees and expenses and (b) any broker commissions due to any broker engaged by such party respectively.

**Section 13.13 Attorneys' Fees**. In the event either party brings an Action to enforce or interpret any of the provisions of this Agreement, the "prevailing party" in such Action shall, in addition to any other recovery, be entitled to its reasonable attorneys' fees and expenses arising from such Action, whether or not such matter proceeds to trial. For purposes of this Section 13.13, "prevailing party" shall mean, in the case of a Person asserting a Claim, such Person is successful in obtaining substantially all of the relief sought, and in the case of a Person defending against or responding to a Claim, such Person is successful in denying substantially all of the relief sought.

**Section 13.14 Limited Liability**. No past, present, or future member, partner, shareholder, director, officer of employee of any party to this Agreement shall have any Liability

-77-

of any nature whatsoever in connection with or under this Agreement or any Transaction Document contemplated hereby or in connection with the Contemplated Transactions.

**Section 13.15** **Survival of Defined Terms**.  Where this Agreement provides that a term or provision shall survive the Closing or the expiration or earlier termination of this Agreement, any defined terms contained in Article I that are used in such surviving term or provision shall also survive the Closing or the expiration or earlier termination of this Agreement.

**Section 13.16** **Time of Essence**.  Time shall be of the essence with respect to all matters contemplated by this Agreement.  The time in which any act is to be done under this Agreement is computed by excluding the first day (such as the Execution Date), and including the last day, unless the last day is not a Business Day, in which case that day is also excluded and the event time shall be extended to the next Business Day.

**Section 13.17** **No Third-Party Beneficiary**.  The provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Buyer and Seller and their permitted assignees only and are not for the benefit of any third party; and, accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing; provided, however, that nothing contained herein shall alter or diminish the Non-Contingent Former Residents' rights in and entitlement to receive the payments from the Seller once Buyer remits the amounts set forth in Section 3.01(c) of this Agreement to Seller.

**(THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.)**

EAST\166812324.12

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed as of the Execution Date.

**SELLER:**

**MAYFLOWER COMMUNIES, INC.**

By:_____

Louis E. Robichaux IV, Chief Restructuring Officer

**BUYER:**

**PRAIRIE LANDING COMMUNITY, INC.**

By:_____

John Dattilo, President and Chief Executive Officer

Signature Page to Asset Purchase Agreement