**<u>Exhibit B</u>**

Clean Version of the Final Disclosure Statement

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **CHAPTER 11** |
| **MAYFLOWER COMMUNITIES, INC.** [1] | § | |
| | § | **CASE NO. 19-30283 (HDH)** |
| Debtor. | § | |

## FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S FIRST AMENDED PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Daniel B. Prieto, State Bar No. 24048744
DLA Piper LLP (US)
1900 North Pearl Street, Suite 2200
Dallas, Texas 75201
Telephone:  (214) 743-4500
Facsimile:  (214) 743-4545
E-mail:  dan.prieto@dlapiper.com

Thomas R. Califano (admitted *pro hac vice*)
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone:  (212) 335-4500
Facsimile:  (212) 335-4501
E-mail:  thomas.califano@dlapiper.com

Rachel Nanes (admitted *pro hac vice*)
DLA Piper LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Telephone:  (305) 423-8563
Facsimile:  (305) 675-8206
E-mail:  rachel.nanes@dlapiper.com

*Attorneys for the Debtor and Debtor in Possession*

Dated:  August 5, 2019

---

[1]  The last four digits of the Debtor's federal tax identification number are 6350.  The mailing address for the Debtor is 1335 S. Guilford Road Carmel, Indiana 46032-2810.

### TABLE OF CONTENTS

I.     **INTRODUCTION** .................................................................................................... **3**

    A.    Overview of Chapter 11 and the Plan Confirmation Process ................................ 4

    B.    Recommendation of the Debtor and Plan Overview ............................................ 4

    C.    Classification and Treatment of Claims Under the Plan ..................................... 6

    D.    Summary of Voting Requirements for Plan Confirmation ................................... 7

II.    **BACKGROUND INFORMATION** ................................................................... **9**

    A.    Overview of the Debtor's Business .................................................................... 9

    B.    Organizational Structure of the Debtor ............................................................ 11

    C.    The Debtor's Prepetition Capital Structure ..................................................... 12

    D.    Events Leading to the Chapter 11 Case ........................................................... 16

III.    **EVENTS OCCURRING DURING DEBTOR'S CHAPTER 11 CASE** ..................... **17**

    A.    Bankruptcy Filings and First Day Orders ........................................................ 17

    B.    Schedules and Statements ................................................................................ 17

    C.    Retention and Employment of Bankruptcy Professionals ................................ 18

    D.    Appointment of Residents' Committee ............................................................ 18

    E.    Interim Compensation and Expense Reimbursement ........................................ 18

    F.    Appointment of Patient Care Ombudsman ....................................................... 18

    G.    The Cash Motion and Cash Motion Objection ................................................ 18

    H.    Venue Motion and Venue Motion Objection .................................................... 19

    I.    The Settlement with the Bond Trustee ............................................................. 19

    J.    Cash Collateral ................................................................................................ 20

    K.    Bid Procedures ................................................................................................ 20

    L.    Selection of Stalking Horse ............................................................................. 21

    M.    Approval of Sale to Stalking Horse ................................................................. 24

IV.    **THE CHAPTER 11 PLAN** .................................................................................. **24**

    A.    Treatment of Claims and Interests Under the Plan ........................................... 25

    B.    Means for Implementation of the Plan .............................................................. 28

    C.    Acceptance or Rejection of the Plan ................................................................ 35

    D.    Distributions .................................................................................................... 36

    E.    Procedures for Disputed Claims ...................................................................... 39

    F.    Executory Contracts and Unexpired Leases ..................................................... 41

G.     Conditions Precedent to Confirmation and the Effective Date............................ 42

H.     Effect of Confirmation ....................................................................................... 43

I.     Modification, Revocation or Withdrawal of the Plan .......................................... 49

J.     Retention of Jurisdiction .................................................................................... 49

K.     Miscellaneous Provisions.................................................................................... 51

**V.     RISK FACTORS IN CONNECTION WITH THE PLAN ...................................... 55**

A.     Bankruptcy Considerations.................................................................................. 55

B.     Risks Related to the Sale..................................................................................... 56

C.     No Duty to Update Disclosures .......................................................................... 56

D.     Representations Outside this Disclosure Statement............................................. 56

E.     No Admission ..................................................................................................... 57

F.     Tax and Other Related Considerations ............................................................... 57

**VI.     PLAN CONFIRMATION AND CONSUMMATION........................................... 57**

A.     The Confirmation Hearing.................................................................................. 57

B.     Plan Confirmation Requirements Under the Bankruptcy Code............................ 58

**VII.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ....................................................................................................... 61**

A.     Chapter 7 Liquidation ........................................................................................ 61

B.     Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code ...................... 61

C.     Dismissal of the Debtor's Chapter 11 Case ........................................................ 62

**VIII.     CERTAIN FEDERAL TAX CONSEQUENCES .................................................. 62**

A.     General............................................................................................................... 62

B.     U.S. Federal Income Tax Consequences to the Debtor ....................................... 63

C.     U.S. Federal Income Tax Treatment With Respect to the Liquidating Trust ...... 63

D.     U.S. Federal Income Tax Treatment With Respect to Holders of Allowed Claims that are Beneficiaries of the Liquidating Trust........................................ 65

E.     Market Discount................................................................................................. 66

F.     Limitation on Use of Capital Losses................................................................... 66

**IX.     RECOMMENDATION AND CONCLUSION ..................................................... 67**

## **EXHIBITS**

Exhibit 1     Debtor's First Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code, dated August 5, 2019

Exhibit 2     Liquidation Analysis

**DISCLAIMER**

**IF YOU ARE ENTITLED TO VOTE TO APPROVE THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THIS DISCLOSURE STATEMENT. THE DEBTOR URGES YOU TO VOTE TO ACCEPT THE PLAN.**

**EACH HOLDER OF A CLAIM AGAINST THE DEBTOR ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND BANKRUPTCY CODE SECTION 1125. NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE DEBTOR, THEIR PROPERTY OR THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS.**

**THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE PLAN. NO SOLICITATIONS FOR OR AGAINST THE PLAN MAY BE MADE EXCEPT THROUGH THIS DISCLOSURE STATEMENT.**

**THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. ALTHOUGH THE DEBTOR BELIEVES AND HAS MADE EVERY EFFORT TO ENSURE THAT THIS SUMMARY PROVIDES ADEQUATE INFORMATION WITH RESPECT TO THE PLAN, IT DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED TO THE EXTENT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL. ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLAN IN ITS ENTIRETY.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016 AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER APPLICABLE NONBANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE LIQUIDATION OF THE DEBTOR AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR.**

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

1

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. NEITHER THIS DISCLOSURE STATEMENT NOR THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.

ALL OF THE PROJECTED RECOVERIES TO CREDITORS ARE BASED UPON THE ANALYSIS PERFORMED BY THE DEBTOR AND ITS PROFESSIONALS. ALTHOUGH THE DEBTOR HAS MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN AND IN THE EXHIBITS ATTACHED HERETO, THE DEBTOR CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE INFORMATION.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER BUT RATHER AS THE DEBTOR'S STATEMENT OF THE STATUS OF THE RESPECTIVE MATTER.

THE DEBTOR RECOMMENDS THAT CREDITORS SUPPORT AND VOTE TO ACCEPT THE PLAN. IT IS THE OPINION OF THE DEBTOR THAT THE TREATMENT OF CREDITORS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR. ACCORDINGLY, THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.

## I.  INTRODUCTION

On January 30, 2019 (the "*Petition Date*"), Mayflower Communities, Inc. d/b/a The Barrington of Carmel (the "*Barrington*" or "*Debtor*") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, as now in effect or as hereafter amended (the "*Bankruptcy Code*").

The Debtor submits this disclosure statement (the "*Disclosure Statement*"), pursuant to section 1125 of the Bankruptcy Code, and rule 3017 of the Federal Rules of Bankruptcy Procedure, as now in effect or as hereafter amended (the "*Bankruptcy Rules*"), in connection with the solicitation of votes on its proposed *First Amended Plan of Liquidation Under Chapter 11 of the Bankruptcy Code*, dated as of August 5, 2019 (as it may be altered, amended, modified or supplemented from time to time, the "*Plan*") and attached hereto as **Exhibit 1**.  The Debtor believes that the confirmation and implementation of the Plan is in the best interests of the Debtor's Estate, Creditors and all other interested parties.

This Disclosure Statement and the other documents described herein are being furnished by the Debtor to Creditors in the Debtor's Chapter 11 Case pending before the United States Bankruptcy Court for the Northern District of Texas (the "*Bankruptcy Court*").  This Disclosure Statement is intended to provide adequate information of a kind, and in sufficient detail, to enable the Debtor's Creditors to make an informed judgment about the Plan, including whether to accept or reject the Plan.  This Disclosure Statement sets forth certain information regarding (i) the Debtor's prepetition operating and financial history; (ii) the Debtor's need to file for relief under chapter 11 of the Bankruptcy Code; (iii) significant events that have occurred during the Debtor's Chapter 11 Case; (iv) the terms of the Plan; (v) the manner in which distributions will be made under the Plan; (vi) certain effects of confirmation of the Plan; (vii) certain risk factors associated with the Plan; and (viii) the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

This Disclosure Statement is subject to the Bankruptcy Court's approval, as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of each of the Classes whose votes are being solicited to make an informed judgment with respect to the Plan.  **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH RESPECT TO THE MERITS OF THE PLAN.  ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN.**

The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  To the extent that the information provided in this Disclosure Statement and the Plan (including any Plan Supplements) conflict, the terms of the Plan (including any Plan Supplements) will control.  Terms not otherwise specifically defined herein will have the meanings attributed to them in the Plan.  Each definition in this Disclosure Statement and in the Plan includes both the singular and plural.  Headings are for convenience or reference and shall not affect the meaning or interpretation of this Disclosure Statement.

### A.     Overview of Chapter 11 and the Plan Confirmation Process.

Chapter 11 of the Bankruptcy Code allows debtors to reorganize or to liquidate and wind up their affairs for the benefit of the debtors and their creditors.  Upon the commencement of a chapter 11 case, an estate is created comprised of all the legal and equitable interests of a debtor as of the date the petition is filed, which typically remain in control of the debtor as a debtor-in-possession.  The Debtor remains in possession of its property and continues to operate its business without the oversight of a trustee.

Pursuant to section 362 of the Bankruptcy Code, the filing of a chapter 11 petition imposes an automatic stay of all attempts by creditors or third-parties to collect or enforce prepetition claims against a debtor or otherwise interfere with its property or business, unless relief from the automatic stay is obtained from the bankruptcy court.

The Bankruptcy Code is designed to encourage the parties-in-interest in a chapter 11 proceeding to negotiate the terms of a chapter 11 plan so that it may be confirmed.  A chapter 11 plan is the vehicle for satisfying or otherwise addressing the claims against and the interests in the debtor.  Confirmation of a chapter 11 plan makes it binding on the debtor and all of its creditors and the prior obligations owed by the debtor to such parties are compromised in exchange for the obligations specified in the plan.

After a chapter 11 plan has been filed, the holders of impaired claims against the debtor are permitted to vote to accept or reject the plan.  Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical, reasonable investor to make an informed judgment about the plan.  This Disclosure Statement is presented to Holders of Claims against the Debtor entitled to vote under section 1125 of the Bankruptcy Code in connection with the Debtor's solicitation of votes on the Plan.

### B.     Recommendation of the Debtor and Plan Overview.

The Debtor believes that the Plan, which provides for, among other things, the orderly distribution of the proceeds of the sale of substantially all of the Debtor's assets (the "*Assets*") and the creation of a liquidating trust to administer, liquidate, and distribute the Debtor's remaining Assets after the sale, will allow for a prompt resolution of the Debtor's Chapter 11 Case and will achieve the best possible result for Creditors and other interested parties.  The following is a brief overview of the Plan and is qualified by reference to the Plan itself.

As discussed more fully herein, the Debtor and the Bond Trustee are parties to a Master Indenture and, shortly before the Petition Date, the Debtor defaulted on certain payment obligations to the Bond Trustee under the Master Indenture and other documents.  The parties engaged in initial discussions regarding a forbearance agreement, however, an agreement could not be reached and the Bond Trustee commenced a receivership action against the Debtor in the Hamilton Superior Court in the County of Hamilton, Indiana (the "***Receivership Action***").  The Debtor responded by commencing this Chapter 11 Case.  Subsequently, several disputes arose between the Debtor and the Bond Trustee with respect to, among other things, the appropriate venue for this Chapter 11 Case, the validity of the Bond Trustee's liens in cash, the timeline for

the sale of substantially all of the Debtor's Assets, and the terms of a consensual budget for operating purposes and payment of professionals (collectively, the "***Disputed Matters***").

The Debtor and the Bond Trustee engaged in extensive negotiations that resulted in a resolution of the Disputed Matters, an agreement with respect to the procedures for the sale of the Debtor's Assets, including the treatment of Continuing Care Contracts as part of the proposed sale process, and an agreement on a consensual path for the Chapter 11 Case that is in the best interests of the Debtor, the Bond Trustee, the Debtor's residents and the Debtor's other creditors (the "***Settlement***"). The Settlement provides, among other things, that the Debtor shall pursue a sale process and seek confirmation of the Plan in accordance with an agreed upon timeline.

Since the Petition Date, the Debtor's real estate broker, Cushman & Wakefield US, Inc. ("***Cushman & Wakefield***") has identified over 750 parties as potential purchasers, including strategic for-profit and not-for-profit investors, real estate and private equity investors, and real estate investment trusts. Of those parties, over 90 parties signed confidentiality agreements and received additional information from Cushman & Wakefield regarding the Debtor's business and Assets. As more fully described in section III herein, the Debtor received several offers from potential stalking horse bidders and, thereafter, entered into an asset purchase agreement (the "***Stalking Horse APA***") with Prairie Landing Community, Inc., an Indiana not-for-profit corporation and an affiliate of BHI Retirement Communities, Inc. (the "***Stalking Horse***"). Pursuant to the Stalking Horse APA, the Debtor has agreed to sell, and the Stalking Horse has agreed to purchase, substantially all of the Debtor's Assets (the "***Sale***"), subject to higher or otherwise better offers through an auction process (the "***Auction***"). The Stalking Horse APA provides, among other things, that the Stalking Horse will (i) pay a purchase price of Sixty-One Million and 00/100 Dollars ($61,000,000.00) (the "***Purchase Price***"), (ii) assume certain of the Debtor's Continuing Care Contracts and (iii) fund the financial obligations owed by the Debtor under certain of its Continuing Care Contracts. Therefore, all past, current and future obligations to current and former residents under the Continuing Care Contracts will either be assumed or funded by the Stalking Horse.

After the Debtor executed the Stalking Horse APA, Cushman and Wakefield continued its marketing efforts to ensure that the Debtor maximized its return on the sale of substantially all of its Assets. In the event a party, other than the Stalking Horse, submitted a qualified bid, the Debtor intended to conduct an auction (the "***Auction***") on July 22, 2019. The deadline for any interested parties to submit bids intending to compete with the Stalking Horse APA was July 16, 2019 at 4:00 p.m. (prevailing Central Time) (the "***Bid Deadline***"). As indicated in the *Notice of Selection of Successful Bidder and Cancellation of Auction* filed with the Bankruptcy Court [Docket No. 292], the Debtor did not receive any other bids by the Bid Deadline. Therefore, the Debtor cancelled the Auction and deemed the Stalking Horse the Successful Bidder (as such term is defined in the Bid Procedures Order). On August 2, 2019, the Bankruptcy Court entered the *Order (I) Approving the Asset Purchase Agreement Between the Debtor and Prairie Landing Community, Inc.; (II) Authorizing the Sale of Substantially All of the Debtor's Assets Free and Clear of Liens, Claims, Interests and Encumbrances, Except for Certain Assumed Liabilities; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith; and (IV) Granting Related Relief* [Docket No. 318] (the "***Sale Order***"), pursuant to which the Sale to the Stalking Horse was approved.

As described in more detail herein, the Plan contemplates that the Holders of the Bond Claims, as the holders of a first priority security interest in substantially all of the Assets, will receive, among other Distributions, (i) the Net Sale Proceeds from the sale of the Assets to the Stalking Horse and (ii) the Assets subject to their Lien that are not included in the Sale. The Debtor's other unencumbered Assets remaining after all required payments have been made pursuant to the Plan, Confirmation Order and Liquidating Trust Agreement (collectively, the "*Liquidating Trust Assets*") will be transferred to a Liquidating Trust for the benefit of the Holders of General Unsecured Claims. Additionally, pursuant to an agreement reached with the Bond Trustee, One Hundred Thousand Dollars ($100,000.00) will be transferred to the Liquidating Trust that will be funded, first, from any Cash on hand of the Debtor on the Effective Date, and, second, from the proceeds of the Sale that would otherwise be paid to the Bond Trustee (the "*Liquidating Trust Contribution*"). The Liquidating Trust Contribution shall constitute a Liquidating Trust Asset.

The Liquidating Trust will be managed by a Liquidating Trustee who will be responsible for liquidating the Liquidating Trust Assets and making Distributions to Holders of Allowed Claims as well as all other administrative tasks necessary for the ultimate resolution of this Chapter 11 Case in accordance with the terms of the Plan and the Liquidating Trust Agreement.

On the Effective Date, an amount to be negotiated between the Debtor and the Bond Trustee ten (10) days prior to the Confirmation Hearing will be funded to the Liquidating Trust from the proceeds of the Sale that is sufficient to permit the Debtor and the Liquidating Trustee to satisfy all obligations under the Plan and Liquidating Trust Agreement.

### C.    Classification and Treatment of Claims Under the Plan

Certain Classes of Claims are impaired under the Plan and, accordingly, are entitled to vote on the Plan. The Debtor is seeking votes to accept the Plan from Holders of Claims in these Classes. For a description of the Classes of Claims and their treatment under the Plan, see Sections 3 and 4 of the Plan – Classification and Treatment of Claims.

Estimated Claim amounts for certain Classes are based upon a preliminary analysis by the Debtor and its Professionals of Claims filed in the Debtor's Chapter 11 Case. There can be no assurance that these estimates are correct. The following treatments are possible only if the Plan is approved and the Debtor's estimate of the Claims is determined to be valid by the Court. The timing of distributions under the Plan, if any, is subject to conditions and determinations described in later sections of this Disclosure Statement.

Each Class of Claims, except Administrative Expense Claims, Accrued Professional Compensation Claims and Priority Tax Claims, are placed in the following Classes and will receive the following treatment under the Plan:

***Summary of Classification and Treatment of Claims Under the Plan***

| Class | Claims and Interests | Status | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No | 100% |
| 2 | Bondholder Secured Claim | Impaired | Yes | Net Sale Proceeds, Net Holdback Escrow Amount and Encumbered Excluded Assets |
| 3 | Other Secured Claims | Impaired | Yes | Cash equal to the amount of such Other Secured Claims; the Collateral securing such Other Secured Claims; or satisfaction of such Other Secured Claims pursuant to such other terms and conditions as may be agreed upon by the Liquidating Trustee and the Holder of such Other Secured Claims |
| 4 | General Unsecured Claims | Impaired | Yes | Pro Rata share of Liquidating Trust Distributable Cash |
| 5 | Interests in the Barrington | Impaired | No | $0.00 |

**D.      Summary of Voting Requirements for Plan Confirmation.**

**1.      In General.**

Creditors should refer only to this Disclosure Statement and the Plan to determine whether to vote to accept or reject the Plan. Under the Bankruptcy Code, only Holders of Claims that are "impaired" are entitled to vote to accept or reject the Plan. Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof; or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default. An impaired class of creditors votes to accept a plan if the holders of at least two-thirds (2/3) in dollar amount, and more than one-half (1/2) in number, of those creditors that actually cast ballots vote to accept such plan. Those classes that are not impaired are not entitled to vote and are deemed to accept a plan. Those classes that are not entitled to a distribution and will not retain property under a plan are deemed to reject a plan.

A class of interest holders is deemed to accept a plan if the holders of at least two-thirds (2/3) in amount of those interest holders that actually cast ballots vote to accept such plan. A class of interest holders is impaired, not entitled to vote, and deemed to reject the plan if the plan treats such holders by providing that they will retain no property and receive no distributions under the plan.

The Debtor has established certain procedures for soliciting and tabulating votes on the Plan that were approved by the Court pursuant to the *Order (I) Approving Disclosure Statement, (II) Establishing Procedures for the Solicitation and Tabulation of Votes to Accept or Reject the Debtor's Chapter 11 Plan, (III) Scheduling a Confirmation Hearing, and (IV) Approving Related Notice Procedures* (the "**Solicitation Procedures Order**") entered on August 5, 2019. Holders of Claims and Interests should review the Solicitation Procedures Order prior to submitting their Ballots.

Pursuant to the Bankruptcy Code, only creditors who actually vote on the Plan will be counted for purposes of determining whether the required number of acceptances have been obtained. Failure to deliver a *properly completed ballot* by the Voting Deadline (as defined herein) will result in an abstention; consequently, the vote will neither be counted as an acceptance or rejection of the Plan.

### 2.    Impaired Classes Entitled to Vote.

The Claims in Classes 2, 3, and 4 are Impaired under the Plan and Holders of such Claims in these Classes are entitled to vote to accept or reject the Plan.

### 3.    Unimpaired Classes Deemed to Accept the Plan.

If a Creditor holds a Claim included within a Class that is not impaired under the Plan, under Bankruptcy Code section 1126(f), the Creditor is deemed to have accepted the Plan with respect to such Claim and its vote of such Claim will not be solicited. Class 1 is Unimpaired under the Plan.

### 4.    Certain Classes Are Deemed to Reject the Plan and Do Not Vote.

Under Bankruptcy Code section 1126(g), Class 5 will receive no distributions on account of such Interests. Thus, Class 5 is deemed to have rejected the Plan and the vote of Holders of such Interests in Class 5 will not be solicited.

### 5.    Voting Deadline.

The Debtor has engaged Donlin, Recano & Company, Inc. as its voting agent (the "**Voting Agent**") to assist in the transmission of voting materials and tabulation of votes with respect to the Plan. If a Creditor holds a Claim classified in a voting Class of Claims under the Plan, the Creditor's acceptance or rejection of the Plan is important and must be in writing and submitted on time. The record date for determining which Creditors may vote on the Plan is July 19, 2019 (the "**Voting Record Date**"). The voting deadline is September 4, 2019 at 5:00 p.m. (prevailing Central Time) (the "**Voting Deadline**").

### 6.    Voting Instructions.

IN ORDER FOR A VOTE TO BE COUNTED, THE BALLOT MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER AND VOTING INSTRUCTIONS ON THE BALLOT.

7. **Ballots.**

Creditors must use only the Ballot or Ballots sent to them with the notice of this Disclosure Statement.  If a Creditor has Claims in more than one Class, it should receive multiple Ballots.  IF A CREDITOR RECEIVES MORE THAN ONE BALLOT, THEN THE CREDITOR SHOULD ASSUME THAT EACH BALLOT IS FOR A SEPARATE CLAIM AND SHOULD COMPLETE AND RETURN ALL OF THEM.

8. **Additional Information.**

If you have any questions about (i) the procedure for voting on your Claim, (ii) the package of materials that you have received, (iii) the amount of your Claim, (iv) obtaining or replacing a Ballot, or (v) obtaining an additional copy of the Solicitation Procedures Order, the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent at (877) 534-8325 or DRCVote@DonlinRecano.com.

9. **The Confirmation Hearing**

The Debtor has requested that the Court schedule a hearing to consider confirmation of the Plan on September 17, 2019 at 9:00 a.m. (prevailing Central Time), before the Honorable Judge Harlin DeWayne Hale, at the United States Bankruptcy Court, Earle Cabell Federal Building, 1100 Commerce Street, 14th Floor, Courtroom 3, Dallas, Texas 75242-1496.  The date of the Confirmation Hearing may be continued at such later time(s) as the Court may announce during the Confirmation Hearing or any continued hearing without further notice.

If the Plan is confirmed by the Court, it will be binding on all Holders of Claims and Interests regardless of whether an individual Holder has supported or opposed the Plan.

II.     **BACKGROUND INFORMATION**

A.      **Overview of the Debtor's Business.**

Incorporated in 2007, the Barrington is a not-for-profit corporation that has built a best-in-class senior living retirement community in Carmel, Indiana dedicated to giving its residents an enriching lifestyle.   In particular, the Barrington operates a continuing care retirement community ("*CCRC*") that offers its senior residents a continuum of care in a campus-style setting, providing living accommodations and related health care and support services to a target market of seniors aged sixty-two (62) and older.  The Barrington is a 267 unit facility located in Carmel, Indiana featuring: (i) 137 independent living ("*IL*") apartments; (ii) 56 assisted living ("*AL*") units; (iii) 26 memory support ("*MS*") units; and (iv) 48 skilled nursing ("*SNF*") beds, all located on a 372,000 square foot, 19-acre campus (the "*Facility*").

The life care benefits that the Facility provides includes the following:

a.      **Assisted Living**.  The Facility provides assistance with daily activities, such as dressing, eating, bathing, toileting, medication administration and ambulating. Services are provided under three levels of care: (i) basic; (ii) level 1; and (iii) level 2.  A resident's acuity level and the extent of

        services required are factors which determine the assigned level of care.

    **b.**    **Memory Support**. The Facility provides a monitored memory support suite with services designed to assist with the daily living and the special needs of MS residents in accordance with applicable law.

    **c.**    **Nursing Care**. The Facility provides licensed nursing care services which may include services required by applicable law to be supervised or administered by a professional licensed nursing staff, e.g., medication administration, condition and behavior observation and assessment, creation and administration of a care plan assistance with activities of daily living and communication with physicians and other care providers.

At the Facility, seniors are offered a variety of residency options, including one-bedroom, one-bedroom-plus den and two-bedroom styles that range in size of 757 square feet to 1,384 square feet. Living units include, among other things, designer kitchens with granite countertops, full size stainless steel appliances, individually controlled heating and air conditioning, and washers and dryers. The Barrington also offers its residents a full roster of activities, wellness programs, fine dining, and trips within the City of Carmel. The Barrington provides its residents with a number of amenities in its 30,800 square foot common area including: (i) a multi-purpose room; (ii) a living room; (iii) a dining room, as well as a private dining room for special occasions; (iv) a bistro/café; (v) a wellness/fitness center; (vi) a library/business center; (vii) a beauty salon/barbershop; (viii) a creative arts center; (ix) a club room; (x) residential storage; and (xi) a mail alcove. Other amenities include concierge service, 24-hour security, landscaped courtyards, and a 53,600 square foot underground parking garage.

The Barrington receives revenue from several sources, which include: (i) entrance fees ("***Entrance Fees***"), (ii) monthly service fees for IL, AL and MS, (iii) per diem rates for SNF services, (iv) fees for optional services, and (v) certain unit upgrade fees. Entrance Fees range from approximately $316,000 to $650,000. Monthly service fees range from $2,800 to $7,600. Per diem rates in the SNF range from approximately $150-$550.

As is common practice in the CCRC industry, a resident interested in occupying an independent living unit in the Facility must enter into a continuing care contract (a "***Continuing Care Contract***") with the Barrington. Unlike a pure rental retirement community, whereby a resident pays monthly fees for services (which fees may increase as the resident's needs change), the Continuing Care Contract is a life care residency contract whereby a resident will pay an Entrance Fee and fixed monthly fees for the Barrington's commitment to provide life care services for the duration of the resident's life, regardless of whether (i) the resident's needs change over time which may require additional services to be provided by the Barrington, or (ii) the costs of providing such services increase for the Barrington. Significantly, the Barrington's commitment to provide life care services continue even if the resident's financial condition deteriorates and is unable to continue to make its payments.

As of the Petition Date, the Barrington offered two (2) types of Continuing Care Contracts: 90% refundable for single occupancy and 80% refundable for double occupancy. The Continuing Care Contract sets forth terms and conditions under which the resident will occupy a unit, including outlining the obligations for the payment of an Entrance Fee, the amount and timing of the refundable portion of that Entrance Fee, the amount of monthly fees to be charged, and other general matters.

In general, a prospective resident must pay an Entrance Fee prior to occupying an IL unit. Typically, in order to reserve a residence and, at the time of execution, a prospective resident provides a fully refundable deposit to the Barrington that is applied toward the payment of the Entrance Fee. The remaining balance of the Entrance Fee is due on or before the move-in date, except in circumstances where a deferred portion of the Entrance Fee is negotiated.

The Continuing Care Contract also requires residents to pay monthly service fees to the Barrington (the "***Monthly Fee***," together with the Entrance Fee, the "***Fees***"). In consideration for payment of the Fees and other fees charged by the Barrington, residents are furnished with a residence and are given access to a wide array of services, including (i) dining service; (ii) housekeeping and laundry; (iii) utilities; (iv) security and emergency alert system; (v) maintenance; (vi) mail; (vii) transportation; (viii) social, educational, and wellness programs; (ix) property taxes and insurance; (x) storage area; (xi) a physician, to serve as a "Medical Director," as that term is defined under federal and Indiana State Department of Health regulations; and (xii) life care benefits. The Barrington uses the Fees to fund its operations, service its debt obligations, and make capital improvements to the Facility.

In addition to Continuing Care Contracts, the Barrington also offers non-life care contracts, pursuant to which residents have access to certain of its services and/or a residence, but are not provided life care services (the "***Non-Life Care Agreements***").

### B.   Organizational Structure of the Debtor.

#### 1.   Corporate Governance.

The Barrington is governed by a Board of Directors who are elected by Senior Quality Lifestyles Corporation ("***SQLC***"). SQLC has been the sole corporate non-voting member and sponsor of the Barrington since May 7, 2012. SQLC is a non-profit chartered under the laws of the State of Texas, a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "***IRC***"), and a "supporting organization" and public charity under section 509(a)(3) of the IRC. SQLC's mission is to enrich lives, provide compassionate care, and ensure financial security.

#### 2.   Management by Seniority

Seniority, Inc. ("***Seniority***") is a California corporation with expertise in developing, operating, and managing CCRCs. SQLC is the sole owner of Seniority. Pursuant to that Master Management Services Agreement dated as of September 7, 2017 (the "***Management Agreement***"), SQLC retained Seniority to serve as exclusive manager of the day-to-day operations of the Barrington and other CCRCs affiliated with SQLC. Seniority is an integral part of the Facility's managerial structure, and its services include: (i) determining operating policies,

procedures, and standards; (ii) developing and executing a sales plan; (iii) establishing food and beverage policies; (iv) establishing all employment policies, including wage and salary terms, benefits, retirement plans, and bonuses; (v) hiring, promoting, supervising, directing, training, transferring, and discharging all of the Barrington's employees; (vi) negotiating and consummating such agreements as Seniority deems necessary or advisable for furnishing all utilities, services, supplies, food, beverages, equipment, and other materials and supplies for the maintenance and operation of the Facility; and (vii) establishing advertising and public relations policies.

Prior to the Petition Date, the Barrington paid to Seniority a management fee of six percent (6%) of the actual monthly revenues (the "***Management Fee***"), as defined in the Management Agreement, attributable to the Barrington for general management, accounting, human resources, and sales services provided.  Seniority was also paid a monthly administrative fee equal to three percent (3%) of the Barrington's monthly management fee for reimbursement of Seniority's out-of-pocket administrative expenses.    In addition, Seniority provides an executive management team for the Barrington, which includes an executive director and a health care administrator, the costs of which are charged to the Barrington in addition to the management fees and monthly administrative fees.  During the Chapter 11 Case, Seniority agreed to accept a discounted Management Fee of 3.75% percent of actual monthly revenues in settlement of all claims that Seniority and the Estate may have against each other, including rejection damages and prepetition claims.

### 3.    Regulators

The CCRC industry nationwide is regulated by various state and federal agencies.  Each state has a different regulatory scheme governing CCRCs.  As a Medicare certified CCRC operating in the State of Indiana, the Barrington is regulated by, among others, the State of Indiana Department of Health and the Indiana Secretary of State, Securities Division.

### C.    The Debtor's Prepetition Capital Structure.

As of the Petition Date, on a book value basis, the Barrington had approximately $96.5 million in Assets consisting of approximately: (i) $3.5 million in cash and cash equivalents; (ii) $300,000 in accounts receivable; (iii) $1.1 million of deferred entrance fee receivables; (iv) $77 million in property and equipment; (v) $8 million of restricted cash; and (vi) $6.6 million of other Assets.

As of the Petition Date, Barrington had approximately $151.9 million of liabilities, which consisted of approximately: (i) $300,000 of trade accounts payable; (ii) $2.4 million of oversight fees owed to SQLC; (iii) $52.4 million of resident refund obligations; (iv) $92.7 million (plus accrued interest) of long-term municipal bond obligations; and (v) $4.1 million (plus accrued interest) of subordinated note obligations.

### 1.    Long-Term Municipal Bond Obligations.

In August 2012, the Barrington secured permanent financing through a series of bond offerings by the City of Carmel, Indiana (the "***Issuer***") in the aggregate principal amount of $119,020,000 (the "***Bonds***").   The bond offerings are memorialized in that Master Trust

Indenture dated as of August 1, 2012 (the "***Master Indenture***") between the Barrington and the Bank of New York Mellon Trust Company, N.A., as master trustee (the "***Master Trustee***"). As security for the issuance of the Bonds, the Barrington issued the following note obligations: (i) $94,575,000 Direct Note Obligation, Series 2012A (the "***Series 2012A Obligation***"); (ii) $3,000,000 Direct Note Obligation, Series 2012B (the "***Series 2012B Obligation***"); (iii) $3,515,000 Direct Note Obligation, Series 2012C-1 (the "***Series 2012C-1 Obligation***"); (iv) $7,905,000 Series 2012C-2 (the "***Series 2012C-2 Obligation***"); (v) $3,025,000 Series 2012C-3 (the "***Series 2012C-3 Obligation***"); (vi) $7,000,000 Direct Note Obligation, Series 2012D (the "***Series 2012D Obligation***") (collectively, the "***Series 2012 Obligations***").

Pursuant to that Loan Agreement entered into as of August 1, 2012 between the Barrington and the Issuer (the "***Loan Agreement***"), the Issuer loaned the proceeds of the Bonds to the Barrington for the purpose of, among other things: (i) payment or reimbursement for the payment of certain costs of acquiring, constructing, renovating, remodeling, and equipping the Facility; (ii) payment or reimbursement for the payment of certain project costs incurred prior to the issuance of the Bonds; (iii) funding a debt service reserve fund; and (iv) paying a portion of the interest of the Bonds.

The rights of the Issuer under the Loan Agreement were assigned to UMB Bank, N.A., as Bond Trustee (the "***Bond Trustee***"), pursuant to that Bond Indenture dated as of August 1, 2012 (the "***Bond Indenture***"). As security for its obligations with respect to the Bonds, the Barrington entered into the Master Indenture and a Mortgage, Assignment of Leases and Rents, Security Agreement, and Fixture Filing dated as of August 1, 2012 (the "***Mortgage and Security Agreement***"), pursuant to which the Barrington granted the Bond Trustee a security interest in substantially all of the Assets of the Barrington as described in the Master Indenture and the Mortgage and Security Agreement.[2]

The Barrington defaulted on the Series 2012 Obligations by, among other things, failing to make the required installments of principal and interest on November 10, 2018, December 10, 2018, and January 10, 2019 (collectively, the "***Payment Defaults***"). The Payment Defaults constitute an event of default under the Bond Documents.

Under the terms of the Bond Documents, certain accounts were established by the Debtor and are being held by the Bond Trustee, including, among others, the Revenue Fund, the Interest Fund, the Bond Sinking Fund, the Optional Redemption Fund, the Debt Service Reserve Fund, the Working Capital Fund, the Operating Reserve Fund, the Liquidity Support Fund, the Supplemental Liquidity Support Fund, and the Special Project Liquidity Support Fund (each as defined in the Bond Documents). As of the Petition Date, the total amount of funds held by the Bond Trustee in each of said accounts was approximately $8.071 million (the "***Trustee-Held Funds***"). Pursuant to the Final Cash Collateral Order (as defined below), the Debtor has stipulated that the Trustee-Held Funds are held in trust for the holders of the Bonds and shall be applied in accordance with the Bond Documents.

---

[2] The Bond Indenture, the Loan Agreement, the Master Indenture, the Mortgage and Security Agreement and any other documents entered into in connection with the Bonds are collectively referred to as the "***Bond Documents***."

### 2. Subordinated Note Obligations

#### a. The Liquidity Support Agreement

On August 1, 2012, SQLC LSA, LLC, ("*SQLC LSA*"), a Texas limited liability company whose sole member is SQLC, SQLC, the Barrington and the Master Trustee entered into that certain Liquidity Support Agreement, dated August 1, 2012 (the "*Liquidity Support Agreement*"). Pursuant to the Liquidity Support Agreement, SQLC LSA agreed to transfer $2,000,000 to the Master Trustee for deposit into a Liquidity Support Fund (as defined in the Liquidity Support Agreement). Additionally, Barrington agreed to make the following payments: (i) $2,375,000 to the Obligated Group Master Trustee for deposit into the Supplemental Liquidity Support Fund (as defined in the Liquidity Support Agreement); and (ii) $1,875,000 to the Master Trustee for deposit into the Special Project Liquidity Support Fund (as defined in the Liquidity Support Agreement).

Pursuant to that liquidity support agreement dated as of August 30, 2012 (the "*SQLC Liquidity Support Funding Agreement*"), by and between SQLC LSA, SQLC, and Northwest Senior Housing Corporation ("*NSHC*"), NSHC agreed to transfer $2,000,000 to SQLC, which in turn agreed to transfer said $2,000,000 to SQLC LSA for the purpose of advancing the amounts, on behalf of the Barrington, that the Barrington agreed to provide pursuant to the Liquidity Support Agreement. In order to secure its obligations under the SQLC Liquidity Support Funding Agreement, the Barrington provided SQLC LSA with an unsecured subordinated note dated August 30, 2012 in the amount of $2,000,000 (the "*SQLC LSA Subordinated Note*"). The SQLC LSA Subordinated Note is subordinated as to the Series 2012B Bonds, the Series 2012C Bonds, and the Series 2012D Bonds as defined in the Master Indenture.

#### b. Loan Agreement with SQLC

The Barrington and SQLC entered into a loan agreement on August 30, 2012 (the "*Pre-Finance Loan Agreement*"), pursuant to which SQLC agreed to advance $1,875,000 to the Barrington for the construction and operation of the Facility, which funds were deposited into a special project liquidity support fund. In order to secure its obligations under the Pre-Finance Loan Agreement, the Barrington provided SQLC with an unsecured subordinated promissory note dated August 30, 2012 in the amount of $1,875,000 (the "*Pre-Finance Subordinated Note*"). The Pre-Finance Subordinated Note is subordinated as to the Series 2012B Bonds, the Series 2012C Bonds, and the Series 2012D Bonds as defined in the Master Indenture.

#### c. The Pre-Permanent Financing Funding Agreement

Pursuant to that pre-permanent financing funding agreement dated July 1, 2012 by and between the Barrington, SQLC and NSHC (the "*Pre-Permanent Financing Funding Agreement*"), NSHC agreed to transfer up to $1,000,000 to SQLC, which in turn agreed to transfer up to said $1,000,000 to the Barrington for the purpose of pursuing the development of the Facility. In order to secure its obligations under the Pre-Permanent Financing Funding Agreement, the Barrington provided SQLC with an unsecured subordinated promissory note dated August 30, 2012 in the amount of $200,000 or such lesser sum as may become due under the Pre-Permanent Financing Funding Agreement (the "*SQLC Subordinated Promissory Note*").

The SQLC Subordinated Promissory Note is subordinated as to the Series 2012 Bonds as defined in the Master Indenture.

### 3. Resident Refund Obligations

Pursuant to the Continuing Care Contracts, Barrington is required to pay the refundable portion of a resident's Entrance Fee (the "***Refund***") upon the occurrence of certain conditions. Specifically, if: (i) a resident terminates the Continuing Care Contract; (ii) a resident dies; or (iii) in rare instances, the Barrington terminates the Continuing Care Contract pursuant to the provisions therein, then such resident is entitled to a Refund pursuant to the terms of his or her Continuing Care Contract. The Refund is due after a resident physically and permanently leaves the unit and is made within ten (10) days of the later of (i) the effective date of termination of the Continuing Care Contract, or (ii) the date a new Entrance Fee and executed Continuing Care Contract is received by the Facility and the new resident has taken occupancy of that resident's unit (collectively, the "***Refund Conditions***").

As of June 6, 2019, Barrington's Refund obligations can be summarized as follows:

i.  **Executory Life Care Agreements**. Barrington is currently a party to 142 Continuing Care Contracts with residents currently living at the Facility. Barrington believes that, as of the date hereof, there are no amounts currently due to such residents. Upon the occurrence of the Refund Conditions with respect to these residents, Barrington will be required to pay Refunds totaling approximately $43 million in accordance with such Continuing Care Contracts (the "***Executory Life Care Agreements***").

ii. **Contingent Former Life Care Agreements**. Barrington is currently a party to five (5) Continuing Care Contracts with residents that have permanently left the Facility, but the Refund Conditions thereunder have not yet been satisfied. Upon satisfaction of the Refund Conditions with respect to these residents, Barrington will be required to pay Refunds totaling approximately $1.6 million in accordance with such Continuing Care Contracts (the "***Contingent Former Life Care Agreements***").

iii. **Non-Contingent Former Life Care Agreements**. Barrington is currently a party to five (5) Continuing Care Contracts with residents that have permanently left the Facility and Barrington has received full payment of the corresponding Entrance Fee as required under the Continuing Care Contracts. Therefore, the Refund Conditions thereunder have been satisfied. Accordingly, Barrington is required to pay Refunds totaling approximately $1.4 million in accordance with such Continuing Care Contracts (the "***Non-Contingent Former Life Care Agreements***").

As described in further detail below, the Stalking Horse has agreed to, among other things: (i) assume the Executory Life Care Agreements and Non-Life Care Agreements without modification; (ii) assume the financial obligations under the Contingent Former Life Care Agreements and pay such amounts as they become due; and (iii) fund the financial obligations owed under the Non-Contingent Former Life Care Agreements on the closing date provided in

the Stalking Horse APA (the "***Closing Date***").  Therefore, all past, current and future obligations to current and former residents under the Continuing Care Contracts will either be assumed or funded by the Stalking Horse.

### D.    Events Leading to the Chapter 11 Case.

Since the Barrington opened the Facility, the senior housing market in Carmel, Indiana has been very competitive.  In fact, the Barrington competes with four (4) primary competitors all located within a ten (10) mile radius of the Facility.  Notwithstanding the competition, in 2014, the Barrington found itself exceeding its initial monthly occupancy budget by thirteen (13) residents per month.  Following on its initial success, the Barrington explored various avenues to remain competitive in the market and provided a number of monthly rent pricing concessions that continued through 2017 (the "***Rent Credits***").  Occupancy in the independent living units remained constant; however, the assisted living and memory support occupancy rates fell short of expectations, which, combined with the Rent Credits and market saturation, put downward pressure on operating margins.  In 2017, the Barrington found its average monthly occupancy in assisted living and memory support decrease by approximately thirteen (13) residents per month.  To make matters worse, the Barrington's operating costs remained generally fixed (as is consistent with the CCRC industry); thus, operating costs remained relatively constant as occupancy rates declined.

To address those issues, in March of 2018, SQLC retained Seniority, which immediately implemented a number of initiatives to control operating costs and improve service quality.  However, due to market conditions and lower than expected occupancy, the Barrington continued to face pressure on its margins.  In July of 2018, the Barrington retained Dixon Hughes Goodman LLP to prepare net operating income projections and conduct a market assessment, which uncovered the following: the Barrington's (i) net resident revenue was 17.9% less than initially projected; (ii) AL occupancy was lower than initially projected; (iii) implied monthly rent per occupant was lower than initially projected; and (iv) operating expenses were 27.5% greater than initially projected.

Additionally, as detailed above, the Barrington has a significant debt obligation.  As a result of its lower than projected revenues and significant debt obligations, Barrington defaulted on the Series 2012 Obligations in November 2018.  In December 2018, Barrington's restructuring professionals engaged in discussions with the Bond Trustee's professionals regarding the terms of a forbearance agreement and operating budget.  The Barrington also interviewed several investment banker candidates and selected Cushman and Wakefield as its real estate broker upon the recommendation of the Bond Trustee.  The Bond Trustee, however, filed a *Complaint for Breach of Contract, Replevin, Foreclosure, and Immediate Appointment of a Receiver* (the "***Complaint***") and *Motion for Immediate Appointment of a Receiver* (the "***Receiver Motion***," and together with the Complaint, the "***Receivership Action***") in the Hamilton Superior Court in the County of Hamilton, Indiana (the "***State Court***") seeking the appointment of a receiver to, among other things, operate the Facility.

On January 23, 2019, the Barrington filed a response opposing the Bond Trustee's request for an expedited hearing on the Receiver Motion.  On January 25, 2019, the State Court scheduled a hearing on the Receiver Motion on January 28, 2019.  On January 25, 2019, the Barrington filed a notice of removal of the Receivership Action to the United States District

Court for the Southern District of Indiana.  After carefully considering the risks and benefits of a receivership and bankruptcy, the Barrington's board of directors, with the support of SQLC, concluded that it was in the best interests of the Debtor and its creditors, residents, employees and other interested parties to seek chapter 11 relief, in order to, among other things, pursue a sale of the Facility.

## III.    EVENTS OCCURRING DURING DEBTOR'S CHAPTER 11 CASE

### A.    Bankruptcy Filings and First Day Orders.

The Debtor commenced the Chapter 11 Case on the Petition Date by filing a voluntary petition under chapter 11 of the Bankruptcy Code.  The Debtor is considered a debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  The Debtor remains in possession of its Assets and continues to operate its business without interruption.

On February 1, 2019, the Bankruptcy Court held an initial hearing to consider certain "first day" matters and subsequently entered orders that, among other things:

1.    Extended the Debtor's time to file its Schedules and statements of financial affairs ("*SOFAs*") through March 4, 2019 [Docket No. 41];

2.    Authorized the implementation of procedures to maintain and protect confidential patient information [Docket No. 42];

3.    Permitted the Debtor to make certain payroll payments to employees and continue certain employee benefit plans and other practices on an interim basis [Docket No. 45];

4.    Authorized the Debtor to pay certain prepetition taxes on an interim basis [Docket No. 46];

5.    Authorized the Debtor's maintenance of existing insurance policies and obligations thereunder on an interim basis [Docket No. 48];

6.    Approved the Debtor's continued use of its existing cash management system, bank accounts and business forms on an interim basis [Docket No. 50];

7.    Authorized the Debtor's use of the Bond Trustee's cash collateral on an interim basis [Docket No. 64]; and

8.    Prohibited utility providers from altering, refusing or discontinuing services to the Debtor on account of prepetition invoices on an interim basis [Docket No. 102].

### B.    Schedules and Statements.

On March 4, 2019, the Debtor filed its Schedules and SOFAs [Docket Nos. 129 & 130]. On June 17, 2019, the Debtor amended certain of its Schedules [Docket No. 259].

### C. Retention and Employment of Bankruptcy Professionals.

During the Chapter 11 Case, the Bankruptcy Court approved the Debtor's retention and employment of the following Professionals to assist in the administration of the Debtor's Chapter 11 Case: (i) DLA Piper LLP (US), as bankruptcy counsel; (ii) Ankura Consulting Group, LLC, to provide a Chief Restructuring Officer and certain additional personnel; (iii) Cushman & Wakefield, as real estate broker; (iv) Larx Advisors, Inc. as financial advisor; and (v) Donlin, Recano & Company, Inc., as notice, claims and solicitation agent [Docket Nos. 151, 162, 190, 205, 208 and 252].

### D. Appointment of Residents' Committee.

On February 11, 2019, an Official Residents' Committee (the "***Residents' Committee***") was appointed by the United States Trustee consisting of the following five (5) residents currently living at the Facility: (i) Robert Reynolds; (ii) Donald E. Boelke; (iii) Ralph E. Lundgren; (iv) William R. Coffey; and (v) Lawrence Mark Henderson, Jr. [Docket No. 79]. The Residents' Committee retained Neligan LLP and Faegre Baker Daniels LLP as its counsel [Docket Nos. 203-04]. Faegre Baker Daniels LLP subsequently withdrew as counsel for the Residents' Committee [Docket No. 224].

### E. Interim Compensation and Expense Reimbursement.

On April 2, 2019, the Bankruptcy Court entered an order approving certain interim compensation and expense reimbursement procedures for Professionals [Docket No. 191] (the "***Interim Compensation Order***"). In accordance with the Interim Compensation Order, Professionals that comply with the procedures set forth therein can request payment of eighty percent (80%) of their fees and one hundred percent (100%) of their expenses on a monthly basis. The fees and expenses paid pursuant to the Interim Compensation Order are not deemed allowed or disallowed for purposes of sections 330 and 331 of the Bankruptcy Code, and Professionals are required to seek approval and allowance of such fees and expenses by filing and serving applications in accordance with the Bankruptcy Code and Bankruptcy Rules.

### F. Appointment of Patient Care Ombudsman.

On April 8, 2019, the Bankruptcy Court entered an order [Docket No. 207] (the "***Ombudsman Order***") directing the appointment of a patient care ombudsman ("***PCO***"), pursuant to section 333 of the Bankruptcy Code, for the protection of residents who receive care within the Facility. In connection with the Ombudsman Order, Susan Goodman, a registered nurse and nurse practitioner was appointed as the PCO charged with monitoring the quality of care provided to the Debtor's residents. Since her appointment, the PCO has, and will continue to, submit reports to the Bankruptcy Court regarding the Facility based upon onsite inspections and interviews of residents and staff.

### G. The Cash Motion and Cash Motion Objection.

As discussed in the *Motion of Debtor for an Order Authorizing the Use of the Debtor's Cash* [Docket No. 17] (the "***Cash Motion***"), the Debtor believed that it did not need consent from the Bond Trustee or relief under section 363 of the Bankruptcy Code in order to use its

prepetition cash held in its operating accounts (the "**Pre-Petition Cash**") and the revenues it expected to receive postpetition (the "**Post-Petition Cash**," together with the Pre-Petition Cash, the "**Cash**") because the Bond Trustee purportedly did not have a perfected security interest in the Cash.

As discussed in the *Limited Objection of UMB Bank, N.A. to Debtor's First Day Motions* [Docket No. 27] and the *Supplement to Limited Objection of UMB Bank, N.A. to Debtor's First Day Motions* [Docket No. 83] (together, the "**Cash Motion Objection**"), the Bond Trustee opposed the Cash Motion and disputed the Debtor's arguments that it does not have a perfected security interest in the Pre-Petition Cash.

**H.      Venue Motion and Venue Motion Objection.**

On February 5, 2019, the Bond Trustee filed the *Motion of UMB Bank, N.A., as Trustee, to Transfer Venue of Bankruptcy Case to Southern District of Indiana* [Docket No. 52] (as supplemented, the "**Venue Motion**"), pursuant to which the Bond Trustee argued that venue for the Chapter 11 Case should be moved to Indiana.  In support of the Venue Motion, the Bond Trustee argued, among other things, that administering the Chapter 11 Case in Indiana "promotes the economic and efficient administration of the estate . . . [because] . . . the operation and/or disposition of the property is governed by state law and the stakeholders who are most affected by such actions are located at or near the property."  Venue Motion, p. 5.  Furthermore, the Bond Trustee argued that administering the case in Indiana "provides those stakeholders with convenient access to the Court, a voice in the process, and fair opportunity to protect their interests in any actions affecting the property."  *Id*.

On February 26, 2019, the Debtor filed the *Debtor's Objection to Motion to Transfer Venue* [Docket No. 113] (the "**Venue Motion Objection**") wherein the Debtor argued that it would be neither convenient nor just to transfer the Chapter 11 Case to the Southern District of Indiana.  In addition to arguing that the Bond Trustee failed to meet the difficult burden of illustrating why a transfer of venue is warranted, the Debtor argued that venue is proper in the Northern District of Texas for, among other things, the following reasons: (i) as the Bond Trustee concedes in the Venue Motion, the Debtor's choice of venue is proper; (ii) courts give great deference to a debtor's selection of venue, if proper; (iii) the principle parties responsible for effectuating the Debtor's restructuring strategy all reside in this district; (iv) the Debtor's key witnesses, who are likely to testify at substantive hearings in this Chapter 11 Case, work and reside in this district; (v) the Debtor's financial books and records are maintained at Dallas-area offices of the company hired to manage the Debtor's day-to-day operations; (vi) transferring venue would place unnecessary burdens on key individuals who are likely to be most active in this Chapter 11 Case and would needlessly increase administrative costs to the Debtor's estate; and (vii) any potential concerns with respect to the involvement of the residents in this Chapter 11 Case are alleviated by the Debtor's protocols, which are aimed at protecting the interests of its residents and their families.

**I.      The Settlement with the Bond Trustee.**

As previously discussed, shortly after the Petition Date, the Debtor and the Bond Trustee agreed to the Settlement that resolved the various Disputed Matters between them, including with respect to the Cash Motion and Venue Motion.  On April 11, 2019, the Bankruptcy Court

entered an order approving the Settlement between the Debtor and the Bond Trustee [Docket No. 216].

The Settlement, among other things: (i) allows the Debtor to operate its business in the ordinary course and administer this Chapter 11 Case in accordance with an agreed upon cash collateral budget; (ii) avoided time-consuming and expensive litigation over the perfection and extent of the Bond Trustee's security interests; (iii) provided for consensual bid procedures and a sale timeline that was formulated to reach the greatest number of prospective buyers and protect the interests of the Debtor's residents; (iv) ensured that all Continuing Care Contracts and all past, current and future resident obligations would be assumed by the Successful Bidder; (v) obviated the need for time-consuming and expensive litigation concerning the proper venue for the Chapter 11 Case; and (vi) provided for the expeditious conclusion of this Chapter 11 Case for the benefit of the Debtor's Estate, residents, and creditors.

**J.    Cash Collateral.**

In the ordinary course of business, the Debtor requires Cash on hand and cash flow from its operations to fund its working capital, liquidity needs and other routine payables. In addition, the Debtor requires Cash on hand to administer the Chapter 11 Case. The Cash and cash proceeds of the Debtor are encumbered by security interests in favor of the Bond Trustee, and, as such, constitutes "***Cash Collateral***" of the Bond Trustee.

On February 7, 2019, the Court entered an interim order approving the Debtor's use of Cash Collateral pending an interim hearing on February 19, 2019 [Docket No. 64] (the "***Interim Cash Order***"). On February 21, 2019, the Court entered an amendment to the Interim Cash Order, which authorized the Debtor's continued use of Cash Collateral through March 8, 2019 [Docket No. 101]. After an additional amendment to the Interim Cash Order was entered on March 12, 2019 [Docket No. 138], the Court entered an agreed final order approving the Debtor's use of Cash Collateral on April 11, 2019 [Docket No. 217] (the "***Final Cash Collateral Order***"), the terms of which were agreed to by the Debtor and the Bond Trustee as part of the Settlement. Pursuant to the Final Cash Collateral Order, the Debtor is authorized to use the Bond Trustee's Cash Collateral through and including September 16, 2019 in accordance with the Budget. Additionally, pursuant to the Final Cash Collateral Order, the Debtor has stipulated that the Trustee-Held Funds are held in trust for the holders of the Bonds and shall be applied in accordance with the Bond Documents.

**K.    Bid Procedures.**

In accordance with the Settlement, on March 26, 2019, the Debtor filed a motion [Docket No. 164] (the "***Bid Procedures Motion***") seeking an order authorizing and approving, among other things, (i) certain bid procedures to be employed in connection with the sale of the Debtor's Assets (the "***Bid Procedures***"); (ii) certain bid protections the Debtor is authorized to offer to a potential stalking horse bidder; (iii) procedures for the assumption and assignment of certain executory contracts, including all past, current, and future obligations to current and former residents, including, but not limited to those obligations arising under the Continuing Care Contracts; and (iv) the Sale.

On April 22, 2019, the Bankruptcy Court entered an order approving the Bid Procedures Motion [Docket No. 223] (the "*Bid Procedures Order*"). The Bid Procedures Order set, among other things: (i) the requirements that must be met to be selected as a stalking horse; (ii) the requirements that must be met for a bid to be a Qualified Bid; (iii) the deadlines to submit bids; (iv) that, in the event of more than one qualified bid, the Debtor will conduct an Auction for the sale of the Assets; and (v) a hearing to approve the Sale to the Successful Bidder in accordance with the Bid Procedures on July 24, 2019 at 9:00 a.m. (prevailing Central Time).

Pursuant to the *Stipulation and Agreed Order Amending Bid Procedures Order to Reschedule Action* [Docket No. 282], the Auction was scheduled to occur on July 22, 2019 at 1:30 p.m. (prevailing Central Time). As previously noted, the Debtor did not receive any other bids by the Bid Deadline. Therefore, the Auction was cancelled and the Stalking Horse was deemed the Successful Bidder.

### L. Selection of Stalking Horse.

On June 13, 2019, pursuant to the Bid Procedures Order, the Debtor, with the approval of the Bond Trustee and after consulting with the Residents' Committee, entered into the Stalking Horse APA with the Stalking Horse. A copy of the Stalking Horse APA was filed with the Bankruptcy Court on June 14, 2019 [Docket No. 254]. Capitalized terms not otherwise defined in this section shall have the meanings ascribed to them in the Stalking Horse APA.

Pursuant to the Stalking Horse APA, the Debtor has agreed to sell the CCRC Assets (as defined below) for the Purchase Price and to assume and assign certain Executory Contracts and Unexpired Leases to the Stalking Horse. Set forth below is brief summary of: (i) the CCRC Assets to be purchased by the Stalking Horse; (ii) the Assets that are excluded from the Stalking Horse APA; (iii) the liabilities to be assumed by the Stalking Horse; (iv) the liabilities that are excluded from the Stalking Horse APA; and (v) the holdback of a portion of the Purchase Price that will provide a source of payment for the Stalking Horse with respect to certain claims that may arise under the Stalking Horse APA after the Closing Date (the "*Holdback*").

### a. CCRC Assets.

Pursuant to the Stalking Horse APA, the Debtor intends to sell substantially all of its Assets to the Stalking Horse, including, but not limited to, the following (collectively, the "*CCRC Assets*"):

(i) Certain real property located in Carmel, Indiana, together with all buildings, structures, fixtures, and other improvements placed, located, constructed or installed on such land (collectively, the "*Real Property*");

(ii) All furniture and equipment (whether movable or attached to the Real Property, motor vehicles, hardware, supplies, inventory, linens, medicine, foodstuffs, consumable and other personal property of any type or description, including, without limitation, all beds, chairs, sofas, wheelchairs, tables, kitchen and laundry equipment;

(iii) Certain Executory Contracts and Continuing Care Contracts;

21

(iv)     All rights of the Debtor in and to security deposits, reservation deposits, entrance fees and similar deposits received by the Debtor following the Petition Date from residents having entered into Continuing Care Contracts after the Petition Date and any entrance fee paid to the Debtor following the Petition Date by the current residents who are occupying or who will occupy the units formerly occupied by certain former residents;

(v)      The Debtor's right, title and interest to the name "Barrington of Carmel" and any derivative name in the operation of the Facility; and

(vi)     All of the Debtor's claims and causes of action against the Debtor's ordinary course vendors, contract counterparties, contractors and other suppliers of services related to the Debtor's business.

**b.     Excluded Assets.**

Certain Assets of the Debtor will not be sold to the Stalking Horse, including, but not limited to, the following (collectively, the "***Excluded Assets***"):

(i)      All deposit accounts, pre-closing accounts receivable, all Cash, cash equivalents, bank deposits or similar cash items of the Debtor, all marketable securities owned by the Debtor and all documents related thereto;

(ii)     All of the Debtor's deposits or prepaid charges, interests, ownership and expenses paid in connection with or relating to any Excluded Assets;

(iii)    All rights, claims or causes of action of the Debtor, including, but not limited to, any rights, claims or causes of action of the Debtor against third parties relating to any Excluded Assets, and any and all actions or claims under Sections 544, 545, 547, 548, 549, 550, 551 and 724(a) of the Bankruptcy Code, but excluding the certain acquired avoidance actions and the guaranty actions; and

(iv)     the Contingent Former Life Care Agreements and Non-Contingent Former Life Care Agreements.

Certain of the aforementioned Excluded Assets are subject to the security interest of the Bond Trustee and will be distributed to the Holders of the Bond Claims. Such encumbered Excluded Assets shall be referred to herein as the "***Encumbered Excluded Assets***." The remaining unencumbered Excluded Assets, to the extent they are owned by the Debtor, will be transferred to the Liquidating Trust.

**c.     Assumed Liabilities.**

As part of the consideration for the Sale, pursuant to the Stalking Horse APA, the Stalking Horse has agreed to assume the following liabilities of the Debtor:

(i) <u>Resident Obligations</u>.

    **a.** All obligations related to future payment or performance under the Executory Life Care Agreements and Non-Life Care Agreements existing as of the Closing Date;

    **b.** All financial obligations under the Contingent Former Life Care Agreements existing as of the Closing Date; and

    **c.** All financial obligations under the Non-Contingent Former Life Care Agreements existing as of the Closing Date.

(ii) <u>Assigned Contracts</u>. All of Debtor's liabilities under the Assigned Contracts, except such liabilities that are satisfied or discharged by payment of Cure Costs (including, for the avoidance of doubt, any Assigned Contracts for which the Cure Costs were set at $0.00 and approved as such by virtue of the Sale Order or such other order authorizing the assumption by Debtor and assignment to Buyer of such Assigned Contracts).

(iii) <u>Cure Costs</u>. All Cure Costs related to the Assigned Contracts and Assigned Residency Agreements.

    **d.**    **Excluded Liabilities**

Pursuant to the Stalking Horse APA, the following liabilities, among others, are excluded:

(i) Any liabilities to the extent based upon any wrongful or negligent act or omission of the Debtor;

(ii) All indebtedness of the Debtor; all guarantees of third party obligations by the Debtor and reimbursement obligations to guarantors of the Debtor's obligations or under letters of credit; and all liabilities of the Debtor to any owner or former owner of capital stock or warrants, or holder of indebtedness;

(iii) Any liability to the extent relating to any breach of contract, breach of warranty, tort, infringement, or violation of applicable law by the Debtor; and

(iv) Any liability related to claims of medical malpractice and/or other professional liability of the Debtor, or any of its employees, attending physicians, agents or independent contractors to the extent arising out of events or omissions occurring prior to the closing of the Sale.

### e. Holdback

Pursuant to the Stalking Horse APA, an amount equal to One Million Dollars ($1,000,000.00) (the "***Gross Holdback Escrow Amount***") will be deposited into a third-party escrow account on the Closing Date to provide a source of payment in the event the Stalking Horse suffers or incurs any losses directly resulting from, or arising directly out of, among other things: (i) any inaccuracy or breach of the Debtor's representations and warranties under the Stalking Horse APA; (ii) any breach or non-fulfillment of any covenant, agreement or obligation to be performed by the Debtor under the Stalking Horse APA; and (iii) any liabilities of the Debtor under Medicare or other government programs. Pursuant to the Stalking Horse APA, the Gross Holdback Escrow Amount will be held in escrow until the date that is the twelve (12) month anniversary of the Closing Date (the "***Holdback Escrow Termination Date***"). Upon the occurrence of the Holdback Escrow Termination Date, the Debtor's interest in the Gross Holdback Escrow Amount existing on that date shall be distributed to the Bond Trustee in accordance with the Plan.

### M. Approval of Sale to Stalking Horse.

On August 2, 2019, the Bankruptcy Court entered the Sale Order pursuant to which the Sale to the Stalking Horse was approved. Subject to the terms of the Sale Order, all amounts received by the Debtor at closing shall be paid directly to the Bond Trustee, and the Debtor is authorized and directed to pay such amounts directly to the Bond Trustee in an amount up to the aggregate amount of outstanding prepetition and postpetition obligations of the Debtor to the Bond Trustee for indefeasible application by the Bond Trustee to all outstanding obligations to the Bond Trustee; *provided, however*, that funds will be withheld and reserved from such payment to the Bond Trustee by the Debtor in the total amount of $5.0 million (the "***Distribution Reserve***") for payment by the Debtor of administrative expenses, certain tax liabilities, statutory fees, and other amounts required to be paid by the Plan to the extent the Debtor is not anticipated to have cash to pay such amounts on the Effective Date of the Plan, with the Bond Trustee retaining its Claim and Lien against such Distribution Reserve and all rights and claims with respect to the ultimate amount reserved for the payments set forth above.

## IV. THE CHAPTER 11 PLAN

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT 1**.

The Claims against the Debtor are divided into Classes according to their seniority and other criteria. The Classes of Claims for the Debtor and the funds and other property to be distributed under the Plan are described more fully below.

**THE DEBTOR BELIEVES THAT THE PLAN AFFORDS CREDITORS THE POTENTIAL FOR THE GREATEST REALIZATION OF THE VALUE OF THE DEBTOR'S ASSETS. ADDITIONALLY, THE DEBTOR BELIEVES THAT THE PLAN AVOIDS SIGNIFICANT HARDSHIP TO RESIDENTS THAT WOULD OTHERWISE OCCUR AS A RESULT OF A LIQUIDATION**.

A. **Treatment of Claims and Interests Under the Plan.**

1. **Administrative and Priority Claims.**

a. **Administrative Expense Claims.**

Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to different treatment with the Debtor or Liquidating Trustee, each Holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to the unpaid amount of such Allowed Administrative Expense Claim on the later of the Effective Date or the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable; *provided*, *however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor, as Debtor in Possession, or liabilities arising under obligations incurred by the Debtor, as Debtor in Possession, prior to the Effective Date, shall be paid by the Debtor in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions, including, but not limited to, the Budget, Final Cash Collateral Order and all other orders entered by the Bankruptcy Court related to the foregoing. In addition, Allowed Administrative Expense Claims of the United States Trustee for statutory fees under 28 U.S.C. § 1930 incurred prior to the Effective Date shall be paid on the Effective Date by the Debtor, and thereafter, as such fees may thereafter accrue and be due and payable, by the Liquidating Trustee in accordance with the applicable schedule for payment of such fees.

b. **Administrative Expense Claims Bar Date.**

To be eligible to receive Distributions under the Plan on account of an Administrative Expense Claim that is not otherwise Allowed by the Plan, a request for payment of an Administrative Expense Claim must have been or be filed with the Bankruptcy Court on or before the Administrative Expense Claims Bar Date. Any Administrative Expense Claim that is not asserted in accordance with section 2.1 of the Plan shall be deemed disallowed under the Plan and shall be forever barred against the Debtor, the Debtor's Estate, the Liquidating Trust, or any of their Assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

2. **Accrued Professional Compensation Claims.**

All Professionals seeking payment of Accrued Professional Compensation Claims shall (i) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred in the Chapter 11 Case by the date that is thirty (30) days after the Effective Date and (ii) be paid (a) the full unpaid amount as is Allowed by the Bankruptcy Court within five (5) Business Days after the date that such Claim is Allowed by order of the Bankruptcy Court, or (b) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Accrued Professional Compensation Claim and the Debtor or Liquidating Trustee; *provided*, *however*, in no event shall any amounts paid to any Professional exceed the amounts set forth for such Professional in the Budget, the Final Cash Collateral Order and all other orders entered by the Bankruptcy Court related to the foregoing.

Any Accrued Professional Compensation Claim that is not asserted in accordance with section 2.2 of the Plan shall be deemed disallowed under the Plan and shall be forever barred against the Debtor, the Debtor's Estate, the Liquidating Trust, or any of their Assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

**3.      Priority Tax Claims.**

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by a Holder of an Allowed Priority Tax Claim and the Debtor, or the Liquidating Trustee, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Priority Tax Claim, payment in full in Cash of the Allowed amount of the Priority Tax Claim on the later of the Effective Date or as soon as practicable after the date when such Claim becomes an Allowed Claim.

**4.      Classification of Claims and Interests.**

Except as set forth in the Plan, all Claims against and Interests in the Debtor are placed in a particular Class.  The Debtor has not classified Administrative Expense Claims, Accrued Professional Compensation Claims, and Priority Tax Claims.

The following table classifies Claims against and Interests in the Debtor for all purposes, including voting, confirmation and Distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. Each Class set forth below is treated under the Plan as a distinct Class for voting and Distribution purposes.

Subject to all other applicable provisions of the Plan (including its Distribution provisions), classified Claims shall receive the treatment described in section 4 of the Plan.  The Plan will not provide any Distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including, without limitation, payments by third parties.

The following table designates the Classes of Claims against and Interests in the Debtor and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interests | Status | Entitled to Vote | Estimated Recovery |
|-------|---------------------|--------|------------------|-------------------|
| 1 | Other Priority Claims | Unimpaired | No | 100% |
| 2 | Bondholder Secured Claim | Impaired | Yes | Net Sale Proceeds, Net Holdback Escrow Amount and Encumbered Excluded Assets |
| 3 | Other Secured Claims | Impaired | Yes | Cash equal to the amount of such Other Secured Claims; the Collateral securing such Other Secured Claims; or satisfaction of such Other Secured Claims pursuant to such other terms and conditions as may be agreed upon by the Liquidating Trustee and the Holder of such Other Secured Claims |
| 4 | General Unsecured Claims | Impaired | Yes | Pro Rata share of Liquidating Trust Distributable Cash |
| 5 | Interests in the Barrington | Impaired | No | $0.00 |

## 5. Treatment of Claims and Interests.

a. **Other Priority Claims (Class 1)**. This Class consists of all Allowed Other Priority Claims against the Debtor that are specified as having priority in section 507(a) of the Bankruptcy Code, if any such Claims exist as of the Effective Date. Except to the extent that a Holder of an Allowed Other Priority Claim against the Debtor has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between the Debtor and the Holder of the Allowed Other Priority Claim against the Debtor.

b. **Bondholder Secured Claim (Class 2)**. This Class consists of the Bondholder Secured Claim of the holders of the Bonds and Bond Trustee against the Debtor. The Bondholder Secured Claim is an Allowed Claim. Upon the terms and subject to the conditions set forth in the Plan, in full and final satisfaction, settlement, release, and discharge of the Bondholder Secured Claim, the Bond Trustee shall receive, on behalf of the Holders of the Bondholder Secured Claim, (i) on the Effective Date or as soon as practicable thereafter, the Net Sale Proceeds of the Sale and the Encumbered Excluded Assets, including the Debtor's Cash on hand on the Effective Date, following funding of the Liquidating Trust Contribution; and (ii) as soon as practicable after the Holdback Escrow Termination Date, the Net Holdback Escrow Amount. In addition, the Liquidating Trustee shall pay to the Bond Trustee on account of the Bondholder Secured Claim the proceeds of any Liquidating Trust Assets on which the Bond Trustee has a Lien. All distributions made on account of the Bondholder Secured Claim shall be paid to the Bond Trustee, and the Bond Trustee shall make further distributions to the holders of the Bonds as set forth in the Bond Documents. In addition to the foregoing and as allowed by the Final Cash Collateral Order, the Bond Trustee may apply any and all funds in its possession

27

as set forth in the Bond Documents free from the automatic stay imposed by section 362 of the Bankruptcy Code or any rights of the Debtor.

           **c.**    ***Other Secured Claims (Class 3)***. This Class consists of all Other Secured Claims against the Debtor. In full satisfaction of an Allowed Other Secured Claim, on the later of the Effective Date and the date on which the Other Secured Claim is Allowed, each Holder of an Allowed Other Secured Claim shall receive, at the sole and exclusive option of the Liquidating Trustee: (a) Cash equal to the amount of such Claim; (b) the Collateral securing such Claim; or (c) satisfaction of such Claim pursuant to such other terms and conditions as may be agreed upon by the Liquidating Trustee and the Holder of such Other Secured Claim.

           **d.**    ***General Unsecured Claims (Class 4)***. This Class consists of all General Unsecured Claims against the Debtor, including the Bondholder Deficiency Claim of the holders of Bonds. Except to the extent that a Holder of an Allowed General Unsecured Claim against the Debtor agrees to a different treatment of such Claim, in full and final satisfaction of each Allowed General Unsecured Claim against the Debtor, each Holder of an Allowed General Unsecured Claim against the Debtor will receive its Pro Rata share of Liquidating Trust Distributable Cash as soon as practicable as determined by the Liquidating Trustee.

           **e.**    ***Interests in the Barrington (Class 5)***. This Class consists of SQLC's interests in the Barrington, which will be cancelled as of the Effective Date. SQLC shall not be entitled to a Distribution on account of its Interests in the Debtor.

    **B.**    **Means for Implementation of the Plan**

        **1.**    **Transfers to the Bond Trustee.**

    The Bond Trustee shall receive the following on account of the Bondholder Secured Claim: (i) on the Effective Date or as soon as practicable thereafter, the Net Sale Proceeds of the Sale and the Encumbered Excluded Assets, including the Debtor's Cash on hand on the Effective Date, following funding of the Liquidating Trust Contribution; and (ii) as soon as practicable after the Holdback Escrow Termination Date, the Net Holdback Escrow Amount. In addition, the Liquidating Trustee shall pay to the Bond Trustee, on account of the Bondholder Secured Claim, the proceeds of any Liquidating Trust Assets transferred to the Liquidating Trust on which the Bond Trustee has a Lien. All distributions made on account of the Bondholder Secured Claim shall be paid to the Bond Trustee, and the Bond Trustee shall make further distributions to the holders of the Bonds as set forth in the Bond Documents.

        **2.**    **Liquidating Trust.**

           **a.**    **Establishment of Liquidating Trust.**

    On the Effective Date, the Liquidating Trustee shall execute the Liquidating Trust Agreement and, in his capacity as Liquidating Trustee, accept all Liquidating Trust Assets on behalf of the Beneficiaries thereof, and be authorized to obtain, seek the turnover, liquidate, and collect all of the Liquidating Trust Assets not in his possession. The Liquidating Trust will then be deemed created and effective without any further action by the Bankruptcy Court or any Person as of the Effective Date. The Liquidating Trust shall be established for the purposes of (i)

28

liquidating any non-Cash Liquidating Trust Assets; (ii) maximizing recovery of the Liquidating Trust Assets for the benefit of the Beneficiaries; and (iii) distributing the proceeds of the Liquidating Trust Assets to the Beneficiaries in accordance with the Plan and the Liquidating Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except only in the event and to the extent necessary for, and consistent with, the liquidating purpose of the Liquidating Trust.

### b.    Liquidating Trust Reserve.

On the Effective Date, an amount to be negotiated between the Debtor and the Bond Trustee ten (10) days prior to the Confirmation Hearing will be funded to the Liquidating Trust that is sufficient to permit the Debtor and the Liquidating Trustee to satisfy all obligations under the Plan and Liquidating Trust Agreement, including: (i) 100% of the Allowed Accrued Professional Compensation Claims that have not been previously paid; (ii) 100% of the Allowed Administrative Expenses Claims that have not been previously paid; (iii) 100% of the Allowed Priority Claims that have not been previously paid; (iv) such other amounts that need to be paid pursuant to the Plan and Liquidating Trust Agreement; and (v) an amount the Debtor determines, with the approval of the Bond Trustee, is necessary to administer and operate the Liquidating Trust in accordance with the Plan and Liquidating Trust Agreement (the "*Liquidating Trust Reserve*").  The Liquidating Trust Reserve will be funded, first, from any Cash on hand of the Debtor on the Effective Date, and, second, from the proceeds of the Sale that would otherwise be paid to the Bond Trustee.  To the extent not paid prior to the Effective Date, the Liquidating Trustee shall be authorized to pay all Allowed Professional Compensation Claims, Allowed Administrative Expense Claims, Allowed Priority Claims and such amounts necessary to administer and operate the Liquidating Trust from the Liquidating Trust Reserve in accordance with the Plan and the Liquidating Trust Agreement.  To the extent the Liquidating Trust Reserve is not needed to fund the foregoing Claims and amounts, such excess funds shall remain subject to the Bond Trustee's Lien and transferred to the Bond Trustee.

### c.    Appointment of the Liquidating Trustee.

The Liquidating Trustee shall be appointed pursuant to the Confirmation Order and subject to removal only by the Bankruptcy Court upon application or motion by a Beneficiary of the Liquidating Trust, after notice and a hearing, and for cause shown, including (i) the willful and continued refusal by the Liquidating Trustee to perform his duties under the Plan and the Liquidating Trust Agreement, and (ii) gross negligence, gross misconduct, fraud, embezzlement or theft.  The Liquidating Trustee will be chosen by the Debtor, after consultation with the Bond Trustee.  During the term of the Liquidating Trust, the Liquidating Trustee shall be entitled to compensation payable from the Liquidating Trust Assets as set forth in the Liquidating Trust Agreement.

### d.    Beneficiaries of Liquidating Trust.

The Holders of Allowed General Unsecured Claims against the Debtor that are entitled to Distributions shall be the Beneficiaries of the Liquidating Trust.  Such Beneficiaries shall be bound by the Liquidating Trust Agreement.  The interests of the Beneficiaries in the Liquidating Trust shall be uncertificated and nontransferable except upon death of the interest holder or by operation of law.

e. **Vesting and Transfer of Liquidating Trust Assets to the Liquidating Trust.**

On the Effective Date, pursuant to section 1141(b) of the Bankruptcy Code, the Liquidating Trust Assets, including the Liquidating Trust Contribution, shall vest in the Liquidating Trust free and clear of all Liens, Claims and Interests, except as otherwise specifically provided in the Plan or in the Confirmation Order; *provided, however*, that the Liquidating Trustee may abandon or otherwise not accept any non-Cash Liquidating Trust Assets that the Liquidating Trustee believes, in good faith, have no value to the Liquidating Trust. Any non-Cash Liquidating Trust Assets that the Liquidating Trustee so abandons or otherwise does not accept shall not be property of the Liquidating Trust. Notwithstanding the foregoing, all Excluded Encumbered Assets, including, but not limited to, the accounts receivable of the Debtor as of the Closing Date, whether in the possession, dominion or control of the Debtor or transferred to the Liquidating Trust, shall remain subject to the Bond Trustee's Lien and be promptly distributed to the Bond Trustee on behalf of the holders of Bonds.

f. **Retention of Professionals.**

The Liquidating Trustee shall have the right to retain the services of attorneys, accountants, and other professionals (collectively, the "*Liquidating Trust Professionals*") that are necessary to assist the Liquidating Trustee in the performance of his duties pursuant to the Plan, the Liquidating Trust Agreement and the Confirmation Order. The reasonable fees and expenses of such professionals shall be paid by the Liquidating Trustee from the Liquidating Trust Reserve and, if necessary, the Liquidating Trust Assets upon submission of monthly statements ("*Liquidating Trust Monthly Fee Statements*") for services rendered and costs incurred to the Liquidating Trustee and Bond Trustee for review and approval. The Liquidating Trustee and Bond Trustee will have thirty (30) days from receipt of each Liquidating Trust Monthly Fee Statement to object to the Liquidating Trust Monthly Fee Statement. In the event that any objection is received by the relevant Liquidating Trust Professional that cannot be promptly resolved by the Liquidating Trust Professional and the objecting party, the dispute will be submitted by the Liquidating Trustee to the Bankruptcy Court for adjudication. The Bankruptcy Court will retain jurisdiction to adjudicate objections to Liquidating Trust Monthly Fee Statements. In the event that no objection is raised to a Liquidating Trust Monthly Fee Statement within the thirty (30) day period, the requested amount in the Liquidating Trust Monthly Fee Statement will be promptly paid by the Liquidating Trustee, subject to any requirements under the Plan.

g. **Liquidating Trust Expenses.**

Subject to the provisions of the Liquidating Trust Agreement, all costs, expenses and obligations incurred by the Liquidating Trustee in administering the Plan, the Liquidating Trust, or in any manner connected, incidental or related thereto, in effecting distributions from, as applicable, the Liquidating Trust shall be a charge against the Liquidating Trust Reserve and, if necessary, the Liquidating Trust Assets remaining from time to time in the hands of the Liquidating Trustee. Such expenses shall be paid in accordance with the Liquidating Trust Agreement.

h. **Certain Powers and Duties of the Liquidating Trust and Liquidating Trustee.**

(i) **General Powers of the Liquidating Trustee.**

The Liquidating Trustee shall be the exclusive trustee of the Liquidating Trust and the Liquidating Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include the authority and responsibility to: (a) receive, manage, invest, supervise, and protect the Liquidating Trust Assets; (b) pay taxes or other obligations incurred by the Liquidating Trust; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals and consultants to advise and assist in the administration, prosecution and distribution of Liquidating Trust Assets; (d) calculate and implement Distributions of Liquidating Trust Assets; (e) investigate, prosecute, compromise, and settle, in accordance with the specific terms of the Liquidating Trust Agreement, Causes of Action vested in the Liquidating Trust; (f) resolve issues involving Claims and Interests in accordance with the Plan; and (g) undertake all administrative functions of the Chapter 11 Case, including the payment of fees payable to the United States Trustee and the ultimate closing of the Chapter 11 Case. The Liquidating Trust is the successor to the Debtor and its Estate.

(ii) **Books and Records.**

On the Effective Date, the Liquidating Trust shall: (a) take possession of all books, records, and files of the Debtor and its Estate; and (b) provide for the retention and storage of such books, records, and files until such time as the Liquidating Trust determines, in accordance with the Liquidating Trust Agreement, that retention of same is no longer necessary or required.

(iii) **Investments of Cash.**

The Liquidating Trust may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code or in other prudent investments, *provided*, *however*, that such investments are permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

(iv) **Claims Process.**

The Liquidating Trust shall have the right to object to Claims not otherwise Allowed in connection with post-Effective Date Claims allowance process or other order of the Bankruptcy Court. Following any such objection, the Liquidating Trustee may resolve any such Claims, which shall require: (i) approval only of the Liquidating Trustee if the resolved Claim amount and the amount of any reduction from the asserted amount of the Claim are each less than One Hundred Thousand Dollars ($100,000.00); and (ii) approval of the Liquidating Trustee and the Bankruptcy Court, upon notice and a hearing, if the amount asserted by the claimant or the amount of the reduction is equal to or greater than One Hundred Thousand Dollars ($100,000.00)).

(v)     **Reporting.**

In no event later than thirty (30) days after the end of the first full month following the Effective Date and on a quarterly basis thereafter until all Cash in the Liquidating Trust has been distributed in accordance with the Plan, the Liquidating Trustee shall file with the Bankruptcy Court a report setting forth the amounts, recipients and dates of all Distributions made by the Liquidating Trustee under the Plan through each applicable reporting period.

(vi)     **Tax Reporting.**

The Liquidating Trustee shall file tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with the Plan. The Liquidating Trust also shall annually (for tax years in which Distributions from the Liquidating Trust are made) send to each Beneficiary a separate statement setting forth the Beneficiary's share of items of income, gain, loss, deduction or credit and all such holders shall report such items on their federal income tax returns; *provided, however*, that no such statement need be sent to any Class that is not expected to receive any Distribution from the Liquidating Trust. The Liquidating Trust's taxable income, gain, loss, deduction or credit will be allocated to the Liquidating Trust's Beneficiaries in accordance with their relative beneficial interests in the Liquidating Trust.

As soon as possible after the Effective Date, the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets, and such valuation shall be used consistently by all parties for all federal income tax purposes. The Liquidating Trust also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any Governmental Unit for taxing purposes. The Liquidating Trust may request an expedited determination of taxes of the Debtor or of the Liquidating Trust under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtor and the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

The Liquidating Trust shall be responsible for filing all federal, state, and local tax returns for the Debtor and the Liquidating Trust. The Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements; *provided, however*, that, if the Liquidating Trustee fails to withhold in respect of amounts received or distributable with respect to any Beneficiaries and the Liquidating Trustee is later held liable for the amount of such withholding, such Beneficiaries shall reimburse the Liquidating Trustee for such liability. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such Beneficiaries for all purposes of the Liquidating Trust Agreement. The Liquidating Trustee shall be authorized to collect such tax information from the Beneficiaries (including, without limitation, social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Liquidating Trust Agreement and the Confirmation Order. In order to receive distributions under the Plan, all Beneficiaries will need to identify themselves to the Liquidating Trustee and provide tax information and the specifics of their holdings, to the extent the Liquidating Trustee deems appropriate (including completing the appropriate Form W-8 or Form W-9, as applicable).

(vii)    **Payment of Taxes.**

The Liquidating Trust shall be responsible for payments of all Allowed tax obligations of the Debtor.

### i.    Preservation of Right to Conduct Investigations.

The preservation for the Liquidating Trust of any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 is necessary and relevant to the liquidation and administration of the Liquidating Trust Assets. Accordingly, any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 held by the Debtor prior to the Effective Date shall vest with the Liquidating Trust and shall continue until dissolution of the Liquidating Trust.

### j.    Prosecution and Resolution of Causes of Action.

(i)    **The Liquidating Trust's Exclusive Authority to Pursue, Settle, or Abandon Causes of Action.**

From and after the Effective Date, prosecution and settlement of all Causes of Action, including Avoidance Actions, transferred to the Liquidating Trust shall be the sole responsibility of the Liquidating Trust pursuant to the Plan and the Confirmation Order. From and after the Effective Date, the Liquidating Trust shall have exclusive rights, powers, and interests of the Debtor's Estate to pursue, settle or abandon such Causes of Action as the sole representative of the Debtor's Estate pursuant to section 1123(b)(3) of the Bankruptcy Code. Proceeds recovered from all Causes of Action will be deposited into the Liquidating Trust and will be distributed by the Liquidating Trustee to the Beneficiaries in accordance with the provisions of the Plan and Liquidating Trust Agreement. All Causes of Action, including Avoidance Actions, that are not expressly released or waived under the Plan are reserved and preserved and vest in the Liquidating Trust in accordance with the Plan. No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtor or Liquidating Trustee will not pursue any and all available Causes of Action against such Person. The Liquidating Trustee expressly reserves all Causes of Action, except for any Causes of Action against any Person that are expressly released or waived under the Plan, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of confirmation or consummation of the Plan. No claims or Causes of Action against the Released Parties expressly released or waived pursuant to the Plan shall be transferred to the Liquidating Trust, the Liquidating Trustee shall not have standing to pursue such claims or Causes of Action, and all such claims and Causes of Action shall be waived, released and discharged pursuant to the Plan.

(ii)    **Settlement of Causes of Action.**

Settlement by the Liquidating Trust of any Cause of Action transferred to the Liquidating Trust shall require: (i) approval only of the Liquidating Trustee if the amount claimed by the Liquidating Trust against a defendant is less than One Hundred Thousand Dollars ($100,000.00); and (ii) approval of the Liquidating Trustee and the Bankruptcy Court, upon notice and a

hearing, if the amount claimed by the Liquidating Trust against a defendant is unliquidated or equals to or exceeds One Hundred Thousand Dollars ($100,000.00).

### k.     Federal Income Tax Treatment of the Liquidating Trust for the Liquidating Trust Assets.

For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury regulations and that such trust be owned by its beneficiaries. Accordingly, for federal income tax purposes, it is intended that the Beneficiaries be treated as if they had received a distribution from the Debtor's Estate of an undivided interest in each of the Liquidating Trust Assets in satisfaction of their Allowed Claims (to the extent of the value of their respective share in the applicable Assets) and then contributed such interests to the Liquidating Trust in exchange for their interests in the Liquidating Trust, and the Liquidating Trust's Beneficiaries will be treated as the grantors and owners thereof.

### l.     Limitation of Liability.

No recourse will ever be had, directly or indirectly, against the Liquidating Trustee or his or her respective employees, professionals, representatives, agents, successors or assigns, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Liquidating Trust under the Plan or by reason of the creation of any indebtedness by the Liquidating Trust or the Liquidating Trustee under the Plan. All such liabilities under the Plan will be enforceable only against, and will be satisfied only out of, the Liquidating Trust Assets. The Liquidating Trust and the Liquidating Trustee and their respective officers, directors, employees, professionals, representatives, agents, successors or assigns will not be liable for any act they may do, or omit to do under the Plan in good faith and in the exercise of their sound judgment; *provided, however*, that this section will not apply to any gross negligence or willful misconduct by the Liquidating Trust and the Liquidating Trustee or their respective officers, directors, employees, professionals, representatives, agents, successors or assigns.

### m.     Term of Liquidating Trust.

The Liquidating Trustee shall be discharged and the Liquidating Trust shall be terminated, at such time as (i) all Disputed Claims have been resolved, (ii) all of the Liquidating Trust Assets have been liquidated, (iii) all duties and obligations of the Liquidating Trustee under the Liquidating Trust Agreement have been fulfilled, (iv) all Distributions required to be made by the Liquidating Trust under the Plan and the Liquidating Trust Agreement have been made, and (v) the Chapter 11 Case has been closed; *provided, however*, that in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension not to exceed one (1) year is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

### n. Conflicts Between the Liquidating Trust Agreement and the Plan.

In the event of any inconsistencies or conflict between the Liquidating Trust Agreement and the Plan, the terms and provisions of the Plan shall control.

### o. Excess Funds.

In the event there is Liquidating Trust Distributable Cash remaining after all required Distributions under the Plan and the Liquidating Trust Agreement have been made, such Cash will be turned over to the Attorney General for the State of Indiana in accordance with Indiana law.

### C. Acceptance or Rejection of the Plan.

#### 1. Holders of Claims and Interests Entitled to Vote.

Pursuant to section 1126 of the Bankruptcy Code, each Impaired Class of Claims or Interests that will receive a Distribution pursuant to the Plan may vote separately to accept or reject the Plan. Each Holder of an Allowed Claim in such an Impaired Class shall receive a Ballot and may cast a vote to accept or reject the Plan. Classes 2, 3, and 4 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

#### 2. Classes Deemed to Reject.

Under Bankruptcy Code section 1126(g), Class 5 will receive no distributions on account of such interests. Thus, Class 5 is deemed to have rejected the Plan and the vote of holders of such Interests in these Classes will not be solicited.

#### 3. Classes Deemed to Accept.

Class 1 is Unimpaired under the Plan and is, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

#### 4. Acceptance by a Class.

A Class of Claims entitled to vote to accept or reject the Plan accepts the Plan if the Holders of Claims in such voting Class that hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Claims that complete and return Ballots in such Class vote to accept the Plan. A Class of Interests is deemed to accept the Plan if the Plan has been accepted by Holders of at least two-thirds (2/3) of the amount of the Allowed Interests held by Holders of such Interests who vote in such Class.

#### 5. Cramdown Under Section 1129(b) of the Bankruptcy Code.

If all applicable requirements for confirmation of the Plan are met as set forth in section 1129(a) of the Bankruptcy Code except subsection (8) thereof, the Debtor may request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code on the bases that the Plan is fair and equitable and does not discriminate unfairly with respect to

each Class of Claims or Interests that is Impaired under, and has not accepted or is deemed to reject, the Plan.

### D. Distributions

#### 1. Distribution Record Date.

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtor or its agents shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Interests. The Debtor or the Liquidating Trustee shall have no obligation to recognize any ownership transfer of the Claims or Interests occurring after the Distribution Record Date. The Debtor, the Liquidating Trustee, or any party responsible for making Distributions shall be entitled to recognize and deal for all purposes under the Plan only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

#### 2. Date of Distributions.

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtor shall receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided therein. Distributions made after the Effective Date to Holders of Allowed Claims shall be deemed to have been made on the Effective Date and, except as otherwise provided in the Plan, no interest shall be payable by the Debtor or the Liquidating Trustee with respect to such Claims or any Distribution related thereto. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on Distributions provided for thereunder, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

#### 3. Disbursing Agent.

Except as otherwise provided in the Plan, all Distributions under the Plan shall be made by the Liquidating Trustee as Disbursing Agent or such other Person designated by the Liquidating Trustee as a Disbursing Agent on the Effective Date.

#### 4. Rights and Powers of Disbursing Agent.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; (b) make all Distributions contemplated under the Plan; (c) employ professionals to represent it with

respect to its responsibilities, subject to the review and approval of the Bond Trustee; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

### 5. Delivery of Distributions in General.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Disbursing Agent. Distributions to Holders of Allowed Claims will be made at the address of each such Holder as set forth in the Debtor's books and records. Distributions under the Plan on account of such Allowed Claims shall not be subject to levy, garnishment, attachment or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. None of the Debtor, the Liquidating Trustee, and the applicable Disbursing Agent shall incur any liability whatsoever on account of any distributions under the Plan except for gross negligence, willful misconduct or fraud. Any distributions on account of the Bond Claims shall be made to the Bond Trustee, and the Bond Trustee shall make such further distributions to the holders of the Bonds as set forth in the Bond Documents.

### 6. Payments and Distributions on Disputed Claims.

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date. Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtor or the Liquidating Trustee, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial Distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

### 7. Manner of Payment.

Any Distributions to be made by or on behalf of the Debtor or the Liquidating Trustee, as applicable, pursuant to the Plan shall be made by checks drawn on accounts maintained by the Debtor or the Liquidating Trustee, respectively, or by wire transfer if circumstances justify, at the option of the Debtor or the Liquidating Trustee, as applicable; *provided*, *however*, any payments made to the Bond Trustee shall be made by wire transfer.

### 8. Undeliverable Distributions and Unclaimed Property.

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such Distribution shall be made as soon as practicable after such Distribution has become deliverable; *provided*, *however*, that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the date of the Distribution. After such date, all "unclaimed property" or interests in property shall revert to the Liquidating Trust (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws

to the contrary), and the Claim of any Holder to such property shall be discharged and forever barred.

### 9. Withholding and Reporting Requirements.

In connection with the Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Distributions under the Plan shall be subject to any such withholding or reporting requirements.

### 10. Surrender Instruments.

Pursuant to section 1143 of the Bankruptcy Code, as a condition precedent to receiving any Distribution under the Plan, except with respect to the Bonds, each holder of a certificated instrument or note must surrender such instrument or note held by it to the Disbursing Agent or its designee. Any such holder of such instrument or note that fails to (i) surrender the instrument or note or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent, as applicable, before the fifth anniversary of the Confirmation Date shall be deemed to have forfeited all rights and claims and may not participate in any Distribution under the Plan. Any Distribution so forfeited shall become property of the Liquidating Trust.

### 11. Setoffs.

Except for the payments to be made to the Bond Trustee, the Debtor and the Liquidating Trustee may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which a Distribution shall be made), any claims of any nature whatsoever that the Debtor and the Liquidating Trustee may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor and the Liquidating Trustee of any such claim the Debtor and the Liquidating Trustee may have against the Holder of such Claim.

### 12. Insurance Claims.

Except for the payments to be made to the Bond Trustee, no Distributions under the Plan shall be made on account of Allowed Claims until the Holder of such Allowed Claim has exhausted all remedies with respect to the Debtor's Insurance Policies. To the extent that the Debtor's insurers agree to satisfy in full a Claim, then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### 13. Applicability of Insurance Policies.

Except as otherwise provided in the Plan, Distributions to Holders of Allowed Claims shall be made in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor, Liquidating Trustee or any Person may hold against any insurers under any of the Debtor's Insurance Policies, nor shall anything contained in the Plan or herein constitute or be

deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### 14. No Postpetition Interest.

Unless otherwise specifically provided for in the Plan or in the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on such Claim or Interest. Notwithstanding the foregoing, nothing in the Plan shall prohibit holders of the Bonds from allocating payments received from the Bond Trustee or the Debtor to principal or interest on the Bonds, in their sole discretion in accordance with applicable law.

### 15. Distributions Free and Clear.

Except as may be otherwise provided for in the Plan, all Distributions under the Plan shall be free and clear of any Liens, Claims, encumbrances, and other interests.

### 16. Fractional Dollars; De Minimis Distributions

Notwithstanding any other provision of the Plan, Cash payments of fractions of dollars shall not be made. Whenever any Distribution to a Holder of a Claim would otherwise call for Distribution of Cash in a fractional dollar amount, the actual Distribution of such Cash shall be rounded to the nearest whole dollar (up or down), with half dollars (or less) being rounded down. Neither the Debtor nor the Liquidating Trustee shall be required to make any Cash payment of less than ten dollars ($10.00) with respect to any Claim or Interest unless a request therefor is made in writing to the Debtor or the Liquidating Trustee, as applicable; *provided*, *however*, that neither the Debtor nor the Liquidating Trustee shall have any obligation to make any Distribution, whether final or not, unless and until the total amount of such Distribution to a specific Holder of an Allowed Claim or Interest is equal to or greater than ten dollars ($10.00).

### E. Procedures for Disputed Claims

### 1. Allowance of Claims and Interests.

Except as expressly provided in the Plan, or in any order entered in the Chapter 11 Case prior to the Effective Date, including the Confirmation Order, no Claim or Interest shall be deemed Allowed unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code or Allowed by the Bankruptcy Court by entry of a Final Order allowing such Claim or Interest. On and following the Effective Date, the Liquidating Trust shall be vested with any and all rights and defenses the Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.

### 2. Objections to Claims.

The Debtor (before the Effective Date) or the Liquidating Trustee (on or after the Effective Date), as applicable, shall have the exclusive authority to file, settle, compromise, withdraw or litigate to judgment any objections to Claims as permitted under the Plan. Any objections to Claims shall be filed and served on or before the later of (i) one hundred eighty

(180) days after the Effective Date or (ii) such date as may be fixed by the Bankruptcy Court. From and after the Effective Date, the Liquidating Trustee may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The Debtor and the Liquidating Trustee reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

### 3.     Estimation of Claims.

The Debtor (before the Effective Date) or the Liquidating Trustee (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Contingent Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to such objection. In the event that the Bankruptcy Court estimates any Contingent Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor or the Liquidating Trustee may pursue supplementary proceedings to object to the allowance of such Claim; *provided*, *however*, the Liquidating Trustee may elect not to pursue such supplementary proceedings, instead electing to treat such maximum amount as the Allowed amount of such Claim.

### 4.     No Distribution Pending Allowance.

Notwithstanding any other provision of the Plan, if any portion of a Claim is Disputed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 5.     Distributions after Allowance.

At such time as a Contingent Claim or a Disputed Claim becomes an Allowed Claim, a Distribution shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Contingent Claim or Disputed Claim becomes a Final Order. To the extent that all or a portion of a Contingent Claim or a Disputed Claim is disallowed, the Holder of such Claim shall not receive any Distribution on account of the portion of such Claim that is disallowed.

### 6.     Preservations of Rights to Settle Claims.

In accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trustee shall have the discretion to retain and enforce, sue on, settle, or compromise all claims, rights, causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its Estate may hold against any person or entity without the approval of the Bankruptcy Court, subject to the terms of the Plan, the Confirmation Order, the Liquidating Trust Agreement, and any contract, instrument, release, indenture, or other agreement entered

into in connection herewith. The Liquidating Trustee may pursue such retained claims, rights, or causes of action, suits, or proceedings, as appropriate, in accordance with the best interests of the Liquidating Trust and its Beneficiaries.

### 7. Disallowed Claims.

All Claims held by persons or entities against whom or which the Debtor or Liquidating Trustee has commenced a proceeding asserting a cause of action under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Bankruptcy Code shall be deemed Disallowed Claims pursuant to section 502(d) of the Bankruptcy Code and Holders of such Claims shall not be entitled to vote to accept or reject the Plan. Disallowed Claims pursuant to this section shall continue to be Disallowed Claims for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Debtor or Liquidating Trustee from such party have been paid.

### F. Executory Contracts and Unexpired Leases

### 1. Assumption and Rejection of Executory Contracts and Unexpired Leases.

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, including the Stalking Horse APA, each of the Executory Contracts and Unexpired Leases of the Debtor shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtor; (2) expired or terminated pursuant to its own terms before the Effective Date; (3) is the subject of a motion to assume or reject filed on or before the Effective Date; or (4) is identified as an Executory Contract or Unexpired Lease to be assumed in connection with the Sale.

### 2. Inclusiveness.

Unless otherwise specified, each Executory Contract and Unexpired Lease assumed or rejected by the Debtor shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease.

### 3. Rejection Claims.

Except as otherwise provided in orders entered by the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court and served on counsel to the Debtor or the Liquidating Trustee on or before the date that is thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; *provided, that* any such Claims arising from the rejection of an Unexpired Lease shall be subject to the cap on rejection damages imposed by section 502(b)(6) of the Bankruptcy Code. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtor or the Liquidating Trustee, the Debtor's

Estate or their property without the need for any objection by the Debtor or the Liquidating Trustee or further notice to, or action, order or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims against the Debtor and shall be treated in accordance with the Plan.

### 4.      Cure of Defaults.

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed under the Plan or otherwise is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by Cure. If there is a dispute regarding (i) the nature or amount of any Cure, or (ii) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption.

### 5.      Full Release and Satisfaction.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

### 6.      Reservation of Rights.

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtor or the Liquidating Trustee that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtor or the Liquidating Trustee have any liability thereunder.

### G.      Conditions Precedent to Confirmation and the Effective Date

### 1.      Conditions Precedent to Confirmation.

Confirmation of the Plan shall not occur, and the Confirmation Order shall not be entered, until each of the following conditions precedent have been satisfied or waived pursuant to the provisions of the Plan:

a.      The Bankruptcy Court shall have entered an order, which shall not be subject to any stay or subject to an unresolved request for revocation under section 1144 of the Bankruptcy Code, in form and substance acceptable to the Debtor, approving the Disclosure Statement with respect to the Plan and the solicitation of votes thereon as being in compliance with section 1125 of the Bankruptcy Code and applicable non-bankruptcy law;

b.      The Bankruptcy Court shall have entered one or more orders, in form and substance acceptable to the Debtor and the Bond Trustee, (i) authorizing the Sale to the Stalking Horse pursuant to section 363 of the Bankruptcy Code and (ii) authorizing the assumption and assignment of those Executory Contracts and Unexpired Leases identified to be assumed and assigned in the Stalking Horse APA;

c.      The proposed Confirmation Order shall be in form and substance satisfactory in all respects to the Debtor and the Bond Trustee; and

d.      The Plan and the Plan Supplement, including any schedules, documents, supplements and exhibits thereto shall be, in form and substance, acceptable to the Debtor and the Bond Trustee.

### 2.      Conditions Precedent to the Effective Date.

The Effective Date shall not occur until each of the following conditions precedent have been satisfied or waived pursuant to the provisions of the Plan:

a.      The Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Debtor and the Bond Trustee, and such Confirmation Order shall not be subject to any stay or an unresolved request for revocation under section 1144 of the Bankruptcy Code;

b.      The Debtor shall have closed on the Sale; and

c.      All actions, documents, certificates, and agreements necessary to implement the Plan, including, without limitation, the Liquidating Trust Agreement, shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

### 3.      Waiver of Conditions.

The conditions to confirmation and consummation of the Plan may be waived at any time by the Debtor, with the consent of the Bond Trustee, without notice to any other parties in interest or the Bankruptcy Court and without a hearing; *provided*, *however*, that the Debtor may not waive the conditions set forth in sections 10.1(b), 10.2(a) and 10.2(b) of the Plan or the entry of the order approving the Disclosure Statement and the Confirmation Order.

### 4.      Effect of Failure of Conditions.

If consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against the Debtor; (2) prejudice in any manner the rights of the Debtor, any Holders of Claims or Interests or any other Person; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtor, any Holders of Claims or Interests or any other Person in any respect.

### H.      Effect of Confirmation

### 1.      Immediate Binding Effect.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan and the Liquidating Trust Agreement shall be immediately effective and enforceable and deemed binding upon the Debtor, the Liquidating Trustee, the Liquating Trust and any and all Holders of Claims or Interests

(irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Persons that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Person acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.

## 2.  Compromise and Settlement of Claims, Interests and Controversies.

Pursuant to sections 363 and 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any Distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate and Holders of Claims and Interests and is fair, equitable and reasonable.

## 3.  Releases by the Debtor.

Pursuant to section 1123(b) of the Bankruptcy Code and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious liquidation of the Debtor and the consummation of the transactions contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtor and its Estate from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtor or its Estate would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Chapter 11 Case, the Sale or the transactions or events giving rise to any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, any Plan Supplement or related agreements, instruments or other documents (collectively, the "***Debtor Released Claims***"), other than Debtor Released Claims against a Released Party arising out of the gross negligence, willful misconduct, intentional fraud, or criminal liability of any such person or entity.

## 4.  Releases by Holders of Claims.

**ON THE EFFECTIVE DATE, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN AND EXCEPT FOR THE RIGHT TO ENFORCE THE PLAN, ALL PERSONS WHO (I) VOTED TO ACCEPT THE PLAN OR WHO ARE PRESUMED OR DEEMED TO HAVE VOTED TO ACCEPT THE PLAN UNDER SECTION 1126(f) OF THE BANKRUPTCY CODE; OR (II) ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN AND WHO VOTE TO REJECT THE PLAN OR ABSTAIN FROM VOTING**

**AND DO NOT MARK THEIR BALLOTS AS OPTING OUT OF THE RELEASES GRANTED UNDER THIS SECTION, SHALL, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BE DEEMED TO FOREVER RELEASE, WAIVE AND DISCHARGE THE RELEASED PARTIES OF AND FROM ALL LIENS, CLAIMS, CAUSES OF ACTION, LIABILITIES, ENCUMBRANCES, SECURITY INTERESTS, INTERESTS OR CHARGES OF ANY NATURE OR DESCRIPTION WHATSOEVER RELATING TO THE DEBTOR, THE CHAPTER 11 CASE OR AFFECTING PROPERTY OF THE ESTATE, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, SCHEDULED OR UNSCHEDULED, CONTINGENT OR NOT CONTINGENT, UNLIQUIDATED OR FIXED, ADMITTED OR DISPUTED, MATURED OR UNMATURED, SENIOR OR SUBORDINATED, WHETHER ASSERTABLE DIRECTLY OR DERIVATIVELY BY, THROUGH, OR RELATED TO ANY OF THE RELEASED PARTIES AND THEIR SUCCESSORS AND ASSIGNS WHETHER AT LAW, IN EQUITY OR OTHERWISE, BASED UPON ANY CONDITION, EVENT, ACT, OMISSION OCCURRENCE, TRANSACTION OR OTHER ACTIVITY, INACTIVITY, INSTRUMENT OR OTHER AGREEMENT OF ANY KIND OR NATURE OCCURRING, ARISING OR EXISTING PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO OR ARISING OUT OF, IN WHOLE OR IN PART, THE DEBTOR, THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE NEGOTIATION AND CONSUMMATION OF THE SALE, THE CONSUMMATION OF THE PLAN OR THE ADMINISTRATION OF THE PLAN, INCLUDING WITHOUT LIMITATION, THE NEGOTIATION AND SOLICITATION OF THE PLAN, ALL REGARDLESS OF WHETHER (A) A PROOF OF CLAIM OR EQUITY INTEREST HAS BEEN FILED OR IS DEEMED TO HAVE BEEN FILED, (B) SUCH CLAIM OR EQUITY INTEREST IS ALLOWED OR (C) THE HOLDER OF SUCH CLAIM OR EQUITY INTEREST HAS VOTED TO ACCEPT OR REJECT THE PLAN, EXCEPT FOR WILLFUL MISCONDUCT OR GROSS NEGLIGENCE. FOR THE AVOIDANCE OF DOUBT, NOTHING CONTAINED HEREIN SHALL IMPACT THE RIGHT OF ANY HOLDER OF AN ALLOWED CLAIM TO RECEIVE A DISTRIBUTION ON ACCOUNT OF ITS ALLOWED CLAIM IN ACCORDANCE WITH SECTION 4 OF THE PLAN. THE RELEASES SET FORTH IN THE PLAN, INCLUDING BUT NOT LIMITED TO IN THIS SECTION 11.4, SHALL NOT RELEASE ANY CLAIMS OR CAUSES OF ACTION AGAINST SENIORITY, INC. OR SQLC WITH RESPECT TO ACTIONS OR CONDUCT RELATED TO FACILITIES OTHER THAN THE DEBTOR.**

       5.    **Exculpation.**

None of the Exculpated Parties shall have or incur any liability to any Holder of a Claim or Interest, or other party in interest, or any of their respective members, officers, directors, employees, advisors, professionals, attorneys or agents or any of their successors and assigns, with respect to any Exculpated Claim, including, without limitation, any act or omission in connection with, related to, or arising out of, in whole or in part, the Chapter 11 Case, except for their willful misconduct or gross negligence as determined by a Final Order of a court of competent jurisdiction, and, in all respects, the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

6.      Injunction.

FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR INTEREST IN THE DEBTOR ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN THE PLAN, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS PURSUANT TO THE PLAN, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS:  (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (B) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (C) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH PERSONS OR THE PROPERTY OR ESTATES OF SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (D) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS THEREUNDER SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTOR OR ANY OF ITS ASSETS, PROPERTY OR ESTATE.   ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTOR SHALL BE FULLY RELEASED, AND THE INTERESTS SHALL BE CANCELLED (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN).

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR IN OBLIGATIONS PURSUANT THERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTOR SHALL BE FULLY RELEASED, AND ALL INTERESTS SHALL BE CANCELLED, AND THE DEBTOR'S LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(g) OF THE BANKRUPTCY CODE.**

**ALL PERSONS SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTOR, THE DEBTOR'S ESTATE, ITS RESPECTIVE SUCCESSORS AND ASSIGNS, AND ITS ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.**

### 7. Term of Injunctions or Stays.

Unless otherwise provided in the Plan or Confirmation Order, all injunctions or stays provided for under the Plan and ordered in the Confirmation Order or pursuant to sections 105 or 362 of the Bankruptcy Code arising under or entered during the Chapter 11 Case, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay and to the extent consistent with the terms and provisions of the Plan or the Confirmation Order, as applicable.

### 8. Injunction Against Interference with Plan.

Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests, the Debtor, and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the Debtor's, the Liquidating Trust's, the Liquidating Trustee's, and their respective affiliates', employees', advisors', officers' and directors', and agents' implementation or consummation of the Plan.

### 9. Release of Liens.

Except as otherwise provided in the Plan, or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with, and conditioned upon, the applicable Distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estate shall be fully released. Except as otherwise provided in the Plan, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Debtor's Estate shall be fully released on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code. The liens of the Secured Lenders on their respective Encumbered Excluded Assets shall not be released or

discharged until such Assets are distributed to the applicable Secured Lender in accordance with the Plan.

### 10. Effectuating Documents and Further Transactions.

Upon entry of the Confirmation Order, the appropriate officers of the Debtor and the Liquidating Trustee shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, consents, certificates, resolutions, programs, and other agreements and/or documents, and take such acts and actions as may be reasonably necessary or appropriate to effectuate, implement, consummate, and/or further evidence the terms and conditions of the Plan and any transactions described in or contemplated by the Plan. The Debtor or Liquidating Trustee, as applicable, may, and all Holders of Allowed Claims or Interests receiving Distributions pursuant to the Plan, at the request or direction of the Debtor or Liquidating Trustee, as applicable, shall, from time to time, prepare, execute, and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 11. Corporate Action.

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtor, and any corporate action required by the Debtor in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the Debtor.

### 12. Cancellation of Documents.

On the Effective Date, except to the extent otherwise provided in the Plan, any and all notes, instruments, debentures, certificates and other documents evidencing Claims and Interests in the Debtor including, without limitation, the Bond Documents shall be deemed inoperative and unenforceable against the Debtor and the Debtor shall have no continuing obligations thereunder; *provided*, *however*, the Bonds and the Bond Documents shall be deemed to continue in effect solely to the extent they relate to and are necessary to: (i) allow applicable distributions pursuant to the Plan and Bond Documents, (ii) permit the Bond Trustee to be compensated for fees and reimbursed for expenses, including expenses of its professionals and enforce its indemnity and other rights and protections with respect to and pursuant to the Bond Documents, (iii) permit the Bond Trustee to set one or more record dates and distribution dates with respect to the distribution of funds to beneficial holders of the Bonds, (iv) permit the Bond Trustee to appear in the Bankruptcy Case with respect to matters relevant to the holders of the Bonds and to enforce their rights under the Plan, (v) otherwise continue to govern relationships of the Bond Trustee and holders of the Bonds, and (vi) permit the Bond Trustee to perform any functions that are necessary in connection with the foregoing clauses (i) through (v).

### 13. Dissolution of the Debtor.

On the Effective Date and upon the Debtor causing the Liquidating Trust Assets to be transferred to the Liquidating Trust in accordance with section 6.2 of the Plan, the Debtor shall

have no further duties or responsibilities in connection with implementation of the Plan. Upon entry of a final decree closing the Chapter 11 Case, the Debtor shall be deemed dissolved for all purposes in accordance with applicable state law without the need to take any further action or file any plan of dissolution, notice, or application with any applicable Governmental Unit.

### 14. Preservation of Causes of Action of the Debtor.

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the releases by the Debtor and exculpation provisions provided in the Plan), the Debtor and Liquidating Trustee shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action.

### I. Modification, Revocation or Withdrawal of the Plan

#### 1. Modification and Amendments.

The Plan or any exhibits thereto may be amended, modified, or supplemented by the Debtor in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, the Debtor or Liquidating Trustee may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

#### 2. Effect of Confirmation on Modifications.

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re solicitation under Bankruptcy Rule 3019.

#### 3. Revocation or Withdrawal of the Plan.

The Debtor reserves the right to, consistent with its fiduciary duties, revoke or withdraw the Plan before the Effective Date. If the Debtor revokes or withdraws the Plan, or if the Confirmation Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtor or any other Person; or (iii) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Person.

### J. Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all

49

matters arising out of, or related to, the Chapter 11 Case and the Plan, including, but not limited to, jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount or allowance of Claims;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (i) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including rejection Claims and cure Claims, pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease in connection with the Sale; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

6.      adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, including, but not limited to, the Causes of Action, involving the Liquidating Trustee or the Liquidating Trust;

7.      adjudicate, decide or resolve any and all matters related to any Cause of Action;

8.      adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

9.      enter and enforce any order for the sale of property pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code;

10.      issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of the Plan;

11.      resolve any cases, controversies, suits, disputes or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications and other

provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

12.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

13.     resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the Liquidating Trust, the Liquidating Trust Agreement, any transactions or payments contemplated thereby, or any contract, instrument, release, indenture or other agreement or document relating to any of the foregoing;

14.     adjudicate any and all disputes arising from or relating to Distributions under the Plan;

15.     consider any modifications of the Plan, cure any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

16.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

17.     hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

18.     hear and determine all disputes involving the existence, nature or scope of the Debtor's discharge;

19.     enforce all orders previously entered by the Bankruptcy Court;

20.     hear any other matter not inconsistent with the Bankruptcy Code; and

21.     enter a final decree closing the Chapter 11 Case.

### K.     Miscellaneous Provisions

#### 1.     Payment of Statutory Fees.

All fees payable pursuant to 28 U.S.C. § 1930 shall be paid on the earlier of when due or the Effective Date by the Debtor.  After the Effective Date, the Liquidating Trustee shall be liable for payment of any such fees until entry of a final decree closing the Chapter 11 Case.

#### 2.     Dissolution of Residents' Committee.

On the Effective Date, the Residents' Committee shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Case.

### 3. Section 1125(e) Good Faith Compliance.

As of and subject to the occurrence of the Confirmation Date, the Debtor and its Related Persons shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation.

### 4. Substantial Consummation.

On the Effective Date, the Plan shall be deemed to be substantially consummated within the meaning set forth in section 1101 and pursuant to section 1127(b) of the Bankruptcy Code.

### 5. Section 1146 Exemption.

To the fullest extent permitted under section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of any security under or pursuant to the Plan, and the execution, delivery, or recording of any instrument of transfer under or pursuant to the Plan, and the revesting, transfer, or sale of any property of or to the Liquidating Trust or the Stalking Horse at the Sale, shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or other Governmental Unit in which any instrument under the Plan is to be recorded in accordance with the Plan shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, mortgage recording tax, intangible tax, or similar tax.

### 6. Closing of the Chapter 11 Case.

When all Liquidating Trust Assets have been liquidated and converted into Cash and such Cash has been distributed in accordance with the Liquidating Trust Agreement and the Confirmation Order, the Liquidating Trustee shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### 7. Plan Supplement.

Any exhibits or schedules not filed with the Plan may be contained in the Plan Supplement, if any, and the Debtor reserves the right to file such exhibits or schedules as a Plan Supplement.

### 8. Further Assurances.

The Debtor or the Liquidating Trustee may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtor, the Liquidating Trustee, and all Holders of Claims receiving Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

52

9.      **Exhibits Incorporated.**

All exhibits to the Plan, including the Plan Supplement, are incorporated into and are part of the Plan as if fully set forth therein.

10.     **Inconsistency.**

In the event of any inconsistency among the Plan, the Disclosure Statement and any exhibit to the Disclosure Statement, the provisions of the Plan shall govern.

11.     **No Admissions.**

If the Effective Date does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor, (b) prejudice in any manner the rights of the Debtor or any other party in interest, or (c) constitute an admission of any sort by the Debtor or other party in interest.

12.     **Reservation of Rights.**

Except as expressly set forth therein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order and the Effective Date has occurred.  None of the Plan, any statement or provision contained in the Plan or any action taken or not taken by the Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the Holders of Claims or Interests before the Effective Date.

13.     **Successors and Assigns.**

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries or guardian, if any, of each Person.

14.     **Entire Agreement.**

On the Effective Date, the Plan, supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

15.     **Notices.**

All notices, requests, and demands to or upon the Debtor in the Chapter 11 Case shall be in writing and, unless otherwise provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, if by facsimile transmission, when received and telephonically confirmed to the below recipients:

MAYFLOWER COMMUNITIES, INC.
c/o Ankura Consulting Group LLC
Attention: Louis E. Robichaux IV
15950 Dallas Parkway
Dallas, Texas 75248
Telephone: (214) 200-3689
Facsimile: (214) 200-3686
E-mail: louis.robichaux@ankura.com

with copies to:

DLA PIPER LLP (US)
Attention:  Thomas R. Califano
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone:  (212) 335-4500
Facsimile:  (212) 335-4501
E-mail: thomas.califano@dlapiper.com

- and -

DLA PIPER LLP (US)
Attention:  Rachel Nanes
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Telephone:  (305) 423-8563
Facsimile:  (305) 675-8206
E-mail: rachel.nanes@dlapiper.com
- and -

DLA PIPER LLP (US)
Attention:  Daniel B. Prieto
1900 North Pearl Street, Suite 2200
Dallas, Texas 75201
Telephone: (214) 743-4500
Facsimile: (214) 743-4545
E-mail: dan.prieto@dlapiper.com

All notices and requests to Persons holding any Claim or Interest in any Class shall be sent to them at their last known address or to the last known address of their attorney of record in the Chapter 11 Case.  Any such Holder of a Claim or Interest may designate in writing any other address for purposes of this section, which designation will be effective upon receipt by the Debtor.

### 16. Severability.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 17. Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflicts of laws, shall govern the rights, obligations, construction, and implementation of the Plan and the transactions consummated or to be consummated in connection therewith.

## V. RISK FACTORS IN CONNECTION WITH THE PLAN

The Holders of Claims against the Debtor should read and carefully consider the following risk factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith), before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

### A. Bankruptcy Considerations.

Although the Debtor believes the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan as proposed. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the occurrence of the Effective Date is conditioned on the satisfaction (or waiver) of the conditions precedent set forth in section 10 of the Plan, and there can be no assurance that such conditions will be satisfied or waived. In the event the conditions precedent described in section 10 of the Plan have not been satisfied, or waived (to the extent possible) by the Debtor or applicable parties (as provided for in the Plan) as of the Effective Date, then the Confirmation Order will be vacated, no Distributions will be made pursuant to the Plan, and the Debtor and all Holders of Claims and Interests will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtor believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each Class of Claims and Interests encompass Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Plan provides that Holders of Claims in Class 4 are to receive a Pro Rata share of Liquidating Trust Distributable Cash, which will be generated, in part, by the liquidation of certain Assets and the prosecution of certain Causes of Action. The potential recoveries from such actions, however, are unknown. In addition, there can be no assurance that the Liquidating Trust Assets will be sufficient to pay the fees and expenses of the Liquidating Trustee and/or the Liquidating Trust Professionals or make any Distributions to the Beneficiaries.

The Plan provides for no Distribution to certain Classes as specified in sections 3 and 4 of the Plan. The Bankruptcy Code conclusively deems these Classes to have rejected the Plan. Pursuant to section 1129(a)(10) of the Bankruptcy Code, notwithstanding the fact that these Classes are deemed to have rejected the Plan, the Bankruptcy Court may confirm the Plan if at least one Impaired Class votes to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such class). As to each Impaired Class that has not accepted the Plan, the Plan may be confirmed if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to these Classes. The Debtor believes that the Plan satisfies these requirements.

## B.     Risks Related to the Sale.

The Plan contemplates that the Sale will be consummated with the Stalking Horse and that the Net Sale Proceeds from the Sale will distributed to certain Holders of Claims in accordance with the Plan. Although the Debtor has executed the Stalking Horse APA with the Stalking Horse and the Stalking Horse has been deemed the Successful Bidder, there is no guarantee that the Stalking Horse will close on the transactions. Moreover, there is no guarantee that the Stalking Horse will obtain the requisite approval from state and federal regulatory authorities in connection with the Sale.

## C.     No Duty to Update Disclosures.

The Debtor has no duty to update the information contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Debtor is required to do so pursuant to an order of the Bankruptcy Court. Delivery of the Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

## D.     Representations Outside this Disclosure Statement.

This Disclosure Statement contains representations concerning or related to the Debtor and the Plan that are authorized by the Bankruptcy Code and the Bankruptcy Court. Please be advised that any representations or inducements outside this Disclosure Statement and any related documents which are intended to secure your acceptance or rejection of the Plan should

not be relied upon by Holders of Claims or Interests that are entitled to vote to accept or reject the Plan.

### E.    No Admission.

The information and representations contained herein shall not be construed to constitute an admission of, or be deemed evidence of, any legal effect of the Plan on the Debtor or Holders of Claims and Interests.

### F.    Tax and Other Related Considerations.

A discussion of potential tax consequences of the Plan is provided in section VIII hereof; however, the content of this Disclosure Statement is not intended and should not be construed as tax, legal, business or other professional advice.  Holders of Claims and/or Interests should seek advice from their own independent tax, legal or other professional advisors based on their own individual circumstances.

## VI.    PLAN CONFIRMATION AND CONSUMMATION

### A.    The Confirmation Hearing.

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan (the "***Confirmation Hearing***").  On, or as promptly as practicable after the filing of the Plan and this Disclosure Statement, the Debtor will request, pursuant to the requirements of the Bankruptcy Code and the Bankruptcy Rules, that the Bankruptcy Court schedule the Confirmation Hearing.  Notice of the Confirmation Hearing (the "***Confirmation Hearing Notice***") will be provided to all known Creditors or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Pursuant to Bankruptcy Code section 1128(b), any party in interest may object to confirmation of a plan of reorganization or liquidation.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtor, the basis for the objection and the specific grounds of the objection, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon: (i) counsel for the Debtor, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, New York 10020, Attn: Thomas R. Califano (thomas.califano@dlapiper.com), DLA Piper LLP (US), 1900 North Pearl Street, Suite 2200, Dallas, Texas 75201, Attn: Dan Prieto (dan.prieto@dlapiper.com) and DLA Piper LLP (US), 200 South Biscayne Boulevard, Suite 2500, Miami, Florida 33131, Attn: Rachel Nanes (rachel.nanes@dlapiper.com); (ii) the Debtor's Chief Restructuring Officer and restructuring advisor, Ankura Consulting Group LLC, 15601 Dallas Parkway, Suite 200, Dallas, Texas 75001, Attn: Louis E. Robichaux IV (louis.robichaux@ankura.com) and Michael Morton (michael.morton@ankura.com); (iii) counsel for UMB Bank, N.A., Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn: Daniel Bleck (dbleck@mintz.com) and Charles W. Azano (cwazano@mintz.com); (iv) counsel for the Residents' Committee, Neligan LLP, 325 N. St. Paul Street, Suite 3600, Dallas, Texas

75201; Attn: Patrick J. Neligan, Jr. (pneligan@neliganlaw.com); (v) the Office of the United States Trustee, 1100 Commerce St, Room 976, Dallas, Texas 75242-1699, Attn: Lisa Lambert; and (vi) such other parties as the Bankruptcy Court may order, so as to be *actually received* no later than the date and time designated in the Confirmation Hearing Notice.

Bankruptcy Rule 9014 governs objections to confirmation of the Plan. **UNLESS AN OBJECTION TO CONFIRMATION OF THE PLAN IS TIMELY SERVED UPON THE PARTIES LISTED ABOVE AND FILED WITH THE BANKRUPTCY COURT, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT IN DETERMINING CONFIRMATION OF THE PLAN**.

### B.      Plan Confirmation Requirements Under the Bankruptcy Code.

In order for the Plan to be confirmed, the Bankruptcy Code requires that the Bankruptcy Court determine that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures concerning the Plan have been adequate and have included information concerning all payments made or promised in connection with the Plan and this Chapter 11 Case.  The Bankruptcy Code also requires that: (1) the Plan be accepted by the requisite votes of Creditors except to the extent that confirmation despite dissent is available under Bankruptcy Code section 1129(b); (2) the Plan is feasible (that is, there is a reasonable probability that the Debtor will be able to perform its obligations under the Plan without needing further financial reorganization not contemplated by the Plan); and (3) the Plan is in the "best interests" of all Creditors (that is, Creditors will receive at least as much under the Plan as they would receive in a hypothetical liquidation case under chapter 7 of the Bankruptcy Code).  To confirm the Plan, the Bankruptcy Court must find that all of the above conditions are met, unless the applicable provisions of Bankruptcy Code section 1129(b) are employed to confirm the Plan, subject to satisfying certain conditions, over the dissent or deemed rejections of Classes of Claims.

### 1.      Best Interests of Creditors.

The Bankruptcy Code requires that, with respect to an impaired class of claims or interests, each holder of an impaired claim or interest in such class either (i) accepts the plan or (ii) receives or retains under the plan property of a value, as of the effective date of the plan, that is not less than the amount (value) such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The Debtor, with the assistance of its professionals, have prepared the Liquidation Analysis attached hereto as **Exhibit 2**.  The Liquidation Analysis is based upon a hypothetical liquidation in a chapter 7 case.  In preparing the Liquidation Analysis, the Debtor has taken into account the nature, status and underlying value of its Assets, the ultimate realizable value of its Assets, and the extent to which such Assets are subject to liens and security interests.  In addition, the Liquidation Analysis also reflects the required time and resources necessary to effectuate an orderly wind down of the Facility, which provides critical care to residents and must comply with numerous federal and state regulations.

Based upon the Liquidation Analysis, the Debtor believes that liquidation under chapter 7 would result in smaller distributions, if any, being made to Creditors than those provided for in

the Plan because of: (a) the likelihood that other Assets of the Debtor would have to be sold or otherwise disposed of in a less orderly fashion; (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals; and (c) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtor's operations. In the opinion of the Debtor, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford the Holders of Claims as great a realization potential as afforded to them under the Plan.

Accordingly, the Debtor believes that in a chapter 7 liquidation, Holders of Claims would receive less than such Holders would receive under the Plan. There can be no assurance, however, as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Debtor's conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

## 2. Feasibility of the Plan.

Pursuant to section 1129(a)(11) of the Bankruptcy Code, a debtor must demonstrate that a bankruptcy court's confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor or its successor under the plan, unless such liquidation or reorganization is proposed under the plan. Pursuant to the Plan, the Debtor intends to sell the CCRC Assets to the Stalking Horse and transfer the Excluded Assets (to the extent they are unencumbered), the Causes of Action and all remaining unencumbered Assets to the Liquidating Trust to be liquidated and distributed to Beneficiaries in accordance with the Plan and Liquidating Trust Agreement. Therefore, the Bankruptcy Court's confirmation of the Plan is not likely to be followed by liquidation or the need for any further reorganization.

## 3. Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, that, except as described below, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. As a general matter under the Bankruptcy Code, a class is "impaired," unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such claim or interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their ballots in favor of acceptance. A vote may be disregarded if the Bankruptcy Court determines, after

notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. If no votes to accept or reject the Plan are received with respect to a Class whose votes have been solicited under the Plan (other than a Class that is deemed eliminated under the Plan), such Class shall be deemed to have voted to accept the Plan.

#### 4.      Section 1129(b).

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as: (a) the plan otherwise satisfies the requirements for confirmation; (b) at least one impaired class of claims has accepted it without taking into consideration the votes of any insiders in such class; and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan. These so called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

#### 5.      No Unfair Discrimination.

The "no unfair discrimination" test requires that the plan not provide for unfair treatment with respect to classes of claims or interests that are of equal priority, but are receiving different treatment under the plan.

#### 6.      Fair and Equitable.

The fair and equitable requirement applies to classes of claims of different priority and status, such as secured versus unsecured. The plan satisfies the fair and equitable requirement if no class of claims receives more than 100% of the allowed amount of the claims in such class. Further, if a class of claims is considered a dissenting class ("***Dissenting Class***"), *i.e.*, a Class of Claims that is deemed to reject the Plan because the required majorities in amount and number of votes is not received from the Class, the following requirements apply:

#### a.      Class of Secured Claims.

Each holder of an impaired secured claim either: (i) retains its liens on the subject property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim; (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof); or (iii) receives the "indubitable equivalent" of its allowed secured claim.

#### b.      Class of Unsecured Creditors.

Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and

interests that are junior to the claims of the Dissenting Class will not receive any property under the plan.

### c.     Class of Interests.

Either (i) each interest holder will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the interests of the Dissenting Class will not receive any property under the plan.

The Debtor believes the Plan does not "discriminate unfairly" and will satisfy the "fair and equitable" requirement notwithstanding that certain Classes of Interests are deemed to reject the Plan because no Class that is junior to such Class will receive or retain any property on account of the Claims and Interests in such Class and the Plan does not provide for unfair treatment with respect to Classes of Claims or Interests that are of equal priority.

## VII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor believes the Plan is in the best interests of its Creditors and should accordingly be accepted and confirmed. If the Plan as proposed, however, is not confirmed, the following three alternatives may be available to the Debtor: (i) a liquidation of the Debtor's Assets pursuant to chapter 7 of the Bankruptcy Code; (ii) an alternative plan of reorganization or liquidation may be proposed and confirmed; or (iii) the Debtor's Chapter 11 Case may be dismissed.

### A.     Chapter 7 Liquidation.

If a plan pursuant to chapter 11 of the Bankruptcy Code is not confirmed by the Bankruptcy Court, the Debtor's Chapter 11 Case may be converted to a liquidation case under chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed, pursuant to applicable provisions of chapter 7 of the Bankruptcy Code, to liquidate the Assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtor believes that such a liquidation would result in smaller distributions being made to the Debtor's Creditors than those provided for in the Plan because: (a) the likelihood that other Assets of the Debtor would have to be sold or otherwise disposed of in a less orderly fashion; (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals; and (c) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtor's operations. The Debtor has found that confirmation of the Plan will provide each Holder of an Allowed Claim with a recovery that is not less than such Holder would receive pursuant to liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

### B.     Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code.

If the Plan is not confirmed, the Debtor may propose a different plan, which might involve an alternative means for the reorganization or liquidation of the Debtor's Assets.

However, the Debtor believes that the terms of the Plan provide for an orderly and efficient liquidation of the Debtor's Assets and will result in the realization of the most value for Holders of Claims against the Debtor's Estate.

### C.    Dismissal of the Debtor's Chapter 11 Case.

Dismissal of the Debtor's Chapter 11 Case would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*.  Upon dismissal of the Debtor's Chapter 11 Case, the Debtor would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with the various creditors of the Debtor, and possibly resulting in costly and protracted litigation in various jurisdictions. Most significantly, dismissal of the Debtor's Chapter 11 Case would permit secured Creditors to foreclose upon any Assets that are subject to their Liens.  Dismissal will also permit unpaid unsecured creditors to obtain and enforce judgments against the Debtor.  The Debtor believes that these actions could lead ultimately to the liquidation of the Debtor's Assets under chapter 7 of the Bankruptcy Code.  Therefore, the Debtor believes that dismissal of the Debtor's Chapter 11 Case is not a preferable alternative to the Plan.

## VIII.   CERTAIN FEDERAL TAX CONSEQUENCES

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.   THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

### A.    General.

The following discussion summarizes certain material U.S. federal income tax consequences to the Debtor, the Liquidating Trust and Holders entitled to vote on the Plan.  This discussion is based on current provisions of the IRC, applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service (the "*Service*").   There can be no assurance that the Service will not take a contrary view, no ruling from the Service has been or will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein.  Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to Holders of Claims, the Liquidating Trust or the Debtor.  It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described herein.

62

The following summary is for general information only. The tax treatment of a Holder may vary depending upon such Holder's particular situation. This summary does not address foreign, state or local tax consequences of the transactions contemplated under the Plan, nor does it address all of the tax consequences that may be relevant to a Holder, including any alternative minimum tax consequences and does not address the tax consequences to a Holder that has made an agreement to resolve its Claim in a manner not explicitly provided for in the Plan. This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan or Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities, Holders that have a "functional currency" other than the United States dollar and Holders that have acquired Claims in connection with the performance of services. The following summary assumes that the Claims are held by Holders as "capital assets" within the meaning of Section 1221 of the IRC and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives Distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the Holder. Therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

### B.      U.S. Federal Income Tax Consequences to the Debtor.

The Debtor is a not-for-profit corporation that is exempt from federal income taxation under 501(c)(3) of the IRC. It is intended that nothing in the Plan shall adversely affect the tax-exempt status of the Debtor. Accordingly, the Debtor does not expect the implementation of the Plan to have any adverse federal income tax consequences on the Debtor before or after the Effective Date. If the tax-exempt status of the Debtor would terminate, the Debtor may be subject to tax on its income, which would reduce the amount of distributions payable to the Holders of Claims.

### C.      U.S. Federal Income Tax Treatment With Respect to the Liquidating Trust.

It is intended that the Liquidating Trust will be treated as a "grantor trust" for U.S. federal income tax purposes. In general, a grantor trust is not a separate taxable entity. The Service, in

Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an advanced ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Debtor is not requesting a private letter ruling regarding the status of the Liquidating Trust as a grantor trust. Consistent with the requirements of Revenue Procedure 94-45, however, the Liquidating Trust Agreement requires all relevant parties to treat, for federal income tax purposes, the transfer of the Liquidating Trust Assets to the Liquidating Trust as (i) a transfer of such Assets to the Beneficiaries of the Liquidating Trust (to the extent of the value of their respective interests in the applicable Liquidating Trust Assets) followed by (ii) a transfer of such Assets by such Beneficiaries to the Liquidating Trust (to the extent of the value of their respective interests in the applicable Liquidating Trust Assets), with the beneficiaries of the Liquidating Trust being treated as the grantors and owners of the Liquidating Trust. Each beneficiary of the Liquidating Trust will generally recognize gain (or loss) in its taxable year that includes the Effective Date in an amount equal to the difference between the amount realized in respect of its Claim and its adjusted tax basis in such Claim (other than basis attributable to accrued but unpaid interest previously included in the U.S. Holder's taxable income). The amount realized for this purpose should generally equal the amount of cash and the fair market value of any other Assets received or deemed received for U.S. federal income tax purposes under the Plan in respect of such Holder's Claim (other than any consideration attributable to an Allowed Claim for accrued but unpaid interest described more fully below). A Holder that is deemed to receive for U.S. federal income tax purposes a non-cash asset under the Plan in respect of its Claim should generally have a tax basis in such asset (other than attributable to accrued but unpaid interest, if any, as described more fully below) in an amount equal to the fair market value of such asset on the date of its deemed receipt.

The Plan and the Liquidating Trust Agreement generally provide that the Beneficiaries of the Liquidating Trust must value the Liquidating Trust Assets consistently with the values determined by the Liquidating Trustee for all U.S. federal, state, and local income tax purposes. As soon as possible after the Effective Date, the Liquidating Trustee shall make a good faith valuation of the Liquidating Trust Assets.

Consistent with the treatment of the Liquidating Trust as a grantor trust, the Liquidating Trust Agreement and the Plan will require each Holder to report on its U.S. federal income tax return its allocable share of the Liquidating Trust's income. Therefore, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of the income of the Liquidating Trust whether or not the Liquidating Trust has made any distributions to such Holder. The character of items of income, gain, deduction, and credit to any Holder and the ability of such Holder to benefit from any deduction or losses will depend on the particular situation of such Holder.

In general, a distribution of underlying assets from the Liquidating Trust to a Beneficiary thereof may not be taxable to such Holder because such Holders are already regarded for U.S. federal income tax purposes as owning such assets. Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of distributions from the Liquidating Trust.

The Liquidating Trustee will file with the Service tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and will also send to each Holder a separate statement setting forth such Holder's share of items of Liquidating Trust

income, gain, loss, deduction, or credit. Each such Holder will be required to report such items on its U.S. federal income tax return.

The discussion above assumes that the Liquidating Trust will be respected as a grantor trust for U.S. federal income tax purposes. If the Service were to successfully challenge such classification, the U.S. federal income tax consequences to the Liquidating Trust and the beneficiaries of the Liquidating Trust could differ materially from those discussed herein (including the potential for an entity level tax to be imposed on all income of the Liquidating Trust).

> **D.      U.S. Federal Income Tax Treatment With Respect to Holders of Allowed Claims that are Beneficiaries of the Liquidating Trust.**

Holders of Allowed Claims as of the Effective Date that are Beneficiaries of the Liquidating Trust should be treated as receiving from the Debtor their respective shares of the applicable Liquidating Trust Assets in satisfaction of their Allowed Claims, and simultaneously transferring such assets to the Liquidating Trust. Accordingly, a Holder of such Claim should generally recognize gain or loss in an amount equal to the amount deemed realized on the Effective Date (as described above) less its adjusted tax basis of its Claim (other than basis attributable to accrued but unpaid interest previously included in the U.S. Holder's taxable income). Additionally, such Holders should generally recognize their allocable share of income, gain, loss and deductions recognized by the Liquidating Trust on an annual basis.

Because a Holder's ultimate share of the Liquidating Trust Assets based on its Allowed Claim will not be determinable on the Effective Date due to, among other things, the existence of Disputed Claims and the value of the assets at the time of actual receipt not being ascertainable on the Effective Date, such Holder should recognize additional or offsetting gain or loss if, and to the extent that, the aggregate amount of cash and fair market value of the Liquidating Trust Assets ultimately received by such Holder is greater than or less than the amount used in initially determining gain or loss in accordance with the procedures described in the preceding paragraph. It is unclear when a Holder of an Allowed Claim that is a beneficiary of the Liquidating Trust should recognize, as an additional amount received for purposes of computing gain or loss, an amount attributable to the disallowance of a Disputed Claim.

It is possible that the Service may assert that any loss should not be recognizable until the Liquidating Trustee makes its final distribution of the Liquidating Trust Assets. Holders should consult their tax advisors regarding the possibility that the recognition of gain or loss may be deferred until the final distribution of the Liquidating Trust Assets.

Although not free from doubt, Holders of Disputed Claims should not recognize any gain or loss on the date that the Liquidating Trust Assets are transferred to the Liquidating Trust, but should recognize gain or loss in an amount equal to: (i) the amount of cash and the fair market value of any other property actually distributed to such Holder (other than any consideration attributable to accrued but unpaid interest) less (ii) the adjusted tax basis of its Claim (other than attributable to accrued but unpaid interest, if any). It is possible, however, that such Holders may be required to recognize the fair market value of such Holder's allocable share of the Liquidating Trust Assets, as an amount received for purposes of computing gain or loss, either on the Effective Date or the date such Holder's Claim becomes an Allowed Claim.

To the extent a Holder of an Allowed Claim receives consideration that is attributable to unpaid accrued interest on the Allowed Claim, the Holder will be required to treat such consideration as a payment of interest (except to the extent of unpaid accrued interest previously included in gross income by the Holder). A Holder's tax basis in property received pursuant to the Plan that is considered attributable to unpaid accrued interest should be equal to the amount of interest income treated as satisfied by the receipt of the property, and its holding period in the property should begin on the day after the Effective Date. A Holder generally will be entitled to recognize a loss to the extent any accrued interest previously included in its gross income is not paid in full. Although not entirely clear, such a loss may be treated as an ordinary loss rather than a capital loss. Each Holder should consult its tax advisor regarding the determination of the amount of consideration received under the Plan that is attributable to interest (if any).

E.      **Market Discount.**

Any Holder of a Claim with tax basis less than the amount payable at maturity (or possibly the "adjusted issue price") generally will be subject to the market discount rules of the IRC (unless such difference is less than a prescribed de minimis amount). Under the market discount rules, a Holder is required to treat any principal payment on, or any gain recognized on the sale, exchange, retirement or other disposition of, a Claim as ordinary income (instead of capital gain) to the extent of the market discount that has not previously been included in income and is treated as having accrued on such Claim at the time of such payment or disposition.

Any market discount will be considered to accrue on a straight-line basis during the period from the date of acquisition of such Claims to their maturity date, unless the holder irrevocably elects to compute the accrual on a constant yield basis. This election can be made on a Claim-by-Claim basis.

F.      **Limitation on Use of Capital Losses**

A Holder of a Claim who recognizes capital losses as a result of the implementation of the Plan will be subject to limits on the use of such capital losses. For a non-corporate Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. A non-corporate Holder may carry over unused capital losses and apply them against future capital gains and a similar portion of their ordinary income for an unlimited number of years. For corporate Holders, capital losses may only be used to offset capital gains. A corporate Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three (3) years preceding the capital loss year, but may carry over unused capital losses for only the five (5) years following the capital loss year.

## IX.    RECOMMENDATION AND CONCLUSION

The Debtor believes the Plan is in the best interests of its Estate, Creditors and other interested parties and urge the Holders of Impaired Claims entitled to vote to accept the Plan and to evidence such acceptance by properly voting and timely returning their ballots.

Dated: August 5, 2019                                   Respectfully submitted,

Mayflower Communities, Inc.

By:    */s/ Louis E. Robichaux IV*
        Name: Louis E. Robichaux IV
        Title: Chief Restructuring Officer

**<u>Exhibit 1</u>**

Debtor's First Amended Plan of Liquidation Pursuant to
Chapter 11 of the Bankruptcy Code, dated August 5, 2019

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **CHAPTER 11** |
| **MAYFLOWER COMMUNITIES, INC.[1]** | § | |
| | § | **CASE NO. 19-30283 (HDH)** |
| Debtor. | § | |

**DEBTOR'S FIRST AMENDED PLAN OF LIQUIDATION**
**PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Daniel B. Prieto, State Bar No. 24048744
DLA Piper LLP (US)
1900 North Pearl Street, Suite 2200
Dallas, Texas 75201
Telephone: (214) 743-4500
Facsimile: (214) 743-4545
E-mail: dan.prieto@dlapiper.com

Thomas R. Califano (admitted *pro hac vice*)
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
E-mail: thomas.califano@dlapiper.com

Rachel Nanes (admitted *pro hac vice*)
DLA Piper LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Telephone: (305) 423-8563
Facsimile: (305) 675-8206
E-mail: rachel.nanes@dlapiper.com

*Attorneys for the Debtor and Debtor in Possession*

Dated: August 5, 2019

---

[1] The last four digits of the Debtor's federal tax identification number are 6350. The mailing address for the Debtor is 1335 S. Guilford Road Carmel, Indiana 46032-2810.

## TABLE OF CONTENTS

SECTION 1.     DEFINITIONS AND INTERPRETATION ...................................................... 4
    1.1     Definitions ........................................................................................................ 4
    1.2     Interpretation, Application of Definitions and Rules of Construction ............ 14
    1.3     Computation of Time ...................................................................................... 14
SECTION 2.     ADMINISTRATIVE AND PRIORITY CLAIMS ........................................ 15
    2.1     Administrative Expense Claims ...................................................................... 15
    2.2     Accrued Professional Compensation Claims .................................................. 15
    2.3     Priority Tax Claims ......................................................................................... 16
SECTION 3.     CLASSIFICATION OF CLAIMS AND INTERESTS ................................ 16
SECTION 4.     TREATMENT OF CLAIMS AND INTERESTS ......................................... 17
    4.1     Other Priority Claims (Class 1) ...................................................................... 17
    4.2     Bondholder Secured Claim (Class 2) ............................................................. 17
    4.3     Other Secured Claims (Class 3) ..................................................................... 17
    4.4     General Unsecured Claims (Class 4) .............................................................. 18
    4.5     Interests in the Barrington (Class 5) .............................................................. 18
SECTION 5.     CRAMDOWN. .............................................................................................. 18
SECTION 6.     MEANS FOR IMPLEMENTATION OF THE PLAN .............................. 18
    6.1     Transfers to Bond Trustee ............................................................................... 18
    6.2     Liquidating Trust ............................................................................................ 18
SECTION 7.     DISTRIBUTIONS .......................................................................................... 24
    7.1     Distribution Record Date ................................................................................ 24
    7.2     Date of Distributions ...................................................................................... 24
    7.3     Disbursing Agent ............................................................................................ 25
    7.4     Rights and Powers of Disbursing Agent ........................................................ 25
    7.5     Delivery of Distributions in General .............................................................. 25
    7.6     Payments and Distributions on Disputed Claims ........................................... 25
    7.7     Manner of Payment ......................................................................................... 25
    7.8     Undeliverable Distributions and Unclaimed Property .................................... 26
    7.9     Withholding and Reporting Requirements ...................................................... 26
    7.10    Surrender Instruments ..................................................................................... 26
    7.11    Setoffs ............................................................................................................. 26
    7.12    Insurance Claims ............................................................................................. 26
    7.13    Applicability of Insurance Policies ................................................................ 26
    7.14    No Postpetition Interest .................................................................................. 27
    7.15    Distributions Free and Clear ........................................................................... 27

7.16    Fractional Dollars; De Minimis Distributions ................................................. 27

**SECTION 8.        PROCEDURES FOR DISPUTED CLAIMS .................................. 27**

8.1    Allowance of Claims and Interests .................................................... 27

8.2    Objections to Claims ..................................................................... 27

8.3    Estimation of Claims ..................................................................... 28

8.4    No Distribution Pending Allowance ................................................. 28

8.5    Distributions after Allowance ......................................................... 28

8.6    Preservations of Rights to Settle Claims ........................................... 28

8.7    Disallowed Claims ........................................................................ 28

**SECTION 9.        EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........... 29**

9.1    Assumption and Rejection of Executory Contracts and Unexpired Leases ...... 29

9.2    Inclusiveness ............................................................................... 29

9.3    Rejection Claims ........................................................................... 29

9.4    Cure of Defaults ........................................................................... 29

9.5    Full Release and Satisfaction .......................................................... 29

9.6    Reservation of Rights ..................................................................... 30

**SECTION 10.      CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE ............................................................................ 30**

10.1    Conditions Precedent to Confirmation ............................................. 30

10.2    Conditions Precedent to the Effective Date ....................................... 30

10.3    Waiver of Conditions ................................................................... 31

10.4    Effect of Failure of Conditions ...................................................... 31

**SECTION 11.      EFFECT OF CONFIRMATION ........................................... 31**

11.1    Immediate Binding Effect .............................................................. 31

11.2    Compromise and Settlement of Claims, Interests and Controversies .......... 31

11.3    Releases by the Debtor .................................................................. 31

11.4    Releases by Holders of Claims ....................................................... 32

11.5    Exculpation ................................................................................ 33

11.6    Injunction .................................................................................. 33

11.7    Term of Injunctions or Stays .......................................................... 34

11.8    Injunction Against Interference with Plan ......................................... 34

11.9    Release of Liens .......................................................................... 35

11.10   Effectuating Documents and Further Transactions .............................. 35

11.11   Corporate Action ......................................................................... 35

11.12   Cancellation of Documents ............................................................ 35

11.13   Dissolution of the Debtor .............................................................. 36

11.14   Preservation of Causes of Action of the Debtor .................................. 36

**SECTION 12.**     **MODIFICATION, REVOCATION OR WITHDRAWAL OF THIS PLAN ...... 36**

    12.1     Modification and Amendments .................................................................. 36

    12.2     Effect of Confirmation on Modifications ................................................. 36

    12.3     Revocation or Withdrawal of this Plan .................................................... 36

**SECTION 13.**     **RETENTION OF JURISDICTION .......................................................... 37**

**SECTION 14.**     **MISCELLANEOUS PROVISIONS ........................................................ 38**

    14.1     Payment of Statutory Fees ....................................................................... 38

    14.2     Dissolution of Residents' Committee ...................................................... 39

    14.3     Section 1125(e) Good Faith Compliance ................................................ 39

    14.4     Substantial Consummation ...................................................................... 39

    14.5     Section 1146 Exemption .......................................................................... 39

    14.6     Closing of the Chapter 11 Case ............................................................... 39

    14.7     Plan Supplement ...................................................................................... 39

    14.8     Further Assurances .................................................................................. 39

    14.9     Exhibits Incorporated .............................................................................. 39

    14.10     Inconsistency .......................................................................................... 40

    14.11     No Admissions ........................................................................................ 40

    14.12     Reservation of Rights .............................................................................. 40

    14.13     Successors and Assigns ........................................................................... 40

    14.14     Entire Agreement .................................................................................... 40

    14.15     Notices .................................................................................................... 40

    14.16     Severability ............................................................................................. 41

    14.17     Governing Law ....................................................................................... 41

    14.18     Request for Confirmation ........................................................................ 42

## INTRODUCTION

On January 30, 2019, Mayflower Communities, Inc. d/b/a The Barrington of Carmel filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and rule 3019 of the Federal Rules of Bankruptcy Procedure, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this *Debtor's First Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* prior to its substantial consummation. Reference is made to the *First Amended Disclosure Statement for the Debtor's First Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* for a discussion of the Debtor's history and assets, a summary and analysis of this Plan, and certain related matters, including the distributions to be made under this Plan and the risk factors relating to consummation of this Plan. Capitalized terms used but not defined herein have the meanings ascribed to them in Section 1 of this Plan.

## SECTION 1. DEFINITIONS AND INTERPRETATION

   1.1   *Definitions*.

The following terms used herein shall have the respective meanings below:

   ***Accrued Professional Compensation Claim*** means, at any given time, all accrued, contingent and/or unpaid fees (including any payments owed to Cushman & Wakefield U.S., Inc. in connection with the Sale) for legal, financial advisory, investment banking, accounting, real estate brokerage and other services and obligations for reimbursement of expenses rendered or incurred before the Effective Date under sections 328, 330(a), 331 or 363 of the Bankruptcy Code by any retained Professional in the Chapter 11 Case, or under section 503 of the Bankruptcy Code, that the Bankruptcy Court has not denied by a Final Order, all to the extent that any such fees and expenses have not been previously paid and all subject to the amounts set forth in the Budget and all other orders entered by the Bankruptcy Court related to the foregoing.

   ***Administrative Expense Claim*** means any Claim for costs and expenses of administration pursuant to sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Debtor's Estate and operating the business of the Debtor; (b) all fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930; (c) Claims for the value of any goods received by the Debtor within twenty (20) days before the Petition Date allowed in accordance with section 503(b)(9) of the Bankruptcy Code; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Case pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code.

   ***Administrative Expense Claims Bar Date*** means the first Business Day that is thirty (30) days after the Effective Date or such other date ordered by the Bankruptcy Court.

   ***Allowed*** means, with reference to any Claim against the Debtor, a Claim (i) as to which no objection or request for estimation has been filed on or before any deadline therefor set by the Bankruptcy Court or the expiration of such other applicable period fixed by the Bankruptcy Court or this Plan; (ii) as to which any objection has been settled, waived, withdrawn or denied by a Final Order or in accordance with this Plan; or (iii) that is allowed (a) by a Final Order, (b) by

4

an agreement between the Holder of such Claim and the Debtor or Liquidating Trustee or (c) pursuant to the terms of this Plan; *provided, however*, that, notwithstanding anything herein to the contrary, by treating a Claim as "Allowed" under clause (i) above (the expiration of the applicable deadline), neither the Debtor nor the Liquidating Trustee waives its rights to contest the amount and validity of any disputed, contingent and/or unliquidated Claim in the time, manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Case had not been commenced. An Allowed Claim shall be net of any valid setoff exercised with respect to such Claim pursuant to the provisions of the Bankruptcy Code and applicable law. Moreover, any portion of a Claim that is satisfied, released, or waived during the Chapter 11 Case is not an Allowed Claim. Unless otherwise specified in this Plan, in section 506(b) of the Bankruptcy Code or by Final Order of the Bankruptcy Court, "Allowed" Claims shall not, for purposes of Distributions under this Plan, include interest on such Claim accruing from and after the Petition Date.

*Assets* means all assets of the Debtor of any nature whatsoever, including, without limitation, all property of the Debtor's Estate pursuant to section 541 of the Bankruptcy Code, Cash, Avoidance Actions, Causes of Action, equipment, inventory, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and proceeds of any of the foregoing.

*Avoidance Actions* means any and all avoidance, recovery, subordination or other actions or remedies that may be brought on behalf of the Debtor or the Estate under sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code and under similar state or federal statutes and common law, including, without limitation, fraudulent transfer laws, whether or not litigation is commenced to prosecute such actions or remedies.

*Ballot* means the ballots upon which Holders of Impaired Claims entitled to vote on this Plan have indicated their acceptance or rejection of this Plan in accordance with the instructions regarding voting.

*Bankruptcy Code* means title 11 of the United States Code, as now in effect or hereafter applicable to this Chapter 11 Case.

*Bankruptcy Court* means the United States Bankruptcy Court for the Northern District of Texas having jurisdiction over the Chapter 11 Case.

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure, as amended, and the local rules of the Bankruptcy Court, as applicable to the Chapter 11 Case.

*Barrington* means the Debtor.

*Beneficiaries* means Holders of Allowed General Unsecured Claims and Deficiency Claims against the Debtor's Estate as beneficiaries of the Liquidating Trust, as defined in the Liquidating Trust Agreement.

*Bond Claims* means, collectively, the Bondholder Secured Claim and the Bondholder Deficiency Claim, which Claims are Allowed in the total amount of $94,096,671.88 pursuant to the Final Cash Collateral Order.

5

**Bond Documents** means, collectively, the Bond Indenture, Master Indenture, Mortgage and Security Agreement, Loan Agreement, and any other documents entered into in connection with the Bonds.

**Bond Indenture** means that certain Bond Trust Indenture, dated as of August 1, 2012, between the City of Carmel, Indiana and The Bank of New York Mellon Trust Company, N.A., as predecessor to the Bond Trustee.

**Bond Trustee** means (i) UMB Bank, N.A., in its capacity as successor trustee under the Bond Indenture, (ii) UMB Bank, N.A., in its capacity as successor master trustee under the Master Indenture, and (iii) any successor trustee in either capacity.

**Bondholder Deficiency Claim** means the Allowed General Unsecured Claim of the holders of the Bonds for the difference between (a) $94,096,671.88 and (b) the amount of the Bondholder Secured Claim.

**Bondholder Secured Claim** means the Allowed Secured Claim of the holders of the Bonds in the amount of the value paid to the holders of the Bonds pursuant to section 4.2 of the Plan.

**Bonds** means, collectively, the Series 2012A Bonds, the Series 2012B Bonds, the Series 2012C Bonds, and the Series 2012D Bonds.

**Budget** shall mean the cash collateral budget agreed to between the Debtor and the Bond Trustee attached to the *Final Order (1) Authorizing the Debtor to Use the Cash Collateral of UMB Bank, N.A. as Bond Trustee; (2) Providing UMB Bank, N.A. as Bond Trustee, Adequate Protection; and (3) Modifying the Automatic Stay* [Docket No. 217].

**Business Day** means any day of the calendar week, except Saturday, Sunday, a "legal holiday," as defined in Bankruptcy Rule 9006(a), or any day on which commercial banks are authorized or required by law to close in Dallas, Texas.

**Cash** means cash and cash equivalents including, without limitation, checks and wire transfers; *provided, that* other than as set forth in the Bond Documents, as applicable, no Distributions to be made in Cash under this Plan shall be comprised of any funds held by the Bond Trustee pursuant to the Bond Documents.

**Causes of Action** means any claim, cause of action, controversy, demand, agreement, right (including to legal or equitable remedies), action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law, asserted or which may be asserted by or on behalf of the Debtor and/or the Estate, including: (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Avoidance

6

Action; and (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

*Chapter 11 Case* means the Debtor's chapter 11 case pending in the Bankruptcy Court under case number 19-30283-hdh11.

*Claim* has the meaning set forth in section 101(5) of the Bankruptcy Code.

*Class* means a class or category of Claims or Interests as classified and described in Section 3 of this Plan.

*Closing Date* means the date on which the Debtor closes on the sale of substantially all of its Assets to the Stalking Horse.

*Collateral* means any property or interest in property of the Estate subject to a Lien, charge or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or other applicable law.

*Confirmation Date* means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the Bankruptcy Court's docket in the Chapter 11 Case.

*Confirmation Hearing* means the hearing on confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

*Confirmation Order* means the order entered by the Bankruptcy Court confirming this Plan in accordance with chapter 11 of the Bankruptcy Code.

*Contingent Claim* means any contingent or unliquidated Claim asserted or which may be asserted against the Debtor.

*Continuing Care Contract* means those certain residence and care agreements entered into by and between the residents of the Barrington, on the one hand, and the Barrington, on the other hand, and any additional documents related thereto including resident parking agreements.

*Creditor* means a Holder of a Claim.

*Cure* means the payment of Cash by the Debtor, the Stalking Horse, or the Liquidating Trustee, as applicable, as necessary to (i) cure a monetary default by the Debtor in accordance with the terms of an Executory Contract or Unexpired Lease of the Debtor, and (ii) permit the Debtor to assume such Executory Contract or Unexpired Lease under section 365(a) of the Bankruptcy Code.

*Debtor* means the Barrington as debtor and debtor in possession, and includes the Estate.

***Debtor in Possession*** means the Debtor in its capacity as debtor in possession in the Chapter 11 Case pursuant to sections 1101, 1107(a) and 1108 of the Bankruptcy Code.

***Debtor Released Claims*** shall have the meaning set forth in section 11.3.

***Deficiency Claim*** means a General Unsecured Claim for the difference between (a) the aggregate amount of an Allowed Claim and (b) the value received on account of the portion of such Allowed Claim that is a Secured Claim.

***Disallowed Claim*** means any Claim or portion thereof which has been disallowed by a Final Order and includes any Claim which is not an Allowed Claim for any other reason.

***Disclosure Statement*** means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Plan, as such disclosure statement may be altered, modified, or amended.

***Disputed Claim*** means a Claim that has neither been Allowed nor disallowed pursuant to a Final Order of the Bankruptcy Court, and (a) if no Proof of Claim has been filed by the applicable deadline: (i) a Claim that has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated; or (ii) a Claim that has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but as to which the Debtor, Liquidating Trustee, or any other party in interest has interposed an objection or request for estimation which has not been withdrawn or determined by a Final Order; or (b) if a Proof of Claim or other request for payment has been filed by the applicable deadline: (i) a Claim for which no corresponding Claim has been or hereafter is listed on the Schedules or Allowed in this Plan; (ii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but the nature or amount of the Claim or as asserted in the Proof of Claim varies from the nature and amount of such Claim as listed on the Schedules to the extent of such positive variance; (iii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated; or (iv) a Claim for which a timely objection or request for estimation is interposed by the Debtor, the Liquidating Trustee, or any other party in interest which has not been withdrawn or determined by a Final Order.

***Distribution*** means Cash, property, interests in property or other value distributed to Holders of Allowed Claims, or their designated agents, under this Plan.

***Distribution Record Date*** means five (5) Business Days prior to the Confirmation Date.

***Effective Date*** means the first Business Day after the Confirmation Date on which the conditions precedent specified in Section 10 of this Plan have been either satisfied or waived.

***Encumbered Excluded Assets*** shall have the meaning set forth in section III(L)(b) of the Disclosure Statement.

***Estate*** means the estate created in the Chapter 11 Case containing all property and other interests of the Debtor pursuant to section 541 of the Bankruptcy Code.

8

***Excluded Assets*** shall have the meaning set forth in section III(L)(b) of the Disclosure Statement.

***Exculpated Claim*** means any claim related to any act or omission in connection with, relating to or arising out of (i) any in-court or out-of-court forbearance or restructuring arrangement involving the Debtor and its current and former employees, agents, representatives, advisors, consultants and attorneys, (ii) the Chapter 11 Case, (iii) the negotiation or consummation of the Sale, (iv) the negotiation, administration or consummation of any cash collateral arrangement in the Chapter 11 Case, (v) the formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement or this Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or this Plan, (vi) the filing of the Chapter 11 Case, (vii) the pursuit of confirmation of this Plan, (viii) the administration and implementation of this Plan, or (ix) the Distribution of property under this Plan and/or any other related agreement; *provided*, *however*, that Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct under applicable non-bankruptcy law. No Cause of Action, obligation or liability expressly preserved by the Plan or the Plan Supplement constitutes an Exculpated Claim.

***Exculpated Party*** means each of: (i) the Debtor, (ii) the Residents' Committee; (iii) the Bond Trustee, (iv) the Liquidating Trustee, (v) the Liquidating Trust, and (vi) the current and former officers, directors, members, managers, employees, attorneys, consultants and advisors, each in their respective capacities as such, of each of the foregoing.

***Executory Contract*** means a contract to which the Debtor is a party that is capable of assumption or rejection under section 365 of the Bankruptcy Code.

***Facility*** means the continuing care retirement community owned and operated by the Barrington, known as "The Barrington of Carmel."

***Final Cash Collateral Order*** means any order, whether interim or final, authorizing the use by the Debtor during the Chapter 11 Case of the cash collateral of the Bond Trustee.

***Final Order*** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, that has been entered on the docket in the Chapter 11 Case or the docket of any other court of competent jurisdiction, and, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rule 9024, may be filed relating to such order shall not cause such order to not be a Final Order.

9

**General Unsecured Claim** means a Deficiency Claim and any Claim asserted against the Debtor which is not included within the other specifically defined Classes hereunder.

**Governmental Unit** has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

**Gross Holdback Escrow Amount** means any amount of the Purchase Price held in a third-party escrow account in connection with the Sale.

**Holdback Escrow Termination Date** means the date that is the twelve (12) month anniversary of the Closing Date or such other date on which the Debtor's interest in the Gross Holdback Escrow Amount is released from escrow.

**Holder** means the legal or beneficial holder of a Claim or Interest.

**Impaired** means, with respect to a Claim or Interest, that such Class of Claims or Interests is impaired within the meaning of section 1124 of the Bankruptcy Code.

**Insurance Policies** means, collectively, all of the Debtor's insurance policies.

**Interest** means the interest of any Holder in an equity security of the Debtor, within the meaning of section 101(16) of the Bankruptcy Code represented by any issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership or membership interest in the Debtor, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, including a partnership, limited liability company or similar interest in the Debtor.

**Issuer** means the City of Carmel pursuant to the Bond Indenture.

**Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**Liquidating Trust** means the grantor trust to be created upon the Effective Date for the benefit of the Beneficiaries.

**Liquidating Trust Agreement** means the agreement, substantially in the form included in the Plan Supplement, governing the operations of the Liquidating Trust, as it may be subsequently modified from time to time.

**Liquidating Trust Assets** means the assets held in the Liquidating Trust comprised of (i) Liquidating Trust Contribution; (ii) the Encumbered Excluded Assets that are subject to the Bond Trustee's Lien and not otherwise turned over to the Bond Trustee on the Effective Date; (iii) the Excluded Assets from the Sale, to the extent such assets are not encumbered by a Lien; (iv) all Causes of Action of the Debtor's Estate, except those expressly waived herein, and (v) all other unencumbered assets of the Debtor's Estate remaining after all required payments have been made pursuant to the Plan, Confirmation Order, and Liquidating Trust Agreement, as applicable.

10

*Liquidating Trust Contribution* means $100,000 to be funded, first, from any Cash on hand of the Debtor on the Effective Date, and, second, from the proceeds of the Sale that would otherwise be paid to the Bond Trustee.

*Liquidating Trust Distributable Cash* means all Liquidating Trust Assets, other than the Encumbered Excluded Assets that are subject to the Bond Trustee's Lien and not otherwise turned over to the Bond Trustee on the Effective Date, reduced to Cash.

*Liquidating Trust Monthly Fee Statements* shall have the meaning set forth in section 6.2(f).

*Liquidating Trust Professionals* shall have the meaning set forth in section 6.2(f).

*Liquidating Trust Reserve* shall have the meaning set forth in section 6.2(b).

*Liquidating Trustee* means the individual or entity designated and retained as the trustee to the Liquidating Trust, as of the Effective Date or as soon as reasonably practicable thereafter, as the fiduciary responsible for administering the Liquidating Trust.

*Loan Agreement* means that Loan Agreement dated as of August 1, 2012 between Barrington and the Issuer.

*Master Indenture* means that Master Trust Indenture dated as of August 1, 2012, between Barrington, as the initial member of the obligated group, and the Master Trustee.

*Master Trustee* means the Bank of New York Mellon Trust Company, N.A. in its capacity as prior master trustee under the Bond Indenture and the Master Indenture.

*Mortgage and Security Agreement* means that Mortgage, Assignment of Leases and Rents, Security Agreement, and Fixture Filing dated as of August 1, 2012 between Barrington and the Master Trustee.

*Net Holdback Escrow Amount* means the Debtor's interest in the Gross Holdback Escrow Amount on the Holdback Escrow Termination Date. The Bond Trustee shall continue to have a Lien on the Debtor's right to receive the Net Holdback Escrow Amount.

*Net Sale Proceeds* means the gross proceeds of the Sale, net of (i) the Gross Holdback Escrow Amount; (ii) the Liquidating Trust Reserve; (iii) the Liquidating Trust Contribution, to the extent not funded from Cash on hand of the Debtor on the Effective Date; and (iv) any proceeds of the Sale previously distributed to the Bond Trustee pursuant to the *Order (I) Approving the Asset Purchase Agreement Between the Debtor and Prairie Landing Community, Inc.; (II) Authorizing the Sale of Substantially All of the Debtor's Assets Free and Clear of Liens, Claims, Interests and Encumbrances, Except for Certain Assumed Liabilities; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith; and (IV) Granting Related Relief* [Docket No. 318].

*Other Priority Claim* means any Claim entitled to priority under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

11

**Other Secured Claim** means a Secured Claim other than the Bondholder Secured Claim.

**Person** means an individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust, estate, unincorporated organization, governmental unit, government (or agency or political subdivision thereof), or other entity, including, without limitation, the Debtor.

**Petition Date** means January 30, 2019.

**Plan** means this plan of liquidation, either in its present form or as it may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, or the terms hereof, as the case may be, together with any and all exhibits and schedules hereto.

**Plan Supplement** means the compilation of documents and forms of documents, schedules, and exhibits to this Plan, to be filed ten (10) days prior to the Confirmation Hearing, as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code and the Bankruptcy Rules.

**Priority Claim** means any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code other than an Administrative Expense Claim, Accrued Professional Compensation Claim or Priority Tax Claims.

**Priority Tax Claim** means any Claim of a Governmental Unit of a kind entitled to priority under section 507(a)(8) of the Bankruptcy Code.

**Pro Rata** shall mean the proportion that the amount of a Claim in a particular Class or Classes bears to the aggregate amount of all Claims in such Class or Classes, unless the Plan otherwise provides.

**Professionals** means all professionals employed in the Chapter 11 Case pursuant to sections 327, 363 and 1103 of the Bankruptcy Code.

**Proof of Claim** means a proof of Claim filed against the Debtor in the Chapter 11 Case.

**Purchase Price** shall have the meaning set forth in section I(B) of the Disclosure Statement.

**Related Persons** means, with respect to any Person, such Person's predecessors, successors, assigns and present and former affiliates (whether by operation of law or otherwise) and each of their respective members, partners, equity holders, certificate holders, officers, directors, employees, representatives, advisors, attorneys, auditors, agents, and professionals, in each case acting in such capacity on or any time prior to or after the Petition Date, and any Person claiming by or through any of them.

12

***Released Parties*** means (i) the Debtor, (ii) the Residents' Committee, (iii) the Bond Trustee, (iv) the Liquidating Trustee, (v) the Liquidating Trust, (vi) Seniority, Inc., (vii) SQLC, and (viii) the current and former officers, directors, members, managers, employees, attorneys, consultants and advisors, each in their respective capacities as such, of each of the foregoing.

***Releasing Parties*** means all Persons who have held, hold or may hold Claims or Interests that have been released, discharged or are subject to exculpation pursuant to this Plan.

***Residents*** shall mean all persons that reside at the Facility and are parties to Continuing Care Contracts.

***Residents' Committee*** means the statutory committee of Residents appointed in the Chapter 11 Case by the United States Trustee on February 11, 2019.

***Sale*** shall have the meaning set forth in section I(B) of the Disclosure Statement.

***Schedules*** means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtor pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been or may be amended, modified, or supplemented from time to time.

***Secured Claim*** means any Claim of a Creditor that is secured by property of the Estate, to the extent of the value of the Creditor's interest in the Estate's interest in such property, as provided in section 506(a) of the Bankruptcy Code. Secured Claim also means a Claim of a Creditor that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the amount subject to setoff, as provided in section 506(a) of the Bankruptcy Code. To the extent the value of any property securing such Claim is less than the amount of such Claim, the difference between such value and such Claim is a ***"Deficiency Claim"*** unless the holder of such Claim validly elects under section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent allowed.

***Secured Lender*** means, collectively, the Bond Trustee and Holders of Other Secured Claims.

***Series 2012A Bonds*** means those certain Series 2012A Revenue Bonds, issued by the Issuer pursuant to the Bond Indenture.

***Series 2012B Bonds*** means those certain Series 2012B Revenue Bonds, issued by the Issuer pursuant to the Bond Indenture.

***Series 2012C Bonds*** means those certain Series 2012C Revenue Bonds, issued by the Issuer pursuant to the Bond Indenture.

***Series 2012D Bonds*** means those certain Series 2012D Revenue Bonds, issued by the Issuer pursuant to the Bond Indenture.

***SQLC*** means Senior Quality Lifestyles Corporation, the Debtor's sole corporate member.

***Stalking Horse*** means Prairie Landing Community, Inc.

***Stalking Horse APA*** means that certain Asset Purchase Agreement between the Debtor and Prairie Landing Community, Inc.

***Unexpired Lease*** means a lease to which the Debtor is a party that is subject to assumption, assumption or assignment or rejection under section 365 of the Bankruptcy Code.

***Unimpaired*** means, with respect to a Claim or Interest, a Class of Claims or Interests that is not Impaired within the meaning of section 1124 of the Bankruptcy Code.

***United States Trustee*** means the Office of the United States Trustee for the Northern District of Texas.

***Voting Agent*** means Donlin, Recano & Company, Inc.

***Voting Record Date*** shall have the meaning ascribed to such term in the Disclosure Statement.

1.2 ***Interpretation, Application of Definitions and Rules of Construction.*** Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan, as the same may be amended, supplemented, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein. A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to this Plan. The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Unless otherwise provided, any reference in this Plan to an existing document, exhibit or schedule means such document, exhibit or schedule as it may have been amended, restated, revised, supplemented or otherwise modified. If a time or date is specified for any payments or other Distribution under this Plan, it shall mean on or as soon as reasonably practicable thereafter. Further, where appropriate from a contextual reading of a term, each term includes the singular and plural form of the term regardless of how the term is stated and each stated pronoun is gender neutral. In the event of any ambiguity or conflict between this Plan and the Disclosure Statement, the provisions of this Plan shall govern. Any reference to the "Liquidating Trustee" shall be deemed to include a reference to the "Liquidating Trust" and any reference to the "Liquidating Trust" shall be deemed to include a reference to the "Liquidating Trustee" unless the context otherwise requires.

1.3 ***Computation of Time.*** Bankruptcy Rule 9006 shall apply to all computations of time periods prescribed or allowed by this Plan unless otherwise set forth herein or provided by the Bankruptcy Court.

## SECTION 2.   ADMINISTRATIVE AND PRIORITY CLAIMS

2.1    *Administrative Expense Claims*.

(a)    Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to different treatment with the Debtor or Liquidating Trustee, each Holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to the unpaid amount of such Allowed Administrative Expense Claim on the later of the Effective Date or the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor, as Debtor in Possession, or liabilities arising under obligations incurred by the Debtor, as Debtor in Possession, prior to the Effective Date, shall be paid by the Debtor in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions, including, but not limited to, the Budget, Final Cash Collateral Order and all other orders entered by the Bankruptcy Court related to the foregoing.  In addition, Allowed Administrative Expense Claims of the United States Trustee for statutory fees under 28 U.S.C. § 1930 incurred prior to the Effective Date shall be paid on the Effective Date by the Debtor, and thereafter, as such fees may thereafter accrue and be due and payable, by the Liquidating Trustee in accordance with the applicable schedule for payment of such fees.

(b)    *Administrative Expense Claims Bar Date*.  To be eligible to receive Distributions under the Plan on account of an Administrative Expense Claim that is not otherwise Allowed by the Plan, a request for payment of an Administrative Expense Claim must have been or be filed with the Bankruptcy Court on or before the Administrative Expense Claims Bar Date. Any Administrative Expense Claim that is not asserted in accordance herewith shall be deemed disallowed under the Plan and shall be forever barred against the Debtor, the Debtor's Estate, the Liquidating Trust, or any of their Assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

2.2    *Accrued Professional Compensation Claims*.  All Professionals seeking payment of Accrued Professional Compensation Claims shall (i) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred in the Chapter 11 Case by the date that is thirty (30) days after the Effective Date and (ii) be paid (a) the full unpaid amount as is Allowed by the Bankruptcy Court within five (5) Business Days after the date that such Claim is Allowed by order of the Bankruptcy Court, or (b) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Accrued Professional Compensation Claim and the Debtor or Liquidating Trustee; *provided, however*, in no event shall any amounts paid to any Professional exceed the amounts set forth for such Professional in the Budget, the Final Cash Collateral Order and all other orders entered by the Bankruptcy Court related to the foregoing.  Any Accrued Professional Compensation Claim that is not asserted in accordance with this section 2.2 shall be deemed disallowed under this Plan and shall be forever barred against the Debtor, the Debtor's Estate, the Liquidating Trust, or any of

their Assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

   2.3 ***Priority Tax Claims***.  Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by a Holder of an Allowed Priority Tax Claim and the Debtor, or the Liquidating Trustee, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Priority Tax Claim, payment in full in Cash of the Allowed amount of the Priority Tax Claim on the later of the Effective Date or as soon as practicable after the date when such Claim becomes an Allowed Claim.

## SECTION 3.  CLASSIFICATION OF CLAIMS AND INTERESTS

   3.1 Except as set forth herein, all Claims against and Interests in the Debtor are placed in a particular Class.  The Debtor has not classified Administrative Expense Claims, Accrued Professional Compensation Claims, and Priority Tax Claims.

   The following table classifies Claims against and Interests in the Debtor for all purposes, including voting, confirmation and Distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  This Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.  Each Class set forth below is treated hereunder as a distinct Class for voting and Distribution purposes.

   Subject to all other applicable provisions of this Plan (including its Distribution provisions), classified Claims shall receive the treatment described in section 4 herein.  This Plan will not provide any Distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including, without limitation, payments by third parties.

   The following table designates the Classes of Claims against and Interests in the Debtor and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interests | Status | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No | 100% |
| 2 | Bondholder Secured Claim | Impaired | Yes | Net Sale Proceeds, Net Holdback Escrow Amount and Encumbered Excluded Assets |
| 3 | Other Secured Claims | Impaired | Yes | Cash equal to the amount of such Other Secured Claims; the Collateral securing such Other Secured Claims; or satisfaction of such Other Secured Claims |

16

| | | | | pursuant to such other terms and conditions as may be agreed upon by the Liquidating Trustee and the Holder of such Other Secured Claims |
|---|---|---|---|---|
| 4 | General Unsecured Claims | Impaired | Yes | Pro Rata share of Liquidating Trust Distributable Cash |
| 5 | Interests in the Barrington | Impaired | No | $0.00 |

## SECTION 4. TREATMENT OF CLAIMS AND INTERESTS

4.1 ***Other Priority Claims (Class 1)***. This Class consists of all Allowed Other Priority Claims against the Debtor that are specified as having priority in section 507(a) of the Bankruptcy Code, if any such Claims exist as of the Effective Date. Except to the extent that a Holder of an Allowed Other Priority Claim against the Debtor has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between the Debtor and the Holder of the Allowed Other Priority Claim against the Debtor.

4.2 ***Bondholder Secured Claim (Class 2)***. This Class consists of the Bondholder Secured Claim of the holders of the Bonds and Bond Trustee against the Debtor. The Bondholder Secured Claim is an Allowed Claim. Upon the terms and subject to the conditions set forth in this Plan, in full and final satisfaction, settlement, release, and discharge of the Bondholder Secured Claim, the Bond Trustee shall receive, on behalf of the Holders of the Bondholder Secured Claim, (i) on the Effective Date or as soon as practicable thereafter, the Net Sale Proceeds of the Sale and the Encumbered Excluded Assets, including the Debtor's Cash on hand on the Effective Date, following funding of the Liquidating Trust Contribution; and (ii) as soon as practicable after the Holdback Escrow Termination Date, the Net Holdback Escrow Amount. In addition, the Liquidating Trustee shall pay to the Bond Trustee on account of the Bondholder Secured Claim the proceeds of any Liquidating Trust Assets on which the Bond Trustee has a Lien. All distributions made on account of the Bondholder Secured Claim shall be paid to the Bond Trustee, and the Bond Trustee shall make further distributions to the holders of the Bonds as set forth in the Bond Documents. In addition to the foregoing and as allowed by the Final Cash Collateral Order, the Bond Trustee may apply any and all funds in its possession as set forth in the Bond Documents free from the automatic stay imposed by section 362 of the Bankruptcy Code or any rights of the Debtor.

4.3 ***Other Secured Claims (Class 3)***. This Class consists of all Other Secured Claims against the Debtor. In full satisfaction of an Allowed Other Secured Claim, on the later of the Effective Date and the date on which the Other Secured Claim is Allowed, each Holder of an Allowed Other Secured Claim shall receive, at the sole and exclusive option of the Liquidating Trustee: (a) Cash equal to the amount of such Claim; (b) the Collateral securing such Claim; or (c) satisfaction of such Claim pursuant to such other terms and conditions as may be agreed upon by the Liquidating Trustee and the Holder of such Other Secured Claim.

17

4.4     ***General Unsecured Claims (Class 4)***.  This Class consists of all General Unsecured Claims against the Debtor, including the Bondholder Deficiency Claim of the holders of Bonds.  Except to the extent that a Holder of an Allowed General Unsecured Claim against the Debtor agrees to a different treatment of such Claim, in full and final satisfaction of each Allowed General Unsecured Claim against the Debtor, each Holder of an Allowed General Unsecured Claim against the Debtor will receive its Pro Rata share of Liquidating Trust Distributable Cash as soon as practicable as determined by the Liquidating Trustee.

4.5     ***Interests in the Barrington (Class 5)***.  This Class consists of SQLC's interests in the Barrington, which will be cancelled as of the Effective Date.  SQLC shall not be entitled to a Distribution on account of its Interests in the Debtor.

## SECTION 5.  CRAMDOWN.

If all applicable requirements for confirmation of this Plan are met as set forth in section 1129(a) of the Bankruptcy Code except subsection (8) thereof, the Debtor may request that the Bankruptcy Court confirm this Plan in accordance with section 1129(b) of the Bankruptcy Code on the bases that this Plan is fair and equitable and does not discriminate unfairly with respect to each Class of Claims or Interests that is Impaired under, and has not accepted or is deemed to reject, this Plan.

## SECTION 6.  MEANS FOR IMPLEMENTATION OF THE PLAN

6.1     ***Transfers to Bond Trustee***.

The Bond Trustee shall receive the following on account of the Bondholder Secured Claim:  (i) on the Effective Date or as soon as practicable thereafter, the Net Sale Proceeds of the Sale and the Encumbered Excluded Assets, including the Debtor's Cash on hand on the Effective Date, following funding of the Liquidating Trust Contribution; and (ii) as soon as practicable after the Holdback Escrow Termination Date, the Net Holdback Escrow Amount.  In addition, the Liquidating Trustee shall pay to the Bond Trustee, on account of the Bondholder Secured Claim, the proceeds of any Liquidating Trust Assets transferred to the Liquidating Trust on which the Bond Trustee has a Lien.  All distributions made on account of the Bondholder Secured Claim shall be paid to the Bond Trustee, and the Bond Trustee shall make further distributions to the holders of the Bonds as set forth in the Bond Documents.

6.2     ***Liquidating Trust***

(a)     ***Establishment of Liquidating Trust***.  On the Effective Date, the Liquidating Trustee shall execute the Liquidating Trust Agreement and, in his capacity as Liquidating Trustee, accept all Liquidating Trust Assets on behalf of the Beneficiaries thereof, and be authorized to obtain, seek the turnover, liquidate, and collect all of the Liquidating Trust Assets not in his possession.  The Liquidating Trust will then be deemed created and effective without any further action by the Bankruptcy Court or any Person as of the Effective Date.  The Liquidating Trust shall be established for the purposes of (i) liquidating any non-Cash Liquidating Trust Assets; (ii) maximizing recovery of the Liquidating Trust Assets for the benefit of the Beneficiaries; and (iii) distributing the proceeds of the Liquidating Trust Assets to the Beneficiaries in accordance with this Plan and the Liquidating Trust Agreement, with no objective

18

to continue or engage in the conduct of a trade or business, except only in the event and to the extent necessary for, and consistent with, the liquidating purpose of the Liquidating Trust.

(b) *Liquidating Trust Reserve*. On the Effective Date, an amount to be negotiated between the Debtor and the Bond Trustee ten (10) days prior to the Confirmation Hearing will be funded to the Liquidating Trust that is sufficient to permit the Debtor and the Liquidating Trustee to satisfy all obligations under this Plan and Liquidating Trust Agreement, including: (i) 100% of the Allowed Accrued Professional Compensation Claims that have not been previously paid; (ii) 100% of the Allowed Administrative Expenses Claims that have not been previously paid; (iii) 100% of the Allowed Priority Claims that have not been previously paid; (iv) such other amounts that need to be paid pursuant to this Plan and Liquidating Trust Agreement; and (v) an amount the Debtor determines, with the approval of the Bond Trustee, is necessary to administer and operate the Liquidating Trust in accordance with this Plan and Liquidating Trust Agreement (the "*Liquidating Trust Reserve*"). The Liquidating Trust Reserve will be funded, first, from any Cash on hand of the Debtor on the Effective Date, and, second, from the proceeds of the Sale that would otherwise be paid to the Bond Trustee. To the extent not paid prior to the Effective Date, the Liquidating Trustee shall be authorized to pay all Allowed Professional Compensation Claims, Allowed Administrative Expense Claims, Allowed Priority Claims and such amounts necessary to administer and operate the Liquidating Trust from the Liquidating Trust Reserve in accordance with this Plan and the Liquidating Trust Agreement. To the extent the Liquidating Trust Reserve is not needed to fund the foregoing Claims and amounts, such excess funds shall remain subject to the Bond Trustee's Lien and transferred to the Bond Trustee.

(c) *Appointment of the Liquidating Trustee*. The Liquidating Trustee shall be appointed pursuant to the Confirmation Order and subject to removal only by the Bankruptcy Court upon application or motion by a Beneficiary of the Liquidating Trust, after notice and a hearing, and for cause shown, including (i) the willful and continued refusal by the Liquidating Trustee to perform his duties under this Plan and the Liquidating Trust Agreement, and (ii) gross negligence, gross misconduct, fraud, embezzlement or theft. The Liquidating Trustee will be chosen by the Debtor, after consultation with the Bond Trustee. During the term of the Liquidating Trust, the Liquidating Trustee shall be entitled to compensation payable from the Liquidating Trust Assets as set forth in the Liquidating Trust Agreement.

(d) *Beneficiaries of Liquidating Trust*. The Holders of Allowed General Unsecured Claims against the Debtor that are entitled to Distributions shall be the Beneficiaries of the Liquidating Trust. Such Beneficiaries shall be bound by the Liquidating Trust Agreement. The interests of the Beneficiaries in the Liquidating Trust shall be uncertificated and nontransferable except upon death of the interest holder or by operation of law.

(e) *Vesting and Transfer of Liquidating Trust Assets to the Liquidating Trust*. On the Effective Date, pursuant to section 1141(b) of the Bankruptcy Code, the Liquidating Trust Assets, including the Liquidating Trust Contribution, shall vest in the Liquidating Trust free and clear of all Liens, Claims and Interests, except as otherwise specifically provided in this Plan or in the Confirmation Order; *provided, however*, that the Liquidating Trustee may abandon or otherwise not accept any non-Cash Liquidating Trust Assets that the Liquidating Trustee believes, in good faith, have no value to the Liquidating Trust. Any non-Cash Liquidating Trust Assets that the Liquidating Trustee so abandons or otherwise does not accept shall not be

property of the Liquidating Trust. Notwithstanding the foregoing, all Excluded Encumbered Assets, including, but not limited to, the accounts receivable of the Debtor as of the Closing Date, whether in the possession, dominion or control of the Debtor or transferred to the Liquidating Trust, shall remain subject to the Bond Trustee's Lien and be promptly distributed to the Bond Trustee on behalf of the holders of Bonds.

(f)     *Retention of Professionals*. The Liquidating Trustee shall have the right to retain the services of attorneys, accountants, and other professionals (collectively, the "*Liquidating Trust Professionals*") that are necessary to assist the Liquidating Trustee in the performance of his duties pursuant to this Plan, the Liquidating Trust Agreement and the Confirmation Order. The reasonable fees and expenses of such professionals shall be paid by the Liquidating Trustee from the Liquidating Trust Reserve and, if necessary, the Liquidating Trust Assets upon submission of monthly statements ("*Liquidating Trust Monthly Fee Statements*") for services rendered and costs incurred to the Liquidating Trustee and Bond Trustee for review and approval. The Liquidating Trustee and Bond Trustee will have thirty (30) days from receipt of each Liquidating Trust Monthly Fee Statement to object to the Liquidating Trust Monthly Fee Statement. In the event that any objection is received by the relevant Liquidating Trust Professional that cannot be promptly resolved by the Liquidating Trust Professional and the objecting party, the dispute shall be submitted by the Liquidating Trustee to the Bankruptcy Court for adjudication. The Bankruptcy Court will retain jurisdiction to adjudicate objections to Liquidating Trust Monthly Fee Statements. In the event that no objection is raised to a Liquidating Trust Monthly Fee Statement within the thirty (30) day period, the requested amount in the Liquidating Trust Monthly Fee Statement will be promptly paid by the Liquidating Trustee, subject to any requirements under the Plan.

(g)     *Liquidating Trust Expenses*. Subject to the provisions of the Liquidating Trust Agreement, all costs, expenses and obligations incurred by the Liquidating Trustee in administering this Plan, the Liquidating Trust, or in any manner connected, incidental or related thereto, in effecting distributions from, as applicable, the Liquidating Trust shall be a charge against the Liquidating Trust Reserve and, if necessary, the Liquidating Trust Assets remaining from time to time in the hands of the Liquidating Trustee. Such expenses shall be paid in accordance with the Liquidating Trust Agreement.

(h)     *Certain Powers and Duties of the Liquidating Trust and Liquidating Trustee*.

(i)     *General Powers of the Liquidating Trustee*. The Liquidating Trustee shall be the exclusive trustee of the Liquidating Trust and the Liquidating Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include the authority and responsibility to: (a) receive, manage, invest, supervise, and protect the Liquidating Trust Assets; (b) pay taxes or other obligations incurred by the Liquidating Trust; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals and consultants to advise and assist in the administration, prosecution and distribution of Liquidating Trust Assets; (d) calculate and implement Distributions of Liquidating Trust Assets; (e) investigate, prosecute, compromise, and settle, in accordance with the specific terms of the Liquidating Trust Agreement, Causes of Action vested

20

in the Liquidating Trust; (f) resolve issues involving Claims and Interests in accordance with this Plan; and (g) undertake all administrative functions of the Chapter 11 Case, including the payment of fees payable to the United States Trustee and the ultimate closing of the Chapter 11 Case. The Liquidating Trust is the successor to the Debtor and its Estate.

(ii) *Books and Records*. On the Effective Date, the Liquidating Trust shall: (a) take possession of all books, records, and files of the Debtor and its Estate; and (b) provide for the retention and storage of such books, records, and files until such time as the Liquidating Trust determines, in accordance with the Liquidating Trust Agreement, that retention of same is no longer necessary or required.

(iii) *Investments of Cash*. The Liquidating Trust may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code or in other prudent investments, *provided, however*, that such investments are permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

(iv) *Claims Process*. The Liquidating Trust shall have the right to object to Claims not otherwise Allowed in connection with post-Effective Date Claims allowance process or other order of the Bankruptcy Court. Following any such objection, the Liquidating Trustee may resolve any such Claims, which shall require: (i) approval only of the Liquidating Trustee if the resolved Claim amount and the amount of any reduction from the asserted amount of the Claim are each less than One Hundred Thousand Dollars ($100,000.00); and (ii) approval of the Liquidating Trustee and the Bankruptcy Court, upon notice and a hearing, if the amount asserted by the claimant or the amount of the reduction is equal to or greater than One Hundred Thousand Dollars ($100,000.00).

(v) *Reporting*. In no event later than thirty (30) days after the end of the first full month following the Effective Date and on a quarterly basis thereafter until all Cash in the Liquidating Trust has been distributed in accordance with this Plan, the Liquidating Trustee shall file with the Bankruptcy Court a report setting forth the amounts, recipients and dates of all Distributions made by the Liquidating Trustee under this Plan through each applicable reporting period.

(vi) *Tax Reporting*. The Liquidating Trustee shall file tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Plan. The Liquidating Trust also shall annually (for tax years in which Distributions from the Liquidating Trust are made) send to each Beneficiary a separate statement setting forth the Beneficiary's share of items of income, gain, loss, deduction or credit and all such holders shall report such items on their federal income tax returns; *provided, however,* that no such statement need be sent to any Class that is not expected to receive any Distribution from the Liquidating Trust. The Liquidating Trust's taxable income, gain, loss, deduction or credit will be allocated to the Liquidating Trust's Beneficiaries in accordance with their relative beneficial interests in the Liquidating Trust.

21

As soon as possible after the Effective Date, the Liquidating Trust shall make a good faith valuation of assets of the Liquidating Trust, and such valuation shall be used consistently by all parties for all federal income tax purposes. The Liquidating Trust also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any Governmental Unit for taxing purposes. The Liquidating Trust may request an expedited determination of taxes of the Debtor or of the Liquidating Trust under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtor and the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

The Liquidating Trust shall be responsible for filing all federal, state, and local tax returns for the Debtor and the Liquidating Trust. The Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements; *provided, however*, that, if the Liquidating Trustee fails to withhold in respect of amounts received or distributable with respect to any Beneficiaries and the Liquidating Trustee is later held liable for the amount of such withholding, such Beneficiaries shall reimburse the Liquidating Trustee for such liability. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such Beneficiaries for all purposes of the Liquidating Trust Agreement. The Liquidating Trustee shall be authorized to collect such tax information from the Beneficiaries (including, without limitation, social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Liquidating Trust Agreement and the Confirmation Order. In order to receive distributions under the Plan, all Beneficiaries will need to identify themselves to the Liquidating Trustee and provide tax information and the specifics of their holdings, to the extent the Liquidating Trustee deems appropriate (including completing the appropriate Form W-8 or Form W-9, as applicable).

(vii) **Payment of Taxes**. The Liquidating Trust shall be responsible for payments of all Allowed tax obligations of the Debtor.

(i) **Preservation of Right to Conduct Investigations**. The preservation for the Liquidating Trust of any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 is necessary and relevant to the liquidation and administration of the Liquidating Trust Assets. Accordingly, any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 held by the Debtor prior to the Effective Date shall vest with the Liquidating Trust and shall continue until dissolution of the Liquidating Trust.

(j) **Prosecution and Resolution of Causes of Action**.

(i) **The Liquidating Trust's Exclusive Authority to Pursue, Settle, or Abandon Causes of Action**. From and after the Effective Date, prosecution and settlement of all Causes of Action, including Avoidance Actions, transferred to the Liquidating Trust shall be the sole responsibility of the Liquidating Trust pursuant to the Plan and the Confirmation Order. From and after the Effective Date, the Liquidating Trust shall have exclusive rights, powers, and interests of the Debtor's Estate to pursue, settle or abandon such Causes of Action as the sole representative of the Debtor's Estate pursuant to section 1123(b)(3) of the Bankruptcy Code. Proceeds recovered from all Causes of Action will be deposited into the Liquidating Trust and will be distributed by the Liquidating Trustee to the Beneficiaries in

22

accordance with the provisions of the Plan and Liquidating Trust Agreement. All Causes of Action, including Avoidance Actions, that are not expressly released or waived under the Plan are reserved and preserved and vest in the Liquidating Trust in accordance with this Plan. No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtor or Liquidating Trustee will not pursue any and all available Causes of Action against such Person. The Liquidating Trustee expressly reserves all Causes of Action, except for any Causes of Action against any Person that are expressly released or waived under the Plan, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of confirmation or consummation of the Plan. No claims or Causes of Action against the Released Parties expressly released or waived pursuant to the Plan shall be transferred to the Liquidating Trust, the Liquidating Trustee shall not have standing to pursue such claims or Causes of Action, and all such claims and Causes of Action shall be waived, released and discharged pursuant to the Plan.

(ii) *Settlement of Causes of Action*. Settlement by the Liquidating Trust of any Cause of Action transferred to the Liquidating Trust shall require: (i) approval only of the Liquidating Trustee if the amount claimed by the Liquidating Trust against a defendant is less than One Hundred Thousand Dollars ($100,000.00); and (ii) approval of the Liquidating Trustee and the Bankruptcy Court, upon notice and a hearing, if the amount claimed by the Liquidating Trust against a defendant is unliquidated or equals to or exceeds One Hundred Thousand Dollars ($100,000.00).

(k) *Federal Income Tax Treatment of the Liquidating Trust for the Liquidating Trust Assets*. For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury regulations and that such trust be owned by its beneficiaries. Accordingly, for federal income tax purposes, it is intended that the Beneficiaries be treated as if they had received a distribution from the Debtor's Estate of an undivided interest in each of the Liquidating Trust Assets in satisfaction of their Allowed Claims (to the extent of the value of their respective share in the applicable assets) and then contributed such interests to the Liquidating Trust in exchange for their interests in the Liquidating Trust, and the Liquidating Trust's Beneficiaries will be treated as the grantors and owners thereof.

(l) *Limitation of Liability*. No recourse will ever be had, directly or indirectly, against the Liquidating Trustee or his or her respective employees, professionals, representatives, agents, successors or assigns, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Liquidating Trust under this Plan or by reason of the creation of any indebtedness by the Liquidating Trust or the Liquidating Trustee under this Plan. All such liabilities under this Plan will be enforceable only against, and will be satisfied only out of, the Liquidating Trust Assets. The Liquidating Trust and the Liquidating Trustee and their respective officers, directors, employees, professionals, representatives, agents, successors or assigns will not be liable for any act they may do, or omit to do hereunder in good faith and in the exercise of their sound judgment; *provided, however*, that this section will not apply to any gross negligence or willful misconduct

by the Liquidating Trust and the Liquidating Trustee or their respective officers, directors, employees, professionals, representatives, agents, successors or assigns.

(m)     *Term of Liquidating Trust*.  The Liquidating Trustee shall be discharged and the Liquidating Trust shall be terminated, at such time as (i) all Disputed Claims have been resolved, (ii) all of the Liquidating Trust Assets have been liquidated, (iii) all duties and obligations of the Liquidating Trustee under the Liquidating Trust Agreement have been fulfilled, (iv) all Distributions required to be made by the Liquidating Trust under this Plan and the Liquidating Trust Agreement have been made, and (v) the Chapter 11 Case has been closed; *provided, however*, that in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension not to exceed one (1) year is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

(n)     *Conflicts Between the Liquidating Trust Agreement and the Plan*. In the event of any inconsistencies or conflict between the Liquidating Trust Agreement and this Plan, the terms and provisions of this Plan shall control.

(o)     *Excess Funds*.  In the event there is Liquidating Trust Distributable Cash remaining after all required Distributions under the Plan and the Liquidating Trust Agreement have been made, such Cash will be turned over to the Attorney General for the State of Indiana in accordance with Indiana law.

**SECTION 7.  DISTRIBUTIONS**

7.1     *Distribution Record Date*.  As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtor or its agents shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Interests.  The Debtor or the Liquidating Trustee shall have no obligation to recognize any ownership transfer of the Claims or Interests occurring after the Distribution Record Date.  The Debtor, the Liquidating Trustee, or any party responsible for making Distributions shall be entitled to recognize and deal for all purposes under the Plan only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

7.2     *Date of Distributions*.  Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtor shall receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided therein.  Distributions made after the Effective Date to Holders of Allowed Claims shall be deemed to have been made on the Effective Date and, except as otherwise provided in the Plan, no interest shall be payable by the Debtor or the Liquidating Trustee with respect to such Claims or any Distribution related thereto.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed

24

on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on Distributions provided for thereunder, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

7.3 ***Disbursing Agent***. Except as otherwise provided in this Plan, all Distributions under this Plan shall be made by the Liquidating Trustee as Disbursing Agent or such other Person designated by the Liquidating Trustee as a Disbursing Agent on the Effective Date.

7.4 ***Rights and Powers of Disbursing Agent***. The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under this Plan; (b) make all Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities, subject to the review and approval of the Bond Trustee; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of this Plan.

7.5 ***Delivery of Distributions in General***. Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Disbursing Agent. Distributions to Holders of Allowed Claims will be made at the address of each such Holder as set forth in the Debtor's books and records. Distributions under this Plan on account of such Allowed Claims shall not be subject to levy, garnishment, attachment or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in this Plan. None of the Debtor, the Liquidating Trustee, and the applicable Disbursing Agent shall incur any liability whatsoever on account of any distributions under this Plan except for gross negligence, willful misconduct or fraud. Any distributions on account of the Bond Claims shall be made to the Bond Trustee, and the Bond Trustee shall make such further distributions to the holders of the Bonds as set forth in the Bond Documents.

7.6 ***Payments and Distributions on Disputed Claims***. Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date. Notwithstanding any provision otherwise in this Plan and except as may be agreed to by the Debtor or the Liquidating Trustee, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial Distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

7.7 ***Manner of Payment***. Any Distributions to be made by or on behalf of the Debtor or the Liquidating Trustee, as applicable, pursuant to this Plan shall be made by checks drawn on accounts maintained by the Debtor or the Liquidating Trustee, respectively, or by wire transfer if circumstances justify, at the option of the Debtor or the Liquidating Trustee, as applicable; *provided, however*, any payments made to the Bond Trustee shall be made by wire transfer.

7.8 ***Undeliverable Distributions and Unclaimed Property***. In the event that any Distribution to any Holder is rendered as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such Distribution shall be made as soon as practicable after such Distribution has become deliverable; *provided, however*, that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the date of the Distribution. After such date, all "unclaimed property" or interests in property shall revert to the Liquidating Trust (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any Holder to such property shall be discharged and forever barred.

7.9 ***Withholding and Reporting Requirements***. In connection with this Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Distributions under this Plan shall be subject to any such withholding or reporting requirements.

7.10 ***Surrender Instruments***. Pursuant to section 1143 of the Bankruptcy Code, as a condition precedent to receiving any Distribution under the Plan, except with respect to the Bonds, each holder of a certificated instrument or note must surrender such instrument or note held by it to the Disbursing Agent or its designee. Any such holder of such instrument or note that fails to (i) surrender the instrument or note or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent, as applicable, before the fifth anniversary of the Confirmation Date shall be deemed to have forfeited all rights and claims and may not participate in any Distribution hereunder. Any Distribution so forfeited shall become property of the Liquidating Trust.

7.11 ***Setoffs***. Except for the payments to be made to the Bond Trustee, the Debtor and the Liquidating Trustee may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which a Distribution shall be made), any claims of any nature whatsoever that the Debtor and the Liquidating Trustee may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor and the Liquidating Trustee of any such claim the Debtor and the Liquidating Trustee may have against the Holder of such Claim.

7.12 ***Insurance Claims***. Except for the payments to be made to the Bond Trustee, no Distributions under this Plan shall be made on account of Allowed Claims until the Holder of such Allowed Claim has exhausted all remedies with respect to the Debtor's Insurance Policies. To the extent that the Debtor's insurers agree to satisfy in full a Claim, then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

7.13 ***Applicability of Insurance Policies***. Except as otherwise provided in this Plan, Distributions to Holders of Allowed Claims shall be made in accordance with the provisions of any applicable Insurance Policy. Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor, Liquidating Trustee or any Person may hold against any insurers under any of the Debtor's Insurance Policies, nor shall anything contained in

the Disclosure Statement or herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

7.14 *No Postpetition Interest*. Unless otherwise specifically provided for herein or in the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on such Claim or Interest. Notwithstanding the foregoing, nothing in this Plan shall prohibit holders of the Bonds from allocating payments received from the Bond Trustee or the Debtor to principal or interest on the Bonds, in their sole discretion in accordance with applicable law.

7.15 *Distributions Free and Clear*. Except as may be otherwise provided herein, all Distributions under this Plan shall be free and clear of any Liens, Claims, encumbrances, and other interests.

7.16 *Fractional Dollars; De Minimis Distributions*. Notwithstanding any other provision of this Plan, Cash payments of fractions of dollars shall not be made. Whenever any Distribution to a Holder of a Claim would otherwise call for Distribution of Cash in a fractional dollar amount, the actual Distribution of such Cash shall be rounded to the nearest whole dollar (up or down), with half dollars (or less) being rounded down. Neither the Debtor nor the Liquidating Trustee shall be required to make any Cash payment of less than ten dollars ($10.00) with respect to any Claim or Interest unless a request therefor is made in writing to the Debtor or the Liquidating Trustee, as applicable; *provided, however*, that neither the Debtor nor the Liquidating Trustee shall have any obligation to make any Distribution, whether final or not, unless and until the total amount of such Distribution to a specific Holder of an Allowed Claim or Interest is equal to or greater than ten dollars ($10.00).

## SECTION 8. PROCEDURES FOR DISPUTED CLAIMS

The provisions of this section 8 shall not be applicable to the Bond Claims which are Allowed Claims.

8.1 *Allowance of Claims and Interests*. Except as expressly provided herein, or in any order entered in the Chapter 11 Case prior to the Effective Date, including the Confirmation Order, no Claim or Interest shall be deemed Allowed unless and until such Claim or Interest is deemed Allowed under this Plan or the Bankruptcy Code or Allowed by the Bankruptcy Court by entry of a Final Order allowing such Claim or Interest. On and following the Effective Date, the Liquidating Trust shall be vested with any and all rights and defenses the Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.

8.2 *Objections to Claims*. The Debtor (before the Effective Date) or the Liquidating Trustee (on or after the Effective Date), as applicable, shall have the exclusive authority to file, settle, compromise, withdraw or litigate to judgment any objections to Claims as permitted under this Plan. Any objections to Claims shall be filed and served on or before the later of (i) one hundred eighty (180) days after the Effective Date or (ii) such date as may be fixed by the Bankruptcy Court. From and after the Effective Date, the Liquidating Trustee may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The Debtor and the

27

Liquidating Trustee reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

8.3 ***Estimation of Claims***. The Debtor (before the Effective Date) or the Liquidating Trustee (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Contingent Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to such objection. In the event that the Bankruptcy Court estimates any Contingent Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor or the Liquidating Trustee may pursue supplementary proceedings to object to the allowance of such Claim; *provided, however*, the Liquidating Trustee may elect not to pursue such supplementary proceedings, instead electing to treat such maximum amount as the Allowed amount of such Claim.

8.4 ***No Distribution Pending Allowance***. Notwithstanding any other provision of this Plan, if any portion of a Claim is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

8.5 ***Distributions after Allowance***. At such time as a Contingent Claim or a Disputed Claim becomes an Allowed Claim, a Distribution shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Contingent Claim or Disputed Claim becomes a Final Order. To the extent that all or a portion of a Contingent Claim or a Disputed Claim is disallowed, the Holder of such Claim shall not receive any Distribution on account of the portion of such Claim that is disallowed.

8.6 ***Preservations of Rights to Settle Claims***. In accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trustee shall have the discretion to retain and enforce, sue on, settle, or compromise all claims, rights, causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its Estate may hold against any person or entity without the approval of the Bankruptcy Court, subject to the terms of this Plan, the Confirmation Order, the Liquidating Trust Agreement, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith. The Liquidating Trustee may pursue such retained claims, rights, or causes of action, suits, or proceedings, as appropriate, in accordance with the best interests of the Liquidating Trust and its Beneficiaries.

8.7 ***Disallowed Claims***. All Claims held by persons or entities against whom or which the Debtor or Liquidating Trustee has commenced a proceeding asserting a cause of action under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Bankruptcy Code shall be deemed Disallowed Claims pursuant to section 502(d) of the Bankruptcy Code and Holders of such Claims shall not be entitled to vote to accept or reject the Plan. Disallowed Claims pursuant

to this Section shall continue to be Disallowed Claims for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Debtor or Liquidating Trustee from such party have been paid.

## SECTION 9. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

9.1 *Assumption and Rejection of Executory Contracts and Unexpired Leases*. Except as otherwise provided in this Plan, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with this Plan, including the Stalking Horse APA, each of the Executory Contracts and Unexpired Leases of the Debtor shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtor; (2) expired or terminated pursuant to its own terms before the Effective Date; (3) is the subject of a motion to assume or reject filed on or before the Effective Date; or (4) is identified as an Executory Contract or Unexpired Lease to be assumed in connection with the Sale.

9.2 *Inclusiveness*. Unless otherwise specified, each Executory Contract and Unexpired Lease assumed or rejected by the Debtor shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease.

9.3 *Rejection Claims*. Except as otherwise provided in orders entered by the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court and served on counsel to the Debtor or the Liquidating Trustee on or before the date that is thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; *provided, that* any such Claims arising from the rejection of an Unexpired Lease shall be subject to the cap on rejection damages imposed by section 502(b)(6) of the Bankruptcy Code. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtor or the Liquidating Trustee, the Debtor's Estate or their property without the need for any objection by the Debtor or the Liquidating Trustee or further notice to, or action, order or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims against the Debtor and shall be treated in accordance with this Plan.

9.4 *Cure of Defaults*. Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed under this Plan or otherwise is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by Cure. If there is a dispute regarding (i) the nature or amount of any Cure, or (ii) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption.

9.5 *Full Release and Satisfaction*. Assumption of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall result in the full release and satisfaction

of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

9.6 ***Reservation of Rights***. Nothing contained in this Plan or the Plan Supplement shall constitute an admission by the Debtor or the Liquidating Trustee that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtor or the Liquidating Trustee have any liability thereunder.

## SECTION 10. CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

10.1 ***Conditions Precedent to Confirmation***. Confirmation of this Plan shall not occur, and the Confirmation Order shall not be entered, until each of the following conditions precedent have been satisfied or waived pursuant to the provisions of this Plan:

(a) The Bankruptcy Court shall have entered an order, which shall not be subject to any stay or subject to an unresolved request for revocation under section 1144 of the Bankruptcy Code, in form and substance acceptable to the Debtor, approving the Disclosure Statement with respect to this Plan and the solicitation of votes thereon as being in compliance with section 1125 of the Bankruptcy Code and applicable non-bankruptcy law;

(b) The Bankruptcy Court shall have entered one or more orders, in form and substance acceptable to the Debtor and the Bond Trustee, (i) authorizing the Sale to the Stalking Horse pursuant to section 363 of the Bankruptcy Code and (ii) authorizing the assumption and assignment of those Executory Contracts and Unexpired Leases identified to be assumed and assigned in the Stalking Horse APA;

(c) The proposed Confirmation Order shall be in form and substance satisfactory in all respects to the Debtor and the Bond Trustee; and

(d) The Plan and the Plan Supplement, including any schedules, documents, supplements and exhibits thereto shall be, in form and substance, acceptable to the Debtor and the Bond Trustee.

10.2 ***Conditions Precedent to the Effective Date***. The Effective Date shall not occur until each of the following conditions precedent have been satisfied or waived pursuant to the provisions of this Plan:

(a) The Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Debtor and the Bond Trustee, and such Confirmation Order shall not be subject to any stay or an unresolved request for revocation under section 1144 of the Bankruptcy Code;

(b) The Debtor shall have closed on the Sale; and

30

(c)     All actions, documents, certificates, and agreements necessary to implement this Plan, including, without limitation, the Liquidating Trust Agreement, shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

10.3   ***Waiver of Conditions***.  The conditions to confirmation and consummation of this Plan set forth herein may be waived at any time by the Debtor, with the consent of the Bond Trustee, without notice to any other parties in interest or the Bankruptcy Court and without a hearing; *provided, however*, that the Debtor may not waive the conditions set forth in sections 10.1(b), 10.2(a) and 10.2(b) herein or the entry of the order approving the Disclosure Statement and the Confirmation Order.

10.4   ***Effect of Failure of Conditions***.  If consummation of this Plan does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any claims by or Claims against the Debtor; (2) prejudice in any manner the rights of the Debtor, any Holders of Claims or Interests or any other Person; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtor, any Holders of Claims or Interests or any other Person in any respect.

## SECTION 11.  EFFECT OF CONFIRMATION

11.1   ***Immediate Binding Effect***.  Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of this Plan and the Liquidating Trust Agreement shall be immediately effective and enforceable and deemed binding upon the Debtor, the Liquidating Trustee, the Liquating Trust and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted this Plan), all Persons that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in this Plan, each Person acquiring property under this Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.

11.2   ***Compromise and Settlement of Claims, Interests and Controversies***.  Pursuant to sections 363 and 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any Distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate and Holders of Claims and Interests and is fair, equitable and reasonable.

11.3   ***Releases by the Debtor***.  Pursuant to section 1123(b) of the Bankruptcy Code and except as otherwise specifically provided in this Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious liquidation of the Debtor and the consummation of the transactions contemplated by

31

the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtor and its Estate from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtor or its Estate would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Chapter 11 Case, the Sale or the transactions or events giving rise to any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, any Plan Supplement or related agreements, instruments or other documents (collectively, the "***Debtor Released Claims***"), other than Debtor Released Claims against a Released Party arising out of the gross negligence, willful misconduct, intentional fraud, or criminal liability of any such person or entity.

11.4 ***Releases by Holders of Claims.*** **ON THE EFFECTIVE DATE, EXCEPT AS OTHERWISE PROVIDED HEREIN AND EXCEPT FOR THE RIGHT TO ENFORCE THIS PLAN, ALL PERSONS WHO (I) VOTED TO ACCEPT THIS PLAN OR WHO ARE PRESUMED OR DEEMED TO HAVE VOTED TO ACCEPT THIS PLAN UNDER SECTION 1126(f) OF THE BANKRUPTCY CODE; OR (II) ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THIS PLAN AND WHO VOTE TO REJECT THIS PLAN OR ABSTAIN FROM VOTING AND DO NOT MARK THEIR BALLOTS AS OPTING OUT OF THE RELEASES GRANTED UNDER THIS SECTION, SHALL, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BE DEEMED TO FOREVER RELEASE, WAIVE AND DISCHARGE THE RELEASED PARTIES OF AND FROM ALL LIENS, CLAIMS, CAUSES OF ACTION, LIABILITIES, ENCUMBRANCES, SECURITY INTERESTS, INTERESTS OR CHARGES OF ANY NATURE OR DESCRIPTION WHATSOEVER RELATING TO THE DEBTOR, THE CHAPTER 11 CASE OR AFFECTING PROPERTY OF THE ESTATE, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, SCHEDULED OR UNSCHEDULED, CONTINGENT OR NOT CONTINGENT, UNLIQUIDATED OR FIXED, ADMITTED OR DISPUTED, MATURED OR UNMATURED, SENIOR OR SUBORDINATED, WHETHER ASSERTABLE DIRECTLY OR DERIVATIVELY BY, THROUGH, OR RELATED TO ANY OF THE RELEASED PARTIES AND THEIR SUCCESSORS AND ASSIGNS WHETHER AT LAW, IN EQUITY OR OTHERWISE, BASED UPON ANY CONDITION, EVENT, ACT, OMISSION OCCURRENCE, TRANSACTION OR OTHER ACTIVITY, INACTIVITY, INSTRUMENT OR OTHER AGREEMENT OF ANY KIND OR NATURE OCCURRING, ARISING OR EXISTING PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO OR ARISING OUT OF, IN WHOLE OR IN PART, THE DEBTOR, THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION OF THIS PLAN, THE NEGOTIATION AND CONSUMMATION OF THE SALE, THE CONSUMMATION OF THIS PLAN OR THE ADMINISTRATION OF THIS PLAN, INCLUDING WITHOUT LIMITATION, THE NEGOTIATION AND SOLICITATION OF THIS PLAN, ALL REGARDLESS OF WHETHER (A) A PROOF OF CLAIM OR EQUITY INTEREST HAS BEEN FILED OR IS DEEMED TO HAVE BEEN FILED, (B) SUCH CLAIM OR EQUITY INTEREST IS ALLOWED OR (C) THE HOLDER OF SUCH**

32

CLAIM OR EQUITY INTEREST HAS VOTED TO ACCEPT OR REJECT THIS PLAN, EXCEPT FOR WILLFUL MISCONDUCT OR GROSS NEGLIGENCE. FOR THE AVOIDANCE OF DOUBT, NOTHING CONTAINED HEREIN SHALL IMPACT THE RIGHT OF ANY HOLDER OF AN ALLOWED CLAIM TO RECEIVE A DISTRIBUTION ON ACCOUNT OF ITS ALLOWED CLAIM IN ACCORDANCE WITH SECTION 4 OF THIS PLAN. THE RELEASES SET FORTH IN THIS PLAN, INCLUDING BUT NOT LIMITED TO IN THIS SECTION 11.4, SHALL NOT RELEASE ANY CLAIMS OR CAUSES OF ACTION AGAINST SENIORITY, INC. OR SQLC WITH RESPECT TO ACTIONS OR CONDUCT RELATED TO FACILITIES OTHER THAN THE DEBTOR.

11.5 *Exculpation*. None of the Exculpated Parties shall have or incur any liability to any Holder of a Claim or Interest, or other party in interest, or any of their respective members, officers, directors, employees, advisors, professionals, attorneys or agents or any of their successors and assigns, with respect to any Exculpated Claim, including, without limitation, any act or omission in connection with, related to, or arising out of, in whole or in part, the Chapter 11 Case, except for their willful misconduct or gross negligence as determined by a Final Order of a court of competent jurisdiction, and, in all respects, the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

11.6 *Injunction*. FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR INTEREST IN THE DEBTOR ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN THIS PLAN, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THIS PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS PURSUANT TO THIS PLAN, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (B) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH

PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (C) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH PERSONS OR THE PROPERTY OR ESTATES OF SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (D) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THIS PLAN.

THE RIGHTS AFFORDED IN THIS PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS THEREUNDER SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTOR OR ANY OF ITS ASSETS, PROPERTY OR ESTATE. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTOR SHALL BE FULLY RELEASED, AND THE INTERESTS SHALL BE CANCELLED (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN).

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THIS PLAN OR IN OBLIGATIONS PURSUANT THERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTOR SHALL BE FULLY RELEASED, AND ALL INTERESTS SHALL BE CANCELLED, AND THE DEBTOR'S LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(g) OF THE BANKRUPTCY CODE.

ALL PERSONS SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTOR, THE DEBTOR'S ESTATE, ITS RESPECTIVE SUCCESSORS AND ASSIGNS, AND ITS ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

11.7 *Term of Injunctions or Stays*. Unless otherwise provided in this Plan or Confirmation Order, all injunctions or stays provided for under this Plan and ordered in the Confirmation Order or pursuant to sections 105 or 362 of the Bankruptcy Code arising under or entered during the Chapter 11 Case, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay and to the extent consistent with the terms and provisions of this Plan or the Confirmation Order, as applicable.

11.8 *Injunction Against Interference with Plan*. Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests, the Debtor, and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the Debtor's, the Liquidating

Trust's, the Liquidating Trustee's, and their respective affiliates', employees', advisors', officers' and directors', and agents' implementation or consummation of this Plan.

11.9 ***Release of Liens***. Except as otherwise provided in this Plan, or in any contract, instrument, release or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with, and conditioned upon, the applicable Distributions made pursuant to this Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estate shall be fully released. Except as otherwise provided in this Plan, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Debtor's Estate shall be fully released on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code. The liens of the Secured Lenders on their respective Encumbered Excluded Assets shall not be released or discharged until such assets are distributed to the applicable Secured Lender in accordance with this Plan.

11.10 ***Effectuating Documents and Further Transactions***. Upon entry of the Confirmation Order, the appropriate officers of the Debtor and the Liquidating Trustee shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, consents, certificates, resolutions, programs, and other agreements and/or documents, and take such acts and actions as may be reasonably necessary or appropriate to effectuate, implement, consummate, and/or further evidence the terms and conditions of this Plan and any transactions described in or contemplated by this Plan. The Debtor or Liquidating Trustee, as applicable, may, and all Holders of Allowed Claims or Interests receiving Distributions pursuant to this Plan, at the request or direction of the Debtor or Liquidating Trustee, as applicable, shall, from time to time, prepare, execute, and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

11.11 ***Corporate Action***. Upon the Effective Date, all actions contemplated by this Plan shall be deemed authorized and approved in all respects (whether to occur before, on or after the Effective Date). All matters provided for in this Plan involving the corporate structure of the Debtor, and any corporate action required by the Debtor in connection with this Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the Debtor.

11.12 ***Cancellation of Documents***. On the Effective Date, except to the extent otherwise provided in this Plan, any and all notes, instruments, debentures, certificates and other documents evidencing Claims and Interests in the Debtor including, without limitation, the Bond Documents shall be deemed inoperative and unenforceable against the Debtor and the Debtor shall have no continuing obligations thereunder; *provided, however*, the Bonds and the Bond Documents shall be deemed to continue in effect solely to the extent they relate to and are necessary to: (i) allow applicable distributions pursuant to this Plan and Bond Documents, (ii) permit the Bond Trustee to be compensated for fees and reimbursed for expenses, including expenses of its professionals and enforce its indemnity and other rights and protections with respect to and pursuant to the Bond Documents, (iii) permit the Bond Trustee to set one or more record dates and distribution dates with respect to the distribution of funds to beneficial holders of

the Bonds, (iv) permit the Bond Trustee to appear in the Bankruptcy Case with respect to matters relevant to the holders of the Bonds and to enforce their rights under this Plan, (v) otherwise continue to govern relationships of the Bond Trustee and holders of the Bonds, and (vi) permit the Bond Trustee to perform any functions that are necessary in connection with the foregoing clauses (i) through (v).

11.13 ***Dissolution of the Debtor***. On the Effective Date and upon the Debtor causing the Liquidating Trust Assets to be transferred to the Liquidating Trust in accordance with section 6.2 of this Plan, the Debtor shall have no further duties or responsibilities in connection with implementation of this Plan. Upon entry of a final decree closing the Chapter 11 Case, the Debtor shall be deemed dissolved for all purposes in accordance with applicable state law without the need to take any further action or file any plan of dissolution, notice, or application with any applicable Governmental Unit.

11.14 ***Preservation of Causes of Action of the Debtor***. In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the releases by the Debtor and exculpation provisions provided in the Plan), the Debtor and Liquidating Trustee shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action.

## SECTION 12.  MODIFICATION, REVOCATION OR WITHDRAWAL OF THIS PLAN

12.1 ***Modification and Amendments***. This Plan or any exhibits thereto may be amended, modified, or supplemented by the Debtor in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, the Debtor or Liquidating Trustee may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of this Plan.

12.2 ***Effect of Confirmation on Modifications***. Entry of a Confirmation Order shall mean that all modifications or amendments to this Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re solicitation under Bankruptcy Rule 3019.

12.3 ***Revocation or Withdrawal of this Plan***. The Debtor reserves the right to, consistent with its fiduciary duties, revoke or withdraw this Plan before the Effective Date. If the Debtor revokes or withdraws this Plan, or if the Confirmation Date does not occur, then: (a) this Plan shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (c) nothing contained in this Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtor or any other Person; or (iii) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Person.

36

## SECTION 13.  RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and this Plan, including, but not limited to, jurisdiction to:

(a)     allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount or allowance of Claims;

(b)     decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or this Plan;

(c)     resolve any matters related to:  (i) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including rejection Claims and cure Claims, pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease in connection with the Sale; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

(d)     ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

(e)     adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

(f)     adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, including, but not limited to, the Causes of Action, involving the Liquidating Trustee or the Liquidating Trust;

(g)     adjudicate, decide or resolve any and all matters related to any Cause of Action;

(h)     adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(i)     enter and enforce any order for the sale of property pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code;

(j)    issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of this Plan;

(k)    resolve any cases, controversies, suits, disputes or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications and other provisions contained in this Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

(l)    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(m)    resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Liquidating Trust, the Liquidating Trust Agreement, any transactions or payments contemplated thereby, or any contract, instrument, release, indenture or other agreement or document relating to any of the foregoing;

(n)    adjudicate any and all disputes arising from or relating to Distributions under this Plan;

(o)    consider any modifications of this Plan, cure any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(p)    determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

(q)    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(r)    hear and determine all disputes involving the existence, nature or scope of the Debtor's discharge;

(s)    enforce all orders previously entered by the Bankruptcy Court;

(t)    hear any other matter not inconsistent with the Bankruptcy Code; and

(u)    enter a final decree closing the Chapter 11 Case.

## SECTION 14.  MISCELLANEOUS PROVISIONS

14.1    ***Payment of Statutory Fees***.  All fees payable pursuant to 28 U.S.C. § 1930 shall be paid on the earlier of when due or the Effective Date by the Debtor.  After the Effective Date, the Liquidating Trustee shall be liable for payment of any such fees until entry of a final decree closing the Chapter 11 Case.

14.2 ***Dissolution of Residents' Committee***. On the Effective Date, the Residents' Committee shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Case.

14.3 ***Section 1125(e) Good Faith Compliance***. As of and subject to the occurrence of the Confirmation Date, the Debtor and its Related Persons shall be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation.

14.4 ***Substantial Consummation***. On the Effective Date, the Plan shall be deemed to be substantially consummated within the meaning set forth in section 1101 and pursuant to section 1127(b) of the Bankruptcy Code.

14.5 ***Section 1146 Exemption***. To the fullest extent permitted under section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of any security under or pursuant to this Plan, and the execution, delivery, or recording of any instrument of transfer under or pursuant to this Plan, and the revesting, transfer, or sale of any property of or to the Liquidating Trust or the Stalking Horse at the Sale, shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or other Governmental Unit in which any instrument hereunder is to be recorded in accordance with this Plan shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, mortgage recording tax, intangible tax, or similar tax.

14.6 ***Closing of the Chapter 11 Case***. When all Liquidating Trust Assets have been liquidated and converted into Cash and such Cash has been distributed in accordance with the Liquidating Trust Agreement and the Confirmation Order, the Liquidating Trustee shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

14.7 ***Plan Supplement***. Any exhibits or schedules not filed with this Plan may be contained in the Plan Supplement, if any, and the Debtor hereby reserves the right to file such exhibits or schedules as a Plan Supplement.

14.8 ***Further Assurances***. The Debtor or the Liquidating Trustee may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan. The Debtor, the Liquidating Trustee, and all Holders of Claims receiving Distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

14.9 ***Exhibits Incorporated***. All exhibits to the Plan, including the Plan Supplement, are incorporated into and are part of this Plan as if fully set forth herein.

14.10  ***Inconsistency***.  In the event of any inconsistency among this Plan, the Disclosure Statement and any exhibit to the Disclosure Statement, the provisions of this Plan shall govern.

14.11  ***No Admissions***.  If the Effective Date does not occur, this Plan shall be null and void in all respects, and nothing contained in this Plan shall (a) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor, (b) prejudice in any manner the rights of the Debtor or any other party in interest, or (c) constitute an admission of any sort by the Debtor or other party in interest.

14.12  ***Reservation of Rights***.  Except as expressly set forth herein, this Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order and the Effective Date has occurred.  None of this Plan, any statement or provision contained in this Plan or any action taken or not taken by the Debtor with respect to this Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the Holders of Claims or Interests before the Effective Date.

14.13  ***Successors and Assigns***.  The rights, benefits and obligations of any Person named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries or guardian, if any, of each Person.

14.14  ***Entire Agreement***.  On the Effective Date, this Plan, supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

14.15  ***Notices***.  All notices, requests, and demands to or upon the Debtor in the Chapter 11 Case shall be in writing and, unless otherwise provided herein, shall be deemed to have been duly given or made when actually delivered or, if by facsimile transmission, when received and telephonically confirmed to the below recipients:

MAYFLOWER COMMUNITIES, INC.
c/o Ankura Consulting Group LLC
Attention: Louis E. Robichaux IV
15950 Dallas Parkway
Dallas, Texas 75248
Telephone: (214) 200-3689
Facsimile: (214) 200-3686
E-mail: louis.robichaux@ankura.com

with copies to:

DLA PIPER LLP (US)
Attention:  Thomas R. Califano
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone:  (212) 335-4500

Facsimile: (212) 335-4501
E-mail: thomas.califano@dlapiper.com

- and -

DLA PIPER LLP (US)
Attention: Rachel Nanes
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Telephone: (305) 423-8563
Facsimile: (305) 675-8206
E-mail: rachel.nanes@dlapiper.com

- and -

DLA PIPER LLP (US)
Attention: Daniel B. Prieto
1900 North Pearl Street, Suite 2200
Dallas, Texas 75201
Telephone: (214) 743-4500
Facsimile: (214) 743-4545
E-mail: dan.prieto@dlapiper.com

All notices and requests to Persons holding any Claim or Interest in any Class shall be sent to them at their last known address or to the last known address of their attorney of record in the Chapter 11 Case. Any such Holder of a Claim or Interest may designate in writing any other address for purposes of this section, which designation will be effective upon receipt by the Debtor.

14.16 *Severability*. If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

14.17 *Governing Law*. Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflicts of laws, shall govern the rights, obligations, construction, and implementation of the Plan and the transactions consummated or to be consummated in connection therewith.

14.18    ***Request for Confirmation***.  The Debtor requests entry of the Confirmation
Order under section 1129(a) of the Bankruptcy Code and, to the extent necessary, section 1129(b)
of the Bankruptcy Code.

Dated: August 5, 2019                              Respectfully submitted,


                                                   Mayflower Communities, Inc.


                                                   By:    */s/ Louis E. Robichaux IV*_____
                                                          Name: Louis E. Robichaux IV
                                                          Title: Chief Restructuring Officer

42

**<u>Exhibit 2</u>**

Liquidation Analysis

Liquidation Analysis

**Background**

Section 1129(a)(7) of the Bankruptcy Code, which is often referred to as the "best interests of creditors" test, requires that as a condition to confirmation of the Plan, each holder of a Claim or Interest in each Impaired Class must either (i) accept the plan or (ii) receive or retain under the Plan property of value that is not less than the amount the holder of a Impaired Class Claim would receive or retain in a hypothetical liquidation under chapter 7 of the Bankruptcy Code (the "Liquidation Analysis").

The Debtor prepared the Liquidation Analysis to include: (i) estimated cash proceeds that a chapter 7 trustee would generate if the Debtor's chapter 11 case were converted to a chapter 7 case on the Effective Date and the assets of the Debtor's estate were liquidated; (ii) estimated distribution that each holder of a Claim or Interest would receive from the liquidation proceeds; and (iii) compared each holder's estimated distribution and recovery under a chapter 7 liquidation to the distribution and recovery under the Plan.

The Liquidation Analysis is based upon certain assumptions, and as such certain aspects may be different from those represented in the Plan. The Liquidation Analysis should be read in conjunction with the Disclosure Statement.

THE DEBTOR MAKES NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THESE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN, OR A CHAPTER 7 TRUSTEE'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. IN THE EVENT THAT THIS CHAPTER 11 CASE IS CONVERTED TO A CHAPTER 7 LIQUIDATION, ACTUAL RESULTS MAY VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THIS LIQUIDATION ANALYSIS.

**Presentation**

The Liquidation Analysis has been prepared assuming the Debtor converted its current chapter 11 case to chapter 7 of the Bankruptcy Code on or about August 23, 2019 (the "Liquidation Date"). The Liquidation Date represents the approximate date the Plan would be confirmed under a chapter 11 proceeding.

Unless otherwise identified herein, the Liquidation Analysis is based on the Debtor's unaudited financial statements as of April 30, 2019. The values presented herein, are assumed to be representative of the Debtor's assets and liabilities as of the Liquidation Date.

On the Liquidation Date, it is assumed the Bankruptcy Court would appoint a chapter 7 trustee to conduct the liquidation of the Debtor's estate. The liquidation of the Debtor's estate is assumed to occur through the cash sale of substantially all of the Debtor's assets. The proceeds of such sale are assumed to be applied in the following order: (i) payment of administrative claims, including chapter 7 trustee costs, other supporting professional fee costs, and the costs to wind-down the estate; (ii) Secured Bond Claims, including Other Secured Claims; and (iii) Unsecured Claims,

including claims by residents for outstanding obligations due and payable under Continuing Care Contracts, General Unsecured Claims, and any applicable deficiency claims.

The Liquidation Analysis assumes that upon conversion of the case to chapter 7, the assets will be sold and residents will be transitioned from the community over a four-month process under the direction of the chapter 7 trustee. Given the uncertainty around the transition process and the marketability of the assets, there can be no assurances given that a four-month liquidation process or that estimated recoveries outlined in this Liquidation Analysis may be achieved. An extension of the liquidation process may result in an increase to wind-down costs which may negatively impact creditor recoveries.

## Conclusion

The Liquidation Analysis demonstrates that holders of Claims in certain Unimpaired Classes that would receive a full recovery under the Plan would receive less than a full recovery in a hypothetical liquidation. Further, holders of Claims in Impaired Classes would receive a lower recovery in a hypothetical liquidation than they would under the Plan.

| Liquidation Analysis | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | Recovery (%) | | | Proceeds | |
| | | Book Value | Low | High | | Low | High |
| Cash and Cash Equivalents | [A] | $ 1,032,918 | 100.0% | 100.0% | $ | 1,032,918 | $ 1,032,918 |
| Accounts Receivable, net | [B] | 334,015 | 55.0% | 75.0% | | 183,708 | 250,511 |
| Other Receivables | [C] | 1,409,914 | 0.0% | 0.0% | | - | - |
| Inventory | [D] | 31,666 | 5.0% | 10.0% | | 1,583 | 3,167 |
| Prepaid Expenses | [E] | 639,315 | 35.0% | 55.0% | | 223,760 | 351,623 |
| Fixed Assets, net | [F] | 76,350,231 | 50.0% | 70.0% | | 38,175,116 | 53,445,162 |
| Intangible Assets, net | [G] | 5,239,211 | 0.0% | 0.0% | | - | - |
| Restricted Assets | [H] | 7,833,977 | 100.0% | 100.0% | | 7,833,977 | 7,833,977 |
| **Gross Proceeds from Liquidation** | | **$ 92,871,247** | | | **$** | **47,451,063** | **$ 62,917,358** |
| | | | | | | | |
| Administrative Claims | [I] | | | | | 7,331,953 | 8,569,257 |
| Liquidation Proceeds Available to Secured DIP / Bond Claims | | | | | | 40,119,110 | 54,348,102 |
| | | | | | | | |
| Secured Bond Claims | | | | | | | |
| Secured Bond Claim | [J] | 94,096,672 | 42.6% | 57.8% | | 40,119,110 | 54,348,102 |
| Total Secured Bond Claims | | 94,096,672 | | | | 40,119,110 | 54,348,102 |
| | | | | | | | |
| Liquidation Proceeds Available to Unsecured Claims | | | | | $ | - | $ - |
| | | | | | | | |
| Unsecured Claims | | | | | | | |
| Resident Claims | [K] | 51,680,449 | 0.0% | 0.0% | | - | - |
| General Unsecured Claims | | 367,100 | 0.0% | 0.0% | | - | - |
| Secured Bond Claims - Deficiency | [L] | 46,863,066 | 0.0% | 0.0% | | - | - |
| Total Unsecured Claims | | $ 98,910,615 | | | | - | - |
| | | | | | | | |
| **Total Distributions** | | | | | **$** | **47,451,063** | **$ 62,917,358** |

**Notes to the Liquidation Analysis**

[A]: The cash balances are projected as of August 23, 2019, consistent with the assumed plan effective date. Cash balances are based on the Cash Collateral Budget as of April 11, 2019 (Docket 217), and include $308,169 of cash escrow deposits, which are comprised entirely of entrance fees received that have not yet been paid and minimal earned interest.

[B]: Accounts receivable recovery of 55% to 75% has been estimated based on payor type and account aging.

[C]: Other receivables are comprised of miscellaneous resident entrance fee receivables and intercompany receivables, which are not expected to be recoverable.

[D]: Inventory is comprised of various perishable goods, which are expected to recover 5% to 10% of net book value.

[E]: Unused portion of insurance premiums are expected to be recoverable at 35% to 55%.

[F]: Estimated recovery for fixed assets, which include land, building, and land improvements range from 50% to 70%. Recovery amount represents a high-level estimate by the Debtor. No third-party liquidation appraisals or estimates are available. Significant uncertainty exists around the ability to economically repurpose the facility for alternative uses given (i) the market saturation of senior living facilities (non-CCRC) in Carmel Indiana and (ii) prospective resident demographics. Additionally, the liquidation value of the Debtor's property after closure, which under a chapter 7 liquidation would include resident impairment, is highly speculative due to the reputational damage associated with such a process.

[G]: Intangible assets are comprised of capitalized marketing costs and deferred financing costs associated with the 2012 bond issuance which are expected to recover 0% of net book value.

[H]: Restricted assets are $7,833,977 as of April 30, 2019. Restricted assets are comprised of reserve funds held by the bondholder trustee. Restricted assets are expected to be 100% recoverable; however, funds are assumed to be applied in full against the Secured Bond Claims.

[I]: Administrative claims assume the following: (i) liquidating trustee fees of 3% of net collectible proceeds; (ii) other liquidation professionals of 5% of net collectible proceeds, including liquidator costs for fixed assets, accounts receivable, etc.; (iii) wind-down costs consistent with historical monthly operating expense run-rates at 100% for month one and two, 50% for month three and four, and limited costs thereafter; and (iv) medical records preservation costs and other healthcare specific required costs of $100,000.

[J]: The Secured Bond Claims recovery includes 100% of the restricted asset liquidation proceeds.

[K]: Resident claims include the net current and non-current resident refundable entrance fee liability under each Continuing Care Contract as of April 30, 2019. Balance is net of non-refundable accumulated entrance fee amortization.

[L]: Amount represents estimated Secured Bond Claims deficiency claim.